### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **MD BEVCO, INC. DBA MAD DOGS** | § | |
| **SAN ANTONIO; CRAZY SAM'S** | § | |
| **SEAFOOD, INC. DBA BIER GARTEN;** | § | |
| **MD SPORTS PUB, INC. AND MD** | § | |
| **RIVERWALK, LLC DBA ON THE** | § | |
| **BEND,** | § | |
| *Plaintiffs*, | § | **CASE NO.  5:20-CV-899** |
| | § | |
| **v.** | § | |
| | § | |
| **THE CINCINNATI INDEMNITY** | § | |
| **COMPANY AND JOHNATHAN** | § | |
| **ANDREW MALISH.** | § | |
| *Defendants*. | § | |

### NOTICE OF REMOVAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes Defendant, The Cincinnati Indemnity Company ("CIC" or "Defendant"), and files this Notice of Removal under 28 U.S.C. § 1332. In support of this Notice of Removal ("Removal"), Defendant respectfully shows the Court as follows:

### I.
### STATEMENT OF GROUNDS FOR REMOVAL

1.      This suit is an action in which this Court has original jurisdiction under 28 U.S.C. §1332, as it is an action between citizens of different states, and the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Thus, this action may be removed to this Court pursuant to the provisions of 28 U.S.C. §1441[1] and 28 U.S.C. §1446.

2.      Plaintiffs, MD BEVCO, INC. DBA MAD DOGS SAN ANTONIO; CRAZY

---

[1] 28 U.S.C. §1441(b) provides that suits that do not arise under federal law are removable if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such actions is brought.

SAM'S SEAFOOD, INC. DBA BIER GARTEN; MD SPORTS PUB, INC.; AND MD RIVERWALK, LLC DBA ON THE BEND ("Plaintiffs"), filed their Original Petition on or about June 24, 2020, in the 166th Judicial District Court, Bexar County, Texas, in Cause No. 2020CI11466 styled "*MD Bevco, Inc. DBA Mad Dogs San Antonio; Crazy Sam's Seafood, Inc. DBA Bier Garten; MD Sports Pub, Inc.; and MD Riverwalk, LLC DBA On The Bend v. The Cincinnati Indemnity Company, and Jonathan Andrew Malish.*" [2]

3.       Plaintiffs allege claims against CIC for breach of contract, violations of the Texas Insurance Code under chapters 541 and 542, and breach of the duty of good faith and fair dealing. Plaintiff alleges claims against Mr. Malish for violations of the Texas Insurance Code under chapters 541 and 542. Plaintiffs further allege a cause of action for civil conspiracy against both Defendants.

4.       Defendant Mr. Malish was served on July 9, 2020.

5.       Defendant The Cincinnati Indemnity Company was served on July 7, 2020. Defendant files this Removal within 30 days after the receipt of the Original Petition, as required by 28 U.S.C. § 1446(b)(1).

## DIVERSITY OF CITIZENSHIP

6.       For the purpose of determining diversity, a corporation is deemed to be a citizen of both the state of its incorporation and the place where it maintains its principal place of business.[3]

7.       The forum state is Texas. At the time of the filing of Plaintiffs' Original Petition, and at the time of this Removal, Plaintiff, MD Bevco, Inc. DBA Mad Dogs San Antonio, was formed and incorporated under the laws of the State of Texas, and was authorized to transact business in Texas with its principal place of business in Bexar County, Texas. After conducting a

---

[2] *See* Exhibit "1" Plaintiff's Original Petition.
[3] *See* 28 U.S.C. §1332(c)(1).

diligent search of publicly available information, and upon information and belief of the Defendant, Plaintiff, MD Bevco, Inc. DBA Mad Dogs San Antonio, is a citizen of the State of Texas and maintains its principal place of business in Bexar County, Texas.[4]

8.      At the time of the filing of Plaintiffs' Original Petition, and at the time of this Removal, Plaintiff, Crazy Sam's Seafood Inc. DBA Bier Garten, was formed and incorporated under the laws of the State of Texas, and was authorized to transact business in Texas with its principal place of business in Bexar County, Texas. After conducting a diligent search of publicly available information, and upon information and belief of the Defendant, Plaintiff, Crazy Sam's Seafood Inc. DBA Bier Garten, is a citizen of the State of Texas and maintains its principal place of business in Bexar County, Texas.[5]

9.      At the time of the filing of Plaintiffs' Original Petition, and at the time of this Removal, Plaintiff, MD Sports Pub, Inc., was formed and incorporated under the laws of the State of Texas, and was authorized to transact business in Texas with its principal place of business in Bexar County, Texas. After conducting a diligent search of publicly available information, and upon information and belief of the Defendant, Plaintiff, MD Sports Pub, Inc., is a citizen of the State of Texas and maintains its principal place of business in Bexar County, Texas.[6]

10.      At the time of the filing of Plaintiffs' Original Petition, and at the time of this Removal, Plaintiff, MD Riverwalk, LLC DBA On The Bend, was a Texas Limited Liability Company authorized to transact business in Texas with its principal place of business in Bexar County, Texas. After conducting a diligent search of publicly available information, and upon

---

[4] *See* Exhibit "2" Articles of Incorporation, Amendment to Articles of Incorporation, and Assumed Name Certificates for MD Bevco, Inc. DBA Mad Dogs San Antonio filed with the Texas Secretary of State.
[5] *See* Exhibit "3" Articles of Incorporation and Assumed Name Certificate for Crazy Sam's Seafood Inc. DBA Bier Garten filed with the Texas Secretary of State.
[6] *See* Exhibit "4" Articles of Incorporation for MD Sports Pub, Inc. filed with the Texas Secretary of State.

information and belief of the Defendant, Plaintiff, MD Riverwalk, LLC DBA On The Bend is managed by sole member, Terry J. Corless, who is a citizen of the State of Texas.[7]

11.     Accordingly, Plaintiffs are citizens of the State of Texas for purposes of determining diversity.

12.     Defendant, The Cincinnati Indemnity Company, is and was at the time that this action was instituted against it, incorporated and existing under the laws of the State of Ohio with its principal place of business in Fairfield, Ohio. Defendant, The Cincinnati Indemnity Company, was not at the time this action was instituted against it, and still is not, a citizen of the State of Texas.

13.     Defendant, Johnathan Andrew Malish ("Malish") is employed by CIC as an insurance adjuster, and at the time of the filing of Plaintiffs' Original Petition, was a citizen of the State of Texas and domiciled in Bexar County, Texas. At all times, Malish was acting within the scope and course of his employment for CIC. With respect to the claims against Defendant Malish, CIC asserts that Malish has been improperly joined in this action for the sole purpose of defeating diversity jurisdiction.

14.      When improper joinder is asserted, the Court must "pierce the pleadings" to determine whether a cause of action grounded in fact exists.[8] The United States Fifth Circuit Court of Appeals has consistently maintained that a district court may look to evidence outside of the pleadings in determining an improper joinder claim.[9]

---

[7] *See* Exhibit "5" Certificate of Formation, Assumed Name Certificate, and Public Information Report for MD Riverwalk, LLC DBA On The Bend filed with the Texas Secretary of State.
[8] *Carriere v. Sears, Roebuck & Co.,* 893 F.2d 98, 100 (5th Cir. 1990), cert. denied, 498 U.S. 817 (1990).
[9] *See, e.g., Cavallini v. State Farm Mut. Auto Ins. Co.,* 44 F.3d 256, 263 (5th Cir. 1995) (court can consider summary judgment-type evidence); *Ford v. Elsbury,* 32 F.3d 931, 935 (5th Cir. 1994) (fraudulent joinder claims can be resolved by "piercing the pleadings" and considering summary judgment-type evidence); *Jernigan v. Ashland Oil Inc.,* 989 F.2d 812, 816 (5th Cir. 1993) (upholding district court's consideration of affidavits and depositions), *cert. denied,* 510 U.S. 868 (1993); *LeJeune v. Shell Oil Co.,* 950 F.2d 267, 271 (5th Cir. 1992) ("court is to pierce the pleadings to determine whether, under controlling state law, the non-removing party has a valid claim against the non-diverse

15.     The removing party bears the burden of proving that non-diverse defendants have been improperly joined to defeat diversity, either by showing that (1) there has been outright fraud in the plaintiff's recitation of jurisdictional facts, or (2) there is no possibility that the plaintiff would be able to establish a cause of action against the non-diverse defendants in state court.[10] The instant case involves the latter element: whether, "as a matter of law, there [is] no reasonable basis for predicting that the plaintiff might establish liability against a named in-state defendant in state court."[11] The failure to specify a legal and factual basis for a claim against a non-diverse party constitutes a failure to state a claim and results in improper joinder of that party.[12]

16.     As the Court noted in *Struder v. State Farm Lloyds*, "whether the plaintiff has stated a valid state law cause of action depends upon and is tied to the factual fit between the plaintiff's allegations and the pleaded theory of recovery."[13] A "factual fit" means "that the state-court petition must allege facts sufficient to establish the essential elements of each asserted cause of action."[14] The Court further elaborated that merely "asserting a laundry list of statutory violations without factual support as to how a non-diverse defendant violated the statute will not suffice" to establish a valid joinder. [15]

17.     Similar to *Struder*, Plaintiffs assert generic claims against Malish for alleged violations of the Texas Insurance Code.[16] Based on Plaintiffs' Original Petition, there is no basis for predicting that Plaintiffs might be able to establish liability against Malish because Plaintiffs'

---

parties"); *Carriere v. Sears, Roebuck and Co.*, 893 F.2d 98, 100 (5th Cir. 1990) (trial court properly considered affidavits and depositions), *cert. denied*, 498 U.S. 817 (1990).
[10] *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815 (5th Cir. 1993) citing *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 548 (5th Cir. Unit A Dec. 1981).
[11] *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 550 (5th Cir. Unit A Dec. 1981).
[12] *Waters v. State Farm Mut. Auto. Ins. Co.*, 158 F.R.D. 107, 109 (S.D. Tex. 1994).
[13] *Struder v. State Farm Lloyds*, No. 13-CV-413, 2014 WL 234352, at *3 (E.D. Tex. Jan. 21, 2014).
[14] *Id.*
[15] *Id.*
[16] *See* Exhibit "1" at 37-41.

claims are merely repetitive and conclusory statements that he violated certain statutes and consist of labels, conclusions, and formulaic recitations of the elements of causes of action.[17] As such, Plaintiffs cannot establish a cause of action against Malish in state court.[18]

18.    Plaintiffs only pled that the policy covers direct loss to the properties, not direct physical loss or damage. Plaintiffs further allege the policy does not define "loss," and that term has been broadly defined in property polices for decades to include losses that are not actual tangible damage to physical property. These assertions are incorrect. In fact, the policy at issue specifically defines "loss" as "accidental physical loss or accidental physical damage."[19] Thus, direct physical loss or damage is required. Accordingly, Plaintiffs' assertions that Malish misrepresented policy provisions to Plaintiffs are not only incorrect, but also conclusory and not supported by specific facts or the policy language itself, and should not be afforded the assumption of truth.

19.    Plaintiffs also only argue generally that Malish failed to conduct a reasonable investigation. In support of their allegations, Plaintiffs refer only to Exhibit "E" to their Original Petition. However, a closer look at Exhibit "E" reveals Malish was not even the signatory to this correspondence. Accordingly, Plaintiffs' allegations based on that letter are not applicable to him, amount to nothing more than conclusory and speculative allegations which are unsupported by facts, and should not be afforded the assumption of truth.

20.    Additionally, a relevant persuasive opinion in a similar situation as this matter was rendered by the United States District Court for the Central District of California in *Mark's Engine*

---

[17] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 127 S. Ct. 1955, 1964-65, 167 L.Ed.2d 929, 940 (2007). *See also Ashcroft v Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1945, 173 L.Ed.2d 868 (2009).
[18] *Travis v. Irby*, 326 F.3d 644, 647 (5th Cir. 2003) (citing *Griggs v. State Farm Lloyds*, 181 F.3d 694, 698 (5th Cir. 1999)); *see also TAJ Properties, LLC v. Zurich American Ins. Co.*, Civil Action No. H-10-2512, 2010 WL 4923473 at *2 (S.D. Tex. Nov. 29, 2010) (Werlein, J.).
[19] *See* Exhibit "1," Plaintiffs' Original Petition, Exhibit B at FM 101 05 16 at p. 38.

*Co. No. 28 Rest., LLC v. Traveler's Indem. Co. of Conn., et al.* In *Marks Engine*, the Court issued an opinion denying the plaintiff policyholder's motion for remand.[20] The Court rejected the plaintiff's argument and found that the declaratory judgment claim against Los Angeles Mayor Garcetti was a sham because "plaintiff's claims against [the] alleged sham defendant [are] all predicated on a contract to which the defendant [is] not a party." [21] Similarly in this matter, Plaintiff has attempted to argue that Malish, a CIC employee, is a proper party to this action construing Plaintiff's insurance policy with Cincinnati—despite the fact that Malish is not a party to the contract/policy.  Accordingly, Defendants request that this Court take judicial notice of the *Mark's Engine* opinion and, as the Court did there, dismiss Malish on the basis of fraudulent joinder.

21.     Because Plaintiffs' assertions against Malish are speculative and conclusory allegations, which are not supported by facts, they should not be afforded the assumption of truth. There is no reasonable basis to predict that Plaintiffs might be able to establish liability against Malish. Plaintiffs have not set forth any specific facts that would indicate Malish improperly handled, undercut, or compromised the investigation leading up to CIC's denial of the property damage claim. Absent any specific factual allegations that Malish violated a provision of the insurance code in his handling of the claim, liability cannot be imputed to him for merely doing his job.[22]

22.     Plaintiffs' use of speculative and conclusory allegations against Malish is a common tactic that is disfavored by courts in this Circuit.[23] Plaintiffs' case is an example of a simple dispute over insurance coverage "clothed in legal garb woven with a multitude of legal

---

[20] *See* Exhibit "6" Opinion issued by the United States District Court for the Central District of California; Case No. 2:20-cv-04423-AB-SK, *Mark's Engine Co. No. 28 Rest., LLC v. Traveler's Indem. Co. of Conn., et al.*
[21] *See Id.*, at page 7.
[22] *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.
[23] *See Waters*, 158 F.R.D. at 109 (finding fraudulent joinder).

theories designed to maximize" their gain and impose liability on a third party "because of [the] alleged relationships to the insurance coverage dispute."[24]

23.    Moreover, as stated above, Plaintiff's conspiracy allegations based on the fact that the investigation was allegedly outcome-oriented and Malish allegedly misrepresented provisions of the policy are conclusory, not supported by facts or the policy, and should not be afforded the assumption of truth.

24.    Based on the factual allegations made, it is evident that Plaintiffs have no intention of pursuing an action against Malish, and there is no plausible basis for joining Malish in this lawsuit other than to defeat diversity.[25] Another case analogous to the type of situation found here is *Plascencia v. State Farm,* where the court found that a "standard form petition developed for use in similar cases" which appears "purposefully designed to defeat federal court jurisdiction" is a badge of improper joinder sufficient to defeat remand. [26] In *Plascencia*, the court reasoned that plaintiff's use of  boilerplate language to establish liability against the adjuster, and the fact that adding the adjuster to the lawsuit would not add any benefit to plaintiff other than destroying diversity jurisdiction, the court could find no evidence that plaintiff genuinely intended to pursue an action against the adjuster.[27]

25.    Similarly, this Court should look past Plaintiffs' cursory, incorrect, and general pleadings against Malish and find he was improperly joined for the sole purpose of defeating removal on diversity grounds, as this matter is an insurance coverage dispute in which he cannot be liable as a matter of law. Therefore, the prior Texas citizenship of Malish should be disregarded

---

[24] *See McLaren v. Imperial Cas. & Indem. Co.*, 767 F. Supp. 1364, 1367 (N.D. Tex. 1991) (finding fraudulent joinder), aff'd, 968 F.2d 17 (5th Cir. 1992).
[25] *See Plascencia v. State Farm*, No. 4:14-CV-00524-A (N.D. Tex. Sept. 25, 2014). (finding fraudulent joinder).
[26] *See Plascencia v. State Farm*, No. 4:14-CV-00524-A (N.D. Tex. Sept. 25, 2014). (finding fraudulent joinder).
[27] *Id.*

for the purposes of evaluating diversity in this matter.[28]

26.     There is complete diversity of citizenship between Plaintiffs and Defendant CIC. Therefore, removal is proper under 28 U.S.C. §1332 and this Court has jurisdiction over these proceedings.

27.     A defendant can remove without the consent of a defendant who should be disregarded based on the doctrine of improper joinder.[29]

## II.
## AMOUNT IN CONTROVERSY

28.     Defendant would show that the Court has diversity jurisdiction over this matter as there is complete diversity of citizenship between the parties and the monetary relief sought by Plaintiffs exceeds the minimum jurisdictional amount of $75,000.

29.     While Plaintiffs did not specify in their Original Petition the total amount of damages that they seeks to recover, Plaintiffs pled that their damages will be more than $200,000 but not more than $1,000,000.[30] Therefore, it is apparent from the face of the pleading that the amount in controversy between the Plaintiffs and Defendants exceeds $75,000.00, exclusive of interest and costs.

## III.
## PROCEDURAL REQUIREMENTS FOR REMOVAL

30.     Defendant files this Notice of Removal within 30 days of July 7, 2020, the date it received Plaintiffs' Original Petition, which was the first pleading instituting this action against it, and within the one year period set forth in 28 U.S.C. §1446(c). Defendant files this Notice of Removal without waiving any objections, exceptions or defenses to Plaintiffs' Original Petition.

---

[28] *Burden v. Gen. Dynamics Corp.*, 60 F.3d 213, 218 (5th Cir. 1995).
[29] *Jernigan v. Ashland Oil, Inc*. 989 F.2d 812, 815 (5th Cir.1993).
[30] *See* Exhibit "1" Plaintiffs' Original Petition at 61.

31.     This Court embraces the locality in which the state court action is now pending and, thus, is a proper forum for this action pursuant to 28 U.S.C. §1441(a).

32.     In accordance with 28 U.S.C. §1446(d), a copy of this Notice of Removal is being served on all parties, and a copy is being filed with the Clerk of the 166th Judicial District Court of Bexar County, Texas.[31]

33.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the following documents are being submitted with this Notice of Removal: (a) a copy of the docket sheet in the state court action; (b) each document filed in the state court action; (c) a Certificate of Interested Parties and Corporate Disclosure Statement.

34.     Petitioner filed and presented herewith the sum of $400 to the Clerk of the United States District Court for the Western District of Texas as required by this Court with the Original Notice of Removal filed on August 3, 2020.

35.     If any question arises as to the propriety of the removal of this action, Defendant requests the opportunity to present a memorandum of law, evidence, and oral argument in support of the Notice and the removal of this action.

36.     WHEREFORE, Defendant prays the Court hereby remove the state court action from the 166th Judicial District Court of Bexar County, Texas to the United States District Court for the Western District of Texas San Antonio Division.

Respectfully submitted,

 /s/ S. Jan Hueber
**S. Jan Hueber**
State Bar No. 20331150
Hueber@litchfieldcavo.com
**Mahan V. Wright** - *Motion for Pro Hac Vice to be filed*

---

[31] *See* Notice to State Court of Removal, attached herein as Exhibit "7."

State Bar No. 24096880
wrightM@litchfieldcavo.com
**LITCHFIELD CAVO LLP**
100 Throckmorton St., Ste. 500
Fort Worth, Texas 76102
Telephone: (817) 945-8025
Facsimile: (817) 753-3232

**ATTORNEYS FOR DEFENDANT
THE CINCINNATI INDEMNITY COMPANY**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was served on this the

3rd day of August, 2020, on all counsel of record, by Email in accordance with the Federal Rules

of Civil Procedure.

**Email: shannon@theloydlawfirm.com**
Shannon E. Loyd
State Bar No. 24045706
THE LOYD LAW FIRM, P.L.L.C.
12703 Spectrum Drive, Suite 201
San Antonio, Texas 78249
**ATTORNEYS FOR PLAINTIFFS**

_/s/ S. Jan Hueber_
**S. Jan Hueber**

# Exhibit 1

FILED
6/24/2020 1:06 PM
Mary Angie Garcia
Bexar County District Clerk
Accepted By: Martha Medellin

Case 5:20-cv-00899-FB    Document 1    Filed 08/03/20    Page 13 of 385

CAUSE NO. **2020CI11466**

| | | |
|---|---|---|
| MD BEVCO, INC. DBA MAD DOGS | § | IN THE DISTRICT COURT |
| SAN ANTONIO; CRAZY SAM'S SEAFOOD, | § | |
| INC. DBA BIER GARTEN; MD SPORTS | § | |
| PUB, INC. AND MD RIVERWALK, LLC | § | |
| DBA ON THE BEND | § | |
| | § | **166th** JUDICIAL DISTRICT |
| V. | § | |
| | § | |
| THE CINCINNATI INDEMNITY COMPANY | § | |
| AND JOHNATHAN ANDREW MALISH | § | BEXAR COUNTY, TEXAS |

<u>**PLAINTIFFS' ORIGINAL PETITION**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

      COME NOW Plaintiffs, MD BEVCO, INC. DBA MAD DOGS SAN ANTONIO; CRAZY

SAM'S SEAFOOD, INC. DBA BIER GARTEN; MD SPORTS PUB, INC. and MD

RIVERWALK, LLC DBA ON THE BEND and files this Original Petition against THE

CINCINNATI INDEMNITY COMPANY, ("Cincinnati") and JOHNATHAN ANDREW

MALISH ("Malish") and in support thereof, would show as follows:

**I.**
**<u>DISCOVERY CONTROL PLAN LEVEL</u>**

      1.    Plaintiffs intend for discovery to be conducted under Level 3 of Rule 190 of the

Texas Rules of Civil Procedure. This case involves complex issues and will require extensive

discovery. Therefore, Plaintiffs will ask the Court to order that discovery be conducted in

accordance with a discovery control plan tailored to the particular circumstances of this suit.

**II.**
**<u>PARTIES AND SERVICE</u>**

      2.    Plaintiffs are doing business in Bexar County, Texas.

      3.    Cincinnati is in the business of insurance in the State of Texas. The insurance

business done by Cincinnati in Texas includes, but is not limited to, the following:

- The making and issuing of contracts of insurance with the Plaintiffs;

- The taking or receiving of application for insurance, including the Plaintiffs' application for insurance;

- The receiving or collection of premiums, commissions, membership fees, assessments, dues or other consideration for any insurance or any part thereof, including any such consideration or payments from the Plaintiffs; and

- The issuance or delivery of contracts of insurance to residents of this state or a person authorized to do business in this state, including the Plaintiffs.

4.      Defendant **The Cincinnati Indemnity Company** can be served at through its registered agent at the following address: CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136. **Service is requested at this time.**

5.      Defendant **Johnathan Andrew Malish** is a Texas resident and may be served at his business address at 31872 Cast Iron CV, Bulverde, Texas 78163-4045 by certified mail, return receipt requested.  **Service is requested at this time.**

### III.
### JURISDICTION AND VENUE

6.      Venue is appropriate in Bexar County, Texas because all or part of the conduct giving rise to the causes of action were committed in Bexar County, Texas and Plaintiffs and Properties which are the subject of this suit are located in Bexar County, Texas. Accordingly, venue is proper pursuant to Texas Civil Practice & Remedies Code §15.002.

### IV.
### BACKGROUND FACTS

7.      Plaintiffs are the owners of an Insurance Policy (hereinafter referred to as "the Policy"). Defendant provided the Plaintiffs' business insurance for the businesses located at 123 Losoya Street, Suite 19, San Antonio, Texas; 126 Losoya Street, San Antonio, Texas; 123 Losoya

Street, Suite 7, San Antonio, Texas; and 420 E. Houston Street, San Antonio, Texas (hereinafter referred to as "the Properties"). Cincinnati sold the Policy insuring the Properties to Plaintiffs. The Declarations pages for the Policy and the policy provided to Plaintiffs are attached hereto as Exhibit A. The Policy is an all-risk policy and has been continuously in full force and effect since inception, providing coverage for property, business personal property, business income, extra expense and additional coverages including Civil Authority.

8.    During the terms of said Policy, Plaintiffs have sustained and will sustain covered losses during the Covid-19 outbreak and subsequent Bexar County and State of Texas Orders (hereinafter the "Orders"), attached hereto as Exhibits B and C, and Plaintiffs reported same to Cincinnati pursuant to the terms of the Policy. Plaintiffs asked that Cincinnati cover the cost for business interruption pursuant to the Policy. Cincinnati assigned Johnathan Andrew Malish to adjust the claim and investigate the loss related to business interruption; but as described in more detail below, he failed to conduct a reasonable investigation in violation of the Texas Insurance Code. To date, Cincinnati and Malish have mishandled Plaintiffs' claim and caused and will continue to cause Plaintiffs further and additional damages.

9.    The World Health Organization ("WHO") identified the disease caused by the 2019 Novel Coronavirus as "COVID-19" on February 11, 2020. On March 11, WHO characterized COVID-19 as a pandemic. WHO saw "alarming levels of spread and severity, and by the alarming levels of inaction." WHO representatives stated, "[W]e have never before seen a pandemic sparked by a coronavirus. This is the first pandemic caused by a coronavirus. And we have never before seen a pandemic that can be controlled, at the same time." The Center for Disease Control ("CDC") has stated that a "pandemic is a global outbreak of disease. Pandemics happen when a new virus emerges to infect people and can spread between people sustainably. Because there is little to no pre-existing

immunity against the new virus, it spreads worldwide."

10.     Plaintiffs are in the restaurant business. On March 23, 2020, Nelson W. Wolff, Bexar County Judge, issued an executive order closing all businesses unless "exempted" beginning on March 24th and ending April 9th. *See* Exhibit B. Plaintiffs' business was not exempt for its inside dining and bar services. *Id.* On March 31, 2020, the State of Texas Governor Greg Abbott signed an executive order closing all "non-essential" businesses beginning April 2nd through April 30th of 2020. *See* Exhibit C. Plaintiffs' inside dining and bar service businesses are not considered "essential" by Governor Abbott's order even though Plaintiffs could offer take out service. *Id.* Regardless of the Orders allowing take-out services from restaurants, three of the Properties are located in a hotel which closed making Plaintiffs unable to operate.  Plaintiffs were beginning to lose business income even before March 23, 2020 because of peoples' fear of Covid-19.

11.     The described purposes of the Orders are to protect the "health, safety and welfare" of Bexar County and Texas residents, and to slow the spread of Covid-19 by "minimizing social gatherings" and "minimize in-person contact." *See* Exhibits B and C. According to the Texas Department of Health and Human Services, Covid-19 has been and continues to be present in Bexar County.

12.     Beginning on March 18, 2020, Plaintiffs could no longer open and conduct business and were losing business income. Plaintiffs submitted its claims to Cincinnati, and it denied the claim despite the fact the Policy provides coverage. The pandemic and health care crises have resulted in the Plaintiffs suffering a direct loss to the insured Properties, and alternatively damage to the insured Properties and suspension of the business that are covered under the Business Income Loss provisions of the Policy. Alternatively, coverage is available under Civil Authority coverage under the Policy.

A.    **Coverage for Business Income**

13.    Plaintiffs' Policy insures for "loss" caused by a "Covered Cause of Loss." *See* Exhibit A, pg. 29. A "Covered Cause of Loss" is a direct "loss" unless the loss is excluded or limited. *Id.* at 31. Further, Plaintiffs' Policy provides coverage for Loss of Business Income and Extra Expense as follows:

> "We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss."

*Id* at pg. 44 and 102. Plaintiffs suffered lost income when the Orders closed the inside dining and bar services, and on information and belief Plaintiffs will continue to suffer lost income even after the Orders are lifted due to fear of Covid-19. The pandemic, consumer fear, and the stay at home Orders have caused Plaintiffs loss of the Properties and loss of business income and are not specifically excluded by the Policy. Plaintiffs' businesses have been transformed by external events, not specifically excluded, from a sustainable, revenue generating operation to the unsatisfactory state of closure of inside dining and bar services and now slowed business. The presence of the Covid-19 in Bexar County alone triggers coverage because it is a loss that renders the Properties unsafe or makes them unusable for their intended purpose.

B.    **Coverage for Civil Authority**

14.    Plaintiffs' Policy also provides additional coverage for Civil Authority:

> "When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:
>
>  **(a)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
>
>  **(b)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused

the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id* at pg. 45, 103. The Orders are clearly acts of Civil Authority which have caused Plaintiffs loss of business income as described above. The Orders, along with their stated purposes, qualify as a Covered Cause of Loss under the Policy, especially given that there is precedent that holds "loss" can occur without actual tangible physical damage to a property. The premises immediately surrounding Plaintiffs' Properties have suffered the same loss as Plaintiffs have suffered due to the pandemic. As well, damage is not defined by the Policy and other premises have suffered damage as the term is defined in its common, ordinary meaning.

**C.   Cincinnati's Wrongful Denial**

15.   Cincinnati and Malish conducted an outcome-oriented investigation of the claim, and Cincinnati denied Plaintiffs' claim shortly after the claim was presented meaning they could not have done a proper or thorough  investigation or have any evidence that any exclusions apply.

16.   Cincinnati's denial was based, in part, on a lack of "physical damage" to Plaintiffs' Properties. *See* Exhibit D. But the Policy does not require a loss caused by "physical damage" as it provides coverage for direct "loss." The words "physical" and "damage" are not used to describe what the Policy covers or in the definition of a "Covered Cause of Loss." The Policy does not define "loss" and that term has been broadly defined in property policies for decades to include losses that are not actual tangible damage to physical property. At the very least, Plaintiffs suffered a loss of the covered Properties as a result of fear and actions taken to limit the impact of the pandemic on the health, safety and welfare of Bexar County citizens. Further, Plaintiffs clearly suffered physical loss to Covered Property because they were unable to operate. Malish failed to conduct a reasonable investigation and then Cincinnati wrongfully denied the coverage for

Civil Authority without considering damage to property other than Plaintiffs'. The Policy does not define "damage" in the property coverage section, and "damage" is broadly defined in its common ordinary meaning. It could have, but did not, define "loss" under the Property coverage portion of the Policy.

17.     Cincinnati relies on the exclusion for "Pollution" as a basis for denial, but contrary to its assertion, this is not a pandemic exclusion and Covid-19 is not a pollutant. *See* Exhibit D. The word "virus" does not even appear in the Policy definition of "Pollutant." *See* Exhibit A, pg. 110.

18.     The exclusion for pollutant has no application to Plaintiffs' claim in light of its plain language. Alternatively, the exclusion is vague and ambiguous and must be construed in the light most favorable to Plaintiffs.

19.     Cincinnati failed to give proper, advance notice and disclosure of the Exclusion and is thus barred from reliance upon it.

20.     On information and belief, Cincinnati is barred from relying on the Exclusion as a result of regulatory and/or administrative estoppel.

21.     Alternatively, the Exclusion as interpreted by Cincinnati is unconscionable and/or contrary to public policy and cannot be enforced as written.

22.     Cincinnati made material misrepresentations about Policy provisions, coverage and the law in Texas applying thereto with regard to Plaintiffs' Loss of Business Income and Civil Authority additional coverages.

23.     Malish considered only Cincinnati's interests, proceeded only according to a one-sided and self-serving interpretation of the Policy, and attempted to conceal from Plaintiffs that he made no effort to consider its interests. Malish pre-textually looked only for ways to avoid coverage

rather than first trying to find coverage.

24.     Cincinnati wrongfully denied Plaintiffs' claims for business interruption even though the Policy provides coverage for losses such as those suffered by Plaintiffs. Furthermore, by information and belief, Cincinnati engaged its agents to misrepresent Policy provisions and coverage. To date, Cincinnati continues to deny the payment for Plaintiffs' loss of business.

**V.**
**CAUSES OF ACTION AGAINST CINCINNATI**

**A.     BREACH OF CONTRACT**

25.     Plaintiffs re-allege the foregoing paragraphs. Cincinnati and its agents' conduct constitute a breach of the insurance contracts between it and Plaintiffs. Cincinnati's failure and/or refusal, as described above, to pay Plaintiffs adequate compensation as it is obligated to do under the terms of the Policy in question pursuant to the additional coverages of Loss of Business Income and Civil Authority, and under the laws of the State of Texas, constitutes a breach of the insurance contracts with Plaintiffs.

26.     Cincinnati failed to perform its contractual duty to adequately compensate Plaintiffs under the terms of the Policy pursuant to the additional coverages of Loss of Business Income and Civil Authority. Specifically, Cincinnati wrongfully denied coverage and refused to offer the full proceeds of the Policy, although due demand was made for proceeds to be paid in an amount sufficient to cover Plaintiffs' business loss, and all conditions precedent to recovery under the Policy have been carried out and accomplished by Plaintiffs. Cincinnati's conduct constitutes a breach of the insurance contracts between it and Plaintiffs.

**B.     NONCOMPLIANCE WITH TEXAS INSURANCE CODE**

**1.     UNFAIR SETTLEMENT PRACTICES**

27.     Plaintiffs re-allege the foregoing paragraphs. Texas law is clear that insurance

companies and anyone engaged in the business of insurance by investigating and adjusting a claim must conduct a reasonable, full and fair claim investigation. Cincinnati violated Chapter 541 of the Texas Insurance Code, in one or more of the following particulars:

### § 541.061.  Misrepresentation of Insurance Policy.

- Making an untrue statement of material fact;
- Failing to state a material fact necessary to make other statements made not misleading;
- Making a misleading statement; and
- Failing to disclose a material matter of law.

### § 541.060.  Unfair Settlement Practices.

Insurance Code chapter 541, section 541.060 by, among other things:

- misrepresenting one or more material facts and/or policy provisions relating to coverage;
- making misrepresentations of law;
- failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which their liability has become reasonably clear;
- failing to promptly provide a reasonable explanation of the basis in law or fact for the denial of Plaintiffs' claims;
- refusing to affirm or deny coverage within a reasonable time;
- refusing to conduct a reasonable investigation;
- ignoring damage known to be covered by the Policy;
- conducting an outcome-oriented investigation in order to provide a basis to underpay the claim; and/or
- relying on biased adjusters.

As alleged above, Cincinnati misrepresented to Plaintiffs that the Policy required actual physical, damage to its Properties in order for them to have coverage for Business Income and Civil Authority.

### 2.      THE PROMPT PAYMENT OF CLAIMS

28.      Plaintiffs re-allege the foregoing paragraphs. Cincinnati's conduct constitutes and will continue to constitute multiple violations of the Texas Insurance Code, Prompt Payment of Claims. All violations made under this article are made actionable by TEX. INS. CODE §542.060.

29.     Cincinnati failed to meet its obligations under the Texas Insurance Code regarding timely beginning an investigation of Plaintiffs' claim, and requesting all information reasonably necessary to investigate Plaintiffs' claim within the statutorily mandated time of receiving notice of Plaintiffs' claim. Its conduct constitutes a violation of the Texas Insurance Code, Prompt Payment of Claims. TEX. INS. CODE §542.055.

30.     Further, Cincinnati failed to accept Plaintiffs' full and entire claim within the statutorily-mandated time of receiving all necessary information. Its conduct constitutes a violation of the Texas Insurance Code, Prompt Payment of Claims. TEX. INS. CODE §542.056.

31.     Cincinnati failed and will fail to timely pay Plaintiffs' claim, and for all of the covered losses due to its wrongful denial of the policy benefits.  TEX. INS. CODE §542.057.

32.     Cincinnati failed and will fail to meet its obligations under the Texas Insurance Code regarding payment of claim without delay due to its wrongful denial. Its conduct constitutes a violation of the Texas Insurance Code, Prompt Payment of Claims. TEX. INS. CODE §542.058.

33.     Because of Cincinnati's wrongful acts and omissions, Plaintiffs were forced to retain the professional services of the attorney and law firm who is representing it with respect to these causes of action.

## C.     BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

34.     Plaintiffs re-allege the foregoing paragraphs. Cincinnati's conduct constitutes a breach of the common law duty of good faith and fair dealing owed to the insureds pursuant to insurance contracts.

35.     From and after the time Plaintiffs' loss was presented to Cincinnati, its liability to pay the full claim in accordance with the terms of the Policy was reasonably clear. However, it has refused to pay Plaintiffs in full and wrongfully denied the claim, despite there being no basis upon

which a reasonable insurance company would have relied to deny the full payment. Cincinnati's conduct constitutes a breach of the common law duty of good faith and fair dealing.

36.     Further, Cincinnati's failure, as described above, to adequately and reasonably investigate and evaluate Plaintiffs' claim, although, at that time, it knew or should have known by the exercise of reasonable diligence that its liability was reasonably clear, constitutes a breach of the duty of good faith and fair dealing.

## VI.

## CAUSES OF ACTION AGAINST DEFENDANT MALISH

### A.     NONCOMPLIANCE WITH TEXAS INSURANCE CODE

37.     Plaintiffs re-allege the foregoing paragraphs. At all pertinent times, Malish was engaged in the business of insurance as defined by the Texas Insurance Code. The acts and omissions of Malish constitute one or more violations of the Texas Insurance Code. More specifically, Malish has, among other violations, violated the following provisions of the Code:

1. Insurance Code § 542.003(b)(5).

2. Insurance Code chapter 541, section 541.060 by, among other things:

   - misrepresenting one or more material facts and/or policy provisions relating to coverage;

   - failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claims with respect to which their liability has become reasonably clear;

   - failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claims under one portion of a policy with respect to which liability has become reasonably clear in order to influence Plaintiffs to settle its claims with respect to another portion of the policy;

   - failing to promptly provide a reasonable explanation of the basis in law or fact for the denial of Plaintiffs' claims;

   - refusing to affirm or deny coverage within a reasonable time;

- refusing to conduct a reasonable investigation;

- ignoring damage known to be covered by the Policy;

- creating evidence to provide the carrier with a basis to deny coverage; and/or

- conducting an outcome-oriented investigation in order to provide the carrier with a basis to deny the claim.

38.     Cincinnati assigned the loss and the claim to Malish who was at all pertinent times the agent of Cincinnati, through both actual and apparent authority. The acts, representations and omissions of Malish are attributed to Cincinnati. Malish was tasked with the responsibility of conducting a thorough and reasonable investigation of Plaintiffs' loss. Despite the fact that the Texas Insurance Code dictates adjusters must conduct a reasonable investigation and adjustment of a claim, Malish failed to do so and actually set out to conduct an outcome-oriented investigation and adjustment, which has and will result in an inequitable settlement of Plaintiffs' claim.

39.     Malish pre-textually looked only for ways to avoid coverage rather than first trying to find coverage. He actually sent Plaintiffs a list of questions created to aid in the denial of the claim. *See* Exhibit E. Notably, he made requests to Plaintiffs to identify and/or describe the "direct physical loss or damage" to their businesses, when the Policy only requires direct "loss" to Covered Property for coverage to exist. He also asked Plaintiffs to identify and/or describe the "direct physical loss or damage" to other properties around Plaintiffs even though, again, the Policy does not require "physical damage" to trigger coverage. Malish even included a cross-examination type leading question that no matter how answered assumes Covid-19 is present at other properties around Plaintiffs' aiding Malish in asserting an exclusion to coverage of Plaintiffs' claim. This is despite the fact that a claim investigation is not supposed to be adversarial, rather adjusters should be in search of facts proving coverage.

40.     In his letter acknowledging the claim, Malish misrepresented the policy coverages to Plaintiffs. He misrepresented to Plaintiffs that in order to have coverage for Business Income, they had to have sustained direct physical damage to the Properties. However, Plaintiffs' Policy covers direct "loss" to the Properties, not physical damage. As well, Malish misrepresented to Plaintiffs that because access to the properties were not prohibited due to direct physical loss or physical damage to other properties, there was no Civil Authority coverage. But again, the Policy does not have a requirement for a "physical damage" to trigger coverage. He also wholly ignored the Orders. Malish's conduct clearly shows he conducted an outcome-oriented investigation and as a result, caused a failure to effectuate a settlement of the claim. As result of Malish's misrepresentations, inadequate and outcome-oriented investigation, Plaintiffs have not received any payment for the claim.

41.     The foregoing conduct was and is the producing cause(s) of injury and damage to Plaintiffs and Plaintiffs have suffered damages including, without limitation, actual damages, economic damages, and consequential damages. Malish's conduct caused a failure to effectuate a prompt, reasonable settlement of the claim. Moreover, one or more of the foregoing acts or omissions were committed "knowingly" entitling Plaintiffs to seek treble damages pursuant to the Insurance Code.

## VII.
## CAUSES OF ACTION AGAINST ALL DEFENDANTS FOR CIVIL CONSPIRACY

42.     Plaintiffs re-allege the foregoing paragraphs. The Defendants conspired to delay and deny Plaintiffs' claim. Cincinnati assigned Malish to investigate Plaintiffs' claim, and the Defendants set out to intentionally conduct an outcome-oriented investigation in order to avoid paying for all of the damages to Plaintiffs' Properties covered by the Policy. The denial letter

misrepresenting coverage, as well as the questions asked of Plaintiffs to create a basis for denial via application of various exclusions in the Policy, were either independent acts by Malish in violation of the Insurance Code or a meeting of the minds between Malish and Cincinnati to accomplish violations of the Insurance Code – the discovery process will bear out which. The Defendants' conspiracy was a proximate cause of Plaintiffs' damages.

## VIII.
## KNOWLEDGE

43.     Each of the acts described above, together and singularly, was done "knowingly" by Defendants as that term is used in the Texas Insurance Code and was a producing cause of Plaintiffs' damages described herein.

## IX.
## DAMAGES

44.     Plaintiffs would show that all of the aforementioned acts, taken together or singularly, constitute the proximate and producing causes of the damages sustained by Plaintiffs.

45.     For breach of contract, Plaintiffs are entitled to regain the benefit of the bargain, which is the amount of the claim, together with attorney's fees.

46.     For noncompliance with the Texas Insurance Code, Unfair Settlement Practices, Plaintiffs are entitled to actual damages, which include the loss of the benefits that should have been paid pursuant to the Policy but for the wrongful denial, court costs, consequential damages not covered by Plaintiffs' Policy and attorney's fees.  For knowing conduct of the acts described above, Plaintiffs ask for three times the actual damages. TEX. INS. CODE §541.152.

47.     For noncompliance with the Texas Insurance Code, Prompt Payment of Claims, Plaintiffs are entitled to the amount of the claim, as well as eighteen (18) percent interest per annum on the amount of such claim as damages, together with attorney's fees. TEX. INS. CODE

§542.060.

48.     For breach of the common law duty of good faith and fair dealing, Plaintiffs are entitled to compensatory damages, including all forms of loss resulting from the insurer's breach of duty, such as additional costs, economic hardship, losses due to nonpayment of the amount the insurer owed, and exemplary damages.

49.     For the prosecution and collection of this claim, Plaintiffs have been compelled to engage the services of the attorney whose name is subscribed to this pleading. Therefore, Plaintiffs are entitled to recover a sum for the reasonable and necessary services of Plaintiffs' attorney in the preparation and trial of this action, including any appeals to the Court of Appeals and/or the Supreme Court of Texas.

**X.**

50.     In addition, as to any exclusion, condition, or defense pled by Defendants, Plaintiffs would show that:

51.     The clear and unambiguous language of the policy provides coverage for business interruption and other losses to the Properties caused by losses made the basis of Plaintiffs' claims;

52.     In the alternative, any other construction of the language of the policy is void as against public policy;

53.     Any other construction and its use by the Defendants violate the Texas Insurance Code section 541 et. seq. and is void as against public policy;

54.     Any other construction is otherwise void as against public policy, illegal, and violates state law and administrative rule and regulation.

55.     In the alternative, should the Court find any ambiguity in the policy, the rules of construction of such policies mandate the construction and interpretation urged by Plaintiffs;

56.     In the alternative, Defendants are judicially, administratively, or equitably estopped from denying Plaintiffs' construction of the policy coverage at issue;

57.     In the alternative, to the extent that the wording of such policy does not reflect the true intent of all parties thereto, Plaintiffs plead the doctrine of mutual mistake requiring reformation.

## XI.
## REQUEST FOR DISCLOSURES

58.     Pursuant to the Texas Rules of Civil Procedure 194, Plaintiffs request that Defendants provide the information required in a Request for Disclosure.

## XII.
## FIRST REQUEST FOR PRODUCTION TO CINCINNATI

59.     Pursuant to the Texas Rules of Civil Procedure 196, Plaintiffs request that Defendant Cincinnati provide the information required:

1) Produce the non-privileged portion of Cincinnati's complete claim file for Plaintiffs' Properties relating to or arising out of Plaintiffs' losses for which Cincinnati opened a claim under the Policy.

2) Produce all emails and other forms of communication between Cincinnati, its agents, adjusters, employees, or representatives and the agent and adjuster, and/or their agents, adjusters, representatives or employees relating to, mentioning, concerning or evidencing the Plaintiffs' Policy and/or Properties which are the subject of this suit.

3) Underwriting documents and communications, including but not limited to, any and all materials, documents, notations, files, reports, correspondence and/or other communications related to Plaintiffs' application/s for coverage, binders, proposals, and the issuance of the policy, including renewals thereof. This request also includes materials, determination and/or method for determining the forms and endorsements to be used in creating the policy. This request also includes information regarding the basis for rating and premium classifications used for Plaintiffs. Finally, this request includes any internal communications or guidelines regarding the handling and/or coverage positions of Defendant regarding business interruption and other claims related to the 2019 Novel Coronavirus and/or COVID-19.

4) Any and all documents and/or communications from Cincinnati or any parent, subsidiary or affiliated entities to any third-party, including but not limited to insurance agents and brokers, marketing and/or public relations firms, at any time after December 15, 2019, and relating in

any way to coverage or exclusions or denials of coverage for civil authority or for business interruption or business income loss and/ or commercial property coverage mentioning or referencing the 2019 Novel Coronavirus, the pandemic, and/or COVID-19.

## XIII.
## FIRST REQUEST FOR PRODUCTION TO MALISH

60.      Pursuant to the Texas Rules of Civil Procedure 196, Plaintiffs request that

Defendant Malish provide the information required:

1) Produce Malish's complete claim or adjusting file for Plaintiffs' claim.

2) Produce all emails and other forms of communication between Cincinnati, its agents, adjusters, employees, or representatives and Malish and/or his agents, adjusters, representatives or employees relating to, mentioning, concerning or evidencing the claim which is the subject of this suit. This request includes Documents and/or Communications relating to the handling of business interruption and other claims related to the 2019 Novel Coronavirus and/or COVID-19.

## XIV.

61.      WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendants be

cited to appear and answer herein; that, on final hearing, Plaintiffs have judgment against

Defendants for an amount, deemed to be just and fair by the jury, which will be a sum within the

jurisdictional limits of this Court.  FOR THE COURT:  Plaintiffs are forced to state a range amount

of damages sought although Plaintiffs believe that the amount of damages is solely for the jury to

determine.  However, because Plaintiffs must state a range of damages, Plaintiffs plead that the

damages will be more than $200,000 but not more than $1,000,000. Plaintiffs further plead for costs

of suit; for interest on the judgment; for pre-judgment interest; and, for such other and further

relief, in law or in equity, either general or special, including the non-monetary relief of declaratory

judgment against Defendants, to which Plaintiffs may be justly entitled.

Respectfully submitted,

THE LOYD LAW FIRM, P.L.L.C.
12703 Spectrum Drive, Suite 201
San Antonio, Texas  78249
Telephone:      (210) 775-1424
Facsimile:       (210) 775-1410
Electronic Mail:  shannon@theloydlawfirm.com


BY: _____
        SHANNON E. LOYD
        State Bar No. 24045706

ATTORNEY FOR PLAINTIFFS


**PLAINTIFFS REQUEST A TRIAL BY JURY**

# Exhibit A



**The Cincinnati Insurance Company**
**The Cincinnati Casualty Company**
**The Cincinnati Indemnity Company**

**Policy Number:** ENP 006 54 53

**Effective Date:** 03-01-2020

**Named Insured:** MD BEVCO INC DBA MAD DOGS SAN ANTONIO

For professional advice and policy questions or changes, please contact your local independent agency:

CATTO & CATTO LLP
106 S SAINT MARYS ST STE 800
SAN ANTONIO, TX 78205-3603

210-222-2161

Dear Policyholder:

**Thank you**
Thank you for trusting The Cincinnati Insurance Companies with your commercial insurance coverage. We recognize that locally based independent agents have the working knowledge to help you choose the right insurance company for your needs. Together with your local independent insurance agency, we are committed to providing you with the highest level of service.

Please review your enclosed policy information to verify your coverage details, as well as deductibles and coverage amounts. Should your needs change, your agent is available to review and update your policy.

**Please promptly report claims**
If you experience a policy-related loss, you may report it by contacting your local professional independent agency representing The Cincinnati Insurance Companies or by directly calling us toll-free at **877-242-2544** and providing your policy number and claim-related information.

Sincerely,

Sean M. Givler
Senior Vice President - Commercial Lines

IA 4443 04 14

# NOTICE TO POLICYHOLDERS - FLOOD DISCLOSURE STATEMENT - TEXAS

You should read your policy and review your Declarations page for complete information on the coverage you are provided.

Flood Insurance: You may also need to consider the purchase of flood insurance. Your insurance policy does not include coverage for damage resulting from a flood even if hurricane winds and rain caused the flood to occur. Without separate flood insurance coverage, you may have uncovered losses caused by a flood. Please discuss the need to purchase separate flood insurance coverage with your insurance agent or insurance company or visit www.floodsmart.gov.



# The Cincinnati Indemnity Company
A Stock Insurance Company

**Headquarters:** 6200 S. Gilmore Road, Fairfield, OH 45014-5141
**Mailing address:** P.O. Box 145496, Cincinnati, OH 45250-5496
*www.cinfin.com* ■ 513-870-2000

## COMMON POLICY DECLARATIONS

Billing Method: **AGENCY BILL**

POLICY NUMBER     **ENP 006 54 53 / EBA 006 54 53**

**NAMED INSURED** MD BEVCO INC DBA MAD DOGS SAN ANTONIO
                  REFER TO IA905
**ADDRESS**       4714 SHAVANO OAK STE 2
(Number & Street,  SAN ANTONIO, TX 78249-4029
Town, County,
State & Zip Code)

**Previous Policy Number:**
ENP0065453

**Policy Period:**   At 12:01 A.M., STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**All coverages except Automobile and / or Garage**
    Policy number: **ENP 006 54 53**          FROM: **03-01-2020**   TO: **03-01-2021**

**Automobile and / or Garage**
    Policy number: **EBA 006 54 53**          FROM: **03-01-2020**   TO: **03-01-2021**

Agency    **CATTO & CATTO LLP 42-018**
City     **SAN ANTONIO, TX**

**Legal Entity / Business Description**

**PARTNERSHIP**

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

FORMS APPLICABLE TO ALL COVERAGE PARTS:
| | | |
|---|---|---|
| IA4514TX | 01/20 | NOTICE TO POLICYHOLDERS - FLOOD DISCLOSURE STATEMENT - TEXAS |
| IL0017 | 11/98 | COMMON POLICY CONDITIONS |
| IA102A | 09/08 | SUMMARY OF PREMIUMS CHARGED |
| IA904 | 04/04 | SCHEDULE OF LOCATIONS |
| IA905 | 02/98 | NAMED INSURED SCHEDULE |
| IA4331TX | 06/16 | TEXAS CHANGES - CANCELLATION AND NONRENEWAL PROVISIONS FOR CASUALTY LINES AND COMMERCIAL PACKAGE POLICIES |
| IL0171 | 09/07 | TEXAS CHANGES - LOSS PAYMENT |
| IA4186TX | 02/99 | TEXAS NOTICE TO POLICYHOLDERS |
| IA4236 | 01/15 | POLICYHOLDER NOTICE TERRORISM INSURANCE COVERAGE |
| IA4344TX | 10/09 | TEXAS NOTICE TO POLICYHOLDERS EXCLUSION - ASBESTOS |
| IA4427 | 02/13 | NOTICE OF LOSS CONTROL SERVICES |
| IP446 | 08/01 | NOTICE TO POLICYHOLDERS |
| IA4006 | 07/10 | SPECIAL PER OCCURRENCE DEDUCTIBLE ENDORSEMENT |
| IA4238 | 01/15 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| IA4332TX | 08/16 | TEXAS IMPORTANT NOTICE |
| IA4338 | 05/11 | SIGNATURE ENDORSEMENT |
| IL0168 | 05/02 | TEXAS CHANGES - DUTIES |
| FMD502 | 07/08 | COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS |
| GAD531 | 07/08 | CLAIMS-MADE EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM DECLARATIONS |

FORMS APPLICABLE TO ALL COVERAGE PARTS:

| | | |
|---|---|---|
| CAD519XCP | 03/09 | CINCIPLUS® CRIME XC+® (EXPANDED COVERAGE PLUS) COVERAGE PART DECLARATIONS |
| CAD516 | 03/09 | CRIME AND FIDELITY COVERAGE PART DECLARATIONS (COMMERCIAL ENTITIES) |
| AAD505 | 03/06 | BUSINESS AUTO COVERAGE PART DECLARATIONS |
| XSD504 | 05/10 | EXCESS LIABILITY COVERAGE PART DECLARATIONS |
| HC502 | 01/18 | CINCINNATI DATA DEFENDER™ COVERAGE PART DECLARATIONS |
| HC503 | 01/18 | CINCINNATI NETWORK DEFENDER™ COVERAGE PART DECLARATIONS |

02-14-2020 16:22

Countersigned _____ By _____
                          (Date)                                      (Authorized Representative)

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections and Surveys**

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

**F. Transfer of Your Rights and Duties Under this Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1998

# SUMMARY OF PREMIUMS CHARGED

Attached to and forming part of
POLICY NUMBER:  **ENP 006 54 53 / EBA 006 54 53**          Effective Date:  **03-01-2020**

Named Insured:  **MD BEVCO INC DBA MAD DOGS SAN ANTONIO**

## THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED

| | |
|---|---|
| Commercial Property Coverage Part | $  22,108 |
| Commercial General Liability Coverage Part | $ |
| Commercial Auto Coverage Part | $  9,782 |
| Commercial Umbrella / Excess Liability Coverage Part | $  12,403 |
| DATA DEFENDER COVERAGE PART | $  143 |
| NETWORK DEFENDER COVERAGE PART | $  187 |
| CRIME AND FIDELITY COVERAGE PART | $  2,205 |
| CRIME EXPANDED COVERAGE PLUS | $  156 |
| EMPLOYMENT PRACTICES LIABILITY | $  5,535 |
| **TX MOTOR VEHICLE CRIME PREVENTION FEE | $  12 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| Terrorism Coverage | $  342 |
| Installment Charge | $ |
| ANNUAL TOTAL | $  52,861 |

PAYMENTS
**NOT INCLUDED IN ANNUAL TOTAL. SEE FIRST INSTALLMENT.

| | First Installment | Remaining Installment(s) |
|---|---|---|
| ANNUAL | 52,873 | |

Automobile Coverages, Employers Liability, Employment Practices Liability Coverage, Professional Liability Coverage, Terrorism Coverage and / or Wrongful Acts Coverage, if included in the policy, are subject to Annual Adjustment of rates and premium on each anniversary of the policy.

Commercial Umbrella and Excess Liability, if included in the policy, may be subject to Annual Adjustment of premium on each anniversary. Refer to the Commercial Umbrella or Excess Liability Coverage Part Declarations form to see if this is applicable.

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

IA 102 A 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SCHEDULE OF LOCATIONS

| LOC. | STREET ADDRESS | CITY | STATE | ZIP CODE |
|------|----------------|------|-------|----------|
| 1 | 123 LOSOYA ST<br>STE 19<br>SAN ANTONIO, TX 78205-2607 | | | |
| 2 | 4714 SHAVANO OAK<br>SAN ANTONIO, TX 78249-4032 | | | |
| 3 | 126 LOSOYA ST<br>SAN ANTONIO, TX 78205-2608 | | | |
| 4 | 123 LOSOYA ST STE 7<br>SAN ANTONIO, TX 78205-2678 | | | |
| 5 | 420 E HOUSTON ST<br>SAN ANTONIO, TX 78205-2616 | | | |

IA 904 04 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NAMED INSURED SCHEDULE

This Schedule supplements the Declarations.

**SCHEDULE**

Named Insured:

```
MD BEVCO INC DBA MAD DOGS SAN ANTONIO
MD MANAGE CO INC
MD PROPERTY CO LLC
MD FRANCHISE CO LLC
CATHAY CALEDONIAN INC
GENERAL PARTNER FOR CALEDONIAN PACIFIC LTD
GENERAL PARTNER FOR TEXAS CALEDONIAN LTD
MD RIVERWALK LLC
CRAZY SAM'S SEAFOOD INC DBA BIER GARTEN
MD SPORTS PUB INC
TICKET SPORTS PUBS, INC. DBA MADDY MCMURPHY'S
MD RIVERWALK LLC DBA ON THE BEND
```

IA 905 02 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES - CANCELLATION
# AND NONRENEWAL PROVISIONS FOR
# CASUALTY LINES AND
# COMMERCIAL PACKAGE POLICIES

This endorsement modifies insurance provided under the following Monoline Policy:

**CHEMICAL DRIFT LIMITED LIABILITY COVERAGE PART
CINCINNATI CYBER DEFENSE™ COVERAGE PART
CINCINNATI DATA DEFENDER™ COVERAGE PART
CINCINNATI NETWORK DEFENDER™ COVERAGE PART
CLAIMS-MADE EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL UMBRELLA LIABILITY COVERAGE PART
CONTRACTOR'S ERRORS AND OMISSIONS COVERAGE PART CLAIMS-MADE
CONTRACTOR'S LIMITED POLLUTION LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
EXCESS LIABILITY COVERAGE PART
FARM COVERAGE PART - FARM LIABILITY COVERAGE FORM
GOLF COURSE CHEMICAL APPLICATION LIMITED LIABILITY COVERAGE PART
HOLE-IN-ONE COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART (NON-MEDICAL)
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART
PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

This endorsement also modifies insurance provided under the following when written as part of a Commercial Package Policy:

**CHEMICAL DRIFT LIMITED LIABILITY COVERAGE PART
CLAIMS-MADE EXCESS LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL OUTPUT COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL UMBRELLA LIABILITY COVERAGE PART
CONTRACTOR'S ERRORS AND OMISSIONS COVERAGE PART CLAIMS-MADE
CONTRACTOR'S LIMITED POLLUTION LIABILITY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
EXCESS LIABILITY COVERAGE PART
FARM COVERAGE PART
GOLF COURSE CHEMICAL APPLICATION LIMITED LIABILITY COVERAGE PART
HOLE-IN-ONE COVERAGE PART
INTERNET LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MACHINERY AND EQUIPMENT COVERAGE PART
POLLUTION LIABILITY COVERAGE PART**

**PRODUCT WITHDRAWAL COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**
**PROFESSIONAL LIABILITY COVERAGE PART (NON-MEDICAL)**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**A.** Paragraph **2.** of the **CANCELLATION** contained in **IL 00 17 Common Policy Conditions** is replaced by the following:

**2.** We may cancel this policy:

**a.** By mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least 10 days before the effective date of cancellation.

However, if this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then the notice of cancellation, as described above, will be provided to the First Named Insured 30 days before the effective date of cancellation. We will also provide 30 days' written notice to each unit-owner to whom we issued a certificate or memorandum of insurance, by mailing or delivering the notice to each last mailing address known to us.

**b.** For the following reasons, if this policy does not provide coverage to a governmental unit as defined under 28 TEX. ADMIN. CODE. Section 5.7001 or on one-and two-family dwellings:

The permissible reasons for cancellation are as follows:

**(1)** If this policy has been in effect for 60 days or less, we may cancel for any reason except, that under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**(2)** If this policy has been in effect for more than 60 days, or if it is a renewal, we may cancel only for one or more of the following reasons:

**(a)** Fraud in obtaining coverage;

**(b)** Failure to pay premiums when due;

**(c)** An increase in hazard within the control of the insured which would produce an increase in rate;

**(d)** Loss of our reinsurance covering all or part of the risk covered by the policy; or

**(e)** If we have been placed in supervision, conservatorship or receivership and the cancellation is approved or directed by the supervisor, conservator or receiver.

**c.** For the following reason, if this policy provides coverage to a governmental unit as defined under 28 TEX ADMIN. CODE Section 5.7001 or on one- and two-family dwellings:

**(1)** If this policy has been in effect for less than 90 days, we may cancel coverage for any reason.

**(2)** If this policy has been in effect for 90 days or more, or if it is a renewal, we may cancel coverage only for the following reasons:

**(a)** If the first named insured does not pay the premium or any portion of the premium when due;

**(b)** If the Texas Department of Insurance determines that continuation of this policy would result in violation of the Texas Insurance Code or any other law governing the business of insurance in Texas;

**(c)** If the Named Insured submits a fraudulent claim; or

**(d)** If there is an increase in the hazard within the control of the named insured which would produce an increase in rate.

**B.** The following condition is added and supersedes any provision to the contrary:

**NONRENEWAL**

**1.** We may elect not to renew this policy except, that under the provisions of the Texas Insurance Code, we may not refuse to

Includes copyrighted material of ISO
Properties, Inc., with its permission.

renew this policy solely because the policyholder is an elected official.

2.  This Paragraph, **2.**, applies unless the policy qualifies under Paragraph **3.** below.

    If we elect not to renew this policy, we may do so by mailing or delivering to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal, stating the reason for nonrenewal, at least 60 days before the expiration date. If notice is mailed or delivered less than 60 days before:

    **a.**  The expiration date of this policy; or

    **b.**  The anniversary date of this policy, if the policy is written for a term of more than one year.

        If notice is mailed or delivered less than 60 days before the expiration or anniversary date, this policy will remain in effect until the 61st day after the date on which the notice is mailed or delivered. Earned premium for any period of coverage that extends beyond the expiration or anniversary date will be computed pro rata based on the previous year's premium.

3.  If this policy covers a condominium association, and the condominium property contains at least one residence or the condominium declarations conform with the Texas Uniform Condominium Act, then we will mail or deliver written notice of nonrenewal, at least 30 days before the expiration or anniversary date of the policy, to:

    **a.**  The first Named Insured; and

    **b.**  Each unit-owner to whom we issued a certificate or memorandum of insurance.

    We will mail or deliver such notice to each last mailing address known to us.

4.  If notice is mailed, proof of mailing will be sufficient proof of notice.

5.  The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

Includes copyrighted material of ISO Properties, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES - LOSS PAYMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL INLAND MARINE COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**
**EQUIPMENT BREAKDOWN COVERAGE PART**

**A. LOSS PAYMENT**

1. With respect to the Crime And Fidelity Coverage Part and Equipment Breakdown Coverage Part, the following conditions are added.

2. With respect to the COMMERCIAL INLAND MARINE COVERAGE PART, the following conditions replace Item **E.** LOSS PAYMENT in the Commercial Inland Marine Loss Conditions:

   **a. Claims Handling**

   (1) Within 15 days after we receive written notice of claim, we will:

      (a) Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment.

      (b) Begin any investigation of the claim; and

      (c) Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

   (2) We will notify you in writing as to whether:

      (a) The claim or part of the claim we will be paid;

      (b) The claim or part of the claim has been denied, and inform you of the reasons of denial;

      (c) More information is necessary; or

      (d) We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

   We will provide notification, as described in **(2)(a)** through **(2)(d)** above, within:

      (i) 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

      (ii) 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

   If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

   **b.** We will pay for covered loss or damage within 5 business days after:

      (1) We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

      (2) An appraisal award has been made.

   However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this policy, we will make payment within 5 business days after the date you have complied with such terms.

   **c. Catastrophe Claims**

   If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **a.**

© ISO Properties, Inc., 2001

and **b.** above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which is:

**(1)** Declared a disaster under the Texas Disaster Act of 1975; or

**(2)** Determined to be a catastrophe by the State Board of Insurance.

**d.** The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**B.** With respect to the Commercial Inland Marine Coverage Part the following is added:

We will not be liable for any part of a "loss" that has been paid or made good by others.

# TEXAS
# NOTICE TO POLICYHOLDERS

**The Cincinnati Insurance Companies can provide loss control services to your organization at no additional charge.  It is our goal to provide loss control services as a value added service to your insurance investment.  If you wish to utilize our services or have questions about the types of services we offer, please contact us at (513) 870-2731.**

# POLICYHOLDER NOTICE
# TERRORISM INSURANCE COVERAGE

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

Your policy may contain coverage for certain losses caused by terrorism.

**Premium:**

In accordance with the federal Terrorism Risk Insurance Act, we are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

- Refer to the SUMMARY OF PREMIUMS CHARGED or DECLARATIONS PAGE for the portion of your premium that is attributable to coverage for terrorist acts certified under the Act.

**Federal Participation:**

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

- Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the federal share equals a percentage, as specified in the Schedule below, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

- **Schedule:**

| Federal Share of Terrorism Losses | |
|---|---|
| Percentage | Calendar Year |
| 85% | 2015 |
| 84% | 2016 |
| 83% | 2017 |
| 82% | 2018 |
| 81% | 2019 |
| 80% | 2020 |

**Cap on Insurer Participation:**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**NOTE:** **IF YOUR POLICY IS A RENEWAL POLICY, THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER TO RENEW THE POLICY AND (2) AT THE TIME THE RENEWAL IS COMPLETED.**

**IA 4236 01 15**

# TEXAS NOTICE TO POLICYHOLDERS
# EXCLUSION - ASBESTOS

This Notice does **not** form a part of your insurance contract. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply. Please read your policy, and the endorsements attached to your policy, carefully.

This notice applies to the asbestos exclusion endorsement included in the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PARTS**
**COMMERCIAL UMBRELLA COVERAGE PARTS**
**EXCESS LIABILITY COVERAGE PARTS**
**FARM LIABILITY**
**GARAGE COVERAGE FORM**
**INLAND MARINE COVERAGE PARTS**

Your policy contains an exclusion for liability arising out of, attributable to or in any way related to asbestos.

**IA 4344 TX 10 09**

# NOTICE OF LOSS CONTROL SERVICES

The Cincinnati Insurance Companies provide certain loss prevention services to policyholders at no additional cost. These services are designed to prevent or reduce the impact of potential loss causing events or conditions related to the type(s) of insurance coverage you have purchased from us. One of these services that you can receive is described below:

Employment Practices Liability (EPL) Toll-Free Hot Line

Have a question on how to handle an employment situation? Simply call The Cincinnati Insurance Companies Employment Connection at 1-888-811-3427 for assistance. We offer policyholders an unlimited number of calls seeking advice on employment policies and procedures.

The services provided are advisory in nature. While this program is offered as a resource in developing or maintaining a loss prevention program, you should consult competent legal counsel to design and implement your own program. No liability is assumed by reason of the services, access or information provided. All services are subject to change without notice. Use of the EPL Toll-Free Hot Line will not be deemed to satisfy any notice of claim or notice of wrongful act provision contained in any policy.

**IA 4427 02 13**

# THE **CINCINNATI INSURANCE COMPANY**
# THE **CINCINNATI CASUALTY COMPANY**
# THE **CINCINNATI INDEMNITY COMPANY**

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company.  The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

**IP 446 08 01**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPECIAL PER OCCURRENCE DEDUCTIBLE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**

**A. Special Per Occurrence Deductible**

**1.** If an "occurrence" happens to Covered Property under the Commercial Property Coverage Part and to Covered Property under at least one of the following:

**a.** The Commercial Inland Marine Coverage Part, and

**b.** The Crime and Fidelity Coverage Part;

the most we will deduct from any loss or damage in any one "occurrence" is the deductible indicated on the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS.**

**2.** This endorsement does not apply to any of the forms listed in Paragraphs **a.** and **b.:**

**a.** * Electronic Data Processing Coverage Form, Section III, 2. Deductible, a.(2) Specified Losses Deductible

* Water Backup from Sewers, Drains, Septic Systems or Sump Pumps Endorsement

Windstorm or Hail Percentage Deductible Form

Earthquake and Volcanic Eruption Endorsement

Earthquake and Volcanic Eruption Endorsement (Sub-Limit Form)

Flood Coverage Endorsement

Equipment Breakdown Coverage (Including Production Equipment)

Equipment Breakdown Coverage (Excluding Production Equipment)

* Temperature Change Coverage Form

Commercial Crime Coverage Form, A. Insuring Agreements, 1. Employee Theft, 2. Forgery or Alteration, 6. Computer Fraud and 7. Funds Transfer Fraud

Crime Expanded Coverage (XC®) Coverage or Expanded Coverage Plus Forms, A. Insuring Agreements, 1. Employee Theft and 2. Forgery or Alteration

Government Crime Coverage Form, A. Insuring Agreements, 1. Employee Theft - Per Loss Coverage, 2. Employee Theft - Per Employee Coverage, 3. Forgery or Alteration, 7. Computer Fraud and 8. Funds Transfer Fraud

\* Or such coverage as provided in the CinciPlus® Commercial Property or Commercial Property Power Expanded Coverage or Expanded Coverage Plus Forms

**b.** ☒ **Other**   WINDSTORM OR HAIL DOLLAR DEDUCTIBLE

**B.   Definition**

For the purpose of this endorsement only, any definition of "occurrence" is deleted in its entirety and the following definition is added to:

1. **COMMERCIAL PROPERTY CONDITIONS,**
2. **COMMERCIAL INLAND MARINE CONDITIONS,**
3. **COMMERCIAL CRIME COVERAGE FORM,**
4. **CRIME EXPANDED COVERAGE (XC®) COVERAGE FORM, and**
5. **GOVERNMENT CRIME COVERAGE FORM:**

**"Occurrence"** means all loss, damage, or a sequence of loss or damage, casualties or disasters arising from a single happening or event.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**All Commercial Lines Coverage Parts, Coverage Forms, Policies and Endorsements subject to the federal Terrorism Risk Insurance Act and any amendments and extensions thereto**

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** **Cap On Losses from Certified Acts of Terrorism**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that ex-

ceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C.** **Application of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability, omission or absence of a terrorism exclusion, does not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part, Coverage Form, Policy or Endorsement such as losses excluded by:

**1.** Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination;

**2.** Exclusions that address pollutants, contamination, deterioration, fungi or bacteria; or

**3.** Any other exclusion,

regardless if the "certified act of terrorism" contributes concurrently or in any sequence to the loss.

**D.** **Sunset Clause**

If the federal Terrorism Risk Insurance Act expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.

Includes copyrighted material of ISO Properties, Inc. and American Association of Insurance Services, with their permission.

IA 4238 01 15

# TEXAS IMPORTANT NOTICE

To obtain information or make a complaint:

You may call our toll-free telephone number for information or to make a complaint at:

**1-800-635-7521**

You may also write to us at:

| | | |
|---|---|---|
| The Cincinnati Insurance Companies | or | The Cincinnati Insurance Companies |
| 6200 South Gilmore Road | | P.O. Box 145496 |
| Fairfield, Ohio 45014 - 5141 | | Cincinnati, Ohio 45250-5496 |

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may write the Texas Department of Insurance:

P.O. Box 149104
Austin, TX 78714-9104
FAX# (512) 490-1007
Web: http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

**IA 4332 TX 08 16**

# SIGNATURE ENDORSEMENT

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield, Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of ours. The failure to countersign does not void coverage in Arizona, Virginia and Wisconsin.

Secretary                                                    President

The signature on any form, endorsement, policy, declarations, jacket or application other than the signature of the President or Secretary named above is deleted and replaced by the above signatures.

IA 4338 05 11

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES - DUTIES

This endorsement modifies insurance provided under the following:

      **COMMERCIAL GENERAL LIABILITY COVERAGE PART**
      **EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART**
      **FARM COVERAGE PART**
      **LIQUOR LIABILITY COVERAGE PART**
      **OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART**
      **POLLUTION LIABILITY COVERAGE PART**
      **PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**
      **PROFESSIONAL LIABILITY COVERAGE PART**
      **RAILROAD PROTECTIVE LIABILITY COVERAGE PART**

The following is added to the **Duties** Condition.

We will notify the first Named Insured in writing of:

1. An initial offer to compromise or settle a claim made or "suit" brought against any insured under this coverage.  The notice will be given not later than the 10th day after the date on which the offer is made.

2. Any settlement of a claim made or "suit" brought against the insured under this coverage.  The notice will be given not later than the 30th day after the date of the settlement.

© ISO Properties, Inc., 2001

# THE CINCINNATI INDEMNITY COMPANY

### A Stock Insurance Company

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

Attached to and forming part of POLICY NUMBER:   **ENP 006 54 53**

Named Insured is the same as it appears on the Common Policy Declarations unless otherwise stated here.

**Loc.**   **(address)**
REFER TO IA904

|  | | | | | OPTIONAL COVERAGES — Applicable only when an entry is made | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | COVERAGE PROVIDED | | | | | | | Business Income Indemnity | | | |
| Item | Coverage | Limits | Coin-surance | Covered Cause Of Loss | Inflation Guard (%) | Replace-ment Cost (x) | Replace-ment Cost Incl. Stock (x) | Agreed Value (x) | Monthly Limit (fraction) | Maximum Period (X) | Extended Period (Days) |
| 1-1 | BUSINESS PERSONAL PROPERTY INCLUDING IMPROVEMENTS AND BETTERMENTS | 2,550,000 | 80% | SPECIAL | | | X | | | | |
| 1-1 | BUSINESS INCOME W/EXTRA EXPENSE (b) | 12 MONTHS ALS SEE FA242 | | SPECIAL | | | | | | | |
| 2-1 | BUILDING | 398,820 | 80% | SPECIAL | | X | | | | | |
| 2-1 | BUSINESS PERSONAL PROPERTY INCLUDING IMPROVEMENTS AND BETTERMENTS | 153,000 | 80% | SPECIAL | | | X | | | | |
| 2-2 | BUILDING | 255,000 | 80% | SPECIAL | | X | | | | | |
| 2-2 | BUSINESS PERSONAL PROPERTY INCLUDING IMPROVEMENTS AND BETTERMENTS | 102,000 | 80% | SPECIAL | | | X | | | | |
| 3-1 | BUSINESS PERSONAL PROPERTY INCLUDING IMPROVEMENTS AND BETTERMENTS | 357,000 | 80% | SPECIAL | | | X | | | | |
| 3-1 | BUSINESS INCOME W/EXTRA EXPENSE (b) | 12 MONTHS ALS SEE FA242 | | SPECIAL | | | | | | | |
| 4-1 | BUSINESS PERSONAL PROPERTY INCLUDING IMPROVEMENTS AND BETTERMENTS | 204,000 | 80% | SPECIAL | | | X | | | | |
| 4-1 | BUSINESS INCOME W/EXTRA EXPENSE (b) | 12 MONTHS ALS SEE FA242 | | SPECIAL | | | | | | | |

```
5-1    BUSINESS PERSONAL        306,000  80%  SPECIAL              X
       PROPERTY INCLUDING
       IMPROVEMENTS AND
       BETTERMENTS


5-1    BUSINESS INCOME       12 MONTHS ALS       SPECIAL
       W/EXTRA EXPENSE (b)     SEE FA242
```

DEDUCTIBLE: $500.00 unless otherwise stated $    2,500

MORTGAGE HOLDER

Item               Name and Address

FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:

```
FM101    05/16  BUILDING AND PERSONAL PROPERTY COVERAGE FORM (INCLUDING SPECIAL CAUSES
                OF LOSS)
CP0142   09/10  TEXAS CHANGES
FA242    10/12  ACTUAL LOSS SUSTAINED BUSINESS INCOME ENDORSEMENT
FA4098   01/09  CINCIPLUS® COMMERCIAL PROPERTY POWER XC+® (EXPANDED COVERAGE PLUS)
                ENDORSEMENT SUMMARY OF COVERAGE LIMITS
FA4144   05/16  WINDSTORM OR HAIL DOLLAR DEDUCTIBLE
FA450    05/16  COMMERCIAL PROPERTY CONDITIONS
FA458    04/04  BUSINESS INCOME CHANGES - WAITING PERIOD
FA480    02/16  LOSS PAYABLE PROVISIONS
FA258    05/16  CINCIPLUS® COMMERCIAL PROPERTY POWER XC+® (EXPANDED COVERAGE PLUS)
                ENDORSEMENT
FA213    05/16  BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM
```

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM (INCLUDING SPECIAL CAUSES OF LOSS)

## TABLE OF CONTENTS

Begins on Page

SECTION A. COVERAGE ............................................................................................3
1. Covered Property ..........................................................................................3
    a. Building ...............................................................................................3
    b. Outdoor Signs ....................................................................................3
    c. Outdoor Fences .................................................................................3
    d. Business Personal Property................................................................3
2. Property Not Covered ...................................................................................4
    a. Accounts, Deeds, Money or Securities ..............................................4
    b. Animals...............................................................................................4
    c. Automobiles........................................................................................4
    d. Contraband.........................................................................................4
    e. Electronic Data...................................................................................4
    f. Excavations, Grading & Backfilling....................................................4
    g. Foundations ........................................................................................4
    h. Land, Water or Growing Crops ..........................................................4
    i. Paved Surfaces ..................................................................................4
    j. Property While Airborne or Waterborne .............................................4
    k. Pilings or Piers...................................................................................4
    l. Property More Specifically Insured ....................................................4
    m. Retaining Walls ..................................................................................4
    n. Underground Pipes, Flues or Drains..................................................4
    o. Valuable Papers & Records and Cost to Research.............................5
    p. Vehicles or Self-Propelled Machines..................................................5
    q. Property While Outside of Buildings....................................................5
3. Covered Causes of Loss ..............................................................................5
    a. Covered Causes of Loss....................................................................5
    b. Exclusions..........................................................................................5
    c. Limitations........................................................................................11
4. Additional Coverages .................................................................................13
    a. Change in Temperature or Humidity ................................................13
    b. Debris Removal................................................................................13
    c. Fire Department Service Charge.......................................................14
    d. Fire Protection Equipment Recharge ................................................14
    e. Inventory or Appraisal ......................................................................14
    f. Key and Lock Expense .....................................................................15
    g. Ordinance or Law .............................................................................15
    h. Pollutant Clean Up and Removal .....................................................16
    i. Preservation of Property...................................................................16
    j. Rewards............................................................................................16

# TABLE OF CONTENTS (CONT'D)

**Begins on Page**

5.  **Coverage Extensions** ......................................................................................................16
    a.  Accounts Receivable....................................................................................17
    b.  Business Income and Extra Expense.............................................................18
    c.  Collapse.....................................................................................................21
    d.  Electronic Data..........................................................................................22
    e.  Exhibitions, Fairs or Trade Shows.................................................................23
    f.  Fences .......................................................................................................23
    g.  Fungi, Wet Rot, Dry Rot, and Bacteria - Limited Coverage..............................23
    h.  Glass.........................................................................................................24
    i.  Newly Purchased, Leased or Constructed Property.........................................25
    j.  Nonowned Building Damage.........................................................................26
    k.  Outdoor Property........................................................................................26
    l.  Personal Effects..........................................................................................26
    m.  Property Off Premises..................................................................................27
    n.  Signs.........................................................................................................27
    o.  Trailers (Nonowned Detached).....................................................................27
    p.  Transportation............................................................................................27
    q.  Utility Services...........................................................................................27
    r.  Valuable Papers and Records.......................................................................28
    s.  Water Damage, Other Liquids, Powder or Molten Material Damage...................29
**SECTION B. LIMITS OF INSURANCE**...................................................................................29
**SECTION C. DEDUCTIBLE**...............................................................................................29
  1.  Deductible Examples........................................................................................30
  2.  Glass Deductible..............................................................................................30
**SECTION D. LOSS CONDITIONS**.......................................................................................30
  1.  Abandonment...................................................................................................30
  2.  Appraisal........................................................................................................30
  3.  Duties in the Event of Loss or Damage ..............................................................30
  4.  Loss Payment..................................................................................................31
  5.  Recovered Property..........................................................................................34
  6.  Vacancy..........................................................................................................34
    a.  Description of Terms...................................................................................34
    b.  Vacancy Provisions.....................................................................................34
  7.  Valuation........................................................................................................34
**SECTION E. ADDITIONAL CONDITIONS**.............................................................................35
  1.  Coinsurance....................................................................................................35
  2.  Mortgage Holders ...........................................................................................36
**SECTION F. OPTIONAL COVERAGES**.................................................................................36
  1.  Agreed Value...................................................................................................37
  2.  Inflation Guard................................................................................................37
  3.  Replacement Cost............................................................................................37
**SECTION G. DEFINITIONS**...............................................................................................38

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM
# (INCLUDING SPECIAL CAUSES OF LOSS)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION G. DEFINITIONS.**

## SECTION A. COVERAGE

We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

1. **Covered Property**

   Covered Property, as used in this Coverage Part, means the following types of property for which a Limit of Insurance is shown in the Declarations:

   a. **Building**

      Building, means the building or structure described in the Declarations, including:

      (1) Completed additions;

      (2) Fixtures, including outdoor fixtures;

      (3) Permanently installed:

         (a) Machinery and equipment;

         (b) Building glass, including any lettering and ornamentation;

         (c) Signs attached to a building or structure that is Covered Property;

         (d) Awnings and canopies;

      (4) Personal property owned by you that is used to maintain or service a covered building or its "premises", including:

         (a) Fire extinguishing equipment;

         (b) Outdoor furniture;

         (c) Floor coverings; and

         (d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

      (5) If not covered by other insurance:

         (a) Additions under construction, alterations and repairs to a covered building;

         (b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the "premises", used for making additions, alterations or repairs to a covered building.

   b. **Outdoor Signs**

      Your outdoor signs permanently installed and not attached to a covered building, and located within 1,000 feet of the "premises".

   c. **Outdoor Fences**

      Your outdoor fences.

   d. **Business Personal Property**

      Your Business Personal Property consists of the following property located in or on the building or structure described in the Declarations or in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater. Your Business Personal Property consists of the following unless otherwise specified in the Declarations or on the **BUSINESS PERSONAL PROPERTY - SEPARATION OF COVERAGE ENDORSEMENT.**

      (1) Furniture;

      (2) Machinery and equipment;

      (3) "Stock";

      (4) All other personal property owned by you and used in your business;

      (5) The cost of labor, materials or services furnished or arranged by you on personal property of others;

      (6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

         (a) Made a part of the building or structure you occupy but do not own; and

         (b) You acquired or made at your expense but cannot legally remove;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(7) Leased personal property used in your business for which you have a contractual responsibility to insure. Such leased property is not considered personal property of others in your care, custody or control;

(8) Personal Property of Others that is in your care, custody or control or for which you are legally liable.

    (a) This does not include personal effects owned by you, your officers, your partners, or if you are a limited liability company, your members or your managers, or your employees (including leased and temporary workers), except as provided in **5. Coverage Extensions, l. Personal Effects**;

    (b) This does not include property of others for which you are legally liable as:

        1) A carrier for hire; or

        2) An arranger of transportation, including car loaders, consolidators, brokers, freight forwarders, or shipping associations; and

(9) Sales samples.

**2. Property Not Covered**

Covered Property does not include:

**a. Accounts, Deeds, Money or Securities**

Except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, a. Accounts Receivable,** Accounts, bills, currency, deeds, food stamps or other evidences of debt, "money", notes or "securities";

**b. Animals**

Animals, unless

(1) Owned by others and boarded by you; or

(2) Owned by you and covered as "stock" while inside of buildings;

and then only as provided in **3. Covered Causes of Loss, c. Limitations**.

**c. Automobiles**

Automobiles held for sale;

**d. Contraband**

Contraband, or property in the course of illegal transportation or trade;

**e. Electronic Data**

Except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, d. Electronic Data,** "Electronic data". This Paragraph **e.** does not apply to your "stock" of prepackaged software or to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**f. Excavations, Grading & Backfilling**

The cost of excavations, grading, backfilling or filling;

**g. Foundations**

Foundations of buildings, structures, machinery or boilers, if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement.

**h. Land, Water or Growing Crops**

Land (including land on which the property is located), water, growing crops or lawns (other than lawns which are part of a vegetative roof);

**i. Paved Surfaces**

Bridges, roadways, walks, patios or other paved surfaces;

**j. Property While Airborne or Waterborne**

Personal property while airborne or waterborne;

**k. Pilings or Piers**

Pilings, piers, bulkheads, wharves or docks;

**l. Property More Specifically Insured**

Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except as provided in **G. Other Insurance** of the **COMMERCIAL PROPERTY CONDITIONS**;

**m. Retaining Walls**

Retaining walls that are not part of any building described in the Declarations;

**n. Underground Pipes, Flues or Drains**

Underground pipes, flues or drains;

o.  **Valuable Papers & Records and Cost to Research**

Except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, r. Valuable Papers and Records,** the cost to research, replace or restore the information on "valuable papers and records", including those which exist as "electronic data".

This does not apply to "valuable papers and records" held for sale by you.

p.  **Vehicles or Self-Propelled Machines**

Vehicles or self-propelled machines (including aircraft or watercraft) that:

(1)  Are licensed for use on public roads; or

(2)  Are operated principally away from the "premises".

This paragraph does not apply to:

(1)  Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

(2)  Vehicles or self-propelled machines, other than autos, you hold for sale;

(3)  Rowboats or canoes out of water and located at the "premises"; or

(4)  Trailers, but only as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, o. Trailers (Nonowned Detached).**

q.  **Property While Outside of Buildings**

The following property while outside of buildings (except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions**):

(1)  Grain, hay, straw or other crops;

(2)  Signs, except:

(a)  Signs attached to a covered building or structure;

(b)  Signs for which a Limit of Insurance is shown in the Declarations.

(3)  Outdoor fences, except outdoor fences for which a Limit of Insurance is shown in the Declarations;

(4)  Radio antennas, television antennas or satellite dishes; including their lead-in wiring, masts, and towers; and

(5)  Trees, shrubs or plants (other than trees, shrubs or plants that are "stock" or part of a vegetative roof).

3.  **Covered Causes of Loss**

a.  **Covered Causes of Loss**

Covered Causes of Loss means direct "loss" unless the "loss" is excluded or limited in this Coverage Part.

b.  **Exclusions**

(1)  We will not pay for "loss" caused directly or indirectly by any of the following, unless otherwise provided. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

(a)  **Ordinance or Law**

Except as provided in **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law,** the enforcement of or compliance with any ordinance or law:

1)  Regulating the construction, use or repair of any building or structure; or

2)  Requiring the tearing down of any building or structure, including the cost of removing its debris.

This exclusion applies whether "loss" results from:

1)  An ordinance or law that is enforced even if the building or structure has not been damaged; or

2)  The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of any building or structure, or removal of its debris, following a direct "loss" to that building or structure.

(b)  **Earth Movement**

1)  Earthquake, including tremors and aftershocks and any earth sinking, rising or shifting related to such event;

2)  Landslide, including any earth sinking, rising or shifting related to such event;

**3)** Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

**4)** Earth sinking (other than "sinkhole collapse"), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

But if Earth Movement, as described in **(b)1)** through **4)** above, results in fire or explosion, we will pay for the "loss" caused by that fire or explosion.

**5)** Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or volcanic action, we will pay for the "loss" caused by that fire, building glass breakage or volcanic action.

Volcanic action means direct "loss" resulting from the eruption of a volcano when the "loss" is caused by:

**a)** Airborne volcanic blast or airborne shock waves;

**b)** Ash, dust or particulate matter; or

**c)** Lava flow.

With respect to coverage for Volcanic Action, all volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct "loss" to the described property.

This Earth Movement exclusion applies regardless of whether any of the above, in paragraphs **1)** through **5),** is caused by an act of nature or is otherwise caused.

**(c) Governmental Action**

Seizure or destruction of property by order of governmental authority. However, we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

**(d) Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

**(e) Utility Services**

**1)** Except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, q. Utility Services**, the failure of power, communication, water or other utility services supplied to the "premises", however caused, if the failure:

**a)** Originates away from the "premises"; or

**b)** Originates at the "premises", but only if such failure involves equipment used to supply the utility service to the "premises" from a source away from the "premises".

Failure of any utility service includes lack of sufficient capacity and reduction in supply. "Loss" caused by a surge of power is also excluded if the surge would not have occurred but for an event causing the failure of power.

However, if the failure or surge of power, or the failure of communication, water, wastewater removal or other utility service results in a Covered Cause of Loss, we will pay for that portion of "loss" caused by that Covered Cause of Loss.

Communication services include but are not limited to

service relating to Internet access or access to any electronic, cellular or satellite network.

**(f) War and Military Action**

1) War, including undeclared or civil war;

2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**(g) Water**

1) Flood, meaning the partial or complete inundation of normally dry land areas due to:

   a) The unusual or rapid accumulation or runoff of rain or surface waters from any source; or

   b) Waves, tidal waters, tidal waves (including tsunami); or

   c) Water from rivers, ponds, lakes, streams, or any other body of water that rises above, overflows from, or is not contained within its natural or man-made boundary;

   and all whether driven by wind or not, including storm surge.

2) Mudslides or mudflows, which are caused by flooding as defined above in Paragraph **(g)1** above. Mudslide or mudflow involves a river of liquid and flowing mud on the surface of normally dry land areas as when earth is carried by a current of water and deposited along the path of the current;

3) Water that has entered and then backs up through and is discharged from a sewer, drain, septic system, sump pump system or related equipment; or

4) Water under the ground surface pressing on, or flowing or seeping through:

   a) Foundations, walls, floors or paved surfaces;

   b) Basements, whether paved or not; or

   c) Doors, windows or other openings.

5) Waterborne material carried or otherwise moved by any of the water referred to in Paragraphs **(g)1), 3)** or **4),** or material carried or otherwise moved by mudslide or mudflow as described in Paragraph **(g)2).**

This exclusion applies regardless of whether any of the above in Paragraphs **(g)1)** through **(g)5)** is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam, levee, seawall or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

However, if any of the above, as described in Paragraphs **(g)1)** through **(g)5),** results in fire, explosion or sprinkler leakage, we will pay for that portion of "loss" caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss).

**(h) "Fungi", Wet Rot, Dry Rot, and Bacteria**

1) Presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot or bacteria. But if "fungi", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the "loss" caused by that "specified cause of loss".

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**2)** This exclusion does not apply:

    **a)** When "fungi", wet or dry rot or bacteria results from fire or lightning; or

    **b)** To the extent that coverage is provided in **SECTION A. COVERAGE, 5. Coverage Extensions, g. "Fungi", Wet Rot, Dry Rot and Bacteria - Limited Coverage** with respect to "loss" from a cause of loss other than fire or lightning.

Exclusions **b.(1)(a)** through **b.(1)(h)** apply whether or not the "loss" event results in widespread damage or affects a substantial area.

**(2)** We will not pay for "loss" caused by or resulting from any of the following:

**(a) Electrical Current**

Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**1)** Electrical or electronic wire, device, appliance, system or network; or

**2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**1)** Electrical current, including arcing;

**2)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**3)** Pulse of electromagnetic energy; or

**4)** Electromagnetic waves or microwaves.

However, if fire results, we will pay for "loss" caused by that fire.

**(b) Delay or Loss of Use**

Delay, loss of use or loss of market.

**(c) Smoke, Vapor, Gas**

Smoke, vapor or gas from agricultural smudging or industrial operations.

**(d) Miscellaneous Causes of Loss**

**1)** Wear and tear;

**2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**3)** Smog;

**4)** Settling, cracking, shrinking or expansion;

**5)** Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

**6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. However, if mechanical breakdown results in elevator collision, we will pay for that portion of "loss" caused by that elevator collision; or

**7)** The following causes of loss to personal property:

    **a)** Marring or scratching;

    **b)** Except as provided in **SECTION A. COVERAGE, 4. Additional Coverages, a. Change in Temperature or Humidity** and **5. Coverage Extensions, q. Utility Services;**

        **i)** Dampness or dryness of atmosphere; and

        **ii)** Changes in or extremes of temperature.

However, if an excluded cause of loss listed in **(2)(d)1** through **7)** results in a "specified cause of "loss" or building glass breakage, we will pay for that portion of "loss" caused by that "specified cause of loss" or building glass breakage.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(e)  Explosion of Steam Apparatus**

Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. However, if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for that portion of "loss" caused by that fire or combustion explosion. We will also pay for "loss" caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**(f)  Water Seepage**

Continuous or repeated seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor that occurs over a period of 14 days or more.

**(g)  Freezing of Plumbing**

Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protection systems) caused by or resulting from freezing, unless:

**1)**  You did your best to maintain heat in the building or structure; or

**2)**  You drained the equipment and shut off the supply if the heat was not maintained.

**(h)  Dishonest or Criminal Acts**

Dishonest or criminal acts (including theft) by you, any of your partners, members (if a limited liability company), officers, managers, employees (including leased workers or temporary employees) directors, trustees, or authorized representatives; whether acting alone or in collusion with each other or with any other party; or theft by any person to whom you entrust the property for any purpose, whether acting alone or in collusion with any other party.

This exclusion applies whether or not an act occurs during the hours of operation.

This **Dishonest or Criminal Acts** exclusion does not apply to acts of destruction by your employees (including leased workers or temporary employees) or by authorized representatives; except theft by employees (including leased workers or temporary employees) is not covered.

**(i)  Voluntary Parting Under False Pretense**

Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**(j)  Exposure to Weather**

Rain, snow, ice or sleet to personal property in the open.

**(k)  Collapse**

Collapse, including any of the following conditions of property or any part of the property:

**1)**  An abrupt falling down or caving in;

**2)**  Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

**3)**  Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to Paragraph **(k)1)** or **2)** above.

But if collapse results in a Covered Cause of Loss at the "premises", we will pay for "loss" caused by that Covered Cause of Loss.

This exclusion **Collapse** does not apply:

**1)**  To the extent that coverage is provided under the **SECTION A. COVERAGE, 5. Coverage Extensions, c. Collapse**; or

**2)**  To collapse caused by one or more of the following:

Includes copyrighted material of Insurance
Services Office, Inc., with its permission.

    **a)** The "specified causes of loss";

    **b)** Breakage of building glass;

    **c)** Weight of rain that collects on a roof; or

    **d)** Weight of people or personal property.

**(l) Pollutants**

Discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" unless the discharge, dispersal, seepage, migration, release, escape or emission is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" results in a "specified cause of loss", we will pay for the "loss" caused by that "specified cause of loss".

This exclusion does not apply to "loss" to glass caused by chemicals applied to the glass.

**m) Loss or Damage to Product**

We will not pay for "loss" to Covered Property consisting of merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for "loss" caused by that Covered Cause of Loss.

**(n) Neglect**

Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of "loss".

**(3)** We will not pay for "loss" caused by or resulting from any of the following in Paragraphs **(3)(a)** through **(3)(c)**. However, if an excluded cause of loss that is listed in Paragraphs **(3)(a)** through **(3)(c)** results in a Covered Cause of Loss, we will pay for that portion of "loss" caused by that Covered Cause of Loss:

    **(a) Weather Conditions**

    Weather conditions, but this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions, (1)(a)** through **(1)(h)** to produce the "loss".

    **(b) Acts or Decisions**

    Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

    **(c) Defects, Errors, and Omissions**

      **1)** An act, error, or omission (negligent or not) relating to:

        **a)** Land use;

        **b)** Design, specifications, construction, workmanship;

        **c)** Planning, zoning, development, surveying, siting, grading, compaction; or

        **d)** Maintenance, installation, renovation, repair, or remodeling

      of part or all of any property on or off the "premises";

      **2)** A defect, weakness, inadequacy, fault, or unsoundness in materials used in construction or repair of part or all of any property on or off the "premises"; or

      **3)** The cost to make good any error in design.

**(4) Special Exclusions**

The Special Exclusions apply only to **SECTION A. COVERAGE, 5. Coverage Extensions, b. Business Income and Extra Expense**; and if attached to this policy, the following coverage forms: **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM,** and **EXTRA EXPENSE COVERAGE FORM.**

We will not pay for:

**(a)** Any "loss" caused by or resulting from:

**1)** Damage or destruction of "finished stock"; or

**2)** The time required to reproduce "finished stock".

This Exclusion **(4)(a)** does not apply to Extra Expense.

**(b)** Any "loss" caused by or resulting from damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

**(c)** Any increase of "loss" caused by or resulting from:

**1)** Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

**2)** Suspension, lapse or cancellation of any license, lease or contract. However, if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such "loss" that affects your "Business Income" during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period of Indemnity Optional Coverage or any variation of these.

**(d)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(e)** Any other indirect "loss".

**c.** <u>Limitations</u>

The following limitations apply to all policy forms and endorsements shown on the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS**, unless otherwise stated:

**(1) Limitations – Various Types of Property**

We will not pay for "loss" to property as described and limited in this section. In addition, we will not pay for any "loss" that is a consequence of "loss" as described and limited in this section.

**(a) Steam Apparatus**

Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for "loss" to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**(b) Hot Water Boilers**

Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

**(c) Building Interiors**

The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

**1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**2)** The "loss" is caused by or results from thawing of

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

snow, sleet or ice on the building or structure.

**(d) Theft of Building Materials**

Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

However, this limitation does not apply to:

**1)** Building materials and supplies held for sale by you; or

**2)** "Business Income" coverage or Extra Expense coverage.

**(e) Missing Property**

Property that is missing, where the only evidence of the "loss" is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

**(f) Transferred Property**

Property that has been transferred to a person or to a place outside the "premises" on the basis of unauthorized instructions.

**(g) Vegetative Roofs**

Lawns, trees, shrubs or plants which are part of a vegetated roof, caused by or resulting from:

**1)** Dampness or dryness of atmosphere or of soil supporting the vegetation;

**2)** Changes in or extremes of temperature;

**3)** Disease;

**4)** Frost or hail; or

**5)** Rain, snow, ice or sleet.

**(2) Limitations - Various Property for Specified Causes**

We will not pay for "loss" to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

**(a)** Animals, and then only if they are killed or their destruction is deemed necessary.

**(b)** Contractors equipment, machinery and tools owned by you or entrusted to you, provided such property is Covered Property.

However, this limitation does not apply:

**1)** If the property is located on or within 1,000 feet of the "premises"; or

**2)** To Business Income coverage or to Extra Expense coverage.

**(3) Limitation - Personal Property Theft**

This Limitation does not apply to "Business Income" coverage or to Extra Expense coverage. For each category described in Paragraph **c.(3)(a)** through **(3)(d)** below, the most we will pay for "loss" in any one occurrence of theft to all property in that category, regardless of the types or number of articles for that category that are lost or damaged in that occurrence, are the following special limits:

**(a)** $2,500 for Furs, fur garments and garments trimmed with fur.

**(b)** $2,500 for Jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limitation does not apply to jewelry and watches worth $100 or less per item.

**(c)** $2,500 for Patterns, dies, molds and forms.

**(d)** $250 for Stamps, tickets, including lottery tickets held for sale, and letters of credit.

These special limits are not additional Limits of Insurance.

**(4) Limitation - System or Appliance Defects**

**(a)** We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes; and

**(b)** We will not pay to replace the substance that escapes as described in Paragraph **c.(4)(a)** above.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage results in discharge of any substance from an automatic fire protection system, or is directly caused by freezing.

However, this Limitation **c.(4)(a)** does not apply to "Business Income" Coverage or to Extra Expense Coverage.

4. **Additional Coverages**

Unless stated otherwise, **SECTION C. DEDUCTIBLE** does not apply to Paragraph **4. Additional Coverages.**

Unless stated otherwise, these Paragraph **4. Additional Coverages** apply on a per location basis.

a. **Change in Temperature or Humidity**

We will pay for direct "loss" to your covered Business Personal Property caused by a change in temperature or humidity or contamination by refrigerant resulting from damage by a Covered Cause of Loss to equipment used for refrigerating, cooling, humidifying, dehumidifying, air conditioning, heating, generating or converting power (including their connections and supply or transmission lines and pipes) when located on the "premises".

This Coverage is included within the Limits of Insurance shown in the Declarations.

b. **Debris Removal**

(1) Subject to Paragraphs **b.(2)**, **(3)** and **(4)** of this Additional Coverage, we will pay your expense to remove debris of Covered Property and other debris that is on the "premises", when such debris is caused by or results from a Covered Cause of Loss that occurs during the "coverage term". The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct "loss".

(2) Debris Removal does not apply to costs to:

(a) Extract "pollutants" from land or water;

(b) Remove, restore or replace polluted land or water;

(c) Remove debris of property of yours that is not insured under this Coverage Part, or property in your possession that is not Covered Property;

(d) Remove debris of property owned by or leased to the landlord of the building where your "premises" are located, unless you have a contractual responsibility to insure such property and it is insured under this Coverage Part;

(e) Remove any property that is Property Not Covered, including property addressed under **5. Coverage Extensions, k. Outdoor Property**.

(f) Remove property of others of a type that would not be Covered Property under this Coverage Part;

(g) Remove deposits of mud or earth from the grounds of the "premises".

(3) Subject to the exceptions in Paragraph **b.(4)** below, the following provisions apply:

(a) The most we will pay for the total of direct "loss" plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained "loss".

(b) Subject to Paragraph **b.(3)(a)**, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct "loss" to the Covered Property that has sustained "loss".

(4) We will pay up to an additional $10,000 for debris removal expense for each "premises", in any one occurrence of direct "loss" to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct "loss" exceeds the Limit of Insurance on the Covered Property that has sustained "loss".

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct "loss" to the Covered Property that has sustained "loss".

Therefore, if Paragraph **b.(4)(a)** and/or **(4)(b)** apply, our total payment for direct

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

"loss" and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained "loss", plus $10,000.

**(5)** **Examples**

The following examples assume that there is no coinsurance penalty.

**Example #1**

| | |
|---|---|
| Limit of Insurance | $90,000 |
| Amount of Deductible | $500 |
| Amount of "Loss" | $50,000 |
| Amount of "Loss" Payable ($50,000 - $500) | $49,500 |
| Debris Removal Expense | $10,000 |
| Debris Removal Expense Payable ($10,000 is 20% of $50,000) | $10,000 |

The debris removal expense is less than 25% of the sum of the "loss" payable plus the deductible. The sum of the "loss" payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore, the full amount of debris removal expense is payable in accordance with the terms of Paragraph **(3).**

**Example #2**

| | |
|---|---|
| Limit of Insurance | $90,000 |
| Amount of Deductible | $500 |
| Amount of "Loss" | $80,000 |
| Amount of "Loss" Payable ($80,000 - $500) | $79,500 |
| Debris Removal Expense | $30,000 |
| Debris Removal Expense Payable | |
|     Basic Amount | $10,500 |
|     Additional Amount | $10,000 |

The basic amount payable for debris removal expense under the terms of Paragraph **(3)** is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the "loss" payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph **(4),** because the debris removal expense ($30,000) exceeds 25% of the "loss" payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the "loss" payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph **(4).** Thus the total payable for debris removal ex-

pense in this example is $20,500; $9,500 of the debris removal expense is not covered.

**c.** **Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $5,000 in any one occurrence for your liability, which is determined prior to the direct "loss", for fire department service charges:

**(1)** Assumed by contract or agreement; or

**(2)** Required by local ordinance.

Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed. This Coverage is in addition to the Limits of Insurance shown in the Declarations.

**d.** **Fire Protection Equipment Recharge**

**(1)** We will pay for the expenses you incur to recharge your automatic fire suppression system or portable fire extinguishers when the equipment is discharged:

**(a)** To combat a covered fire to which this insurance applies;

**(b)** As a result of another covered Cause of Loss other than fire; or

**(c)** As a result of an accidental discharge.

**(2)** We will not pay your expenses to recharge fire protection equipment as a result of a discharge during testing or installation.

**(3)** If it is less expensive to do so, we will pay your costs to replace your automatic fire suppression system or portable fire extinguishers rather than recharge that equipment.

The most we will pay in any one occurrence under this Additional Coverage is $25,000. This Coverage is in addition to the Limits of Insurance shown in the Declarations.

**e.** **Inventory or Appraisal**

**(1)** We will pay the necessary expenses you incur to prepare claim information as required by this Coverage Part. Expenses must result from:

**(a)** Taking inventories;

**(b)** Making appraisals; and

**(c)** Preparing a statement of loss and other supporting exhibits.

**(2)** We will not pay for any expenses:

**(a)** Incurred to prove that "loss" is covered;

**(b)** Incurred under **SECTION D. LOSS CONDITIONS, 2. Appraisal;**

**(c)** Incurred for examinations under oath;

**(d)** Billed by and payable to independent or public adjusters; or

**(e)** To prepare claims not covered by this Coverage Part.

The most we will pay for any one occurrence under this Additional Coverage is $10,000. This Coverage is in addition to the shown in the Declarations.

**f.** <u>Key and Lock Expense</u>

**(1)** If a key or master key is lost, stolen, or damaged, we will pay for:

**(a)** The actual expense of the new keys; and

**(b)** The adjustment of locks to accept new keys; or

**(c)** If required, new locks, including the expense of their installation;

but only for locks at buildings or structures covered by this Coverage Part.

**(2)** This Coverage does not apply to keys that were given to former employees.

The most we will pay in any one occurrence under this Additional Coverage is Limit of Insurance $1,000. This Coverage is in addition to the Limit of Insurance shown in the Declarations.

**g.** <u>Ordinance or Law</u>

**(1)** If a covered building or structure sustains direct "loss" from a Covered Cause of Loss, resulting in the enforcement of or compliance with an ordinance or law that is in force at the time of "loss" and regulates the demolition, construction or repair of buildings or structures, or establishes zoning or land use requirements at the "premises", then subject to **SECTION D, LOSS CONDITIONS, 4. Loss Payment,** we will pay:

**(a) Loss of Use of Undamaged Parts of Buildings**

The costs you incur to rebuild at the same "premises" any undamaged portion of your building or structure caused by enforcement of or compliance with an ordinance or law requiring demolition of undamaged parts of the same building or structure. We will only pay the costs to satisfy the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered.

**(b) Demolition Costs**

The costs you incur to demolish and clear the site of undamaged parts of the same building or structure as a result of Paragraph **g.(1)(a)** above.

**(c) Increased Costs of Construction**

**1)** For buildings or structures to which **SECTION F. OPTIONAL COVERAGES, 3. Replacement Cost** applies, the increased costs to comply with the minimum standards of an ordinance or law to:

**a)** Repair or reconstruct damaged portions of that building or structure; and

**b)** Reconstruct or remodel undamaged portions of that building or structure whether or not demolition is required;

However, this increased cost of construction applies only if the building or structure is repaired, reconstructed or remodeled and is intended for occupancy similar to the building or structure it replaces, unless such occupancy is not permitted by zoning or land use ordinance or law.

**2)** For this Paragraph **g.(1)(c)** only, the increased costs to repair or reconstruct the following:

**a)** The cost of excavations, grading, backfilling and filling;

**b)** Foundation of the building;

**c)** Pilings;

**d)** Underground pipes, flues and drains.

The items listed in Paragraphs **g.2)a)** through **g.2)d)** above are deleted from **SECTION A. COVERAGE, 2. Property Not Covered**;

**(2)** We will not pay for:

**(a)** Enforcement of or compliance with any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot or bacteria; or

**(b)** The costs associated with the enforcement of or compliance with any ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungi", wet or dry rot or bacteria.

**(3)** We will not pay for "loss" due to any ordinance or law that:

**(a)** You were required to comply with before the "loss", even if the building or structure was undamaged; and

**(b)** With which you failed to comply.

**(4)** The terms of this Additional Coverage apply separately to each building or structure covered by this Coverage Part.

The most we will pay under this Additional Coverage is $10,000 per building. This is in addition to the Limit of Insurance shown in the Declarations for the building suffering "loss".

**h.    Pollutant Clean Up and Removal**

We will pay your expenses to extract "pollutants" from land or water at the "premises" if the discharge, dispersal, seepage, migration, release, escape or emission of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the "coverage term". The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each "premises" is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss during each "coverage term". This Coverage is in addition to the Limit of Insurance shown in the Declarations.

**i.    Preservation of Property**

If it is necessary to move Covered Property from the "premises" to preserve it from imminent "loss" by a Covered Cause of Loss, we will pay for any direct "loss" to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the "loss" occurs within 60 days after the property is first moved.

This Coverage is included within Limit of Insurance shown in the Declarations for such Covered Property.

**j.    Rewards**

We will pay to provide a reward for information that leads to a conviction for arson, theft, vandalism, or burglary. The conviction must involve a covered "loss" caused by arson, theft, vandalism, or burglary.

The most we will pay for "loss" in any one occurrence under this Additional Coverage is $10,000. This Coverage is in addition to the Limit of Insurance shown in the Declarations.

**5.    Coverage Extensions**

Unless amended within a particular Coverage Extension, each Extension applies to property located in or on the building described in the Declarations or in the open (or in a vehicle or portable storage unit) within 1,000 feet of the "premises".

The limits applicable to the Coverage Extensions are in addition to the Limit of Insurance shown in the Property Declarations. Limits of Insurance specified in these Extensions apply per location unless stated otherwise.

**SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance**, does not apply to these Coverage Extensions.

a. <u>Accounts Receivable</u>

**SECTION C. DEDUCTIBLE** does not apply to this Coverage Extension.

(1) When you sustain direct "loss" to your accounts receivable records caused by a Covered Cause of Loss, we will pay:

(a) All amounts due from your customers that you are unable to collect;

(b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by the "loss"; and

(d) Other reasonable expenses that you incur to re-establish your records of accounts receivable.

(2) Coverage does not apply to:

(a) Records of accounts receivable in storage away from the "premises"; or

(b) Contraband, or property in the course of illegal transportation or trade.

(3) We will extend coverage to include:

(a) Removal

If you give us written notice within 30 days of removal of your records of accounts receivable because of imminent danger of direct "loss" from a Covered Cause of Loss, we will pay for "loss" while they are:

1) At a safe place away from your "premises"; or

2) Being taken to and returned from that place.

This Removal coverage is included within the Limit of Insurance applicable to this Coverage Extension.

(b) Away From Your Premises

The most we will pay in any one occurrence is $5,000, regardless of the number of locations, for "loss" caused by a Covered Cause of Loss to Accounts Receivable while they are away from your "premises".

This Away From Premises Limit is in addition to the Limit of Insurance applicable to this Coverage Extension.

(4) **SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions** does not apply to this Coverage Extension, except as follows:

(a) **Exclusion (1)(c) Governmental Action;**

(b) **Exclusion (1)(d) Nuclear Hazard;**

(c) **Exclusion (1)(f) War and Military Action.**

(5) In addition to Paragraph **a.(4)** of this Coverage Extension, we will not pay for "loss" resulting from any of the following:

(a) Dishonest or criminal acts by:

1) You, your partners, employees, directors, trustees or authorized representatives;

2) A manager or a member if you are a limited liability company;

3) Anyone else with an interest in the records of accounts receivable, or their employees or authorized representatives; or

4) Anyone else entrusted with the records of accounts receivable for any purpose.

This Paragraph **a.(5)(a)** applies whether or not such persons are acting alone or in collusion with other persons or such act occurs during the hours of employment.

However, this Paragraph **a.(5)(a)** does not apply to dishonest acts of a carrier for hire or to acts of destruction by your employees. However, theft by employees is still not covered.

(b) Alteration, falsification, concealment or destruction of records of

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

**(c)** Bookkeeping, accounting or billing errors or omissions.

**(d)** Electrical or magnetic injury, disturbance or erasure of "electronic data" that is caused by or results from:

**1)** Programming errors or faulty machine instructions;

**2)** Faulty installation or maintenance of data processing equipment or component parts;

**3)** An occurrence that took place more than 100 feet from your "premises"; or

**4)** Interruption of electrical power supply, power surge, blackout or brownout if the cause of such occurrence took place more than 100 feet from your "premises".

But we will pay for direct "loss" caused by lightning.

**(e)** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

**(f)** A "loss" that requires any audit of records or any inventory computation to prove its factual existence.

**(6) Determination of Receivables:**

**(a)** If you cannot accurately establish the amount of accounts receivable outstanding as of the time of direct "loss", the following method will be used:

**1)** Determine the total of the average monthly amounts of accounts receivable for the 12 months immediately preceding the month in which the direct "loss" occurs; and

**2)** Adjust that total for any normal fluctuations in the amount of accounts receiv-

able for the month in which the direct "loss" occurred or for any demonstrated variance from the average for that month.

**(b)** The following will be deducted from the total amount of accounts receivable, however that amount is established:

**1)** The amount of the accounts for which there is no direct "loss"; and

**2)** The amount of the accounts that you are able to re-establish or collect; and

**3)** An amount to allow for probable bad debts that you are normally unable to collect; and

**4)** All unearned interest and service charges.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $25,000.

**b.** <u>**Business Income and Extra Expense**</u>

**SECTION C. DEDUCTIBLE** does not apply to this Coverage Extension.

**(1) Business Income**

We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

With respect to the requirements of the preceding paragraph, if you are a tenant and occupy only part of the site at which the "premises" are located, for the purpose of this Coverage Extension only, your "premises" is the portion of the building that you rent, lease or occupy, including:

**(a)** Any area within the building or on the site at which the "premises" are located if that area ser-

vices or is used to gain access to the "premises"; and

**(b)** Your personal property in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

**(2) Extra Expense**

**(a)** We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d)**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

**(b)** If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **(2)(c)**) to:

**1)** Avoid or minimize the "suspension" of business and to continue "operations" either:

**a)** At the "premises"; or

**b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

**2)** Minimize the "suspension" of business if you cannot continue "operations".

**(c)** We will also pay expenses to:

**1)** Repair or replace property; or

**2)** Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage will be reduced by the salvage value of that property.

**(d)** Extra Expense does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

**(3) Civil Authority**

When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(a)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(b)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

**1)** 30 consecutive days after the time of that action; or

**2)** When your "Business Income" coverage ends;

whichever is later.

**(4) Alterations and New Buildings**

We will pay for the actual loss of "Business Income" you sustain and Extra Expense you incur due to direct "loss" at the "premises" caused by or resulting from any Covered Cause of Loss to:

**(a)** New buildings or structures, whether complete or under construction;

**(b)** Alterations or additions to existing buildings or structures; and

**(c)** Machinery, equipment, supplies or building materials located on or within 1,000 feet of the "premises" and:

**1)** Used in the construction, alterations or additions; or

**2)** Incidental to the occupancy of new buildings.

If such direct "loss" delays the start of "operations", the "period of restoration" for "Business Income" Coverage will begin on the date "operations" would have begun if the direct "loss" had not occurred.

**(5) Newly Purchased or Leased Locations**

We will pay the actual loss of "Business Income" you sustain and Extra Expense you incur due to direct "loss" to Covered Property at any location you purchase or lease caused by or resulting from a Covered Cause of Loss. This coverage for the Newly Purchased or Leased Locations will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** You report values to us;

**(c)** 90 days pass from the date you acquire or begin to construct the Covered Property.

**(6) Extended Business Income**

**(a)** For "Business Income" Other Than "Rental Value", if the necessary "suspension" of your "operations" produces a "Business Income" or Extra Expense "loss" payable under this Coverage Part, we will pay for the actual loss of "Business Income" you sustain and Extra Expense you incur during the period that:

**1)** Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**2)** Ends on the earlier of:

**a)** The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct "loss" had occurred; or

**b)** 60 consecutive days after the date determined in **b.(6)(a)1)** above.

However, Extended Business Income does not apply to loss of "Business Income" sustained or Extra Expense incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the "premises" are located.

Loss of "Business Income" must be caused by direct "loss" at the "premises" caused by or resulting from any Covered Cause of Loss.

**(b)** For "Rental Value", if the necessary "suspension" of your "operations" produces a "Rental Value" "loss" payable under this Coverage Part, we will pay for the actual loss of "Rental Value" you incur during the period that:

**1)** Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**2)** Ends on the earlier of:

**a)** The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct "loss" had occurred; or

**b)** 60 consecutive days after the date determined in **b.(6)(b)1)** above.

However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Loss in the area where the "premises" are located.

Loss of "Rental Value" must be caused by direct "loss" at the "premises" caused by or resulting from any Covered Cause of Loss.

**(7) Interruption of Computer Operations**

(a) Subject to all provisions of this Coverage Extension, you may extend the insurance that applies to "Business Income" and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of "electronic data" as described in **SECTION A. COVERAGE, 5. Coverage Extensions, d. Electronic Data.**

(b) Paragraph **b.(7)(a)** does not apply to "loss" sustained or expense incurred after the end of the "period of restoration", even if the amount of insurance stated in Paragraph **b.(7)(c)** has not been exhausted.

(c) The most we will pay under Paragraph **b.(7)** of this Coverage Extension is $2,500 for all "loss" sustained and expense incurred in the "coverage term", regardless of the number of interruptions or the number of "premises" or computer systems involved. If loss payment relating to the first interruption does not exhaust this amount, then the balance is available for subsequent interruptions in that "coverage term". A balance remaining at the end of a "coverage term" does not carry over to the next "coverage term". With respect to an interruption that begins in a "coverage term" and continues or results in additional "loss" or expense in a subsequent "coverage term", all "loss" and expense is deemed to be sustained in the "coverage term" in which the interruption began.

This $2,500 coverage for Interruption of Computer Operations does not increase the Limit of Insurance provided in this Coverage Extension.

The most we will pay for "loss" in any one occurrence under this "Business Income" and Extra Expense Coverage Extension is $25,000.

c. **Collapse**

The coverage provided under this Coverage Extension applies only to an abrupt collapse as described and limited in Paragraphs **c.(1)** through **c.(7)** below.

(1) For the purpose of this Coverage Extension only, abrupt collapse means an abrupt falling down or caving in of a building or structure or any part of a building or structure with the result that the building or structure or part of the building or structure cannot be occupied for its intended purpose.

(2) We will pay for direct "loss" to Covered Property, caused by abrupt collapse of a building or structure or any part of a building or structure insured under this Coverage Part, or that contains Covered property insured under this Coverage Part, if such collapse is caused by one or more of the following:

(a) Building or structure decay that is hidden from view, unless the presence of such decay is known or should reasonably have been known to an insured prior to collapse;

(b) Insect or vermin damage that is hidden from view, unless the presence of such damage is known or should reasonably have been known to an insured prior to collapse;

(c) Use of defective material or methods in construction, remodeling, or renovation if the abrupt collapse occurs during the course of the construction, remodeling, or renovation.

(d) Use of defective materials or methods in construction, remodeling, or renovation if the abrupt collapse occurs after construction, remodeling, or renovation is complete but only if the collapse is caused in part by:

1) A cause of loss listed in Paragraph **c.(2)(a)** or **c.(2)(b)** of this Coverage Extension;

2) One or more of the "specified causes of loss";

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**3)**   Breakage of building glass;

**4)**   Weight of people or personal property; or

**5)**   Weight of rain that collects on a roof.

**(3)**   This Coverage Extension does not apply to:

    **(a)**   A building or structure or any part of a building or structure that is in danger of falling down or caving in;

    **(b)**   A part of a building or structure that is standing, even if it has separated from another part of the building or structure; or

    **(c)**   A building or structure that is standing or any part of a building or structure that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(4)**   With respect to the following property:

    **(a)**   Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

    **(b)**   Awnings, gutters and downspouts;

    **(c)**   Yard fixtures;

    **(d)**   Outdoor swimming pools;

    **(e)**   Fences;

    **(f)**   Piers, wharves and docks;

    **(g)**   Beach or diving platforms; including their appurtenances;

    **(h)**   Retaining walls; and

    **(i)**   Walks, roadways and other paved surfaces;

if an abrupt collapse is caused by a cause of loss listed in Paragraph **c.(2)(a)** through **c.(2)(d)**, we will pay for "loss" to that property only if:

    **(a)**   Such "loss" is a direct result of the abrupt collapse of a building or structure insured under this Coverage Part; and

    **(b)**   The property is Covered Property under this Coverage Part.

**(5)**   If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building or structure, we will pay for direct "loss" to Covered Property caused by such collapse of personal property only if:

    **(a)**   The collapse of personal property was caused by a Cause of Loss listed in **c.(2)(a)** through **c.(2)(d)** of this Coverage Extension;

    **(b)**   The personal property that collapses is inside a building; and

    **(c)**   The property that collapses is not of a kind listed in Paragraph **c.(4)** above of this Coverage Extension, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **c.(5)** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

**(6)**   This Coverage Extension does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**(7)**   This Coverage Extension shall not increase the Limit of Insurance provided in this Coverage Part.

**(8)**   The term Covered Cause of Loss includes Collapse as described and limited in Paragraphs **c.(1)** through **c.(7)**.

**d.**   <u>Electronic Data</u>

**(1)**   This Coverage Extension does not apply to your "stock" of prepackaged software, or to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)**   We will pay for the cost to replace or restore "electronic data" which has been destroyed or corrupted by a Covered Cause of Loss that applies to **SECTION A. COVERAGE, 1. Covered Property, d. Business Personal Property.** To the extent that "electronic data" is not replaced or restored, the "loss" will be valued at the cost of replacement of the me-

dia on which the "electronic data" was stored with blank media of substantially identical type.

**(3)** For the purposes of this Coverage Extension only, Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, that is designed to damage or destroy any part of the system or disrupt its normal operation. However, there is no coverage for "loss" caused by or resulting from manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system or "electronic data".

**(4)** The most we will pay for all direct "loss" under this Coverage Extension, regardless of the number of "premises" or computer systems involved, is $2,500. This limit is the most we will pay for the total of all direct "loss" arising out of all occurrences that take place in the "coverage term". If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent "loss" sustained in the "coverage term". A balance remaining in a "coverage term" does not carry over to the next "coverage term". With respect to an occurrence which begins in the "coverage term" and continues or results in additional "loss" in a subsequent "coverage term", all "loss" is deemed to be sustained in the "coverage term" in which the occurrence began.

**e.** **Exhibitions, Fairs or Trade Shows**

We will pay for direct "loss" caused by a Covered Cause of Loss to your Covered Property, including covered property of others, while it is located at exhibitions, fairs or trade shows. This Coverage Extension does not apply while Covered Property is in transit to or from the exhibition, fair or trade show.

The most we will pay for "loss" in any one occurrence is $10,000.

The Limit of Insurance provided under this Coverage Extension does not apply per location.

**f.** **Fences**

We will pay for direct "loss" caused by a Covered Cause of Loss to your outdoor fences that are located within 1,000 feet of the "premises" and not otherwise insured as Covered Property in this Coverage Part.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $5,000.

**g.** **Fungi, Wet Rot, Dry Rot, and Bacteria - Limited Coverage**

**(1)** The coverage described in Paragraphs **g.(2)** and **g.(3)** of this Coverage Extension only apply when the "fungi", wet or dry rot or bacteria is the result of a Covered Cause of Loss that occurs during the "coverage term" and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

**(2)** We will pay for "loss" by "fungi", wet or dry rot or bacteria. As used in this Coverage Extension, the term "loss" means:

**(a)** Direct "loss" to Covered Property caused by "fungi", wet or dry rot or bacteria, including the cost of removal of the "fungi", wet or dry rot or bacteria;

**(b)** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet or dry rot or bacteria; and

**(c)** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet or dry rot or bacteria are present.

**(3)** For the coverage described under Paragraph **g.(2)** of this Coverage Extension, the most we will pay for "loss", regardless of the number of claims, is $15,000. This limit is the most we will pay for the total of all "loss" arising out of all occurrences that take place in the "coverage term". With respect to a particular occurrence of "loss" which results in "fungi", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungi", wet or dry rot or bacteria continues to be pre-

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

sent or active, or recurs, in a subsequent "coverage term".

**(4)** The coverage provided under this Coverage Extension does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in "loss" by "fungi", wet or dry rot or bacteria, and other "loss", we will not pay more, for the total of all "loss" than the applicable Limit of Insurance on the affected Covered Property.

If there is covered "loss" to Covered Property, not caused by "fungi", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Coverage Extension, except to the extent that "fungi", wet or dry rot or bacteria causes an increase in the "loss". Any such increase in the "loss" will be subject to the terms of this Coverage Extension.

**(5)** The terms of this Coverage Extension do not increase or reduce the coverage provided under:

**(a)** **SECTION A. COVERAGE, 5. Coverage Extensions, c. Collapse;**

**(b)** **SECTION A. COVERAGE, 5. Coverage Extensions, s. Water, Other Liquids, Powder or Molten Material Damage**

**(6)** The following **(6)(a)** or **(6)(b)** apply only if "Business Income", "Rental Value", or Extra Expense Coverage applies to the "premises" and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable "Business Income", "Rental Value", or Extra Expense Coverage.

**(a)** If the "loss" which resulted in "fungi", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to "loss" to property caused by "fungi", wet or dry rot or bacteria, then our payment under "Business Income" and/or Extra Expense is limited to the amount of "loss" and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

**(b)** If a covered "suspension" of "operations" was caused by "loss" other than "fungi", wet or dry rot or bacteria but remedia-

tion of "fungi", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for "loss" and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

**(7)** This Coverage Extension does not apply to lawns, trees, plants or shrubs that are part of any vegetative roof.

**h.** **Glass**

**(1)** If a Covered Cause of Loss occurs to building glass that is Covered Property, we will also pay necessary expenses you incur to:

**(a)** Put up temporary plates or board up openings if repair or replacement of damaged glass is delayed;

**(b)** Repair or replace encasing frames;

**(c)** Remove or replace obstructions (except expenses to remove or replace window displays); and

**(d)** Repair or replace alarm tapes.

**(2)** If you are a tenant at a covered "premises" and:

**(a)** The building you occupy is not Covered Property; and

**(b)** You are legally liable for direct "loss" to the building glass in that building;

such building glass, for the purposes of this Paragraph **h.(2)**, is Covered Property. The most we will pay for "loss" in any one occurrence is $5,000. This building glass is subject to the building deductible as described in **SECTION C. DEDUCTIBLE.**

**(3)** For the purposes of this Coverage Extension only, **SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions** does not apply except as follows:

**(a)** **Exclusion (1)(b) Earth Movement;**

**(b)** **Exclusion (1)(c) Governmental Action;**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(c)** Exclusion (1)(d) Nuclear Hazard;

**(d)** Exclusion (1)(f) War and Military Action;

**(e)** Exclusion (2)(d)1) Wear and tear; and

**(f)** As listed in **Exclusion (2)(d)2**: Rust or other corrosion, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

**i.** <u>**Newly Purchased, Leased or Constructed Property**</u>

**(1) Buildings**

If buildings are Covered Property in this Coverage Part, we will pay for direct "loss" caused by a Covered Cause of Loss to:

**(a)** Your new buildings or additions while being built on the "premises";

**(b)** Buildings you newly purchase or become newly required to insure by written contract that are:

**1)** Intended for use by you as a warehouse; or

**2)** Similarly used by you as buildings insured under this Coverage Part.

The most we will pay for "loss" in any one occurrence to a building under this Coverage Extension is 1,000,000 for each building.

**(2) Business Personal Property**

**(a)** If business personal property is Covered Property in this Coverage Part, we will pay for direct "loss" caused by a Covered Cause of Loss to business personal property you newly purchase or are required to insure by written contract:

**1)** While located at buildings described in Paragraph **a.(1)** of this Coverage Extension; or

**2)** While located in a leased building or space therein that you are not required to insure. Such lease must be for a period of 12 consecutive months or longer.

**(b)** Paragraph **a.(2)(a)** of this Coverage Extension does not apply to:

**1)** Any business personal property covered under **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, e. Exhibitions, Fairs, or Trade Shows** or **m. Property Off Premises;**

**2)** Any business personal property that is covered under **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, p. Transportation** or is otherwise considered to be in-transit to or from a "premises".

**3)** Business personal property of others that is temporarily in your possession in the course of installing or performing work on such property, or temporarily in your possession in the course of your manufacturing or wholesaling activities.

The most we will pay for "loss" in any one occurrence to your Business Personal Property under this Coverage Extension is $500,000 at each building.

**(3) Period of Coverage**

Coverage provided under this Coverage Extension will end when any of the following first occurs:

**(a)** This policy expires,

**(b)** For buildings described in Paragraph **(1)(a)** of this Coverage Extension, 90 days pass from the date you begin construction on that part of the building that would qualify as Covered Property;

**(c)** For business property described in Paragraph **(1)(b)** and Paragraph **(2)(a)1)**, 90 days after your purchase or lease;

**(d)** For business personal property described in Paragraph **(2)(a)2)**, 90 days from the effective date

of the lease of the building space in the building; or

**(e)** You report values to us.

We will charge you additional premium for values reported from the date you lease or purchase the property, or begin construction on that part of the building that would qualify as Covered Property.

**j.** **Nonowned Building Damage**

If you are a tenant at a covered "premises" and:

**(1)** The building you occupy is not Covered Property; and

**(2)** You are legally liable for direct "loss" to that building;

We will pay for direct "loss" to that building caused by burglary, robbery, theft or attempted theft.

This Coverage Extension does not apply to:

**(1)** Glass, including lettering and ornamentation, and also necessary:

    **(a)** Repair or replacement of encasing frames or alarm tapes; and

    **(b)** Expenses incurred to board up openings or remove or replace obstruction.

**(2)** Building materials and equipment removed from the "premises".

This Coverage Extension does not apply if you have purchased other insurance in your name on the building you occupy as required by the lease.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $25,000.

**k.** **Outdoor Property**

We will pay for direct "loss" caused by a Covered Cause of Loss to the following types of your Covered Property:

**(1)** Radio antennas, television antennas or satellite dishes (including their lead-in wiring, masts and towers);

**(2)** Trees, shrubs or plants (other than trees, shrubs or plants which are "stock" or part of a vegetative roof), including debris removal ; and

**(3)** If you are a tenant, to your awnings that are attached to a building you occupy;

but only if caused by or resulting from any of the following causes of loss if they are included as Covered Causes of Loss under this Coverage Part:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion;

**(5)** Aircraft; or

**(6)** Falling objects.

We will pay for the debris removal expenses of the above type property that are not your Covered Property if such debris is on your "premises" due to the Covered Causes of Loss described in this Coverage Extension. If you are a tenant, we do not pay debris removal expenses for trees, plants or shrubs owned by the landlord or owner of the building you occupy.

No other coverage for debris removal expenses provided in this Coverage Part applies to this Outdoor Property Coverage Extension.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $5,000, but not more than $1,000 for any one tree, shrub or plant.

**l.** **Personal Effects**

If business personal property is Covered Property in this Coverage Part, we will pay for direct "loss" caused by a Covered Cause of Loss to personal effects owned by:

**(1)** You, your officers, or your partners, or if you are a limited liability company, your members or your managers; or

**(2)** Your employees (including temporary and leased employees), including tools owned by your employees that are used in your business. However, employee tools are not covered for theft.

This Coverage Extension does not apply to "money" or "securities".

If theft is included as a Covered Cause of Loss under this Coverage Part, then this Coverage Extension has a $500 per occurrence limitation for direct "loss" by theft.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $10,000.

**m. Property Off Premises**

(1) We will pay for direct "loss" caused by a Covered Cause of Loss to your Covered Property, including covered personal property of others, while it is away from the "premises", if it is:

    (a) Temporarily at a location you do not own, lease or operate; or

    (b) In storage at a location you lease, provided the lease was executed for the first time after the beginning of the current "coverage term".

(2) This Coverage Extension does not apply to Covered Property at exhibitions, fairs, trade show, or in transit.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $10,000.

The Limit of Insurance provided by this Coverage Extension does not apply per location.

**n. Signs**

We will pay for direct "loss" caused by a Covered Cause of Loss, including debris removal expense, to signs not otherwise insured by this Coverage Part.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $5,000.

The Limit of Insurance provided by this Coverage Extension does not apply per location.

**o. Trailers (Nonowned Detached)**

(1) If business personal property is Covered Property in this Coverage Part, we will pay for direct "loss" caused by a Covered Cause of Loss to trailers that you do not own, provided that:

    (a) The trailer is used in your business;

    (b) The trailer is temporarily in your care, custody or control at the "premises"; and

    (c) You have a contractual responsibility to pay for "loss" to the trailer.

(2) We will not pay for any direct "loss" that occurs:

    (a) While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

    (b) During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

(3) This insurance is excess over the amount due, whether you can collect on it or not, from any other insurance covering such property.

(4) This Coverage Extension does not apply to any property inside or on the trailer.

The most we will pay for "loss" in any one occurrence under this Coverage Extension is $5,000.

**p. Transportation**

We will pay for direct "loss" caused by a Covered Cause of Loss to your Covered Property, including covered personal property of others while it is in or on a vehicle, including loading and unloading of the property.

The most we will pay for "loss" in any one occurrence is $10,000.

The Limit of Insurance provided by this Coverage Extension does not apply per location.

**q. Utility Services**

We will pay for:

(1) Direct "loss" to Covered Property at your "premises" except for direct "loss" resulting from the partial or complete failure of Wastewater Removal Services; and

(2) Loss of "Business Income" you sustain and Extra Expenses you incur as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, b. Business Income and Extra Expense;**

caused by or resulting from the partial or complete failure of utility services to the "premises".

The partial or complete failure of the utility services listed below must be caused by direct "loss" caused by a Covered Cause of Loss to the following property:

(1) Power Supply Property, meaning the following types of property supplying

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

electricity, steam or natural gas to the "premises":

**(a)** Utility generating plants;

**(b)** Switching stations;

**(c)** Substations;

**(d)** Transformers; and

**(e)** Transmission, distribution, service, or similar lines, excluding all such overhead lines of any type.

**(2)** Water Supply Property, meaning the following types of property supplying water to the "premises":

**(a)** Pumping stations; and

**(b)** Water mains.

**(3)** Wastewater Removal Property, meaning a utility system for removing wastewater and sewage from the "premises", other than a system designed primarily for draining storm water. The utility property includes sewer mains, pumping stations and similar equipment for moving the effluent to a holding, treatment or disposal facility, and includes such facilities. Coverage under this Coverage Extension does not apply to interruption in service caused by or resulting from a discharge of water or sewage due to heavy rainfall or flooding.

**(4)** Communication Supply Property, meaning property supplying communication services, including service relating to Internet access or access to any electronic, cellular or satellite network; telephone, radio, microwave or television services to the "premises", such as:

**(a)** Communication transmission, distribution, service or similar lines, including fiber optic lines, excluding all such overhead lines of any type;

**(b)** Coaxial cables; and

**(c)** Microwave radio relays, excluding satellites.

This Coverage Extension does not apply to "loss" to "electronic data", including destruction or corruption of "electronic data".

The most we will pay for all direct "loss" and loss of "Business Income" and Extra Expense in any one occurrence is $25,000.

**r.** **Valuable Papers and Records**

**SECTION C. DEDUCTIBLE** does not apply to this Coverage Extension.

**(1)** Subject to Paragraph **r.(3)** of this Coverage Extension, we will pay necessary costs you incur to research, replace or restore lost or damaged information on "valuable papers and records" that are your property or the property of others in your care, custody or control; resulting from direct "loss" caused by a Covered Cause of Loss.

**(2)** Coverage does not apply to:

**(a)** Property that cannot be replaced with other property of like kind and quality;

**(b)** Property held as samples or for delivery after sale;

**(c)** Property in storage away from the "premises", except as provided in Paragraph **r.(4)(b)** of this Coverage Extension;

**(d)** Contraband, or property in the course of illegal transportation or trade;

**(e)** "Valuable papers and records" in the form of "electronic data", including the materials on which the "electronic data" is recorded.

**(3)** The most we will pay for "loss" is the least of the following amounts:

**(a)** The cost of reasonably restoring the damaged property to its condition immediately before the "loss";

**(b)** The cost of replacing the damaged property with substantially identical property; or

**(c)** The actual cash value of the damaged property at the time of "loss".

However, we will not pay for "loss" unless or until the damaged property is actually replaced or restored; and then only if such replacement or restoration occurs within 36 months from the date of direct "loss".

**(4)** We will extend coverage to include:

**(a)** **Removal**

If you give us written notice within 30 days of removal of your "valuable papers and records"

because of imminent danger of direct "loss" from a Covered Cause of Loss, we will pay for direct "loss" while they are:

**1)** At a safe place away from your "premises"; or

**2)** Being taken to and returned from that place.

This Removal coverage is included within the Limits of Insurance applicable to this Coverage Extension.

**(b) Away From Your Premises**

We will pay up to $5,000 in any one occurrence, regardless of the number of locations, for direct "loss" caused by a Covered Cause of Loss to "valuable papers and records" while they are away from your "premises".

This Away From Premises limit is in addition to the Limit of Insurance applicable to this Coverage Extension.

**(5) SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions** does not apply to this Coverage Extension except as follows:

**(a) Exclusion (1)(c) Governmental Action;**

**(b) Exclusion (1)(d) Nuclear Hazard; and**

**(c) Exclusion (1)(f) War and Military Action.**

**(6)** In addition to Paragraph **r.(5)** of this Coverage Extension, we will not pay for direct "loss" resulting from any of the following:

**(a)** Dishonest or criminal acts by:

**1)** You, your partners, employees, directors, trustees or authorized representatives;

**2)** A manager or a member if you are a limited liability company;

**3)** Anyone else with an interest in the records of accounts receivable, or their employees or authorized representatives; or

**4)** Anyone else entrusted with the records of accounts receivable for any purpose.

This Paragraph **r.(6)(a)** applies whether or not such persons are acting alone or in collusion with other persons or such act occurs during the hours of employment.

However, this Paragraph **r.(6)(a)** does not apply to dishonest acts of a carrier for hire or to acts of destruction by your employees. However, theft by employees is still not covered.

**(b)** Errors or omissions in processing or copying. However, we will pay for that portion of direct "loss" caused by resulting fire or explosion if these causes of loss would be covered by this Coverage Part.

**(c)** Electrical or magnetic injury, disturbance or erasure of electronic recordings. But we will pay for direct "loss" caused by lightning.

**(d)** Voluntary parting with any property by you or anyone entrusted with the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

The most we will pay for "loss" in any one occurrence is $25,000.

**s.** <u>**Water Damage, Other Liquids, Powder or Molten Material Damage**</u>

If a covered direct "loss" to which this insurance applies was caused by or resulted from water or other liquid, powder or molten material damage, we will also pay the cost to tear out and replace any otherwise undamaged part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

**SECTION B. LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations, except as amended in **SECTION A. COVERAGE, 3. Covered Causes of Loss, c. Limitations, 4. Additional Coverages,** and **5. Coverage Extensions.**

**SECTION C. DEDUCTIBLE**

Except as otherwise provided; in any one occurrence of direct "loss" we will first reduce the amount of "loss" if required by **SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance** or **SECTION F. OPTIONAL COVERAGES, 1. Agreed Value.** If the adjusted amount of direct "loss" is less than or equal to the Deductible, we will not pay for that direct "loss". If the adjusted amount of direct "loss" exceeds the Deductible, we will then

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

subtract the Deductible from the adjusted amount of direct "loss", and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves direct "loss" to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

1. **Deductible Examples**

   **Example No. 1:**

   (This example assumes there is no coinsurance penalty as outlined in **SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance**).

   | | |
   |---|---|
   | Deductible: | $250 |
   | | |
   | Limit of Insurance - Bldg. 1: | $60,000 |
   | Limit of Insurance - Bldg. 2: | $80,000 |
   | | |
   | "Loss" to Bldg. 1: | $60,100 |
   | "Loss" to Bldg. 2: | $90,000 |

   The amount of "loss" to Bldg. 1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Bldg. 1 plus the Deductible.

   The Deductible will be subtracted from the amount of "loss" in calculating the "loss" payable for Bldg. 1:

   $60,100 - $250 = $59,850 "Loss" Payable - Bldg. 1

   The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of "loss" payable for Bldg. 2. "Loss" payable for Bldg. 2 is the Limit of Insurance of $80,000.

   Total amount of "loss" payable: $59,850 + 80,000 = $139,850.

   **Example No. 2:**

   (This example also assumes there is no coinsurance penalty).

   The Deductible and Limits of Insurance are the same as those in Example No. 1:

   "Loss" to Bldg. 1: $70,000 (Exceeds Limit of Insurance plus Deductible)

   "Loss" to Bldg. 2: $90,000 (Exceeds Limit of Insurance plus Deductible)

   "Loss" Payable - Bldg. 1: $60,000 (Limit of Insurance)

   "Loss" Payable - Bldg. 2: $80,000 (Limit of Insurance)

   Total amount of "loss" payable: $140,000.

2. **Glass Deductible**

   When direct "loss" to the building you occupy only involves building glass, the Deductible for that "loss" will be the lesser of:

   **a.** $500; or

   **b.** The Deductible shown in the Declarations for that Covered Property.

## SECTION D. LOSS CONDITIONS

The following conditions apply in addition to the **COMMON POLICY CONDITIONS** and the **COMMERCIAL PROPERTY CONDITIONS.**

1. **Abandonment**

   There can be no abandonment of any property to us.

2. **Appraisal**

   If we and you disagree on the value of the property, the amount of Net Income and operating expense, or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property, the amount of Net Income and operating expense, and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

   **a.** Pay its chosen appraiser; and

   **b.** Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we still retain our right to deny the claim.

3. **Duties in the Event of Loss or Damage**

   **a.** In the event of "loss" to Covered Property, you must see that the following are done in order for coverage to apply:

      **(1)** Notify the police if a law may have been broken.

      **(2)** Give us prompt notice of the "loss". Include a description of the property involved.

      **(3)** As soon as possible, give us a description of how, when and where the "loss" occurred.

      **(4)** Take all reasonable steps to protect the Covered Property from further damage. If feasible, set the damaged property aside and in the best possible order for examination. Keep a

record of your expenses necessary to protect the Covered Property for consideration in the settlement of the claim. This will not increase your limit of insurance. However, in no event will we pay for any subsequent "loss" resulting from a cause of loss that is not a Covered Cause of Loss.

**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of "loss" claimed.

**(6)** As often as may be reasonably required, permit us to inspect the property proving the "loss" and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis and permit us to make copies from your books and records.

**(7)** Submit a signed sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

**(9)** If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4.** <u>Loss Payment</u>

**a.** In the event of "loss" insured by this Coverage Part, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property;

**(3)** Take all or any part of the property at an agreed or appraised value; or

**(4)** Repair, rebuild or replace the property with other property of like kind and quality.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of **SECTION D. LOSS CONDITIONS, 7. Valuation** or any applicable provision that amends or supercedes this valuation condition.

**b.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property, except as provided in **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law.**

**c.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

**d.** We will not pay you more than your financial interest in the Covered Property.

**e.** We may adjust "losses" with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

**f.** Our payment for "loss" to personal property of others and personal effects will only be for the account of the owner of the property.

**g.** We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

**h.** We will pay for insured "loss" within 30 days after we receive the sworn proof of loss if you have complied with all of the terms of this Coverage Part; and

**(1)** We have reached agreement with you on the amount of "loss"; or

**(2)** An appraisal award has been made.

**i.** **Loss Payment - Ordinance or Law.**

With respect to **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law:**

**(1)** **Loss of Use of Undamaged Parts of Building**

When there is a loss in value of an undamaged portion of a building or structure to which this coverage applies, the loss payment for that building, including damaged and undamaged portions, will be determined as follows:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(a)** If **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION F. OPTIONAL COVERAGES, 3. Replacement Cost** applies and the property is repaired or replaced, on the same "premises" or another "premises"; we will not pay more than the lesser of:

1) The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to restore the building on the same "premises" and to the same height, floor area, style and comparable quality of the original property insured; or

2) The limit of insurance indicated in **SECTION A. COVERAGE, 4. Additional Coverages g. Ordinance or Law** for **Loss of Use of Undamaged Parts of Building** for the building that has suffered "loss".

**(b)** If **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION F. OPTIONAL COVERAGES, 3. Replacement Cost** applies and the property is not repaired or replaced, or if the Replacement Cost Coverage Option does not apply, we will not pay more than the lesser of:

1) The "actual cash value" of the building at the time of "loss"; or

2) The limit of insurance indicated in **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law** for **Loss of Use of Undamaged Parts of Building** for the building that has suffered "loss".

**(2) Demolition Costs**

Loss payment for Demolition Costs will be determined as follows:

We will not pay more than the lesser of the following:

**(a)** The amount you actually spend to demolish and clear the site of the "premises"; or

**(b)** The limit of insurance indicated in **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law** for **Demolition Costs** for the building that has suffered "loss".

**(3) Increased Costs of Construction**

Loss payment for **Increased Costs of Construction** will be determined as follows:

**(a)** We will not pay for the increased cost of construction until the property is actually repaired or replaced, at the same "premises" or another location and unless the repairs or replacement are made as soon as reasonably possible after the direct "loss", not to exceed two years. We may extend this period in writing during the two years.

**(b)** If the building is repaired or replaced at the same "premises", or if you elect to rebuild at another "premises", the most we will pay for the **Increased cost of construction** is the lesser of:

1) The increased cost of construction at the same "premises"; or

2) The limit of insurance indicated in **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law** for **Increased Costs of Construction** for the building that has suffered "loss".

**(c)** If the ordinance or law requires relocation to another location the most we will pay for the increased cost of construction is the lesser of:

1) The increased cost of construction at the new location; or

2) The limit of insurance indicated in **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law** for **Increased Costs of Construction** for the building that has suffered "loss".

**(4) Proportional Payments**

If the building or structure sustains both direct "loss" that is covered un-

Includes copyrighted material of Insurance
Services Office, Inc., with its permission.

der this Coverage Part and direct "loss" that is not covered under this Coverage Part; and as a result of the direct "loss" in its entirety you are required to comply with the ordinance or law, we will not pay the full amount of direct "loss" otherwise payable under the terms of **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law**. Instead, we will pay a proportion of such direct "loss"; meaning the proportion that the covered direct "loss" bears to the total direct "loss".

**j.   Loss Determination - Business Income and Extra Expense**

With respect to **SECTION A. COVERAGE, 5. Coverage Extensions, b. Business Income and Extra Expense,**

**(1)**   The amount of "Business Income" and "Rental Value" "loss" will be determined based on:

**(a)**   The Net Income of the business before the direct "loss" occurred;

**(b)**   The likely Net Income of the business if no direct "loss" had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

**(c)**   The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct "loss"; and

**(d)**   Other relevant sources of information, including:

**1)**   Your financial records and accounting procedures;

**2)**   Bills, invoices and other vouchers; and

**3)**   Deeds, liens or contracts.

**(2)**   The amount of Extra Expense will be determined based on:

**(a)**   All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct "loss"

had occurred. We will deduct from the total of such expenses:

**1)**   The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

**2)**   Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

**(b)**   Necessary expenses that reduce the "Business Income" and "Rental Value" "loss" that otherwise would have been incurred.

**(3)   Resumption of Operations**

We will reduce the amount of your:

**(a)**   "Business Income" and "Rental Value" "loss", other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or "stock") at the "premises" or elsewhere.

**(b)**   Extra Expense "loss" to the extent you can return "operations" to normal and discontinue such Extra Expense.

**(4)**   If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**k.   Party Walls**

A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the "loss" to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the "loss" to the party wall, subject to all applicable policy provisions all other provisions of this **SECTION D. LOSS CONDITIONS, 4. Loss Payment** including:

**(1)** Limit of Insurance shown in the Declarations;

**(2)** **SECTION D. LOSS CONDITIONS, 7. Valuation**; and

**(3)** **SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance**.

Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of **COMMERCIAL PROPERTY CONDITIONS, I. Transfer Of Rights Of Recovery Against Others To Us** in this Coverage Part.

**5.** **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

**6.** **Vacancy**

**a.** **Description of Terms**

**(1)** As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below:

**(a)** When this Coverage Part is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

**(b)** When this Coverage Part is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

**1)** Rented to a lessee or sublessee and used by them to conduct their customary operations; or

**2)** Used by the building owner to conduct customary operations.

**(2)** Buildings under construction or renovation are not considered vacant.

**b.** **Vacancy Provisions**

If the building where direct "loss" occurs has been vacant for more than 60 consecutive days before that "loss", we will:

**(1)** Not pay for any "loss" caused by any of the following, even if they are Covered Causes of Loss:

**(a)** Vandalism;

**(b)** Sprinkler leakage, unless you have protected the system against freezing;

**(c)** Building glass breakage;

**(d)** Water damage;

**(e)** Theft; or

**(f)** Attempted theft.

**(2)** Reduce the amount we would otherwise pay for the "loss" by 15% with respect to Covered Causes of Loss other than those listed in **b.(1)(a)** through **b.(1)(f)** of this Loss Condition.

**7.** **Valuation**

We will determine the value of Covered Property in the event of direct "loss" as follows:

**a.** At "Actual Cash Value" as of the time of direct "loss", except as provided in **b., c., d.,** and **e.** below.

**b.** If the Limit of Insurance for Building satisfies **SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance**, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at actual cash value even when attached to the building:

**(1)** Awnings or floor coverings;

**(2)** Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

**(3)** Outdoor equipment or furniture.

**c.** "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**d.** Glass at the cost of replacement with safety glazing material if required by law.

**e.** Tenant's Improvements and Betterments at:

**(1)** Replacement Cost of the lost or damaged property if you make repairs promptly.

**(2)** A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

**(a)** Multiply the original cost by the number of days from the "loss" or damage to the expiration of the lease; and

**(b)** Divide the amount determined in **(a)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

**(3)** Nothing if others pay for repairs or replacement.

**(4)** For the purposes of valuation, tenants' improvements and betterments are not considered to be the personal property of others.

## SECTION E. ADDITIONAL CONDITIONS

The following conditions apply in addition to the **COMMON POLICY CONDITIONS** and the **COMMERCIAL PROPERTY CONDITIONS.**

**1.** **Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any "loss" if the value of Covered Property at the time of direct "loss" times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

**(1)** Multiply the value of Covered Property at the time of direct "loss" by the Coinsurance percentage;

**(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

**(3)** Multiply to the total amount of "loss", before the application of any deductible, by the figure determined in step **(2)**; and

**(4)** Subtract the deductible from the figure determined in step **(3).**

We will pay the amount determined in step **(4)** or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the "loss" yourself.

**Example No. 1 (Underinsurance):**

The value of the property is:     $250,000
The coinsurance percentage is:       80%
The Limit of Insurance is:       $100,000
The Deductible is:                   $250
The amount of "loss" is:          $40,000

Step (1):

$250,000 X 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2):

$100,000 divided by $200,000 = .50

Step (3):

$40,000 X .50 = $20,000

Step (4):

$20,000 - $250 = $19,750.

We will pay no more than $19,750. The remaining $20,250 is not covered.

**Example No. 2 (Adequate Insurance):**

The value of the property is:     $250,000
The coinsurance percentage is:       80%
The Limit of Insurance is:       $200,000
The Deductible is:                   $250
The amount of "loss" is:          $40,000

Step (1):

$250,000 X 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step (2):

$200,000 : $200,000 = 1.00

Step (3):

$40,000 X 1.00 = $40,000

Step (4):

$40,000 - $250 = $39,750.

We will pay no more than $39,750 "loss" in excess of the Deductible. No penalty applies.

**b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**Example No. 3:**

The values of the property are:

| | |
|---|---|
| Bldg. at Location No. 1: | $75,000 |
| Bldg. at Location No. 2: | $100,000 |
| Personal Property at Location No. 2: | $75,000 |
| | 250,000 |

| | |
|---|---|
| The coinsurance percentage is: | 90% |

The Limit of Insurance for Buildings and Personal

| | |
|---|---|
| Property at Location Nos. 1 and 2 is: | $180,000 |
| The Deductible is: | $1,000 |

The amount of "loss" is:

| | |
|---|---|
| Bldg. at Location No. 2: | $30,000 |
| Personal Property at Location No. 2: | $20,000 |
| | $50,000 |

Step (1):

$250,000 X 90% = $225,000 (the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

Step (2):

$180,000 : $225,000 = .80

Step (3):

$50,000 X .80 =  $40,000

Step (4):

$40,000 - $1,000 = $39,000.

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgage Holders**

**a.** The term "mortgage holder" includes trustee.

**b.** We will pay for covered "loss" to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence, as interests may appear.

**c.** The mortgage holder has the right to receive loss payment even if the mortgage holder has started foreclosure or similar action on the building or structure.

**d.** If we deny your claim because of your acts or because you have failed to comply

with the terms of this Coverage Part, the mortgage holder will still have the right to receive loss payment if the mortgage holder:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgage holder.

All of the terms of this Coverage Part will then apply directly to the mortgage holder.

**e.** If we pay the mortgage holder for any "loss" and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The mortgage holder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

**(2)** The mortgage holder's right to recover the full amount of the mortgage holder's claim will not be impaired.

At our option, we may pay to the mortgage holder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will give written notice to the mortgage holder at least:

**(1)** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgage holder at least ten days before the expiration date of this policy.

**SECTION F. OPTIONAL COVERAGES**

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

1. **Agreed Value**

   a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for direct "loss" to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Limit of Insurance indicated in the most current Statement of Values that applies to this Coverage Part.

   b. If the Agreed Value Optional Coverage is deleted from the policy, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage does not apply.

   c. The terms of this Optional Coverage apply only to "loss" that occurs:

      (1) On or after the effective date of this Optional Coverage; and

      (2) Before the policy expiration date.

   d. This Agreed Value Optional Coverage does not apply to **SECTION A. COVERAGE, 5. Coverage Extensions, b. Business Income and Extra Expense.**

2. **Inflation Guard**

   a. The Limit of Insurance for property to which this Optional Coverage applies will automatically increase by the annual percentage shown in the Declarations.

   b. The amount of increase will be:

      (1) The Limit of Insurance that applied on the beginning of the current "coverage term" or any other Coverage Part change amending the Limit of Insurance, multiplied by

      (2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), multiplied by

      (3) The number of days since the beginning of the current "coverage term" or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365. In the event of "loss", this number of days ends at the original date of "loss".

      Example:

      If:   The applicable Limit of Insurance is: $100,000

            The Annual percentage increase is: 8%

The number of days since the beginning of the policy year (or last policy change) is: 146

The amount of increase is $100,000 X .08 X (146/365) = $3,200

3. **Replacement Cost**

   a. Replacement Cost (without deduction for depreciation) replaces "Actual Cash Value" in **SECTION D. LOSS CONDITIONS, 7. Valuation** of this **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

   b. This Optional Coverage does not apply to:

      (1) Personal Property of others, except leased personal property as described in **SECTION A. COVERAGE, 1. Covered Property, d.(7).** The valuation of such leased personal property will be based on the amount for which you are liable under the lease, but not to exceed the replacement cost of the leased item.

      (2) Personal effects;

      (3) Contents of a residence;

      (4) Manuscripts;

      (5) Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac;

      (6) "Stock" unless the Replacement Cost including "Stock" option is shown in the Declarations; or

      (7) Property, that at the time of "loss":

         (a) Is outdated, or obsolete and is stored or not being used; or

         (b) Has no practical value to you.

   c. You may make a claim for "loss" covered by this insurance on an "Actual Cash Value" basis instead of on a replacement cost basis. In the event you elect to have "loss" settled on an "Actual Cash Value" basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the "loss".

   d. We will not pay on a replacement cost basis for any "loss":

      (1) Until the lost or damaged property is actually repaired or replaced with other property of generally the same construction and used for the same

purpose as the lost or damaged property; and

**(2)** Unless the repairs or replacement have been completed or at least underway within 2 years following the date of "loss".

**e.** We will not pay more for "loss" on a replacement cost basis than the least of:

**(1)** The Limit of Insurance applicable to the lost or damaged property;

**(2)** The cost to replace, on the same "premises", the lost or damaged property with other property:

**(a)** Of comparable material and quality; and

**(b)** Used for the same purpose; or

**(3)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

**f.** The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use, or repair of any building or structure except as provided in **SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law.**

## SECTION G. DEFINITIONS

**1.** "Actual cash value" means replacement cost less a deduction that reflects depreciation, age, condition and obsolescence.

**2.** "Business Income" means the:

**a.** Net Income (net profit or loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses sustained, including payroll.

**3.** "Computer programs" means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**4.** "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

**a.** The year commencing on the Effective Date of this Coverage Part at 12:01 A.M. standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if

any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 A.M. standard time at your mailing address shown in the Declarations on the earlier of:

**(1)** The day the policy period shown in the Declarations ends; or

**(2)** The day the policy to which this Coverage Part is attached is terminated or cancelled.

**b.** However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

**5.** "Electronic data" means information, facts or "computer programs" stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment.

**6.** "Finished stock" means stock you have manufactured, except "stock" you have manufactured that is held for sale on the "premises" of any retail outlet insured under this Coverage Part.

**7.** "Fungi" means any type or form of fungus, and includes, but is not limited to, any form or type of mold, mushroom or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**8.** "Loss" means accidental physical loss or accidental physical damage.

**9.** "Money" means:

**a.** Currency, coins and bank notes whether or not in current use; and

**b.** Travelers checks, registered checks and money orders held for sale to the public.

**10.** "Operations" means:

**a.** Your business activities occurring at the "premises"; and

**b.** The tenantability of the "premises", if coverage for "Business Income" including "Rental Value" or "Rental Value" applies.

**11.** "Period of restoration" means the period of time that:

**a.** Begins at the time of direct "loss".

**b.** Ends on the earlier of:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(1)** The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location.

**c.** "Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

**(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

**d.** The expiration date of the policy will not cut short the "period of restoration".

**12.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, asbestos, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property, or the environment regardless of whether injury or damage is caused directly or indirectly by the "pollutants" and whether:

**a.** You are regularly or otherwise engaged in activities which taint or degrade the environment; or

**b.** You use, generate or produce the "pollutant".

**13.** "Premises" means the Locations and Buildings described in the Declarations.

**14.** "Rental Value" means "Business Income" that consists of :

**a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the "premises" described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the "premises" which is occupied by you; and

**b.** Continuing normal operating expenses incurred in connection with that "premises", including:

**(1)** Payroll; and

**(2)** The amount of charges, which are the legal obligation of the tenant(s) but would otherwise be your obligations.

**15.** "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

**a.** Tokens, tickets, revenue and other stamps whether or not in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which are not of your own issue; but does not include "money". Lottery tickets held for sale are not "securities" or evidences of debt.

**16.** "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the Covered Property into subterranean voids created by the action of water on a limestone or similar rock formation. This does not include:

**a.** The cost of filling sinkholes;

**b.** Sinking or collapse of land into man-made subterranean cavities; or

**c.** The value of the land.

**17.** "Specified causes of loss" means fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; "sinkhole collapse"; volcanic action; falling objects; weight of snow, ice or sleet; and water damage.

**a.** Falling objects does not include "loss" to:

**(1)** Personal property in the open; or

**(2)** The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**b.** Water damage means:

**(1)** Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam; and

**(2)** Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the "premises" and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

But water damage does not include "loss" otherwise excluded under the terms of **BUILDING AND BUSINESS PERSONAL PROPERTY, SECTION A. COVERAGE, 3. Covered Causes of Loss, (g) Water**. Therefore, for example, there is no coverage under this Coverage Part in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking. As another example, and also in accordance with the terms of the Exclusion **(g) Water**, there is no coverage for "loss" caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.

To the extent that accidental discharge or leakage of water falls within the criteria set forth in **18.b.(1)** or **18.b.(2)** of this definition of "Specified causes of loss", such water is not subject to the provisions of Exclusion **(g) Water.**

**18.** "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

**19.** "Suspension" means:

    **a.** The slowdown or cessation of your business activities; and

    **b.** That a part or all of the "premises" is rendered untenantable.

**20.** "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, card index systems, deeds, drawings, films, maps, mortgages, or proprietary information.

But "valuable papers and records" does not mean "money" or "securities" or "electronic data", including the materials on which the "electronic data" is recorded.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**
**STANDARD PROPERTY POLICY**

**A.** When this endorsement is attached to the Standard Property Policy **CP 00 99**, the term Coverage Part is replaced by the term Policy.

**B. Legal Action Against Us**

 **1.** The **Legal Action Against Us** Commercial Property Condition is replaced by the following, except as provided in **B.2.** below:

  **LEGAL ACTION AGAINST US**

  No one may bring a legal action against us under this Coverage Part unless:

  **a.** There has been full compliance with all of the terms of this Coverage Part; and

  **b.** The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

 **2.** Paragraph **B.1.** above does not apply to the Legal Action Against Us loss condition in the Legal Liability Coverage Form **CP 00 40.**

**C. Appraisal**

 **1.** Except as provided in **C.2.** below, the Appraisal Loss Condition in the:

  BUILDING AND PERSONAL PROPERTY COVERAGE FORM;
  CONDOMINIUM ASSOCIATION COVERAGE FORM;
  CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM;
  BUILDERS RISK COVERAGE FORM;
  EXTRA EXPENSE COVERAGE FORM;
  LEASEHOLD INTEREST COVERAGE FORM;
  TOBACCO SALES WAREHOUSES COVERAGE FORM; and
  STANDARD PROPERTY POLICY

  is replaced by the following:

  **APPRAISAL**

  If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and

impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. Each appraiser will state the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding as to the amount of loss. Each party will:

  **a.** Pay its chosen appraiser; and

  **b.** Bear the other expenses of the appraisal and umpire equally.

  If there is an appraisal:

  **a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

  **b.** We will still retain our right to deny the claim.

 **2.** The **Appraisal** Condition in the:

  BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM; and
  BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM

  is replaced by the following:

  **APPRAISAL**

  If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will select an umpire. If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense and the amount of loss.

  If they fail to agree, they will submit their differences to the umpire. A decision

　　　　　© ISO Properties, Inc., 2005

agreed to by any two will be binding as to the amount of loss. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal:

**a.** You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and

**b.** We will still retain our right to deny the claim.

**D.** The provision requiring signed, sworn proof of loss in the **Duties in the Event of Loss or Damage** Loss Condition is replaced by the following:

Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 91 days after our request. We will supply you with the necessary forms.

**E.** Under the Loss Payment Condition, the provisions pertaining to notice of our intentions and the time period for payment of claims are deleted and replaced by the following:

**1. Claims Handling**

**a.** Within 15 days after we receive written notice of claim, we will:

**(1)** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

**(2)** Begin any investigation of the claim; and

**(3)** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**b.** We will notify you in writing as to whether:

**(1)** The claim or part of the claim will be paid;

**(2)** The claim or part of the claim has been denied, and inform you of the reasons for denial;

**(3)** More information is necessary; or

**(4)** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **b.(1)** through **b.(4)** above, within:

**(1)** 15 business days after we receive the signed, sworn proof of loss and all information we requested; or

**(2)** 30 days after we receive the signed, sworn proof of loss and all information we requested, if we have reason to believe the loss resulted from arson.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

**2.** We will pay for covered loss or damage within 5 business days after:

**a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

**b.** An appraisal award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this Coverage Part, we will make payment within 5 business days after the date you have complied with such terms.

The following paragraphs are added:

**3. Catastrophe Claims**

If a claim results from a weather related catastrophe or a major natural disaster, the claim handling and claim payment deadlines described in **E.1.** and **E.2.** above are extended for an additional 15 days.

Catastrophe or Major Natural Disaster means a weather related event which:

**a.** Is declared a disaster under the Texas Disaster Act of 1975; or

**b.** Is determined to be a catastrophe by the State Board of Insurance.

**4.** The term "business day", as used in the Loss Payment Condition, means a day

other than Saturday, Sunday or a holiday recognized by the state of Texas.

**F.** The following is added to the **Valuation Loss** Condition:

**Chapter 862 - Subsection 862.053. Policy A Liquidated Demand.** A fire insurance policy, in case of total loss by fire of property insured, shall be held and considered to be a liquidated demand against the Company for the full amount of such policy. The subsection does not apply to personal property.

**G.** Paragraphs **d.** and **f.** of the **Mortgageholders Additional Condition** are replaced by the following:

    **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

        **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

        **(2)** Submits a signed, sworn proof of loss within 91 days after receiving notice from us of your failure to do so; and

        **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

    All of the terms of this Coverage Part will then apply directly to the mortgageholder.

    **f.** If this policy is cancelled, we will give the mortgageholder named in the Declarations written notice of cancellation.

If we cancel this policy, we will give written notice to the mortgageholder at least:

    **(1)** 14 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

    **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

If you cancel the policy, we will give the mortgageholder notice of cancellation to be effective on the date stated in the notice. The date of cancellation cannot be before the 10th day after the date we mail the notice.

**H.** The following is added to Paragraph **D.1.** in the **Duties in the Event of Accident, Claim or Suit** Loss Condition in the Legal Liability Coverage Form:

We will notify the first Named Insured in writing of:

    **1.** An initial offer to compromise or settle a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 10th day after the date on which the offer is made.

    **2.** Any settlement of a claim made or "suit" brought against the insured under this coverage. The notice will be given not later than the 30th day after the date of the settlement.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ACTUAL LOSS SUSTAINED BUSINESS INCOME ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

**SCHEDULE**

(Enter number of months to activate coverage)

**REFER TO FMD502**   **consecutive months**

**A.** This endorsement applies to the following Coverage Forms:

**BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM**

**BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM**

**B.** For the purposes of this endorsement only, **SECTION A. COVERAGE, Additional Coverages, Extended Business Income, (1), (b), (ii)** is deleted in its entirety and replaced by the following, and **(iii)** is added:

**(ii)** 60 consecutive days after the date determined in **(1)(a)** above; or

**(iii)** The number of consecutive months after the date of direct physical "loss" indicated in the Schedule of this endorsement.

**C.** For the purposes of this endorsement only, **SECTION A. COVERAGE, Additional Coverages, Extended Business Income, (2), (b), (ii)** is deleted in its entirety and replaced by the following, and **(iii)** is added:

**(ii)** 60 consecutive days after the date determined in **(2)(a)** above; or

**(iii)** The number of consecutive months after the date of direct physical "loss" indicated in the Schedule of this endorsement.

**D.** For the purposes of this endorsement only, **SECTION F. DEFINITIONS, 7. "Period of Restoration", b.** is deleted in its entirety and replaced by the following:

**b.** Ends on the earlier of:

**(1)** The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality;

**(2)** The date when business is resumed at a new permanent location; or

**(3)** The number of consecutive months after the date of direct physical "loss" indicated in the Schedule of this endorsement.

**E.** When 12 or 18 months ALS (an acronym of Actual Loss Sustained) is shown in the Declarations as the Limit of Insurance for Business Income for a specific item, **SECTION B. LIMITS OF INSURANCE** is deleted in its entirety for that item.

**F.** If the policy to which this endorsement is attached has been issued for a period of more than one year, then this business income coverage is subject to annual rerating.

**FA 242 10 12**

# CinciPlus®

# COMMERCIAL PROPERTY POWER XC+® (EXPANDED COVERAGE PLUS) ENDORSEMENT
## SUMMARY OF COVERAGE LIMITS

This is a summary of the Coverages and the Limits of Insurance provided by the Commercial Property Power XC+®(Expanded Coverage Plus) Endorsement, **FA 258**, in combination with the Commercial Property Coverage Form, **FM101**, which is included in this policy. **No coverage is provided by this summary**. Refer to endorsement **FA 258** and the Commercial Property Coverage Form, **FM 101**, to determine the scope of your insurance protection.

| Blanket Coverages: | Blanket Coverage Limit: | Page No. (FA 258): |
|---|---|---|
| | $150,000 in total for all loss arising from all Blanket Coverages arising from a single occurrence, except as noted otherwise in the form. | |
| Accounts Receivable | | 1 |
| Debris Removal | | 8 |
| Electronic Data Processing Property (EDP): | | 2 |
|    Duplicate and Backup Electronic Data | $2,000 in addition to the Blanket Coverage Limit | 3 |
|    Newly Acquired EDP | $10,000 in addition to the Blanket Coverage Limit | 3 |
|    In Transit or Away From Premises | $10,000 as part of the Blanket Coverage Limit | 4 |
|    Worldwide Laptop Coverage | | 4 |
| Ordinance or Law (Increased Construction Costs and Demolition) | | 6 |
| Peak Season | | 8 |
| Personal Property of Others | | 8 |
| Tenant Move Back Expenses | | 7 |
| Valuable Papers and Records | | 6 |

| Other Coverages (not subject to Blanket Coverage Limit): | Limit of Insurance: | Page No. (FA 258): |
|---|---|---|
| Brands and Labels | $25,000 | 11 |
| Business Income and Extra Expense: | $100,000 | 1 |
|    Business Income From Dependent Properties | $5,000 (sub-limit, subject to a 24 hour deductible) | 1 |
|    Interruption of Computer Operations | $25,000 (sub-limit, subject to a 24 hour deductible) | 2 |

| **Other Coverages** (not subject to Blanket Coverage Limit): | **Limit of Insurance:** | **Page No. (FA 258):** |
|---|---|---|
| Fine Arts | $25,000 | 5 |
| Fire Department Service Charge | $25,000 | 7 |
| Fire Protection Equipment Recharge | $50,000 | 8 |
| Inflation Guard | 4% on all Building Property referenced in the Declarations | 11 |
| Non-Owned Building Damage: | | 10 |
|     Loss caused by theft, burglary or robbery | Up to the Business Personal Property (BPP) Limit of Insurance | 10 |
|     Loss by any other Covered Cause of Loss | $25,000 or the BPP Limit of Insurance (whichever is less) | 10 |
| Ordinance or Law (other than Increased Construction Costs and Demolition) | Subject to the Building Limit of Insurance | 6 |
| Outdoor Property | $25,000 ($1,000 for any one tree, shrub or plant) | 7 |
| Paved Surfaces | $20,000 | 8 |
| Personal Effects | $25,000 ($1,000 for loss by theft) | 7 |
| Pollutant Clean Up and Removal | $25,000 | 6 |
| Signs | $10,000 | 7 |
| Temperature Change | $15,000 | 9 |
| Underground Property | Subject to the Building Limit of Insurance | 6 |
| Utility Services - direct and time element | $75,000 | 11 |
|     Overhead transmission and distribution lines | $5,000 sublimit at 24 hr waiting period | 11 |
| Water Backup from Sewers, Drains or Sumps | $10,000 | 7 |

    

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WINDSTORM OR HAIL DOLLAR DEDUCTIBLE

This endorsement modifies insurance provided under the following:

### COMMERCIAL PROPERTY COVERAGE PART

## SCHEDULE*

| Loc | Bldg | Windstorm/Hail Dollar Deductible |
|-----|------|----------------------------------|
| 2 | 1 | 5,000 |
| 2 | 2 | 5,000 |

* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION C. DEDUCTIBLE** is deleted in its entirety and replaced with the following:

## WINDSTORM OR HAIL DEDUCTIBLE

1. Except as otherwise provided, in any one occurrence of "loss", we will first reduce the amount of "loss" if required by **SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance** or **F. OPTIONAL COVERAGES, 1. Agreed Value.** If the adjusted amount of "loss" is less than or equal to the Windstorm or Hail Deductible, we will not pay for that "loss". If the adjusted amount of "loss" exceeds that Deductible, we will then subtract that Deductible from the adjusted amount of "loss", and will pay the resulting amount or the Limit of Insurance, whichever is less. When the occurrence involves "loss" to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Windstorm or Hail Deductible.

2. The Windstorm or Hail Deductible, as shown in the Schedule of this endorsement, applies to covered "loss" caused directly or indirectly by Windstorm or Hail. This deductible applies to each occurrence of Windstorm or Hail and applies separately at each "premises" shown in the Schedule of this endorsement as described in Paragraph **5.** below.

3. When property is covered under the Coverage Extension for Newly Purchased, Leased or Constructed Property, the applicable deductible for such property is the highest dollar amount shown in the Schedule of this endorsement.

4. Nothing in this endorsement implies or affords coverage for any "loss" that is excluded under the terms of the Water Exclusion or any other exclusion in this policy. If this policy is endorsed to cover Flood under the Flood Coverage Endorsement, (or if you have a flood insurance policy), a separate Flood Deductible applies to "loss" attributable to Flood, in accordance with the terms of that endorsement or policy.

5. **WINDSTORM OR HAIL DEDUCTIBLE CALCULATIONS**

   A Deductible is calculated separately for and applies separately to each "premises" shown in the Schedule of this endorsement. If both the building and business personal property inside that building at a particular "premises" suffer "loss", the deductible only applies once.

**Example of Windstorm or Hail Dollar Deductible Calculation**

The Windstorm or Hail Deductible Schedule indicates that:

- Location 1, Bldg 1 has a $25,000 deductible.

- Location 2, Bldg 1 has a $50,000 deductible.

The same occurrence of windstorm damages the building and business personal property inside at Location 1 and the building at Location 2.

- The "loss" at Location 1 is subject to a $25,000 deductible,

- The "loss" at Location 2 is subject to a $50,000 deductible.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**FA 4144 05 16**

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. Concealment, Misrepresentation or Fraud**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

**B. Control of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of direct "loss", the breach of condition does not exist.

**C. Insurance Under Two or More Coverages**

If two or more of this policy's coverages apply to the same "loss", we will not pay more than the actual amount of the "loss".

**D. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Part unless:

**1.** There has been full compliance with all of the terms of this Coverage Part; and

**2.** The action is brought within 2 years after the date on which the direct "loss" occurred.

**E. Liberalization**

If, within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

**F. No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. Other Insurance**

**1.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered "loss". Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

**2.** If there is other insurance covering the same "loss", other than that described in **1.** above, we will pay only for the amount of covered "loss" in excess of the amount due from that other insurance, whether you can collect on it or not. **However, we will not reimburse any deductible or difference between Actual Cash Value and Replacement Cost valuations.** We will not pay more than the applicable Limit of Insurance.

**H. Policy Period, Coverage Territory**

Under this Coverage Part:

**1.** We cover "loss" commencing:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

**2.** The coverage territory:

**a.** The United States of America (including its territories and possessions);

**b.** Puerto Rico; and

**c.** Canada.

**I. Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after direct "loss" to impair them. But you may waive your rights against another party in writing:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

1. Prior to a direct "loss" to your Covered Property or Covered Income.

2. After a direct "loss" to your Covered Property or Covered Income only if, at time of direct "loss", that party is one of the following:

    a. Someone insured by this insurance;

    b. A business firm:

        (1) Owned or controlled by you; or

        (2) That owns or controls you; or

    c. Your tenant.

This will not restrict your insurance.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BUSINESS INCOME CHANGES - WAITING PERIOD

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

**SCHEDULE**

**"Period of Restoration" Waiting Period**

☐ 24 hours          ☒ 48 hours          ☐ 72 hours

**A. Applicable Coverage Forms**

This endorsement applies to the following Coverage Forms:

1. **BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM**, and

2. **BUSINESS INCOME (WITHOUT EXTRA EXPENSE) COVERAGE FORM**

**B. SECTION F. DEFINITIONS, 7. "Period of Restoration"**, is deleted in its entirety and replaced with the following:

7. **"Period of Restoration"** means the period of time that:

   **a.** Begins:

      **(1)** After the number of hours selected and shown in the Schedule have passed from the time of direct physical "loss" for Business Income coverage; or

      **(2)** Immediately after the time of direct physical "loss" for Extra Expense coverage;

caused by or resulting from any Covered Cause of Loss at the "premises"; and

   **b.** Ends on the earlier of:

      **(1)** The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      **(2)** The date when business is resumed at a new permanent location.

   "Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

      **(1)** Regulates the construction, use or repair, or requires the tearing down of any property; or

      **(2)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

   The expiration date of this policy will not cut short the "period of restoration".

Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

**SCHEDULE**

| Loc | Bldg | Loss Payee Name and Address: | Applicable Clause (Enter B, C, D or E): |
|-----|------|------------------------------|------------------------------------------|
| 1 | 1 | | B |

US BANK
PO BOX 790448
SAINT LOUIS, MO 63179-0448

**A.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

For the purposes of this endorsement only, the following are added to **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION D. LOSS CONDITIONS, 4. Loss Payment**, as indicated in the Schedule of this endorsement.

**B. Loss Payable**

For Covered Property in which both you and a Loss Payee shown in the Schedule of this endorsement have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**C. Lender's Loss Payable**

**1.** The Loss Payee shown in the Schedule of this endorsement is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**a.** Warehouse receipts;

**b.** A contract for deed;

**c.** Bills of lading;

**d.** Financing statements; or

**e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**a.** We will pay for covered "loss" to each Loss Payee in their order of precedence, as interests may appear.

**b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**c.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any "loss" and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**D. Contract of Sale**

**1.** The Loss Payee shown in the Schedule of this endorsement is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**3.** For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**E. Building Owner Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule of this endorsement is the owner of the building in which you are a tenant.

**2.** We will adjust losses to the building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**3.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

## SCHEDULE

| Loc | Bldg | Loss Payee Name and Address: | Applicable Clause (Enter B, C, D or E): |
|-----|------|------------------------------|-----------------------------------------|
| 1 | 1 | | B |

CITY OF SAN ANTONIO
ATTN: DOWNTOWN OPERATIONS DEPT
202 E NUEVA # 100
SAN ANTONIO, TX 78204-1021

**A.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

For the purposes of this endorsement only, the following are added to **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION D. LOSS CONDITIONS, 4. Loss Payment**, as indicated in the Schedule of this endorsement.

**B. Loss Payable**

For Covered Property in which both you and a Loss Payee shown in the Schedule of this endorsement have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**C. Lender's Loss Payable**

**1.** The Loss Payee shown in the Schedule of this endorsement is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**a.** Warehouse receipts;

**b.** A contract for deed;

**c.** Bills of lading;

**d.** Financing statements; or

**e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**a.** We will pay for covered "loss" to each Loss Payee in their order of precedence, as interests may appear.

**b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**c.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any "loss" and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**D. Contract of Sale**

**1.** The Loss Payee shown in the Schedule of this endorsement is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**3.** For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**E. Building Owner Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule of this endorsement is the owner of the building in which you are a tenant.

**2.** We will adjust losses to the building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**3.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

## SCHEDULE

| Loc | Bldg | Loss Payee Name and Address: | Applicable Clause (Enter B, C, D or E): |
|-----|------|------------------------------|------------------------------------------|
| 1 | 1 | | B |

FROST BANK
PO BOX 1600
SAN ANTONIO, TX 78296-1600

**A.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

For the purposes of this endorsement only, the following are added to **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION D. LOSS CONDITIONS, 4. Loss Payment**, as indicated in the Schedule of this endorsement.

**B. Loss Payable**

For Covered Property in which both you and a Loss Payee shown in the Schedule of this endorsement have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**C. Lender's Loss Payable**

**1.** The Loss Payee shown in the Schedule of this endorsement is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

    **a.** Warehouse receipts;

    **b.** A contract for deed;

    **c.** Bills of lading;

    **d.** Financing statements; or

    **e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

    **a.** We will pay for covered "loss" to each Loss Payee in their order of precedence, as interests may appear.

    **b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

    **c.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

        **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

        **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any "loss" and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**D. Contract of Sale**

**1.** The Loss Payee shown in the Schedule of this endorsement is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**3.** For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**E. Building Owner Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule of this endorsement is the owner of the building in which you are a tenant.

**2.** We will adjust losses to the building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**3.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

**SCHEDULE**

| Loc | Bldg | Loss Payee Name and Address: | Applicable Clause (Enter B, C, D or E): |
|-----|------|------------------------------|-----------------------------------------|
| 2 | 1 | | B |

US BANCORP
1310 MADRID ST STE 101
MARSHALL, MN 56258-4002

**A.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

For the purposes of this endorsement only, the following are added to **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION D. LOSS CONDITIONS, 4. Loss Payment**, as indicated in the Schedule of this endorsement.

**B. Loss Payable**

For Covered Property in which both you and a Loss Payee shown in the Schedule of this endorsement have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**C. Lender's Loss Payable**

**1.** The Loss Payee shown in the Schedule of this endorsement is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

**a.** Warehouse receipts;

**b.** A contract for deed;

**c.** Bills of lading;

**d.** Financing statements; or

**e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

**a.** We will pay for covered "loss" to each Loss Payee in their order of precedence, as interests may appear.

**b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

**c.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

**(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any "loss" and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**D. Contract of Sale**

**1.** The Loss Payee shown in the Schedule of this endorsement is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**3.** For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**E. Building Owner Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule of this endorsement is the owner of the building in which you are a tenant.

**2.** We will adjust losses to the building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**3.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

**SCHEDULE**

| Loc | Bldg | Loss Payee Name and Address: | Applicable Clause (Enter B, C, D or E): |
|-----|------|------------------------------|------------------------------------------|
| 4 | 1 | | B |

```
CITY OF SAN ANTONIO
ATTN: DOWNTOWN OPERATIONS DEPT
202 E NUEVA # 100
SAN ANTONIO, TX 78204-1021
```

**A.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

For the purposes of this endorsement only, the following are added to **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION D. LOSS CONDITIONS, 4. Loss Payment**, as indicated in the Schedule of this endorsement.

**B. Loss Payable**

For Covered Property in which both you and a Loss Payee shown in the Schedule of this endorsement have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**C. Lender's Loss Payable**

**1.** The Loss Payee shown in the Schedule of this endorsement is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

    **a.** Warehouse receipts;

    **b.** A contract for deed;

    **c.** Bills of lading;

    **d.** Financing statements; or

    **e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

    **a.** We will pay for covered "loss" to each Loss Payee in their order of precedence, as interests may appear.

    **b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

    **c.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

        **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

        **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

**FA 480 02 16**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Page 1 of 2**

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any "loss" and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**D. Contract of Sale**

**1.** The Loss Payee shown in the Schedule of this endorsement is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**3.** For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**E. Building Owner Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule of this endorsement is the owner of the building in which you are a tenant.

**2.** We will adjust losses to the building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**3.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOSS PAYABLE PROVISIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

## SCHEDULE

| Loc | Bldg | Loss Payee Name and Address: | Applicable Clause (Enter B, C, D or E): |
|-----|------|------------------------------|------------------------------------------|
| 4 | 1 | | B |

FROST BANK
PO BOX 1600
SAN ANTONIO, TX 78296-1600

**A.** Nothing in this endorsement increases the applicable Limit of Insurance. We will not pay any Loss Payee more than their financial interest in the Covered Property, and we will not pay more than the applicable Limit of Insurance on the Covered Property.

For the purposes of this endorsement only, the following are added to **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION D. LOSS CONDITIONS, 4. Loss Payment**, as indicated in the Schedule of this endorsement.

**B. Loss Payable**

For Covered Property in which both you and a Loss Payee shown in the Schedule of this endorsement have an insurable interest, we will:

**1.** Adjust losses with you; and

**2.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**C. Lender's Loss Payable**

**1.** The Loss Payee shown in the Schedule of this endorsement is a creditor, including a mortgageholder or trustee, whose interest in Covered Property is established by such written instruments as:

    **a.** Warehouse receipts;

    **b.** A contract for deed;

    **c.** Bills of lading;

    **d.** Financing statements; or

    **e.** Mortgages, deeds of trust, or security agreements.

**2.** For Covered Property in which both you and a Loss Payee have an insurable interest:

    **a.** We will pay for covered "loss" to each Loss Payee in their order of precedence, as interests may appear.

    **b.** The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the Covered Property.

    **c.** If we deny your claim because of your acts or because you have failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee:

        **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

        **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the Loss Payee.

All of the terms of this Coverage Part will then apply directly to the Loss Payee.

**d.** If we pay the Loss Payee for any "loss" and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

**(1)** The Loss Payee's rights will be transferred to us to the extent of the amount we pay; and

**(2)** The Loss Payee's rights to recover the full amount of the Loss Payee's claim will not be impaired.

At our option, we may pay to the Loss Payee the whole principal on the debt plus any accrued interest. In this event, you will pay your remaining debt to us.

**3.** If we cancel this policy, we will give written notice to the Loss Payee at least:

**a.** 10 days before the effective date of cancellation if we cancel for your nonpayment of premium; or

**b.** 30 days before the effective date of cancellation if we cancel for any other reason.

**4.** If we elect not to renew this policy, we will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**D. Contract of Sale**

**1.** The Loss Payee shown in the Schedule of this endorsement is a person or organization you have entered a contract with for the sale of Covered Property.

**2.** For Covered Property in which both you and the Loss Payee have an insurable interest we will:

**a.** Adjust losses with you; and

**b.** Pay any claim for "loss" jointly to you and the Loss Payee, as interests may appear.

**3.** For Covered Property that is the subject of a contract of sale, the word "you" includes the Loss Payee.

**E. Building Owner Loss Payable Clause**

**1.** The Loss Payee shown in the Schedule of this endorsement is the owner of the building in which you are a tenant.

**2.** We will adjust losses to the building with the Loss Payee. Any loss payment made to the Loss Payee will satisfy your claims against us for the owner's property.

**3.** We will adjust losses to tenants' improvements and betterments with you, unless the lease provides otherwise.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CINCIPLUS®
# COMMERCIAL PROPERTY POWER XC+®
# (EXPANDED COVERAGE PLUS) ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

**The insurance coverage and Limits of Insurance provided by this endorsement are excess of, and apply in addition to, any similar or identical coverage provided by any other endorsement attached to this Coverage Part, or by any other Coverage Part forming a part of the policy of insurance of which this Coverage Part forms a component.**

**SCHEDULE**

| Blanket Coverage Limit | $150,000 |
|---|---|
| Applicable only to those coverages subject to the Blanket Coverage Limit, as indicated in this endorsement | |

**A. Accounts Receivable**

For the purposes of this endorsement only:

1. In **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, a. Accounts Receivable**, the second paragraph in **(3)(b) Away From Your Premises** is deleted in its entirety and replaced by the following:

   This limit of insurance for Away From Your Premises coverage is not included within the Blanket Coverage Limit and is separate and in addition to the Blanket Coverage Limit.

2. In **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, a. Accounts Receivable**, the last paragraph is deleted in its entirety and replaced by the following:

   The most we will pay for loss in any one occurrence under this Accounts Receivable Coverage Extension is the Blanket Coverage Limit as provided in Section **Y** of this endorsement.

**B. Business Income and Extra Expense**

For the purposes of this endorsement only, in **BUILDING AND PERSONAL PROPERTY**

**COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, b. Business Income and Extra Expense** is modified as follows:

1. **Business Income From Dependent Properties**

   a. For **Business Income from Dependent Properties** only, Paragraph **b.(1)** is deleted in its entirety and replaced by the following:

      (1) **Business Income From Dependent Properties**

         We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to "dependent property" caused by or resulting from any Covered Cause of Loss.

         However, coverage under this endorsement does not apply when the only "loss" to "dependent property" is "loss" to "electronic data", including destruction or corruption of "electronic data". If the "dependent property" sustains "loss" to

Includes copyrighted material of Insurance
Services Office, Inc., with its permission.

"electronic data" and other property, coverage under this endorsement will not continue once the other property is repaired, rebuilt, or replaced.

**b.  Limit of Insurance for Dependent Properties**

The most we will pay for loss in one occurrence under **Business Income From Dependent Properties** is $5,000. This Limit of Insurance is included within, and is not in addition to, the Limit of Insurance for the "Business Income" and Extra Expense Coverage Extension.

**c.  Loss Determination for Dependent Properties**

For **Business Income from Dependent Properties** only, the following is added:

**Resumption of Operations**

We will reduce the amount of your:

**(1)** "Business Income" loss, other than Extra Expense, to the extent you can resume "operations", in whole or in part, by using any other available

**(a)** Source of materials; or

**(b)** Outlet for your products.

**(2)** Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.  Definitions**

**SECTION G. DEFINITIONS** is amended to include the following definitions:

**(1)** "Dependent property" means property operated by others whom you depend on to:

**(a)** Deliver materials or services to you, or to others for your account (Contributing Locations). But any property which delivers the following services is not a Contributing Location with respect to such services:

**1)** Water Supply services;

**2)** Power Supply services; or

**3)** Communication supply services, including services relating to internet access or access to any electronic network;

**(b)** Accept your products or services;

**(c)** Manufacture products for delivery to your customers under contract of sale; or

**(d)** Attract customers to your business.

**(2)** The "Period of restoration" Definition, with respect to "dependent property", is replaced by the following:

"Period of restoration" means the period of time that:

**(a)** Begins 24 hours after the time of direct "loss" caused by or resulting from any Covered Cause of Loss at the "premises" of the "dependent property"; and

**(b)** Ends on the date when the property at the "premises" of the "dependent property" should be repaired, rebuilt or replaced with reasonable speed and similar quality.

"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

**(a)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(b)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this Coverage Part will not cut short the "period of restoration".

The most we will pay is the **Business Income From Dependent Properties** sublimit of insurance. This Limit of Insurance is included within, and is not in addition to, the Limit of Insurance for the

"Business Income" and Extra Expense Coverage Extension.

**2. Interruption of Computer Operations**

**a.** For **Interruption of Computer Operations** only, all references to $2,500 in **b. Business Income and Extra Expense,** Paragraph **(7)(c)** are deleted and replaced by $25,000.

**b.** **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION G. DEFINITIONS** is amended as follows:

With respect to a "suspension" of "operations" caused only by an interruption in computer operations due to the destruction or corruption of "electronic data" as described in **SECTION A. COVERAGE, 5. Coverage Extensions, d. Electronic Data,** Paragraph **a.** of Definition **11.** "Period of restoration" is deleted and replaced by the following:

**a.** Begins 24 hours after the time of direct "loss".

**3. Business Income and Extra Expense Revised Limits of Insurance**

The last paragraph is deleted in its entirety and replaced by the following:

The most we will pay for loss in any one occurrence under this "Business Income" and Extra Expense Coverage Extension is $100,000.

**C. Electronic Data Processing Property**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended by adding the following:

**Electronic Data Processing Property**

**(1) Covered Property**

You may extend the Coverage provided by this Coverage Part to apply to direct "loss" to Covered Property consisting of your:

**(a)** Data processing equipment;

**(b)** Air conditioning and other electrical equipment, used exclusively with your data processing equipment;

**(c)** Programming documentation and instruction manuals;

**(d)** "Electronic data", but only as excess over what is valid and collectible under **SECTION A. COVERAGE, 5. Coverage Extensions, d. Electronic Data;**

**(e)** Media, meaning materials on which "electronic data" is recorded, such as magnetic tapes, disc packs, paper tapes and cards, floppy discs and compact discs used in processing units; and

**(f)** Property of others in your care, custody or control that is similar to property described in **(1)(a)** through **(e)** above.

**(2) Property Not Covered**

This Coverage Extension does not apply to:

**(a)** Accounts, records, documents and other "valuable papers and records" unless they are programming documentation or instruction manuals.

However, we will cover these items once they are converted to "electronic data" form.

**(b)** "Electronic data" or media that cannot be replaced with similar property of equal quality.

**(c)** Your property that you have rented or leased to someone else and that property is not at your "premises".

**(d)** Any machine or apparatus that is used for research, medical, diagnostic, surgical, dental or pathological purposes.

**(e)** "Production equipment".

**(3) Exclusions**

**(a)** **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions** does not apply except as follows:

**1)** **Exclusion (1)(c) Governmental Action;**

**2)** **Exclusion (1)(d) Nuclear Hazard;**

**3)** **Exclusion (1)(f) War and Military Action;**

**4)** **Exclusion (2)(b) Delay or Loss of Use;**

5) **Exclusion (2)(d) Miscellane-ous Causes of Loss, 1)** Wear and tear;

6) **Exclusion (2)(h) Dishonest or Criminal Acts;**

7) **Exclusion (3)(b) Acts or Decisions**; and

8) **Exclusion (3)(c) Defects, Errors and Omissions.**

(b) In addition to Paragraph **(3)(a)** of this Coverage Extension, we will not pay for the following:

Hidden or latent defect, gradual deterioration, and depreciation. However, if direct "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss".

**(4) Duplicate and Backup "Electronic Data"**

We will pay for direct "loss" resulting from any of the Covered Causes of Loss to duplicate and backup "electronic data" that you store at a "premises" not described in the Declarations providing such "electronic data" is not covered by another policy. The most we will pay for loss in any one occurrence is $2,000. This Limit of Insurance is in addition to the other limits provided by this Coverage Extension.

**(5) Newly Purchased Electronic Data Processing Property**

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, i. Newly Purchased, Leased or Constructed Property** is deleted in its entirety and replaced by the following:

(a) We will pay for direct "loss" from a Covered Cause of Loss to newly purchased or leased Covered Property described in Paragraph **(1)** of this Coverage Extension while at:

1) Locations that are newly purchased or leased;

2) Your newly constructed buildings or additions at a "premises"; or

3) Any "premises" described in the Declarations.

(b) Insurance under this Coverage Extension for such newly acquired property, or Covered Property already insured by this Coverage Extension which is moved to a newly

acquired location, will end when any of the following first occurs:

1) This Coverage Part expires;

2) 90 days pass from the date you acquire your new property or move Covered Property to a newly acquired location; or

3) You report values to us.

The most we will pay for loss in any one occurrence is $10,000. This Limit of Insurance is in addition to the other limits provided by this Coverage Extension.

**(6) In Transit or Away From Premises**

**SECTION A. COVERAGE, 5. Coverage Extensions, e. Exhibitions, Fairs or Trade Shows, m. Property Off Premises** and **p. Transportation** are deleted in their entirety and replaced by the following:

(a) You may extend the insurance provided by this Coverage Extension to apply to Covered Property as described in Paragraph **(1)**:

1) While in or on a vehicle, including loading and unloading; or

2) While at a location that is not your "premises".

(b) This **In Transit or Away From Premises** coverage does not apply per location.

The most we will pay for loss in any one occurrence is $10,000. This Limit of Insurance is not in addition to the other limits provided by this Coverage Extension.

**(7) Worldwide Laptop Coverage**

(a) You may extend the insurance provided by this Coverage Extension to apply to your laptops, notebooks and similar highly portable personal computers, including their peripherals and accessories, while such specific Covered Property is:

1) In your or your employee's care, custody and control;

2) Not located at a "premises" you own or lease; and

3) Not located in the coverage territory stated in Paragraph **2.** of the Commercial Property Condition **H. Policy Period, Coverage Territory**, provided that location is not under a United

States Department of State trade or travel restriction at the time of "loss".

**(b)** This **Worldwide Laptop Coverage** does not apply per location.

**(8) Electronic Data Processing Property Deductible**

**SECTION C. DEDUCTIBLE** is amended to include the following:

We will not pay for direct "loss" in any one occurrence unless the amount of "loss" exceeds the Deductible shown in the Declarations. We will then pay the amount of "loss" in excess of the Deductible, up to the Limit of Insurance provided by this Coverage Extension.

However, direct "loss" caused by or resulting from any of the following Causes of Loss will have the greater of the Deductible shown in the Declarations or $1,000 as the applicable deductible:

**a.** "Loss" caused by faulty construction, error in design or processing, or service or work upon the data processing system;

**b.** "Loss" resulting in mechanical breakdown, short circuiting, blowout, or other electrical damage, unless caused by lightning; or

**c.** "Loss" caused by or resulting from interruption of power supply, power surge, blackout or brownout.

**(9) Electronic Data Processing Property Valuation**

**SECTION D. LOSS CONDITIONS, 7. Valuation** is deleted in its entirety and replaced by the following:

**7.** <u>**Valuation of Electronic Data Processing Property**</u>

In the event of direct "loss", we will determine the value of Covered Property as described in Paragraph **(1)** of this Coverage Extension as follows:

**a.** Except for "electronic data":

**(1)** If you repair or replace this Electronic Data Processing property within a reasonable time following the direct "loss", the property will be valued at the full cost of repair or replacement.

However, the most we will pay is the least of the following:

**(a)** The actual cost to repair or restore the property with materials of like kind and quality;

**(b)** The cost of replacing that property with property of similar quality and function;

**(c)** The amount you actually and necessarily spend to repair or replace the property; or

**(d)** The Limit of Insurance applicable to the property.

**(2)** If you do not repair or replace this property within a reasonable time following a direct "loss", the most we will pay will be the least of the following:

**(a)** "Actual cash value" of the property;

**(b)** "Actual cash value" of repairs with material of like kind and quality; or

**(c)** The Limit of Insurance applicable to the property.

We reserve the right to repair or replace the property or to pay for the property in money.

In the event of "loss", the value of property will be determined at the time of direct "loss".

**b.** For "electronic data":

We will not pay more than the actual reproduction costs of your "electronic data". If you do not replace or reproduce your "electronic data" following the "loss", the most we will pay is the cost of blank media as described in Paragraph **C.(1)(e)** of this Coverage Extension.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(10) Electronic Data Processing Property Additional Definition**

The following definition is added to **SECTION G. DEFINITIONS** of the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM:**

"Production equipment" means any machinery and related components, including any integrated or dedicated computer system, which is used, or can be used, to produce or process other tangible property.

The most we will pay in total for all loss in any one occurrence for coverages described in Paragraphs **C.(1), (6),** and **(7)** is the Blanket Coverage Limit as provided in Section **Y.** of this endorsement.

**D.   Fine Arts**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended to include the following:

<u>Fine Arts</u>

**(1)** We will pay for direct "loss" to paintings, etchings, pictures, tapestries, art glass windows, and other bona fide works of art of rarity, historical value, or artistic merit. The direct "loss" must be caused by or result from a Covered Cause of Loss.

**(2)** **SECTION D. LOSS CONDITIONS, 7. Valuation** is deleted in its entirety and replaced by the following:

We will determine the value of Covered Property in the event of direct "loss" at the market value at the time of "loss".

The most we will pay for loss in any one occurrence under this Coverage Extension is $25,000.

**E.   Ordinance or Law**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 4. Additional Coverages, g. Ordinance or Law,** the last paragraph is deleted in its entirety and replaced by the following:

The most we will pay for loss in any one occurrence under Paragraph **(a) Loss of Use of Undamaged Parts of the Building** is the Limit of Insurance shown in the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** as applicable to the covered building or structure sustaining "loss". This

Coverage is included within, and not in addition to, that applicable Limit of Insurance.

The most we will pay for all loss in any one occurrence under Paragraph **(b) Demolition Costs** and Paragraph **(c) Increased Costs of Construction** is the Blanket Coverage Limit as provided in Section **Y** of this endorsement per building or structure sustaining loss. This is an additional Limit of Insurance applicable to the building or structure sustaining loss.

**F.   Pollutant Clean Up and Removal**

For the purposes of this endorsement only, in **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 4. Additional Coverages, h. Pollutant Clean Up and Removal,** the last paragraph is deleted in its entirety and replaced by the following:

The most we will pay for each "premises" under this Pollutant Clean Up and Removal Coverage Extension is $25,000. This limit includes the sum of all covered expenses arising out of Covered Causes of Loss during each "coverage term". This is in addition to the Limits of Insurance shown in the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS**.

**G.   Underground Property**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended to include the following:

<u>Underground Property</u>

**(1)** We will pay for direct "loss" resulting from any of the Covered Causes of Loss to:

**(a)** Foundations of covered buildings, structures, machinery or boilers, if their foundations are below the lowest basement floor or the surface of the ground if there is no basement; and

**(b)** Underground pipes, flues or drains if they are attached to Covered Property.

**(2)** **SECTION A. COVERAGE, 2. Property Not Covered, g. Foundations** is deleted in its entirety and replaced by the following:

**g.   <u>Foundations</u>**

Foundations of buildings, structures, machinery or boilers, if their foundations are below:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(1)** The lowest basement floor; or

**(2)** The surface of the ground, if there is no basement;

except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions.**

**(3)** **SECTION A. COVERAGE, 2. Property Not Covered, n. Underground Pipes, Flues or Drains** is deleted in its entirety and replaced by the following:

**n.** <u>Underground Pipes, Flues or Drains</u>

Underground pipes, flues or drains, except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions.**

The most we will pay for loss in any one occurrence is the Limit of Insurance shown in the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** as applicable to the covered building or structure incurring direct "loss". This Coverage is included within, and not in addition to, that applicable Limit of Insurance.

**H.** **Valuable Papers and Records**

For the purposes of this endorsement only:

**1.** In **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, r. Valuable Papers and Records**, the second paragraph in **(4)(b) Away From Your Premises** is deleted in its entirety and replaced by the following:

This limit of insurance for **Away From Your Premises** coverage is not included within the Blanket Coverage Limit and is separate and in addition to the Blanket Coverage Limit.

**2.** In **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, r. Valuable Papers and Records**, the last paragraph is deleted in its entirety and replaced by the following:

The most we will pay for loss in any one occurrence under this Valuable Papers and Records Coverage Extension is the Blanket Coverage Limit as provided in Section **Y** of this endorsement.

**I.** **Water Backup Discharged from Sewers, Drains, Septic or Sump Pump Systems**

For the purposes of this endorsement only:

**(1)** **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions, (1)(g) Water,** Paragraph **3)** is deleted in its entirety and replaced by the following:

**3)** Except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, Water Backup Discharged from Sewers, Drains, Septic or Sump Pump Systems,** water that has entered and then backs up through and is discharged from a sewer, drain, septic system, sump pump system or related equipment; or

**(2)** **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions, (1)(g) Water,** Paragraph **5)** is deleted in its entirety and replaced by the following:

**5)** Except as provided in **SECTION A. COVERAGE, 5. Coverage Extensions, Water Backup Discharged from Sewers, Drains, Septic or Sump Pump Systems,** waterborne material carried or otherwise moved by any of the water referred to in Paragraph **1), 3)** or **4),** or material carried or otherwise moved by mudslide or mudflow as described in Paragraph **(g)2).**

**(3)** **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions,** is amended to include the following:

**Water Backup Discharged From Sewers, Drains, Septic or Sump Pump Systems**

We will pay for "loss" caused by or resulting from water or waterborne material that has entered and then backs up through and is discharged from a sewer, drain (including roof drains and related fixtures), septic system, sump pump system or related equipment.

**(4)** **SECTION C. DEDUCTIBLE** is amended by adding the following:

<u>Water Backup Deductible</u>

We will not pay for "loss" in any one occurrence caused by or resulting from water or waterborne material which backs up through and is discharged from a sewer, drain, septic system, sump pump system or related equipment, until the amount of "loss" exceeds the De-

ductible shown in the Declarations, or $1,000, whichever is greater. We will then pay the amount of "loss" in excess of that deductible, up to the applicable limit indicated in Paragraph **(5)** of this Coverage Extension.

**(5)** The most we will pay for loss in any one occurrence under this Water Backup Discharged from Sewers, Drains, Septic or Sump Pump Systems Coverage Extension is $10,000, including any "Business Income", "Rental Value" and Extra Expense loss.

## J. Fire Department Service Charge

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 4. Additional Coverages, c. Fire Department Service Charge** is deleted in its entirety and replaced by the following:

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 in any one occurrence for Fire Department Service Charge for your liability, which is determined prior to direct "loss", for fire department service charges:

**(1)** Assumed by contract or agreement; or

**(2)** Required by local ordinance.

This Coverage is in addition to the Limits of Insurance shown in the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** and applies per location. Such limit is the most we will pay regardless of the number of responding fire departments or fire units, and regardless of the number or type of services performed.

## K. Signs

For the purposes of this endorsement only, in **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, n. Signs**, the second paragraph is deleted in its entirety and replaced by the following:

The most we will pay for loss in any one occurrence under this Sign Coverage Extension is $10,000.

## L. Outdoor Property

For the purposes of this endorsement only, in **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, k. Outdoor Property**, the last paragraph is deleted in its entirety and replaced by the following:

The most we will pay for loss in any one occurrence under this Outdoor Property Coverage Extension is $25,000, but not more than $1,000 for any one tree, shrub, or plant.

## M. Personal Effects

For the purposes of this endorsement only, in **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, I. Personal Effects**, the last two paragraphs are deleted in their entirety and replaced by the following:

If theft is included as a Covered Cause of Loss under this Coverage Part, then this Personal Effects Coverage Extension has a $1,000 per occurrence limitation for direct "loss" by theft.

The most we will pay for loss in any one occurrence under this Personal Effects Coverage Extension is $25,000.

## N. Tenant Move Back Expenses

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended to include the following:

**Tenant Move Back Expenses**

**(1)** We will reimburse you for expenses you pay for Covered Move Back Costs of your tenants who temporarily vacate a portion of the building at a "premises". The vacancy must have occurred while the portion of the building rented by your tenant could not be occupied due to direct "loss" to your Covered Property caused by or resulting from a Covered Cause of Loss during the "coverage term". The move back must be completed within 60 calendar days after the portion of the building rented by your tenant has been repaired or rebuilt and is ready for occupancy.

**(2)** Covered Move Back Costs means only documented, reasonable and necessary costs of:

**(a)** Packing, insuring and transporting business personal property;

**(b)** Re-establishing electric utility and communication services, less refunds from discontinued services;

**(c)** Assembling and setting up fixtures and equipment; or

**(d)** Unpacking and re-shelving stock and supplies.

Includes copyrighted material of Insurance
Services Office, Inc., with its permission.

**(3)** If your tenants have valid and collectible insurance for Covered Move Back Costs, we will pay only for the amount of Covered Move Back Costs in excess of the amount payable from such other insurance.

The most we will pay for loss in any one occurrence under this Tenant Move Back Expenses Coverage Extension is the Blanket Coverage Limit as provided in Section **Y** of this endorsement.

**O. Peak Season**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended to include the following:

**Peak Season**

**1.** In the event that the limit of insurance stated in the Declarations for Business Personal Property is insufficient to fully insure a covered "loss" due to a Peak Season Demand for your inventory, we will pay up to the Blanket Coverage Limit as provided in Section **Y** of this endorsement.

**2.** Peak Season Demand means a temporary (90 consecutive days or less) increase in your inventory to meet a seasonal demand as verified by:

**a.** Your previous inventory records for that historical period of time; and

**b.** Custom and practice in your industry.

**P. Personal Property of Others**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended to include the following:

**Personal Property of Others**

In the event that the limit of insurance stated in the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** for Business Personal Property is insufficient to fully insure a covered "loss" to both your Covered Personal Property and property described in Paragraph **(8)** of **SECTION A. COVERAGE, 1. Covered Property, d. Business Personal Property,** we will pay up to the Blanket Coverage Limit in any one occurrence as provided in Section **Y** of this endorsement for such property.

**Q. Debris Removal**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended to include the following:

In the event that the limits of insurance stated in **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 4. Additional Coverages, b. Debris Removal** are insufficient to fully cover a "loss" insured thereunder, we will pay up to the Blanket Coverage Limit in any one occurrence as provided in Section **Y** of this endorsement.

**R. Fire Protection Equipment Recharge**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 4. Additional Coverages, d. Fire Protection Equipment Recharge,** the last paragraph is deleted and replaced by the following:

The most we will pay for loss in any one occurrence under this Fire Protection Equipment Recharge Coverage Extension is $50,000. This Coverage is in addition to the Limits of Insurance shown in the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS.**

**S. Paved Surfaces**

For the purposes of this endorsement only:

**1. BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 2. Property Not Covered, i. Paved Surfaces** is deleted in its entirety and replaced by the following:

Except as provided in **4. Additional Coverages, Paved Surfaces,** bridges, roadways, walks, patios or other paved surfaces.

**2. BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 4. Additional Coverages** is amended to include the following:

**Paved Surfaces**

We will pay for direct "loss" resulting from any of the Covered Causes of Loss to bridges, roadways, walks, patios or other paved surfaces.

The most we will pay for loss in any one occurrence under this Paved Surfaces Coverage Extension is $25,000.

**T.  Temperature Change**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions** is amended to include the following:

**Temperature Change**

**(1)  Coverage**

**(a)  BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 1. Covered Property** is deleted in its entirety and replaced by the following:

Covered Property means "perishable stock" located in a building at a "premises".

**(b)  BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 2. Property Not Covered** is deleted in its entirety and replaced by the following:

Covered Property does not include:

**"Perishable Stock" Not in Buildings**

"Perishable stock" located on buildings, in or on vehicles, or otherwise in the open.

**(2)  Covered Causes of Loss**

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 3. Covered Causes of Loss, a. Covered Causes of Loss** is deleted in its entirety and replaced by the following:

**a.  Covered Causes of Loss**

Covered Causes of Loss means direct "loss" from "temperature change" to Covered Property unless "loss" is excluded or limited in this Coverage Part.

**(3)  Excluded Causes of Loss**

**(a)  BUILDING AND PERSONAL PROPERTY COVERAGE FORM SECTION A. COVERAGE, 3. Covered Causes of Loss, b. Exclusions** does not apply to this Coverage Extension, except as follows:

**(1)  Exclusion (1)(b) Earth Movement**;

**(2)  Exclusion (1)(c) Governmental Action;**

**(3)  Exclusion (1)(d) Nuclear Hazard;**

**(4)  Exclusion (1)(f) War and Military Action;**

**(5)  Exclusion (1)(g) Water**; or

**(6)  Exclusion (1)(h) "Fungi", Wet Rot, Dry Rot, and Bacteria.**

**(b)**  In addition to Paragraph **(3)(a)** of this Coverage Extension, we will not pay for direct "loss" caused by or resulting from any of the following:

**1)**  The disconnecting of any heating, refrigerating, cooling or humidity control system from the source of its power;

**2)**  The deactivation of electrical power caused by the manipulation of any switch or other device (on "premises") used to control the flow of electrical power or current;

**3)**  The inability of an Electrical Utility Company or other power source to provide sufficient power due to:

**a)**  Lack of fuel; or

**b)**  Governmental order;

**4)**  The inability of a power source at the "premises" to provide sufficient power due to the lack of generating capacity to meet demand; or

**5)**  Breaking of any glass that is a permanent part of any heating, refrigeration, cooling or humidity control unit.

**(4)  Limits of Insurance**

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION B. LIMITS OF INSURANCE** is deleted in its entirety and replaced by the following:

**SECTION B. LIMITS OF INSURANCE**

**a.**  The most we will pay for all direct "loss" in any one occurrence under this Temperature Change Coverage Extension is $15,000, including any "Business Income", "Rental Value", and Extra Expense loss.

**b.**  The Limit of Insurance for Temperature Change is not an additional amount of insurance and will not increase the Limit of Insurance shown

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

in the Declarations for Business Personal Property or "stock".

**(5) Duties in the Event of Loss**

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION D. LOSS CONDITIONS, 3. Duties in the Event of Loss or Damage, a.(2)** is deleted in its entirety and replaced by the following:

**(2)** All claims under this Temperature Change Coverage Extension should be reported immediately upon occurrence. Include a description of the damaged "perishable stock". All damaged "perishable stock" must be available for inspection and verification.

**(6) Coinsurance**

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance** does not apply to the coverage provided by this endorsement.

**(7) Definitions**

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION G. DEFINITIONS** is amended to include the following definitions:

"Perishable stock" means personal property:

**a.** Preserved and maintained under controlled conditions; and

**b.** Susceptible to "loss" if the controlled conditions change.

"Temperature change" means:

**a.** The fluctuation or total interruption of electrical power, either on or off "premises", resulting from conditions beyond your control.

**b.** Mechanical breakdown or mechanical failure of any refrigerating or cooling apparatus or equipment (on "premises") including the blowing of any fuse, fuses, or circuit breakers, only while such equipment is at the "premises".

**c.** Contamination by refrigerant.

**d.** Damage due to the freezing of "perishable stock" that is not meant to be frozen resulting from the faulty operation of any stationary heating plant, when such "perishable stock" is contained within a building at the "premises".

**U. Nonowned Building Damage**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 5. Coverage Extensions, j. Nonowned Building Damage** is deleted in its entirety and replaced by the following:

If you are a tenant, you may extend the insurance provided by this Coverage Part for Business Personal Property to direct "loss" that occurs to the building at a "premises" you occupy but do not own.

This Coverage Extension applies only if your lease makes you legally responsible for that part of the building sustaining "loss".

This Coverage Extension does not apply to:

**(1)** Glass, including lettering and ornamentation, and also necessary:

**(a)** Repair or replacement of encasing frames or alarm tapes; and

**(b)** Expenses incurred to board up openings or remove or replace obstruction.

**(2)** Building materials and equipment removed from the "premises".

The most we will pay for loss in any one occurrence under this Nonowned Building Damage Coverage Extension is:

**(1)** The actual "loss" sustained up to the applicable Limit of Insurance for Business Personal Property for direct "loss" caused by theft, burglary or robbery, or the attempt of the foregoing; or

**(2)** The applicable Limit of Insurance for Business Personal Property or $25,000, whichever is less, for "loss" caused by any other Covered Cause of Loss, not referenced in Paragraph **U.(1)** above.

**V. Inflation Guard**

For the purposes of this endorsement only, the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** is amended to show 4% for Inflation Guard in the OPTIONAL COVERAGES - Inflation Guard column for each scheduled Building Property. If an Inflation Guard percentage is already indicated on the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS** for that Building property, this percentage is excess of that Inflation Guard percentage for that Building property.

**W. Brands and Labels**

For the purposes of this endorsement only, **BUILDING AND PERSONAL PROPERTY**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**COVERAGE FORM, SECTION A. COVER-
AGE, 5. Coverage Extensions** is amended
to include the following:

<u>Brands and Labels</u>

If branded or labeled merchandise that is
Covered Property is damaged by a Covered
Cause of Loss, we may take all or any part of
the property at an agreed or appraised value.
If so, you may:

**(1)** Stamp "salvage" on the merchandise or
its containers, if the stamp will not physi-
cally damage the merchandise; or

**(2)** Remove the brands or labels, if doing so
will not physically damage the merchan-
dise. You must re-label the merchandise
or its containers to comply with the law.

The most we will pay for loss in any one
occurrence under this Brands and La-
bels Coverage Extension is $25,000.

**X. Utility Services**

For the purposes of this endorsement only,
**BUILDING AND PERSONAL PROPERTY
COVERAGE FORM, SECTION A. COVER-
AGE, 5. Coverage Extensions, q. Utility
Services** is deleted in its entirety and re-
placed by the following:

**q. Utility Services**

We will pay for:

**(1)** Direct "loss" to Covered Property at
your "premises" except for direct
"loss" resulting from the partial or
complete failure of Wastewater
Removal Services; and

**(2)** Loss of "Business Income", "Rental
Value" and Extra Expenses as pro-
vided in **SECTION A. COVERAGE,
5. Coverage Extensions, b. Busi-
ness Income and Extra Expense;**

caused by or resulting from the partial or
complete failure of utility services to the
"premises".

The partial or complete failure of the
utility services listed below must be
caused by direct "loss" caused by a
Covered Cause of Loss to the following
property:

**(1)** Power Supply Property, meaning
the following types of property sup-
plying electricity, steam or natural
gas to the "premises":

**(a)** Utility generating plants;

**(b)** Switching stations;

**(c)** Substations;

**(d)** Transformers; and

**(e)** Transmission, distribution, ser-
vice, or similar lines, including
all such overhead lines of any
type, except as modified in
Paragraph **X.(6)** below;

**(2)** Water Supply Property, meaning
the following types of property sup-
plying water to the "premises":

**(a)** Pumping stations; and

**(b)** Water mains.

**(3)** Wastewater Removal Property,
meaning a utility system for remov-
ing wastewater and sewage from
the "premises", other than a system
designed primarily for draining
storm water. The utility property in-
cludes sewer mains, pumping sta-
tions and similar equipment for
moving the effluent to a holding,
treatment or disposal facility, and
includes such facilities. Coverage
under this Coverage Extension
does not apply to interruption in
service caused by or resulting from
a discharge of water or sewage due
to heavy rainfall or flooding.

**(4)** Communication Supply Property,
meaning property supplying com-
munication services, including ser-
vice relating to Internet access or
access to any electronic, cellular, or
satellite network; telephone, radio,
microwave, or television services to
the "premises", such as:

**(a)** Communication transmission,
distribution, service, or similar
lines, including fiber optic lines,
including all such overhead
lines of any type, except as
modified in Paragraph **X.(6)** be-
low;

**(b)** Coaxial cables; and

**(c)** Microwave radio relays, exclud-
ing satellites.

**(5)** This Coverage Extension does not
apply to direct "loss" to "electronic
data", including destruction or cor-
ruption of "electronic data".

**(6)** When "loss" from the partial or
complete interruption of utility ser-
vices to a "premises" is caused
solely by "loss" to overhead lines of
any type:

Includes copyrighted material of Insurance
Services Office, Inc., with its permission.

**(a)** The most we will pay in any one occurrence for direct "loss" and loss of "Business Income", "Rental Value" and Extra Expense is $5,000. This Limit of Insurance is part of, not in addition to, the Limit of Insurance provided by this Utility Services Coverage Extension; and

**(b)** For loss of "Business Income", "Rental Value" and Extra Expense, **SECTION G. DEFINITIONS, 11.** Period of restoration, Paragraph **a.** is deleted in its entirety and replaced by the following:

   **a.** Begins:

   **(1)** 24 hours after the time of direct "loss" for "Business Income" and "Rental Value" Coverage; or

**(2)** Immediately after the time of direct "loss" for Extra Expense Coverage.

The most we will pay for all direct "loss" and loss of "Business Income", "Rental Value" and Extra Expense in any one occurrence under this Utility Services Coverage Extension is $75,000.

**Y. Blanket Coverage Limit**

We will pay up to the Limit of Insurance stated in the Schedule of this endorsement in total in any one occurrence for the sum of all "loss" insured under coverages provided in this endorsement which are subject to the Blanket Coverage Limit. You may apportion this Limit among these coverages as you choose.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION F. DEFINITIONS.**

## SECTION A. COVERAGE

Coverage is provided as described and limited below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:

**a.** "Business Income" including "Rental Value".

**b.** "Business Income" other than "Rental Value".

**c.** "Rental Value".

If option **a.** above is selected, the term "Business Income" will include "Rental Value". If option **c.** above is selected, the term "Business Income" will mean "Rental Value" only.

If Limits of Insurance are shown under more than one of the above options, the provisions of this Coverage Part apply separately to each.

**1.** **Business Income**

**a.** We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss. With respect to "loss" to personal property in the open (or personal property in a vehicle or portable storage unit), the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater.

**b.** With respect to the requirements set forth in the preceding paragraph, if you are a tenant and occupy only part of the site at which the "premises" are located, for the purposes of this Coverage Part only, your "premises" is the portion of the building which you rent, lease or occupy, including:

**(1)** Any area within the building or on the site at which the "premises" are located if that area services or is used to gain access to the described "premises".

**(2)** Your personal property in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater.

**2.** **Extra Expense**

**a.** Extra Expense coverage is provided at the "premises" described in the Declarations only if the Declarations show that "Business Income" coverage applies at that "premises".

**b.** Extra Expense means necessary expenses you sustain (as described in Paragraphs **2.c., d.** and **e.**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

**c.** If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **2.d.**) to:

**(1)** Avoid or minimize the "suspension" of business and to continue "operations" either:

**(a)** At the "premises"; or

**(b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

**(2)** Minimize the "suspension" of business if you cannot continue "operations".

**d.** We will also pay expenses to:

**(1)** Repair or replace property; or

---

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(2)** Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage Form will be reduced by the salvage value of that property.

**e.** Extra Expense as described in Paragraphs **2.a.** thru **2.d.** does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

**3. Covered Causes of Loss**

See **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 3. Covered Causes of Loss.**

**4. Limitation for Electronic Data**

**a.** Coverage for "Business Income" does not apply when a "suspension" of "operations" is caused by destruction or corruption of "electronic data", or any "loss" to "electronic data", except as provided under **SECTION A. COVERAGE, 5. Additional Coverages, d. Interruption of Computer Operations**.

**b.** Coverage for Extra Expense does not apply when action is taken to avoid or minimize a "suspension" of "operations" caused by destruction or corruption of "electronic data", or any "loss" to "electronic data", except as provided under **SECTION A. COVERAGE, 5. Additional Coverages, d. Interruption of Computer Operations**.

**c.** This Limitation does not apply when "loss" to "electronic data" involves only "electronic data" which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**5. Additional Coverages**

The Additional Coverages in Paragraphs **5.a.** through **5.e.** are included within and not additional "Business Income" and Extra Expense Limits of Insurance.

**a. Alterations and New Buildings**

We will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain due to direct "loss" at the "premises" caused by or re-

sulting from any Covered Cause of Loss to:

**(1)** New buildings or structures, whether complete or under construction;

**(2)** Alterations or additions to existing buildings or structures; and

**(3)** Machinery, equipment, supplies or building materials located on or within 1,000 feet of the "premises" and:

    **(a)** Used in the construction, alterations or additions; or

    **(b)** Incidental to the occupancy of new buildings.

If such direct "loss" delays the start of "operations", the "period of restoration" for "Business Income" coverage will begin on the date "operations" would have begun if the direct "loss" had not occurred.

**b. Civil Authority**

When a Covered Cause of Loss causes direct damage to property other than Covered Property at the "premises", we will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for "Business Income" will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will apply for a period of up to 30 consecutive days from the date on which such coverage began.

Civil Authority coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will end 30 consecutive days after the date of that action; or when your Civil Authority coverage for "Business income" coverage ends, whichever is later.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**c.   Extended Business Income**

**(1)**   "Business Income" Other Than "Rental Value"

If the necessary "suspension" of your "operations" produces a "Business Income" "loss" payable under this Coverage Part, we will pay for the actual loss of "Business Income" you sustain during the period that:

**(a)**   Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

**(b)**   Ends on the earlier of:

**(i)**   The date you could restore your "operations", with reasonable speed, to the level which would generate the "Business Income" amount that would have existed if no direct "loss" had occurred; or

**(ii)**   60 consecutive days after the date determined in **c.(1)(a)** above.

However, Extended Business Income does not apply to loss of "Business Income" sustained as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the "premises" are located.

Loss of "Business Income" must be caused by direct "loss" at the "premises" caused by or resulting from any Covered Cause of Loss.

**(2)**   "Rental Value"

If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this Coverage Part, we will pay for the actual loss of "Rental Value" you sustain during the period that:

**(a)**   Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and

**(b)**   Ends on the earlier of:

**(i)**   The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct "loss" had occurred; or

**(ii)**   60 consecutive days after the date determined in **c.(2)(a)** above.

However, Extended Business Income does not apply to loss of "Rental Value" sustained as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the "premises" are located.

Loss of "Rental Value" must be caused by direct "loss" at the described "premises" caused by or resulting from any Covered Cause of Loss.

**d.   Interruption of Computer Operations**

**(1)**   Subject to all provisions of this Additional Coverage - **Interruption of Computer Operations**, you may extend the insurance that applies to "Business Income" and Extra Expense to apply to a "suspension" of "operations" caused by an interruption in computer operations due to destruction or corruption of "electronic data" due to a Covered Cause of Loss. This Additional Coverage - **Interruption of Computer Operations** does not apply when "loss" to "electronic data" only involves "loss" to "electronic data" which is integrated in and operates or controls a building's elevator, lighting, heating, ventilation, air conditioning or security system.

**(2)**   The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for an interruption related to manipulation of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, maintain, repair or replace that system.

**(3)**   The most we will pay under this Additional Coverage - **Interruption of Computer Operations** is $2,500 for all "loss" sustained and expense sustained in any "coverage term", regardless of the number of interruptions or the number of "premises", locations or computer systems involved. If loss payment relating to the first interruption does not exhaust this

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

amount, then the balance is available for "loss" or expense sustained as a result of subsequent interruptions in that "coverage term". A balance remaining at the end of a "coverage term" does not increase the amount of insurance in the next "coverage term". With respect to any interruption which begins in one "coverage term" and continues or results in additional "loss" or expense in that subsequent "coverage term", all "loss" and expense is deemed to be sustained in the "coverage term" in which the interruption began.

**(4)** This Additional Coverage - **Interruption in Computer Operations** does not apply to "loss" sustained or expense sustained after the end of the "period of restoration", even if the amount of insurance stated in Paragraph **d.(3)** of this Additional Coverage has not been exhausted.

**e.   Ingress and Egress**

We will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by the prevention of existing ingress or egress at a "premises" shown in the Declarations due to direct "loss" by a Covered Cause of Loss at a location contiguous to such "premises". However, coverage does not apply if ingress or egress from the "premises" is prohibited by civil authority.

Ingress and egress coverage for "Business Income" will begin immediately after the time of the direct "loss" and will continue for a period up to 30 consecutive days.

Ingress and egress coverage for Extra Expense will begin at time of the direct "loss" and will continue for 30 consecutive days or whenever your Ingress and Egress "business income" coverage ends, whichever occurs first.

**6.   Coverage Extension**

The limit applicable to the Coverage Extension is in addition to the Limit of Insurance. **SECTION D. ADDITIONAL CONDITION, 1. Coinsurance** does not apply to this Coverage Extension.

**Newly Purchased or Leased Locations**

**a.**   You may extend your "Business Income" and Extra Expense coverages to apply to property located at:

**(1)**   New buildings or additions while being built on a "premises";

**(2)**   Buildings you newly purchase or become required to insure by written contract; or

**(3)**   Leased buildings or space therein that you are not required to insure. Such lease must be for a period of 12 consecutive months or longer.

This does not apply to property situated at trade shows, fairs or exhibitions.

**b.**   The most we will pay in total for "Business Income" and Extra Expense "loss" under this Coverage Extension is $100,000 at each location described in Paragraph **6.a.**

**c.**   Insurance under this Coverage Extension will end when any of the following first occurs:

**(1)**   This policy expires;

**(2)**   90 days pass from the date you begin construction on that part of the building that would qualify as Covered Property;

**(3)**   90 days pass from the date you purchase, lease, or become contractually required to insure property described in Paragraphs **6.a.(2)** and **(3)**; or

**(4)**   You report values to us when you acquire your new building or business personal property.

We will charge you additional premium for values reported from the date you purchase or lease the property or begin construction on that part of the building that would qualify as Covered Property.

**SECTION B. LIMITS OF INSURANCE**

The most we will pay for "loss" in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

**SECTION C. LOSS CONDITIONS**

The following conditions apply in addition to the **COMMON POLICY CONDITIONS** and the **COMMERCIAL PROPERTY CONDITIONS.**

**1.   Appraisal**

If we and you disagree on the amount of "Business Income" or Extra Expense "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separate-

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ly the amount of "Business Income" or Extra Expense "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**2.** <u>**Duties in the Event of Loss**</u>

**a.** You must see that the following are done in the event you have a "Business Income" or Extra Expense "loss":

  **(1)** Notify the police if a law may have been broken.

  **(2)** Give us prompt notice of the direct "loss". Include a description of the property involved.

  **(3)** As soon as possible, give us a description of how, when, and where the direct "loss" occurred.

  **(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent "loss" resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

  **(5)** As often as may be reasonably required, permit us to inspect the property proving the "loss" and examine your books and records.

    Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

  **(6)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

  **(7)** Cooperate with us in the investigation or settlement of the claim.

  **(8)** If you intend to continue your business, you must resume all or part of

your "operations" as quickly as possible.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**3.** <u>**Loss Determination**</u>

**a.** The amount of "Business Income" "loss" will be determined based on:

  **(1)** The Net Income of the business before the direct "loss" occurred;

  **(2)** The likely Net Income of the business if no direct "loss" had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

  **(3)** The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct "loss"; and

  **(4)** Other relevant sources of information, including:

    **(a)** Your financial records and accounting procedures;

    **(b)** Bills, invoices and other vouchers; and

    **(c)** Deeds, liens or contracts.

**b.** The amount of Extra Expense will be determined based on:

  **(1)** All expenses that exceed the normal operating expenses that would have been sustained by "operations" during the "period of restoration" if no direct "loss" had occurred. We will deduct from the total of such expenses:

    **(a)** The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

    **(b)** Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) Necessary expenses that reduce the "Business Income" "loss" that otherwise would have been incurred.

**c. Resumption of Operations**

We will reduce the amount of your:

(1) "Business Income" "loss", other than Extra Expense to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the "premises" or elsewhere.

(2) Extra Expense "loss" to the extent you can return "operations" to normal and discontinue such Extra Expense.

**d.** If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

**4. Loss Payment**

We will pay for insured "loss" within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

**a.** We have reached agreement with you on the amount of "loss"; or

**b.** An appraisal award has been made.

**SECTION D. ADDITIONAL CONDITION**

**1. Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the **COMMON POLICY CONDITIONS** and the **COMMERCIAL PROPERTY CONDITIONS**.

We will not pay the full amount of any "Business Income" "loss" if the Limit of Insurance for "Business Income" is less than:

**a.** The Coinsurance percentage shown for "Business Income" in the Declarations; times

**b.** The sum of:

(1) The Net Income (Net Profit or Loss before income taxes), and

(2) Operating expenses, including payroll expenses,

that would have been earned or incurred (had no direct "loss" occurred) by your "operations" at the "premises" for the 12 months following the inception, or last previous anniversary date, of this Coverage Part (whichever is later).

Instead, we will determine the most we will pay using the following steps:

**1.** Multiply the Net Income and operating expense for the 12 months following the inception, or last previous anniversary date, of this Coverage Part by the Coinsurance percentage;

**2.** Divide the Limit of Insurance for the described "premises" by the figure determined in Step **1.**; and

**3.** Multiply the total amount of "loss" by the figure determined in Step **2.**

We will pay the amount determined in Step **3.** or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

In determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:

**1.** Prepaid freight - outgoing;

**2.** Returns and allowances;

**3.** Discounts;

**4.** Bad debts;

**5.** Collection expenses;

**6.** Cost of raw stock and factory supplies consumed (including transportation charges);

**7.** Cost of merchandise sold (including transportation charges);

**8.** Cost of other supplies consumed (including transportation charges);

**9.** Cost of services purchased from outsiders (not employees) to resell, that do not continue under contract;

**10.** Power, heat and refrigeration expenses that do not continue under contract (if Form **CP 15 11** is attached);

**11.** All payroll expenses or the amount of payroll expense excluded (if Form **FA 465** is attached); and

**12.** Special deductions for mining properties (royalties unless specifically included in coverage; actual depletion commonly known as unit or cost depletion - not percentage depletion; welfare and retirement fund charges based on tonnage; hired trucks).

**Example No. 1 (Underinsurance):**

When:      The Net Income and operating expenses for the 12 months follow-

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ing the inception, or last previous anniversary date of this Coverage Part at "premises" would have been $400,000.

The Coinsurance percentage is     50%

The Limit of Insurance Is     $150,000

"Business Income" "loss" is     $80,000

Step 1:    $400,000 X 50% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)

Step 2:    $150,000 ÷ $200,000 = .75

Step 3:    $ 80,000 X .75 = $60,000

We will pay no more than $60,000. The remaining $20,000 is not covered.

### Example No. 2 (Adequate Insurance):

When: The Net Income and operating expenses for the 12 months following the inception, or last previous anniversary date of this Coverage Part at the "premises" would have been $400,000.

The Coinsurance percentage is     50%

The Limit of Insurance Is     $200,000

"Business Income" "loss" is     $80,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($400,000 x 50%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $80,000 (amount of "loss").

This condition does not apply to Extra Expense.

## SECTION E. OPTIONAL COVERAGES

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

1. **Maximum Period of Indemnity**

   a. **SECTION D. ADDITIONAL CONDITIONS, 1. Coinsurance** does not apply to this Coverage Part at the "premises" to which this Optional Coverage applies.

   b. The most we will pay in total for "Business Income" and Extra Expense "loss" is the lesser of:

      (1) The amount of "Business Income" and Extra Expense "loss" sustained during the 120 days immediately following the beginning of the "period of restoration"; or

      (2) The Limit of Insurance shown in the Declarations.

2. **Monthly Limit of Indemnity**

   a. **SECTION D. ADDITIONAL CONDITIONS, 1. Coinsurance** does not apply to this Coverage Part at the "premises" to which this Optional Coverage applies.

   b. The most we will pay for "Business Income" "loss" in each period of 30 consecutive days after the beginning of the "period of restoration" is:

      (1) The Limit of Insurance; multiplied by

      (2) The fraction shown in the Declarations for this Optional Coverage.

   **Example:**

   When: The "Business Income" Limit of Insurance is $120,000

   The fraction shown in the Declarations for this Optional Coverage is 1/4

   The most we will pay for "loss" in each period of 30 consecutive days is: $120,000 X 1/4 = $30,000.

   If, in this example, the actual amount of "Business Income" "loss" is:

   | Days | | |
   |------|------|------|
   | Days | 1-30 | $40,000 |
   | Days | 31-60 | 20,000 |
   | Days | 61-90 | 30,000 |
   | | | $90,000 |

   We will pay:

   | Days | | |
   |------|------|------|
   | Days | 1-30 | $30,000 |
   | Days | 31-60 | 20,000 |
   | Days | 61-90 | 30,000 |
   | | | $80,000 |

   The remaining $10,000 is not covered.

3. **Business Income Agreed Value**

   a. To activate this Optional Coverage:

      (1) A Business Income Report/Work Sheet must be on file with the Company and must show financial data for your "operations":

         (a) During the 12 months prior to the date of the Work Sheet; and

         (b) Estimated for the 12 months immediately following the inception of this Optional Coverage.

      (2) The Declarations must indicate that the Business Income Agreed Value Optional Coverage applies. The "Business Income" Limit of Insurance indicated on the Declarations should

be at least equal to the Agreed Value, which is determined by:

    **(a)** The Coinsurance percentage shown in the Declarations; multiplied by

    **(b)** The amount of Net Income and Operating Expenses for the following 12 months you report on the Work Sheet.

**b.** Except as noted in **c.** below, the **ADDITIONAL CONDITION Coinsurance** is suspended until the expiration date of this Coverage Part.

**c.** We will reinstate the **ADDITIONAL CONDITION COINSURANCE** automatically if you do not submit a new Work Sheet and Agreed Value:

    **(1)** When you request a change in your "Business Income" Limit of Insurance; or

    **(2)** When you request the coinsurance percentage be changed on the Work Sheet.

**d.** If the "Business Income" Limit of Insurance is less than the Agreed Value, we will not pay more of any loss than the amount of loss multiplied by:

    **(1)** The "Business Income" Limit of Insurance; divided by

    **(2)** The Agreed Value.

**Example:**

When:   The Limit of Insurance is $100,000

          The Agreed Value is $200,000

          "Business Income" "loss" is $80,000

Step (a): $100,000 ÷ $200,000 = .50

Step (b): .50 X $80,000 = $40,000

We will pay $40,000. The remaining $40,000 is not covered.

**4.** <u>**Extended Period of Indemnity**</u>

In **SECTION A. COVERAGE, 5. Additional Coverages, c. Extended Business Income**, the number "60" in Subparagraphs **(1)(b)** and **(2)(b)** is replaced by the number shown in the Declarations for this Optional Coverage.

## SECTION F. DEFINITIONS

**1.** "Business Income" means the:

    **a.** Net income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

    **b.** Continuing normal operating expenses sustained, including payroll.

**2.** "Computer programs" means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**3.** "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

    **a.** The year commencing on the Effective Date of this Coverage Part at 12:01 A.M. standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 A.M. standard time at your mailing address shown in the Declarations on the earlier of:

        **(1)** The day the policy period shown in the Declarations ends; or

        **(2)** The day the policy to which this Coverage Part is attached is terminated or cancelled.

    **b.** However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

**4.** "Electronic data" means information, facts or "computer programs" stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment.

**5.** "Finished stock" means stock you have manufactured.

"Finished stock" also includes whiskey and alcoholic products being aged, unless there is a coinsurance percentage shown for "Business Income" in the Declarations.

"Finished stock" does not include stock you have manufactured that is held for sale on the "premises" of any retail outlet insured under this Coverage Part.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

6   "Loss" means accidental physical loss or accidental physical damage.

7   "Operations" means:

   a.   Your business activities occurring at the "premises"; and

   b.   The tenantability of the "premises", if coverage for "Business Income" including "Rental Value" or "Rental Value" applies.

8   "Period of restoration" means the period of time that:

   a.   Begins at the time of direct "loss".

   b.   Ends on the earlier of:

      (1)   The date when the property at the "premises" should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      (2)   The date when business is resumed at a new permanent location.

   c.   "Period of restoration" does not include any increased period required due to the enforcement of or compliance with any ordinance or law that:

      (1)   Regulates the construction, use or repair, or requires the tearing down of any property; or

      (2)   Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

   d.   The expiration date of the Coverage Part will not cut short the "period of restoration".

9   "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, asbestos, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property, or the environment regardless of whether injury or damage is caused directly or indirectly by the "pollutants" and whether:

   a.   You are regularly or otherwise engaged in activities which taint or degrade the environment; or

   b.   You use, generate or produce the "pollutant".

10   "Premises" means the Locations and Buildings described in the Declarations.

11   "Rental Value" means "Business Income" that consists of:

   a.   Net income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the "premises" described in the Declarations as furnished and equipped by you, including fair rental value of any portion of the "premises" which is occupied by you; and

   b.   Continuing normal operating expenses incurred in connection with that "premises", including:

      (1)   Payroll; and

      (2)   The amount of charges, which are the legal obligation of the tenant(s) but would otherwise be your obligations.

12   "Suspension" means:

   a.   The slowdown or cessation of your business activities; and

   b.   That a part or all of the "premises" is rendered untenantable if coverage for "Business Income" including "Rental Value" or "Rental Value" applies.

13   "Valuable papers and records" means inscribed, printed or written documents, manuscripts or records, including abstracts, books, card index systems, deeds, drawings, films, maps, mortgages, or proprietary information. But "valuable papers and records" does not mean "money" or "securities" or "electronic data", including the materials on which the "electronic data" is recorded.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# THE CINCINNATI INDEMNITY COMPANY

## CLAIMS-MADE
## EMPLOYMENT PRACTICES LIABILITY COVERAGE
## FORM DECLARATIONS

Attached to POLICY NUMBER: **ENP 006 54 53**        Effective Date: **03-01-2020**

**Named Insured** is the same as it appears in the Common Policy Declarations unless another entry is made

**LIMITS OF INSURANCE**

| | |
|---|---|
| PER WRONGFUL ACT LIMIT | $500,000 |
| AGGREGATE LIMIT | $500,000 |

**DEDUCTIBLE**                              **RETROACTIVE DATE**

DEDUCTIBLE AMOUNT        $10,000                                    NONE

**PREMIUM**

TOTAL ANNUAL PREMIUM        $5,535

FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:
GA116      05/17  EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM
GA4308TX  01/09  TEXAS CHANGES - EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

This Declarations page together with the completed application(s), the Common Policy Declarations, the Common Policy Conditions, the Employment Practices Liability Coverage Form and any accompanying endorsements shall constitute the contract between the insureds and The Cincinnati Insurance Company.

**THIS INSURANCE COVERAGE CONTAINS CLAIMS MADE COVERAGE. EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THIS INSURANCE IS LIMITED TO "WRONGFUL ACTS" FOR WHICH "CLAIMS" ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. PLEASE READ AND REVIEW THIS INSURANCE CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR AGENT.**

**THE LIMITS OF INSURANCE AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE.**

# EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

**TABLE OF CONTENTS**

Begins on Page:

Preamble ........................................................................................................................2

**SECTION I - EMPLOYMENT PRACTICES LIABILITY COVERAGE** ....................................2

A.   Insuring Agreement.................................................................................................2
B.   Exclusions ...........................................................................................................3
C.   Supplementary Payments .......................................................................................4

**SECTION II - WHO IS AN INSURED**.................................................................................4

**SECTION III - LIMITS OF INSURANCE AND INSURED'S DEDUCTIBLE**............................5

**SECTION IV - CONDITIONS** ...........................................................................................6

A.   Duties of the Insureds in the Event of Claim...............................................................6
B.   Legal Action Against Us ..........................................................................................6
C.   Other Insurance ....................................................................................................6
D.   Warranties ...........................................................................................................6
E.   Transfer of Rights of Recovery Against Others To Us....................................................6
F.   Insured's Representative Clause ...............................................................................7
G.   Mediation and Allocation ........................................................................................7
H.   Acquisition of an Insured by Another Organization .......................................................7
I.   Cessation of Subsidiaries .......................................................................................7
J.   Three-or Five-Year Policies .....................................................................................7
K.   Office of Foreign Assets Control (OFAC) Compliance ...................................................7

**SECTION V - EXTENDED REPORTING PERIODS** ..............................................................7

**SECTION VI - DEFINITIONS** ...........................................................................................8

A.   "Benefits" .............................................................................................................8
B.   "Bodily injury" ........................................................................................................8
C.   "Claim"..................................................................................................................8
D.   "Coverage territory" ...............................................................................................8
E.   "Defense costs" .....................................................................................................8
F.   "Domestic partner" .................................................................................................9
G.   "Employee" ...........................................................................................................9
H.   "Executive officer" ..................................................................................................9
I.   "Interrelated wrongful acts"......................................................................................9
J.   "Loss" ..................................................................................................................9
K.   "Personal injury" ....................................................................................................9
L.   "Pollutants" ...........................................................................................................9
M.   "Property damage" .................................................................................................9
N.   "Subsidiary" ..........................................................................................................9
O.   "Wrongful act".......................................................................................................9

NOTICE: THIS INSURANCE COVERAGE CONTAINS CLAIMS-MADE COVERAGE. EXCEPT AS MAY BE OTHERWISE PROVIDED HEREIN, THIS INSURANCE IS LIMITED TO "WRONGFUL ACTS" FOR WHICH "CLAIMS" ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. PLEASE READ AND REVIEW THIS INSURANCE CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR AGENT.

THE LIMITS OF INSURANCE AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE.

# EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION VI - DEFINITIONS**.

## SECTION I - EMPLOYMENT PRACTICES LIABILITY COVERAGE

### A. Insuring Agreement

1. We will pay those sums that the insured becomes legally obligated to pay as damages because of all "loss" generated by a "claim". We will have the right and duty to select counsel and defend the insured against any "claim". However, we will have no duty to defend the insured against any "claim" seeking damages to which this insurance does not apply. We may make any investigation we deem necessary and may, with the consent of the insured, make any settlement of any "claim" we deem expedient. However, if the insured withholds consent to such settlement, our liability for all "loss" in connection with such "claim" shall not exceed the amount for which we could have settled such "claim" plus charges and expenses which have accrued since the date such settlement was proposed in writing by us to the insured; plus:

2. 90% of any settlement or judgment in excess of the proposed settlement amount referenced in **A.1.** above plus 90% of any "defense costs" incurred after the date the insured refused to consent to the proposed settlement. The remaining 10% of any settlement or judgment in excess of the proposed settlement amount refer-

enced in **A.1.** above plus 10% of any "defense costs" incurred after the date the policy "insureds" refused to consent to the proposed settlement shall be borne by the "insureds", uninsured and at their own risk.

But:

    a. The amount we will pay for all "loss" is limited as described in **SECTION III - LIMITS OF INSURANCE AND INSURED'S DEDUCTIBLE**; and

    b. Our right and duty to defend ends when we have used up the applicable limit of insurance in the defense and/or payment of judgments or settlements of covered "claims".

No other obligation or liability to pay sums or perform acts or services is covered unless specifically provided for under **Supplementary Payments**.

3. This insurance applies to "claims" only if those "claims":

    a. Arise from a "wrongful act" committed, attempted or allegedly committed or attempted:

        (1) On or after the Retroactive Date, if any, shown in the Declarations and prior to the termination of this Coverage Form; and

        (2) In the "coverage territory"; and

    b. Are first made against any insured in accordance with Paragraph **4.** below during the policy period or any Extended Reporting Period we may provide under **SECTION V - EXTENDED REPORTING PERIODS**.

4. A "claim" for all "loss" will be deemed to have been made at the earlier of the following times:

    a. When an insured reports to us or another insurer in writing an incident or circumstance that may lead to a "claim" or "loss"; or

**b.** When notice of such "claim" is received in writing by an insured or by us, whichever comes first.

## B. Exclusions

1. This insurance does not apply to:

   **a. ADA Modifications**

   "Loss" incurred by the insured in making physical changes, modifications, alterations, or improvements as part of an accommodation pursuant to the Americans With Disabilities Act or similar provisions of any federal, state or local statutory or common law.

   However, this exclusion does not apply to "defense costs".

   **b. Bodily Injury and Property Damage**

   Any "claim" or "loss" based upon, arising out of, or in consequence of any actual or alleged "bodily injury" or "property damage".

   **c. Contractual Liability**

   Any "claim" based upon, arising out of, or in consequence of, any actual or alleged obligation or liability of others assumed by an insured under any contract or agreement, either oral or written, except to the extent the insured would have been liable in the absence of the contract or agreement.

   **d. Fraudulent Act or Purposeful Violation**

   Any "claim" or "loss" based upon, arising out of, or in consequence of, any deliberately fraudulent, dishonest, criminal or malicious act or omission or willful violation of any statute, law, rule, regulation, agreement, or judicial or regulatory order, if a final and non-appealable judgment or adjudication adverse to the insureds establishes a deliberately fraudulent, dishonest, criminal or malicious act or omission or willful violation of any statute, law, regulation, agreement or judicial or regulatory order.

   **e. Pollutant**

   Any "claim" based upon, arising out of, in consequence of, or in any way involving:

   **(1)** The actual, alleged, or threatened discharge, dispersal, seepage, migration, emission, release or escape of "pollutants"; or

   **(2)** Any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize "pollutants", including but not limited to "claims" alleging damage to an insured;

   provided, however, this exclusion shall not apply to any "claim" under this Coverage Form for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of matters described in **(1)** or **(2)** above.

   **f. Prior Known Acts**

   Any "claim" or "loss" based upon, arising out of, or in consequence of, any actual or alleged "wrongful act" committed, attempted, or allegedly committed or attempted prior to the effective date of this Coverage Form if:

   **(1)** Notice of a "claim" or circumstances which may lead to a "claim" have been reported under any previous policy, whether or not coverage applied, of which this Coverage Form is a renewal or replacement or which it may succeed in time; or

   **(2)** The insured knew or should have reasonably foreseen, prior to the effective date of the first consecutive Coverage Form issued by us, that such circumstances might be the basis of a "claim" or "loss"; or

   **(3)** Notice of a "claim" or circumstances which may lead to a "claim" is based upon, arises out of, directly or indirectly results from or in consequence of, or in any way involves any prior or pending litigation, arbitration or administrative action as of the effective date of the first consecutive Coverage Form issued to the insured by us.

   **g. Violation of Laws**

   Any "claim" based upon, arising out of, in consequence of, or in any way involving any actual or alleged violation(s) of any of the responsibilities, obligations, or duties imposed by the:

   **(1)** Employee Retirement Income Security Act of 1974; or

   **(2)** Fair Labor Standards Act (except the Equal Pay Act), except we shall reimburse the insured for

up to a maximum payment of $100,000 in "defense costs" that exceed the Deductible Amount as set forth in the Declarations. Any payment of "defense costs" shall be part of and not in addition to the Limit of Insurance set forth in the Declarations and such payment reduces the Limit of Insurance; or

**(3)** National Labor Relations Act (including the Labor Management Relations Act of 1947); or

**(4)** Worker Adjustment and Retraining Notification Act; or

**(5)** Consolidated Omnibus Budget Reconciliation Act of 1985; or

**(6)** Occupational Safety and Health Act; or

any amendments to or rules or regulations promulgated pursuant to these laws, or similar provisions of any federal, state, or local statutory or common law. However, this exclusion shall not apply to a "claim" for retaliatory treatment of a person with respect to actual or threatened disclosures by such person of any actual or alleged violation of the Employee Retirement Income Security Act, the Fair Labor Standards Act, the National Labor Relations Act (including the Labor Management Relations Act of 1947), the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act or the Occupational Safety and Health Act by any insured.

**h. Workers' Compensation and Similar Laws**

Any "claim" based upon, arising out of, in consequence of, or in any way involves any actual or alleged obligation of any insured under a workers' compensation, unemployment insurance, social security, disability benefits or similar law, or derivative actions arising out of any of these. However, this exclusion shall not apply to any "claim" for retaliatory treatment by an insured due to the exercise of rights granted under any such law.

**2. Severability of Exclusions**

With respect to the exclusions in this policy:

No fact regarding or knowledge possessed by any insured shall be imputed to any other insured to determine if coverage is available, except that facts pertaining to and knowledge possessed by any past, present or future Chief Financial Officer or Chief Executive Officer of the Named Insured shall be imputed to the Named Insured to determine if coverage is available.

**C. Supplementary Payments**

We will pay with respect to any "claim" we defend:

**1.** The cost of any appeal bond, attachment bond, or any similar bond, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**2.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim", including actual loss of earnings up to $250 a day because of time off from work.

These payments will not reduce the limits of insurance.

**SECTION II - WHO IS AN INSURED**

**A.** If you are designated in the Declarations as:

**1.** An individual, you and your spouse, or "domestic partner" are insureds but only to the extent such spouse or "domestic partner" is a party to any "claim" solely in such person's capacity as a spouse or "domestic partner" of an "insured" and only if the "claim" seeks damages recoverable from marital community property, property jointly held by the "insured" and the spouse or "domestic partner", or property transferred from "insured" to the spouse or "domestic partner", but only with respect to the conduct of a business of which you are the sole owner.

**2.** A partnership or joint venture, you are an insured and any "subsidiary". Your past, present and future members, your past, present and future partners, and their spouses or "domestic partners" are also insureds, but only to the extent such spouse or "domestic partner" is a party to any "claim" solely in such person's capacity as a spouse or "domestic partner" of an "insured" and only if the "claim" seeks damages recoverable from marital community property, property jointly held by the "insured" and the spouse or "domestic partner", or property transferred from "insured" to the spouse or "domestic partner", but only with respect to the conduct of your business.

**3.** A limited liability company and any "subsidiary", you are an insured. Your past

present and future members are also insureds, but only with respect to the conduct of your business. Your past, present and future managers are insureds, but only with respect to their duties as your managers.

4. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your past, present and future "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your past and present stockholders are also insureds, but only with respect to their liability as stockholders.

**B.** Each of the following is also an insured:

1. Your past, present and future "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

2. Any natural person who is an independent contractor as determined by federal, state or local law, but only while acting in the capacity as such for you or any "subsidiary" pursuant to an express written agreement between the independent contractor, or any entity on behalf of the independent contractor, and you or any "subsidiary" and only if you or any "subsidiary" agrees in writing to provide indemnification to such independent contractor; provided, however, any coverage under this Coverage Part for any such independent contractor shall be excess of any indemnification or insurance otherwise available to such independent contractor from any other source;

including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

3. The estates, heirs, legal representatives or assigns of insureds who are deceased or have been declared incompetent.

**C.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However, coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

No person or organization is an insured with respect to the conduct of any current or past partner-

ship, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE AND INSURED'S DEDUCTIBLE

**A.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

1. Insureds under this Coverage Form;

2. "Claims" made or suits brought on account of "wrongful acts" or otherwise; or

3. Persons or Organizations making "claims" or bringing suits.

**B.** Subject to **C.** below, our maximum liability for each "wrongful act" shall be the Limit of Insurance Per Wrongful Act as specified in the Declarations.

All "loss" arising out of the same "wrongful act" and all "interrelated wrongful acts" of any insured shall be deemed one "wrongful act" and have been deemed to have originated in the earliest policy period in which a "claim" is first made against any insured alleging any such "wrongful act" or "interrelated wrongful acts".

**C.** The Aggregate Limit as specified in the Declarations is the most we will pay for "loss" for all "claims" to which this insurance applies.

**D.** "Defense costs" incurred by us or by the insured with our written consent are part of and not in addition to the Limits of Insurance specified in the Declarations. Our payment of "defense costs" reduces the Limits of Insurance.

**E.** Our liability shall apply only to that part of each covered "loss" which is excess of the Deductible Amount specified in the Declarations and such Deductible Amount shall be borne by the insureds.

**F.** Any "claim" which is made or maintained as a class action or other multiple plaintiff suit shall be deemed one "wrongful act" and shall be subject to the Per Wrongful Act Limit of Insurance and Deductible Amount shown in the Declarations.

**G.** In the event this Coverage Form is extended in accordance with the provisions of the Basic Extended Reporting Period, our total liability shall not exceed the Aggregate Limit shown in the Declarations for the last policy period in which coverage is provided hereunder.

The Limits of Insurance of this Coverage Form apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last

preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - CONDITIONS

### A. Duties of the Insureds in the Event of a Claim

As a condition precedent to coverage under this Coverage Form:

1. The insureds shall give us written notice as soon as practicable of any "claim" made against an insured for a "wrongful act" and shall give such information and cooperation as we may reasonably require, including but not limited to a description of the "claim", the nature of the alleged "wrongful act", the nature of the alleged injury, the names of the claimants, and the manner in which the insured first became made aware of the "claim".

2. The insureds shall provide us with all information, assistance and cooperation which we reasonably request and agree that in the event of a "claim" the insureds will do nothing that may prejudice our position or our potential or actual rights of recovery.

3. The insureds shall not settle any "claim", incur any "defense costs" or otherwise assume any contractual obligation or admit any liability with respect to any "claim" without our written consent, which shall not be unreasonably withheld. We shall not be liable for any settlement, "defense costs", assumed obligation or admission to which we have not consented.

### B. Legal Action Against Us

No action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Coverage Form, nor until the amount of an insured's obligation to pay shall have been finally determined either by judgment against an insured after actual trial or by written agreement of the insured, the claimant and us.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Coverage Form to the extent of the insurance afforded by this Coverage Form. No person or organization shall have any right under this Coverage Form to join us as a party to any action against an insured to determine an insured's liability. Bankruptcy or insolvency of an insured or of their estates shall not relieve us of any of our obligations hereunder.

### C. Other Insurance

This insurance is primary except when all or any part of "loss" is also insured under any

other prior or current policy. Then this insurance is excess over that other insurance, whether primary, excess, contingent or on any other basis, unless that other insurance was purchased specifically to apply in excess of this Coverage Form.

When this Coverage Form is excess:

1. We will have no duty to defend any "claim" when any other insurer has that duty. If another insurer fails to defend and we incur costs as a result of such failure, we will be entitled to the insured's rights against such other insurer; and

2. We will pay only our share of the amount of the "loss", if any, that exceeds the sum of:

   a. The total amount that all such other insurance would pay for the "loss" in the absence of this Coverage Form; and

   b. The total of all deductible and self-insured amounts under all such other insurance.

### D. Warranties

By accepting this Coverage Form:

1. The insureds warrant that the application is attached to and forms a part of this Coverage Form;

2. Each and every person who accepts the benefits of coverage as an insured warrants:

   a. That the statements in the application and Declarations are material to our acceptance of risk assumed by us; and

   b. That we have issued this Coverage Form in reliance upon the truth of the statements in the application and Declarations; and

   c. That coverage depends upon the truth of such statements.

### E. Transfer of Rights of Recovery Against Others To Us

In the event of any payment under this Coverage Form we shall be subrogated to the extent of such payment to all insured's rights of recovery. In such case the insured shall execute all papers required and shall do everything necessary to secure and preserve such right, including the execution of such documents necessary to enable us to effectively bring suit in the name of the insured.

## F.   Insured's Representative Clause

By acceptance of this Coverage Form the first Named Insured shown in the Declarations agrees to act on behalf of all insureds with respect to the giving and receiving of notice of "claim", the acceptance of endorsements, the giving or receiving of any other notice provided for in this Coverage Form, and the exercising or declining to exercise any right to an Extended Reporting Period, and agree that such first Named Insured shall act on all insureds' behalf.

## G.   Mediation and Allocation

**1.**   Any dispute including but not limited to tort claims or contract claims between an insured and us arising out of or relating to this Coverage Form shall be submitted to nonbinding mediation prior to commencement of an action between the parties. The mediator shall be chosen by agreement. If the parties cannot agree upon a mediator, the mediator shall be chosen by the American Arbitration Association.

**2.**   If both "loss" covered by this Coverage Form and loss not covered by this Coverage Form are incurred, either because a "claim" against an insured includes both covered and uncovered matters or because a "claim" is made against both an insured and others, we will pay 100% of reasonable and necessary "defense costs" and all remaining "loss" will be allocated between covered "loss" and uncovered "loss" based upon the relative legal exposure of the parties to such matters.

**3.**   If we and the insured cannot agree as to matters in Paragraph **2.** of this condition prior to a judgment or finding in the civil or administrative proceeding dealing with "claims" against the insured, the parties agree that they will, to the extent it is within their control, require that the allocation between covered "loss" and uncovered loss is made in such civil or administrative proceeding. Such efforts shall include but are not limited to the submission of special interrogatories to the finder of fact in such proceedings. Such efforts shall not require us to become a party to such civil or administrative proceedings.

**4.**   Notwithstanding Paragraph **3.** of this condition, if we and the insured cannot agree as to matters in Paragraph **2.** of this condition prior to a judgment or finding in any civil or administrative proceeding in which such issues are decided, we may at any time before or after mediation under Paragraph **1.** of this condition settle all "claims" against any or all insureds. Following such settlement, any dispute between us and the insured as to the proper allocation of covered and uncovered matters under Paragraph **2.** of this condition shall be submitted to a nonbinding mediation prior to the commencement of an action between the parties. In any event, only one mediation as to the same issues shall be required.

## H.   Acquisition of an Insured by Another Organization

If (i) an insured merges into or consolidates with another organization, or (ii) another organization or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than 50% of the outstanding securities representing the present right to vote for election of an insured's directors, coverage under this Coverage Form shall continue until its termination, but only with respect to "claims" for "wrongful acts" committed, attempted or allegedly committed or attempted, by insureds prior to such merger, consolidation or acquisition.

## I.   Cessation of Subsidiaries

In the event a Named Insured ceases to be a "subsidiary", coverage with respect to such "subsidiary" and its insureds shall continue until termination of this Coverage Form, but only with respect to "claims" for "wrongful acts" committed, attempted, or allegedly committed or attempted prior to the date such organization ceases to be a "subsidiary".

## J.   Three-or Five-Year Policies

If this Coverage Form is issued for more than one year, the premium shall be computed annually based on our rates or premiums in effect at each anniversary.

## K.   Office of Foreign Assets Control (OFAC) Compliance

Whenever insurance coverage provided by this Coverage Form would be in violation of any United States economic or trade sanctions, such insurance shall be null and void.

## SECTION V - EXTENDED REPORTING PERIODS

**A.**   Upon termination of this insurance for any reason, other than cancellation for nonpayment of premium, we may provide one or more Extended Reporting Periods as described below.

**B.**   Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They extend the "claims" reporting period.

**C.**   Such Extended Reporting Periods will apply solely with respect to "claims" first made in accordance with **SECTION I - EMPLOYMENT**

**PRACTICES LIABILITY COVERAGE, A. Insuring Agreement, 2.** and **Exclusion f. Prior Known Acts.** Such "claims" must be reported to us prior to the expiration of the Extended Reporting Period.

D. A 90-day Basic Extended Reporting Period is automatically provided without additional charge.

The Basic Extended Reporting Period does not reinstate or increase the Limits of Insurance of this Coverage Form.

E. A Supplemental Extended Reporting Period is available, but only by endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, as set forth by Paragraph **D.,** ends.

The insured must give us a written request for this endorsement within 60 days of the termination of this insurance. The Supplemental Extended Reporting Period will not go into effect unless the insured pays the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

1. The exposure insured;

2. Previous types and amounts of insurance; and

3. Other related factors.

The additional premium will not exceed 200% of the expiring annual premium of this Coverage Form.

The endorsement shall set forth any terms that differ from the basic Coverage Form applicable to the Supplemental Extended Reporting Period.

If the Supplemental Extended Reporting Period endorsement is in effect, we will provide a Supplemental Aggregate Limit of Insurance described below, but only for "claims" first made in accordance with **SECTION I - EMPLOYMENT PRACTICES LIABILITY COVERAGE, A. Insuring Agreement, 2.** and Exclusion **f. Prior Known Acts** against any insured during our Extended Reporting Period.

The Supplemental Aggregate Limit of Insurance will be equal to the dollar amount shown in the Declarations for Aggregate Limit that is in effect at the end of the last policy period.

Any Extended Reporting Period will immediately terminate on the effective date and hour of any other insurance issued to you which replaces this insurance. If you notify us of the effective date of the other insurance, we will send you a refund of any pro rata unearned premium.

## SECTION VI - DEFINITIONS

A. "Benefits" means perquisites, fringe benefits, payments in connection with an employee benefit plan and any other payment, other than salary or wages, to or for the benefit of an "employee" arising out of the employment relationship.

B. "Bodily injury" means physical injury, sickness, disease or death of any person.

C. "Claim" means:

1. A written demand for monetary damage or non-monetary relief;

2. A civil proceeding commenced by filing of a complaint or similar pleading;

3. A formal administrative or regulatory proceeding commenced by a filing of charges, formal investigative order or similar document;

4. An arbitration, mediation or similar alternative dispute resolution proceeding if the insured is required or agrees to participate in such proceeding with our written consent; or

5. A written request to toll or waive a statute of limitations relating to a potential "claim" described above;

which is brought by or on behalf of any past, present or prospective "employee(s)" of a Named Insured against any of the insureds, including any appeal therefrom, as the result of an alleged "wrongful act".

D. "Coverage territory" means anywhere.

E. "Defense costs" means reasonable and necessary fees, costs, and expenses incurred by us or with our consent on behalf of the insured or reimbursed to any insured by us, resulting solely from the investigation, adjustment, defense and appeal of any "claim". "Defense costs" includes but is not limited to the cost of expert consultants and witnesses, premiums for appeal, attachment or supersedeas bonds (but not the obligation to furnish such bonds).

"Defense costs" do not include:

1. Expenses explicitly provided for under **Supplementary Payments**; or

2. The salaries, wages, overhead or expenses of our employees or your directors, officers or "employees", other than that portion of our employed attorneys' fees, salaries and expenses allocated to a specific "claim"; or

3. Any amount covered by the duty to defend obligation of any other insurer; or

4. Any pre-tender fees, costs or expenses.

**F.** "Domestic partner" means a natural person who is not otherwise an "insured", in a committed relationship with an insured person, which is legally recognizable as a marriage, civil union or domestic partnership in the state where the "claim" is made or suit is filed and the legal existence of the relationship is verifiable by legal, government documentation existing prior to the date of the "wrongful act" complained of in the "claim".

**G.** "Employee" includes but is not limited to full-time, part-time, seasonal, volunteer, leased or contingent workers as determined by federal, state or local law. "Employee" does not include independent contractors as determined by federal, state or local law.

**H.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**I.** "Interrelated wrongful acts" means all causally connected "wrongful acts".

**J.** "Loss" means "defense costs" and the total amount of monetary damages which the "insured" becomes legally obligated to pay on account of any "claim" for a "wrongful act" with respect to which coverage hereunder applies, including damages (including back pay and front pay), judgments, settlements, prejudgment and postjudgment interest and punitive or exemplary damages or the multiplied portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary or multiplied damages.

"Loss" shall not include any amount for which an "insured" is not financially liable, compensation earned in the course of employment but not paid by an "insured" or matters which are deemed uninsurable under the law pursuant to which this Coverage Form shall be construed.

"Loss" shall not include, (other than "defense costs"):

1. "Benefits" or the equivalent value, however, this provision does not apply to "loss" resulting solely from wrongful termination of employment; or

2. Amounts which arise out of, are based upon, or are attributable to the employment reinstatement of the claimant by an "insured" or the continued employment of the claimant; or

3. Future compensation, including salary or "benefits" for an "employee" if the "insured" is ordered in accordance with a judgment or other final adjudication but fails to reinstate the claimant as an "employee"; or

4. Civil or criminal fines or penalties imposed by law, liquidated damages, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law; or

5. Future compensation, including salary or "benefits" for an "employee" who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a "claim"; or

6. Medical, pension, disability, life insurance, stock option or other "employee" type "benefit".

**K.** "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Oral or written publication of material that libels or slanders a past, present or prospective "employee";

3. Invasion of a past, present or prospective "employee's" right of privacy;

4. Malicious prosecution; or

5. Abuse of process.

**L.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals, petroleum products and their by-products and waste. Waste includes material to be recycled, reconditioned or reclaimed.

"Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment.

**M.** "Property damage" means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to have taken place at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to have taken place at the time of the incident that caused it.

**N.** "Subsidiary" means any organization in which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more of the insureds.

**O.** "Wrongful act" means any error, misstatement or misleading statement, act or omission, or neglect or breach of duty by an insured or any

person for whose acts the insured is legally liable for:

1. Wrongful discharge or termination of employment, including constructive discharge;

2. Breach of any oral, written or implied employment contract or quasi-employment contract except for that part of any express contract of employment or an express obligation to make payments in the event of the termination of employment;

3. Employment related misrepresentation;

4. Violation of any federal, state or local law that concerns employment discrimination or harassment including sexual harassment involving unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature, or workplace bullying or workplace harassment of a nonsexual nature, that:

   a. Are made a condition of employment;

   b. Are used as a basis for employment decisions; or

   c. Create a work environment that interferes with performance;

5. Wrongful failure to employ or promote;

6. Wrongful discipline;

7. Wrongful deprivation of a career opportunity;

8. Negligent hiring, supervision, promotion, retention, or evaluation;

9. Employment related "personal injury";

10. Wrongful failure to grant tenure;

11. Employment related wrongful infliction of emotional distress;

12. Violation of the Family Medical Leave Act;

13. Wrongful retaliation;

14. Wrongful denial of training, denial or deprivation of seniority or evaluation; or

15. Failure to adopt, create, provide or enforce adequate workplace or employment practices and procedures;

including any actual or alleged assault, battery, or loss of consortium, in connection with Paragraphs **1.** through **15.** above.

# TEXAS CHANGES - EMPLOYMENT
# PRACTICES LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE FORM**

Under **SECTION V - EXTENDED REPORTING PERIODS E.** is deleted in its entirety and replaced by the following:

**E.** A 12 month Supplemental Extended Reporting Period is available, but only by endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, as set forth by Paragraph **D.**, ends.

The insured must give us a written request for this endorsement within 60 days of the termination of this insurance. The Supplemental Extended Reporting Period will not go into effect unless the insured pays the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**1.** The exposure insured;

**2.** Previous types and amounts of insurance; and

**3.** Other related factors.

The additional premium will not exceed 200% of the expiring annual premium of this Coverage Form.

The endorsement shall set forth any terms that differ from the basic coverage form applicable to the Supplemental Extended Reporting Period.

If the Supplemental Extended Reporting Period endorsement is in effect, we will provide a Supplemental Aggregate Limit of Insurance described below, but only for "claims" first made in accordance with **SECTION I - EMPLOYMENT PRACTICES LIABILITY COVERAGE, A. Insuring Agreement, 2.** and Exclusion **f. Prior Known Acts** against any insured during our Extended Reporting Period.

The Supplemental Aggregate Limit of Insurance will be equal to the dollar amount shown in the Declarations for Aggregate Limit that is in effect at the end of the last policy period.

Any Extended Reporting Period will immediately terminate on the effective date and hour of any other insurance issued to you which replaces this insurance. If you notify us of the effective date of the other insurance, we will send you a refund of any pro rata unearned premium. This restriction will only apply if such other replacement insurance is a claims-made policy with the same or earlier Retroactive Date, if any, set forth in the Declarations.

Under **SECTION VI - DEFINITIONS C.4.,** is deleted in its entirety and replaced by the following:

**4.** Violation of any federal, state or local law that concerns employment discrimination or harassment including sexual harassment involving unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature that:

**a.** Are made a condition of employment;

**b.** Are used as a basis for employment decisions; or

**c.** Create a work environment that interferes with performance;

GA 4308 TX 01 09

# THE CINCINNATI INDEMNITY COMPANY

**A Stock Insurance Company**

# CinciPlus®

# CRIME XC+® (EXPANDED COVERAGE PLUS) COVERAGE PART DECLARATIONS

Attached to and forming part of POLICY NUMBER:   ENP 006 54 53

Named Insured is the same as it appears in the Common Policy Declarations

| Insuring Agreements Forming Part of This Coverage Part | Limit of Insurance | Deductible Amount |
|---|---|---|
| | Per Occurrence/ Coverage Term | Per Occurrence |
| 1.   Employee Theft | $25,000 | $500 |
| 2.   Forgery or Alteration | $25,000 | $500 |
| 3.   Inside the Premises - Theft of Money and Securities | $25,000 | $500 |
| 4.   Outside the Premises - Theft of Money and Securities | $5,000 | $500 |
| 5.   Money Orders And Counterfeit Money | $25,000 | $500 |

Forms and endorsements applicable to this Coverage Part at policy inception:
```
CA102     08/07   CRIME EXPANDED COVERAGE (XC®) COVERAGE FORM (DISCOVERY FORM)
CA474TX   09/14   TEXAS CHANGES - LEGAL ACTION AGAINST US
```

The Crime XC+® (Expanded Coverage Plus) Coverage Part consists of this Declaration form and the Crime Coverage Expanded Coverage (XC®) Coverage Form.

# CRIME EXPANDED COVERAGE (XC®) COVERAGE FORM (DISCOVERY FORM)

Various provisions in this Coverage Part restrict coverage. Read the entire Coverage Part carefully to determine rights, duties and what is or is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

**A. Insuring Agreements**

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss Condition **E.1.g.:**

**1. Employee Theft**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

**2. Forgery or Alteration**

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

**(1)** Made or drawn by or drawn upon you; or

**(2)** Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **2.a.,** on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement.

**3. Inside The Premises - Theft of Money and Securities**

**a.** We will pay for loss of "money" and "securities" inside the "premises" or "banking premises":

**(1)** Resulting directly from "theft" committed by a person present inside such "premises" or "banking premises"; or

**(2)** Resulting directly from disappearance or destruction.

**b.** We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

**4. Outside the Premises - Theft of Money and Securities**

We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

**5. Money Orders and Counterfeit Money**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

Includes copyrighted material of ISO Properties, Inc., with their permission

a. Money orders issued by any post office, express company or bank that are not paid upon presentation; or

b. "Counterfeit money" that is acquired during the regular course of business.

**B. Limit of Insurance**

1. The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit of Insurance shown in the Declarations.

2. If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or Coverages.

3. The Limits of Insurance stated in the Declarations are the most we will pay for all loss under any one Insuring Agreement or Coverage in any one "coverage term", regardless of the number of "occurrences".

The Limits of Insurance of this Coverage Part apply separately to each "coverage term".

**C. Deductible**

1. We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

2. In the event this insurance applies on an excess basis per Paragraph **(2)(c)** in Condition **E.1.k. Other Insurance**, then only the single highest deductible will apply to the loss.

**D. Exclusions**

1. This insurance does not cover:

   a. **Acts Committed by You, Your Partners or Your Members**

      Loss resulting from "theft" or any other dishonest act committed by:

      **(1)** You; or

      **(2)** Any of your partners or "members";

      whether acting alone or in collusion with other persons.

b. **Acts of Employees Learned of by You Prior to the Policy Period**

   Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of that "theft" or dishonest act prior to the Policy Period shown in the Declarations.

c. **Acts of Employees, Managers, Directors, Trustees or Representatives**

   Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

   **(1)** Whether acting alone or in collusion with other persons; or

   **(2)** While performing services for you or otherwise;

   except when covered under Insuring Agreement **A.1.**

d. **Confidential Information**

   Loss resulting from:

   **(1)** The unauthorized disclosure of your confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or

   **(2)** The unauthorized use or disclosure of confidential information of another person or entity which is held by you including, but not limited to, financial information, personal information, credit card information or similar non-public information.

e. **Governmental Action**

   Loss resulting from seizure or destruction of property by order of governmental authority.

f. **Indirect Loss**

   Loss that is an indirect result of an "occurrence" covered by this insurance including, but not limited to, loss resulting from:

   **(1)** Your inability to realize income that you would have realized had there been no loss of or

damage to "money", "securities" or "other property".

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance.

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

**g.   Legal Fees, Costs and Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

**h.   Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation or radioactive contamination, however caused.

**i.   Pollutants**

Loss or damage caused by or resulting from pollutants. Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property, or the environment regardless of whether injury or damage is caused directly or indirectly by the "pollutants" and whether:

**(1)** You are regularly or otherwise engaged in activities which taint or degrade the environment; or

**(2)** You use, generate or produce the pollutant.

**j.   War and Military Action**

Loss or damage resulting from:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or

other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**2.**   Insuring Agreement **A.1.** does not cover:

**a.   Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b.   Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c.   Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

**3.**   Insuring Agreements **A.3.** and **A.4.** do not cover:

**a.   Accounting or Arithmetical Errors or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b.   Exchanges or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**c.   Fire**

Loss or damage resulting from fire, however caused, except:

**(1)** Loss of or damage to "money" and "securities"; and

**(2)** Loss from damage to a safe or vault.

Includes copyrighted material of ISO Properties, Inc., with their permission

**d. Money operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**e. Motor Vehicles or Equipment and Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**f. Transfer or Surrender of Property**

**(1)** Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

**(a)** On the basis of unauthorized instructions;

**(b)** As a result of a threat to do bodily harm to any person;

**(c)** As a result of a threat to do damage to any property;

**(d)** As a result of a threat to introduce a denial of service attack into your computer system;

**(e)** As a result of a threat to introduce a virus or other malicious instruction into your computer system which is designed to damage, destroy or corrupt data or computer programs stored within your computer system;

**(f)** As a result of a threat to contaminate, pollute or render substandard your products or goods; or

**(g)** As a result of a threat to disseminate, divulge or utilize:

**(i)** Your confidential information; or

**(ii)** Weaknesses in the source code within your computer system.

**(2)** But, this Exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the

care and custody of a "messenger" if you:

**(a)** Had no knowledge of any threat at the time the conveyance began; or

**(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

**h. Voluntary Parting of Title to or Possession of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**E. Conditions**

The following Conditions apply in addition to the Common Policy Conditions:

**1. Conditions Applicable to all Insuring Agreements**

**a. Additional Premises or Employees**

If, while this insurance is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this insurance. Notice to us of an increase in the number of "premises" or "employees" need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

**b. Concealment, Misrepresentation or Fraud**

This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**(1)** This insurance;

**(2)** The property covered under this insurance;

Includes copyrighted material of ISO
Properties, Inc., with their permission

**(3)** Your interest in the property covered under this insurance; or

**(4)** A claim under this insurance.

**c.  Consolidation - Merger or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

**(1)** You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this insurance to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

**(2)** For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this insurance shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**d.  Cooperation**

You must cooperate with us in all matters pertaining to this insurance as stated in its terms and conditions.

**e.  Duties in the Event of Loss**

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

**(1)** Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities.

**(2)** Submit to examination under oath at our request and give us a signed statement of your answers.

**(3)** Produce for our examination all pertinent records.

**(4)** Give us a detailed, sworn proof of loss within 120 days.

**(5)** Cooperate with us in the investigation and settlement of any claim.

**f.  Employee Benefit Plans**

**(1)** The "employee benefit plans" (hereafter referred to as Plan) are included as Insureds under Insuring Agreement **A.1.**

**(2)** If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator must select a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required if each Plan were separately insured.

**(3)** With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

**(4)** If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

**(5)** If two or more Plans are insured under this insurance, any payment we make for loss:

**(a)** Sustained by two or more Plans; or

**(b)** Of commingled "funds" or "other property" of two or more Plans;

resulting directly from an "occurrence" will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total Limit of Insurance of all Plans sustaining loss.

Includes copyrighted material of ISO Properties, Inc., with their permission

**(6)** The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

**g.    Extended Period to Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:

**(1)** No later than 60 days from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(2)** No later than 1 year from the date of that cancellation with regard to any "employee benefit plans".

**h.    Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any Insured is considered to be an "employee" of every Insured.

**(4)** If this insurance or any of its coverages is cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

**(a)** No later than 60 days from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon

the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(b)** No later than 1 year from the date of that cancellation with regard to any "employee benefit plans".

**(5)** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

**(6)** Payment by us to the first Named Insured for loss sustained by any Insured, other than an "employee benefit plan", shall fully release us on account of such loss.

**i.    Legal Action Against Us**

You may not bring any legal action against us involving loss:

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of loss with us; and

**(3)** Unless brought within 2 years from the date you "discovered" the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**j.    Liberalization**

If, within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part as of the later of:

**a.** The date we implemented the change in your state; or

**b.** The date this Coverage Part became effective; and

will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

**k.** **Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this insurance, our obligations are limited as follows:

**(1)** **Primary Insurance**

When this insurance is written as primary insurance, and:

**(a)** You have other insurance subject to the same terms and conditions as this insurance, issued by an insurer other than us or an insurer affiliated with us, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

**(b)** You have other insurance, issued by an insurer other than us or an insurer affiliated with us, covering the same loss other than that described in Paragraph **(1)(a)**, we will only pay for the amount of loss that exceeds:

**(i)** The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

**(ii)** The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this insurance.

**(2)** **Excess Insurance**

**(a)** When this insurance is written excess over other insurance issued by an insurer other than us or an insurer affiliated with us, we

will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this insurance.

**(b)** However, if loss covered under this insurance is subject to a Deductible, we will reduce the Deductible Amount shown in the Declarations, by the sum total of all such other insurance issued by an insurer other than us or an insurer affiliated with us, plus any Deductible Amount applicable to that other insurance.

**(c)** This insurance is excess of, and applies in addition to, any similar or identical insurance coverage provided by any other Coverage Part forming a part of the policy of insurance of which this Coverage Part forms a component. However, this insurance will not apply to that part of a loss falling within any deductible amount.

Paragraph **(c)** above supersedes any competing Other Insurance Condition contained in any other Coverage Part issued by us.

**l.** **Ownership of Property; Interests Covered**

The property covered under this insurance is limited to property:

**(1)** That you own or lease; or

**(2)** That you hold for others whether or not you are legally liable for the loss of such property.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this insurance must be presented by you.

**m.** **Policy Bridge - Discovery Replacing Loss Sustained**

**(1)** If this insurance replaces insurance that provided you with an

Includes copyrighted material of ISO Properties, Inc., with their permission

extended period of time after cancellation in which to discover loss and which did not terminate at the time this insurance became effective:

**(a)** We will not pay for any loss that occurred during the Policy Period of that prior insurance which is "discovered" by you during the extended period to "discover" loss, unless the amount of loss exceeds the Limit of Insurance and Deductible Amount of that prior insurance. In that case, we will pay for the excess loss subject to the terms and conditions of this policy.

**(b)** However, any payment we make for the excess loss will not be greater than the difference between the Limit of Insurance and Deductible Amount of that prior insurance and the Limit of Insurance shown in the Declarations. We will not apply the Deductible Amount shown in the Declarations to this excess loss.

**(2)** The Other Insurance Condition **E.1.k.** does not apply to this Condition.

**n.   Records**

You must keep records of all property covered under this insurance so we can verify the amount of any loss.

**o.   Recoveries**

**(1)** Any recoveries, whether effected before or after any payment under this insurance, whether made by us or you, shall be applied net of the expense of such recovery:

**(a)** First, to you in satisfaction of your covered loss in excess of the amount paid under this insurance;

**(b)** Second, to us in satisfaction of amounts paid in settlement of your claim;

**(c)** Third, to you in satisfaction of any Deductible Amount; and

**(d)** Fourth, to you in satisfaction of any loss not covered under this insurance.

**(2)** Recoveries do not include any recovery:

**(a)** From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

**(b)** Of original "securities" after duplicates of them have been issued.

**p.   Territory**

This insurance covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**q.   Transfer of Your Rights of Recovery Against Others to Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**r.   Valuation - Settlement**

**(1)** The value of any loss for purposes of coverage under this policy shall be determined as follows:

**(a)** Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

**(i)** At face value in the "money" issued by that country; or

**(ii)** In the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

**(b)** Loss of "securities" but only up to and including their value at the close of busi-

Includes copyrighted material of ISO Properties, Inc., with their permission

ness on the day the loss was "discovered". We may, at our option:

**(i)** Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

**(ii)** Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of:

  **i.** Market value of the "securities" at the close of business on the day the loss was "discovered"; or

  **ii.** The Limit of Insurance applicable to the "securities".

**(c)** Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

**(i)** The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

**(ii)** The amount you actually spend that is necessary to repair or replace the lost or damaged property; or

**(iii)** The Limit of Insurance applicable to the lost or damaged property.

With regard to Paragraphs **r.(1)(c)(i)** through **r.(1)(c)(iii)**, we will not pay on a replacement cost basis for any loss or damage:

  **i.** Until the lost or damaged property is actually repaired or replaced; and

  **ii.** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

**(2)** We will, at your option, settle loss or damage to property other than "money":

**(a)** In the "money" of the country in which the loss or damage occurred; or

**(b)** In the United States of America dollar equivalent of the "money" of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

**(3)** Any property that we pay for or replace becomes our property.

**2. Conditions Applicable to Insuring Agreement A.1.**

**a. Termination as to Any Employee**

This Insuring Agreement terminates as to any "employee":

**(1)** As soon as:

**(a)** You; or

**(b)** Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

**(2)** On the date specified in a notice mailed to the first Named In-

sured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**b. Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition **E.1.p.** for a period of not more than 90 consecutive days.

**3. Conditions Applicable to Insuring Agreement A.2.**

**a. Deductible Amount**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

**b. Electronic and Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

**c. Proof of Loss**

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**d. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.p.** does not apply to Insuring Agreement **A.2.**

**4. Conditions Applicable to Insuring Agreement A.4.**

**a. Armored Motor Vehicle Companies**

Under Insuring Agreement **A.4.,** we will only pay for the amount of loss you cannot recover:

**(1)** Under your contract with the armored motor vehicle company; and

**(2)** From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**b. Special Limit of Insurance for Specified Property**

We will only pay up to the lesser of $5,000 or the Limit of insurance for any one "occurrence" of loss of or damage to:

**(1)** Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

**(2)** Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**F. Definitions**

**1.** "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

**2.** "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

**3.** "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

**a.** The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

**(1)** The day the policy period shown in the Declarations ends; or

**(2)** The day the policy to which this Coverage Part is attached is terminated or cancelled.

**b.** However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

Includes copyrighted material of ISO Properties, Inc., with their permission

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

   "Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this insurance.

6. "Employee":

   a. "Employee" means:

      (1) Any natural person:

         (a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any other dishonest act committed by the "employee";

         (b) Who you compensate directly by salary, wages or commissions; and

         (c) Who you have the right to direct and control while performing services for you;

      (2) Any natural person who is furnished temporarily to you:

         (a) To substitute for a permanent "employee" as defined in Paragraph a.(1), who is on leave; or

         (b) To meet seasonal or short-term work load conditions;

         while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

      (3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph a.(2);

      (4) Any natural person who is:

         (a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; and

         (b) A director or trustee of yours while that person is engaged in handling "funds" or "other property" of any "employee benefit plan";

      (5) Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained as a consultant while performing services for you;

      (6) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the "premises";

      (7) Any "employee" of an entity merged or consolidated with you prior to the effective date of this insurance; or

      (8) Any of your "managers", directors or trustees while:

         (a) Performing acts within the scope of the usual duties of an "employee"; or

         (b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

   b. "Employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph 6.a.

Includes copyrighted material of ISO
Properties, Inc., with their permission

7. "Employee benefit plan" means any welfare or pension benefit plan that you sponsor and which is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

8. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

9. "Funds" means "money" and "securities".

10. "Manager" means a person serving in a directorial capacity for a limited liability company.

11. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

12. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

13. "Money" means:

    a. Currency, coins and bank notes in current use and having a face value; and

    b. Travelers checks, register checks and money orders held for sale to the public.

14. "Occurrence" means:

    a. Under Insuring Agreement **A.1.:**

       (1) An individual act;

       (2) The combined total of all separate acts whether or not related; or

       (3) A series of acts whether or not related;

       committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

    b. Under Insuring Agreement **A.2.:**

       (1) An individual act;

       (2) The combined total of all separate acts whether or not related; or

(3) A series of acts whether or not related;

committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, before such Policy Period or both.

    c. Under All Other Insuring Agreements:

       (1) An individual act or event;

       (2) The combined total of all separate acts or events whether or not related; or

       (3) A series of acts or events whether or not related;

       committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, before such Policy Period or both.

15. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include computer programs, electronic data or any property specifically excluded under this insurance.

16. "Premises" means the interior of that portion of any building you occupy in conducting your business.

17. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or property and includes:

    a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

    but does not include "money".

18. "Theft" means the unlawful taking of property to the deprivation of the Insured.

19. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

Includes copyrighted material of ISO Properties, Inc., with their permission

# TEXAS CHANGES - LEGAL ACTION AGAINST US

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME COVERAGE FORM (DISCOVERY FORM)**
**COMMERCIAL CRIME COVERAGE FORM (LOSS SUSTAINED FORM)**
**CRIME EXPANDED COVERAGE (XC") COVERAGE FORM (DISCOVERY FORM)**
**HOTEL CRIME EXPANDED COVERAGE FORM**

Section **E. CONDITIONS, 1. Conditions Applicable to all Insuring Agreements, i. Legal Action Against US (3)** is deleted in its entirety and replaced by the following:

**(3)**  The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

**CA 474 TX 09 14**

# THE CINCINNATI INDEMNITY COMPANY

**A Stock Insurance Company**

# CRIME AND FIDELITY COVERAGE PART DECLARATIONS (COMMERCIAL ENTITIES)

Attached to and forming part of POLICY NUMBER:   **ENP 006 54 53**

Named Insured is the same as it appears in the Common Policy Declarations

Item    Location (address)
     REFER TO CA911

Employee Benefit Plan(s) Included as Insureds:

**Coverage is Written:**

☒ **Primary**    ☐ **Excess**    ☐ **Coindemnity**    ☐ **Concurrent**

Coverage is provided only for the Crime Coverage for which a Limit of Insurance is shown below:

| Insuring Agreements Forming Part of This Coverage Part | Limit of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|
| 1.  Employee Theft | $   75,000 | $   1,000 |
| 2.  Forgery or Alteration | $ | $ |
| 3.  Inside the Premises - Theft of Money and Securities | $   75,000 | $   1,000 |
| 4.  Inside the Premises - Robbery or Safe Burglary of Other Property | $ | $ |
| 5.  Outside the Premises | $   20,000 | $   1,000 |
| 6.  Computer Fraud | $ | $ |
| 7.  Funds Transfer Fraud | $ | $ |
| 8.  Money Orders and Counterfeit Money | $ | $ |
|  | $ | $ |

 Forms and endorsements applicable to this Coverage Part at policy inception.

| | | |
|---|---|---|
| CR0020 | 05/06 | COMMERCIAL CRIME COVERAGE FORM (DISCOVERY FORM) |
| CA440 | 08/07 | COMMERCIAL CRIME COVERAGE FORM AMENDATORY ENDORSEMENT |
| CA474TX | 09/14 | TEXAS CHANGES - LEGAL ACTION AGAINST US |
| CA911 | 08/07 | CRIME AND FIDELITY SCHEDULE OF LOCATIONS |
| CR0111 | 03/87 | TEXAS CHANGES |

The Crime and Fidelity Coverage Part (Commercial Entities) consist of this Declaration Form and the Commercial Crime Coverage Form.

# COMMERCIAL CRIME COVERAGE FORM
# (DISCOVERY FORM)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

**A. Insuring Agreements**

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss Condition **E.1.g.:**

**1. Employee Theft**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

**2. Forgery or Alteration**

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

**(1)** Made or drawn by or drawn upon you; or

**(2)** Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **2.a.**, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement.

**3. Inside The Premises - Theft of Money and Securities**

**a.** We will pay for loss of "money" and "securities" inside the "premises" or "banking premises":

**(1)** Resulting directly from "theft" committed by a person present inside such "premises" or "banking premises"; or

**(2)** Resulting directly from disappearance or destruction.

**b.** We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

**4. Inside the Premises - Robbery or Safe Burglary of Other Property**

**a.** We will pay for loss of or damage to "other property":

**(1)** Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

**(2)** Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

**b.** We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

© ISO Properties, Inc., 2005

c. We will pay for loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**5. Outside the Premises**

a. We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. We will pay for loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer Fraud**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

a. To a person (other than a "messenger") outside those "premises"; or

b. To a place outside those "premises".

**7. Funds Transfer Fraud**

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

**8. Money Orders and Counterfeit Money**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

a. Money orders issued by any post office, express company or bank that are not paid upon presentation; or

b. "Counterfeit money" that is acquired during the regular course of business.

**B. Limit of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any

one of those Insuring Agreements or Coverages.

**C. Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**D. Exclusions**

1. This insurance does not cover:

a. **Acts Committed by You, Your Partners or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

(1) You; or

(2) Any of your partners or "members";

whether acting alone or in collusion with other persons.

b. **Acts of Employees Learned of by You Prior to the Policy Period**

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this insurance and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of that "theft" or dishonest act prior to the Policy Period shown in the Declarations.

c. **Acts Of Employees, Managers, Directors, Trustees or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

(1) Whether acting alone or in collusion with other persons; or

(2) While performing services for you or otherwise;

except when covered under Insuring Agreement A.1.

d. **Confidential Information**

Loss resulting from:

(1) The unauthorized disclosure of your confidential information including, but not limited to, pat-

ents, trade secrets, processing methods or customer lists; or

**(2)** The unauthorized use or disclosure of confidential information of another person or entity which is held by you including, but not limited to, financial information, personal information, credit card information or similar non-public information.

**e. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**f. Indirect Loss**

Loss that is an indirect result of an "occurrence" covered by this insurance including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this insurance.

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this insurance.

**g. Legal Fees, Costs and Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

**h. Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation or radioactive contamination, however caused.

**i. Pollution**

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**j. War and Military Action**

Loss or damage resulting from:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**2.** Insuring Agreement **A.1.** does not cover:

**a. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b. Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c. Warehouse Receipts**

Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

**3.** Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not cover:

**a. Accounting or Arithmetical Errors or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b. Exchanges or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

c. **Fire**

Loss or damage resulting from fire, however caused, except:

**(1)** Loss of or damage to "money" and "securities"; and

**(2)** Loss from damage to a safe or vault.

d. **Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

e. **Motor Vehicles or Equipment and Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

f. **Transfer or Surrender of Property**

**(1)** Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

**(a)** On the basis of unauthorized instructions;

**(b)** As a result of a threat to do bodily harm to any person;

**(c)** As a result of a threat to do damage to any property;

**(d)** As a result of a threat to introduce a denial of service attack into your computer system;

**(e)** As a result of a threat to introduce a virus or other malicious instruction into your computer system which is designed to damage, destroy or corrupt data or computer programs stored within your computer system;

**(f)** As a result of a threat to contaminate, pollute or render substandard your products or goods; or

**(g)** As a result of a threat to disseminate, divulge or utilize:

**(i)** Your confidential information; or

**(ii)** Weaknesses in the source code within your computer system.

**(2)** But, this Exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

**(a)** Had no knowledge of any threat at the time the conveyance began; or

**(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

g. **Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

h. **Voluntary Parting of Title to or Possession of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

4. Insuring Agreement **A.6.** does not cover:

a. **Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

b. **Funds Transfer Fraud**

Loss resulting from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

c. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

5. Insuring Agreement **A.7.** does not cover:

**COMPUTER FRAUD**

Loss resulting from the use of a computer to fraudulently cause a transfer of "money", "securities" or "other property".

**E. Conditions**

The following Conditions apply in addition to the Common Policy Conditions:

**1. Conditions Applicable to all Insuring Agreements**

**a. Additional Premises or Employees**

If, while this insurance is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this insurance. Notice to us of an increase in the number of "premises" or "employees" need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

**b. Concealment, Misrepresentation or Fraud**

This insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

(1) This insurance;

(2) The property covered under this insurance;

(3) Your interest in the property covered under this insurance; or

(4) A claim under this insurance.

**c. Consolidation - Merger or Acquisition**

If you consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

(1) You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this insurance to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this insurance shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**d. Cooperation**

You must cooperate with us in all matters pertaining to this insurance as stated in its terms and conditions.

**e. Duties in the Event of Loss**

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities.

(2) Submit to examination under oath at our request and give us a signed statement of your answers.

(3) Produce for our examination all pertinent records.

(4) Give us a detailed, sworn proof of loss within 120 days.

(5) Cooperate with us in the investigation and settlement of any claim.

**f. Employee Benefit Plans**

(1) The "employee benefit plans" shown in the Declarations (hereafter referred to as Plan) are included as Insureds under Insuring Agreement **A.1.**

(2) If any Plan is insured jointly with any other entity under this insurance, you or the Plan Administrator must select a Limit of Insurance for Insuring Agree-

ment **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required if each Plan were separately insured.

**(3)** With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

**(4)** If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

**(5)** If two or more Plans are insured under this insurance, any payment we make for loss:

**(a)** Sustained by two or more Plans; or

**(b)** Of commingled "funds" or "other property" of two or more Plans;

resulting directly from an "occurrence" will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total Limit of Insurance of all Plans sustaining loss.

**(6)** The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

**g.   Extended Period to Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:

**(1)** No later than 60 days from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insur-

ance provides coverage for loss sustained prior to its effective date.

**(2)** No later than 1 year from the date of that cancellation with regard to any "employee benefit plans".

**h.   Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this insurance. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any Insured is considered to be an "employee" of every Insured.

**(4)** If this insurance or any of its coverages is cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

**(a)** No later than 60 days from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(b)** No later than 1 year from the date of that cancellation with regard to any "employee benefit plans".

**(5)** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

**(6)** Payment by us to the first Named Insured for loss sustained by any Insured, other than an "employee benefit plan", shall fully release us on account of such loss.

**i. Legal Action Against Us**

You may not bring any legal action against us involving loss:

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of loss with us; and

**(3)** Unless brought within 2 years from the date you "discovered" the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**j. Liberalization**

If we adopt any revision that would broaden the coverage under this insurance without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this insurance.

**k. Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this insurance, our obligations are limited as follows:

**(1) Primary Insurance**

When this insurance is written as primary insurance, and:

**(a)** You have other insurance subject to the same terms and conditions as this insurance, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

**(b)** You have other insurance covering the same loss other than that described in Paragraph **(1)(a)**, we will only pay for the amount of loss that exceeds:

**(i)** The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

**(ii)** The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this insurance.

**(2) Excess Insurance**

**(a)** When this insurance is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this insurance.

**(b)** However, if loss covered under this insurance is subject to a Deductible, we will reduce the Deductible Amount shown in the Declarations, by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

**l. Ownership of Property; Interests Covered**

The property covered under this insurance is limited to property:

**(1)** That you own or lease; or

**(2)** That you hold for others whether or not you are legally liable for the loss of such property.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this insurance must be presented by you.

**m. Policy Bridge - Discovery Replacing Loss Sustained**

**(1)** If this insurance replaces insurance that provided you with an extended period of time after cancellation in which to discover loss and which did not terminate

at the time this insurance became effective:

**(a)** We will not pay for any loss that occurred during the Policy Period of that prior insurance which is "discovered" by you during the extended period to "discover" loss, unless the amount of loss exceeds the Limit of Insurance and Deductible Amount of that prior insurance. In that case, we will pay for the excess loss subject to the terms and conditions of this policy.

**(b)** However, any payment we make for the excess loss will not be greater than the difference between the Limit of Insurance and Deductible Amount of that prior insurance and the Limit of Insurance shown in the Declarations. We will not apply the Deductible Amount shown in the Declarations to this excess loss.

**(2)** The Other Insurance Condition **E.1.k.** does not apply to this Condition.

**n.  Records**

You must keep records of all property covered under this insurance so we can verify the amount of any loss.

**o.  Recoveries**

**(1)** Any recoveries, whether effected before or after any payment under this insurance, whether made by us or you, shall be applied net of the expense of such recovery:

**(a)** First, to you in satisfaction of your covered loss in excess of the amount paid under this insurance;

**(b)** Second, to us in satisfaction of amounts paid in settlement of your claim;

**(c)** Third, to you in satisfaction of any Deductible Amount; and

**(d)** Fourth, to you in satisfaction of any loss not covered under this insurance.

**(2)** Recoveries do not include any recovery:

**(a)** From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

**(b)** Of original "securities" after duplicates of them have been issued.

**p.  Territory**

This insurance covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**q.  Transfer of Your Rights of Recovery Against Others to Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**r.  Valuation - Settlement**

**(1)** The value of any loss for purposes of coverage under this policy shall be determined as follows:

**(a)** Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

**(i)** At face value in the "money" issued by that country; or

**(ii)** In the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

**(b)** Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

© ISO Properties, Inc., 2005

**(i)** Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

**(ii)** Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of:

    **i.** Market value of the "securities" at the close of business on the day the loss was "discovered"; or

    **ii.** The Limit of Insurance applicable to the "securities".

**(c)** Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

**(i)** The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

**(ii)** The amount you actually spend that is necessary to repair or replace the lost or damaged property; or

**(iii)** The Limit of Insurance applicable to the lost or damaged property.

With regard to Paragraphs **r.(1)(c)(i)** through **r.(1)(c)(iii),** we will not pay on a replacement cost basis for any loss or damage:

    **i.** Until the lost or damaged property is actually repaired or replaced; and

    **ii.** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

**(2)** We will, at your option, settle loss or damage to property other than "money":

**(a)** In the "money" of the country in which the loss or damage occurred; or

**(b)** In the United States of America dollar equivalent of the "money" of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

**(3)** Any property that we pay for or replace becomes our property.

**2. Conditions Applicable to Insuring Agreement A.1.**

**a. Termination as to Any Employee**

This Insuring Agreement terminates as to any "employee":

**(1)** As soon as:

**(a)** You; or

**(b)** Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

**(2)** On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If

notice is mailed, proof of mailing will be sufficient proof of notice.

**b. Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition **E.1.p.** for a period of not more than 90 consecutive days.

**3. Conditions Applicable to Insuring Agreement A.2.**

**a. Deductible Amount**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

**b. Electronic and Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

**c. Proof of Loss**

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

**d. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.p.** does not apply to Insuring Agreement **A.2.**

**4. Conditions Applicable to Insuring Agreements A.4. and A.5.**

**a. Armored Motor Vehicle Companies**

Under Insuring Agreement **A.5.,** we will only pay for the amount of loss you cannot recover:

**(1)** Under your contract with the armored motor vehicle company; and

**(2)** From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**b. Special Limit of Insurance for Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

**(1)** Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

**(2)** Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**5. Conditions Applicable to Insuring Agreement A.6.**

**a. Special Limit of Insurance for Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**b. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.p.** does not apply to Insuring Agreement **A.6.**

**F. Definitions**

**1.** "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

**2.** "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

**3.** "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

**4.** "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

"Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party

under circumstances which, if true, would constitute a loss under this insurance.

5.  "Employee":

   a.  "Employee" means:

      (1)  Any natural person:

         (a)  While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any other dishonest act committed by the "employee";

         (b)  Who you compensate directly by salary, wages or commissions; and

         (c)  Who you have the right to direct and control while performing services for you;

      (2)  Any natural person who is furnished temporarily to you:

         (a)  To substitute for a permanent "employee" as defined in Paragraph **a.(1)**, who is on leave; or

         (b)  To meet seasonal or short-term work load conditions;

         while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

      (3)  Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **a.(2)**;

      (4)  Any natural person who is:

         (a)  A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; and

         (b)  A director or trustee of yours while that person is engaged in handling "funds" or "other property" of any "employee benefit plan";

      (5)  Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained as a consultant while performing services for you;

      (6)  Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person having care and custody of property outside the "premises";

      (7)  Any "employee" of an entity merged or consolidated with you prior to the effective date of this insurance; or

      (8)  Any of your "managers", directors or trustees while:

         (a)  Performing acts within the scope of the usual duties of an "employee"; or

         (b)  Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

   b.  "Employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph **5.a.**

6.  "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and which is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

7.  "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

8.  "Fraudulent instruction" means:

   a.  An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

   b.  A written instruction (other than those described in Insuring Agree-

ment **A.2.)** issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

**c.** An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently transmitted by someone else without your or the "employee's" knowledge or consent.

**9.** "Funds" means "money" and "securities".

**10.** "Manager" means a person serving in a directorial capacity for a limited liability company.

**11.** "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

**12.** "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

**13.** "Money" means:

**a.** Currency, coins and bank notes in current use and having a face value; and

**b.** Travelers checks, register checks and money orders held for sale to the public.

**14.** "Occurrence" means:

**a.** Under Insuring Agreement **A.1.:**

**(1)** An individual act;

**(2)** The combined total of all separate acts whether or not related; or

**(3)** A series of acts whether or not related;

committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

**b.** Under Insuring Agreement **A.2.:**

**(1)** An individual act;

**(2)** The combined total of all separate acts whether or not related; or

**(3)** A series of acts whether or not related;

committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, before such Policy Period or both.

**c.** Under All Other Insuring Agreements:

**(1)** An individual act or event;

**(2)** The combined total of all separate acts or events whether or not related; or

**(3)** A series of acts or events whether or not related;

committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, before such Policy Period or both.

**15.** "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include computer programs, electronic data or any property specifically excluded under this insurance.

**16.** "Premises" means the interior of that portion of any building you occupy in conducting your business.

**17.** "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

**a.** Caused or threatened to cause that person bodily harm; or

**b.** Committed an obviously unlawful act witnessed by that person.

**18.** "Safe burglary" means the unlawful taking of:

**a.** Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

**b.** A safe or vault from inside the "premises".

**19.** "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or property and includes:

**a.** Tokens, tickets, revenue and other stamps (whether represented by

actual stamps or unused value in a meter) in current use; and

**b.** Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

**20.** "Theft" means the unlawful taking of property to the deprivation of the Insured.

**21.** "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds":

**a.** By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

**b.** By means of written instructions (other than those described in Insuring Agreement **A.2.)** establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

**22.** "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

 © ISO Properties, Inc., 2005

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMERCIAL CRIME COVERAGE FORM
# AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME COVERAGE FORM**

**A.** It is agreed that **E. Conditions, 1. Conditions Applicable to all Insuring Agreements, j. Liberalization** is deleted in its entirety and replaced by the following:

**j.   Liberalization**

If, within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part as of the latter of:

**a.**   The date we implemented the change in your state; or

**b.**   The date this Coverage Part became effective; and

will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

**B.** It is agreed that **D. Exclusions, 1. i. Pollution** is deleted in its entirety and replaced by the following:

**i.   Pollutants**

Loss or damage caused by or resulting from pollutants. Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property, or the environment regardless of whether injury or damage is caused directly or indirectly by the "pollutants" and whether:

**a.**   You are regularly or otherwise engaged in activities which taint or degrade the environment; or

**b.**   You use, generate or produce the pollutant.

     Includes copyrighted material of Insurance
Services Office, Inc., with its permission.

# TEXAS CHANGES - LEGAL ACTION AGAINST US

This endorsement modifies insurance provided under the following:

> **COMMERCIAL CRIME COVERAGE FORM (DISCOVERY FORM)**
> **COMMERCIAL CRIME COVERAGE FORM (LOSS SUSTAINED FORM)**
> **CRIME EXPANDED COVERAGE (XC") COVERAGE FORM (DISCOVERY FORM)**
> **HOTEL CRIME EXPANDED COVERAGE FORM**

Section **E. CONDITIONS, 1. Conditions Applicable to all Insuring Agreements, i. Legal Action Against US (3)** is deleted in its entirety and replaced by the following:

**(3)** The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

**CA 474 TX 09 14**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CRIME AND FIDELITY SCHEDULE OF LOCATIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME COVERAGE FORM**
**COMMERCIAL CRIME POLICY**
**EMPLOYEE THEFT AND FORGERY POLICY**
**GOVERNMENT CRIME COVERAGE FORM**
**GOVERNMENT CRIME POLICY**

| LOC. | STREET ADDRESS | CITY | STATE | ZIP CODE |
|------|----------------|------|-------|----------|
| 1 | 123 LOSOYA ST<br>STE 19<br>SAN ANTONIO, TX 78205-2607 | | | |
| 2 | 4714 SHAVANO OAK<br>SAN ANTONIO, TX 78249-4032 | | | |

CA 911 08 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**TEXAS CHANGES**

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME COVERAGE PART**

The following is added to the Valuation-Settlement provisions of this policy:

In the event arbitration is utilized, each party will select a competent and impartial arbitrator.  The two arbitrators will select an umpire.  If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction.  The arbitrators will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their difference to the umpire.  A decision agreed to by any two will be binding.  Each party will:

1.   Pay its chosen arbitrator; and

2.   Bear the other expenses of the arbitration and umpire equally.

If we submit to an arbitration, we will still retain our right to deny the claim.

# THE CINCINNATI INDEMNITY COMPANY
## CINCINNATI, OHIO

## BUSINESS AUTO COVERAGE PART DECLARATIONS

**ITEM ONE**
Attached to and forming part of POLICY NUMBER:   EBA 006 54 53
Named Insured is the same as it appears in the Common Policy Declarations.

**ITEM TWO**                    **SCHEDULE OF COVERAGES AND COVERED AUTOS**
This coverage part provides only those coverages where a premium or "incl" is shown in the premium column below. The limit of Insurance for each coverage listed is subject to all applicable policy provisions. Each of these coverages will apply only to those "autos" shown as covered "autos". "Autos" are shown as covered "autos" for a particular coverage by the entry of one or more of the symbols from the COVERED AUTO Section of the Business Auto Coverage Form next to the name of the coverage.

| COVERAGES | COVERED AUTOS (Entry of one or more of the symbols from the COVERED AUTOS Section of the Business Auto Coverage Form shows which autos are covered autos) | LIMIT THE MOST WE WILL PAY FOR ANY ONE ACCIDENT OR LOSS | PREMIUM |
|---|---|---|---|
| LIABILITY | 1 | $1,000,000 | INCL |
| PERSONAL INJURY PROTECTION (or equivalent No-fault coverage) | 5 | Separately stated in each P.I.P. endorsement minus $NONE     Ded. | INCL |
| ADDED PERSONAL INJURY PROTECTION (or equivalent added No-fault coverage) | | Separately stated in each added P.I.P. endorsement | |
| PROPERTY PROTECTION INSURANCE (Michigan only) | | Separately stated in each P. P.I. endorsement minus $          Ded. for each accident | |
| AUTO. MEDICAL PAYMENTS | | $ | |
| UNINSURED MOTORISTS | 7 | $ 1,000,000 | INCL |
| UNDERINSURED MOTORISTS (When not included in Uninsured Motorists Coverage) | 7 | $ SEE AA4183 | INCL |
| PHYSICAL DAMAGE COMPREHENSIVE COVERAGE | 7 | Actual cash value or cost of repair, Whichever is less minus $SEE AA4183 Ded. For each covered auto. But no Deductible applies to loss caused by Fire or lightning. See Item Three for hired or borrowed "autos" | INCL |
| PHYSICAL DAMAGE SPECIFIED CAUSES OF LOSS COVERAGE | | Actual cash value or cost of repair, Whichever is less minus $          Ded. For Each covered auto. For loss caused by mischief or vandalism. See Item Three for hired or borrowed "autos" | |
| PHYSICAL DAMAGE COLLISION COVERAGE | 7 | Actual cash value or cost of repair, Whichever is less minus $SEE AA4183 Ded for each covered auto. See Item Three for hired or borrowed "autos". | INCL |
| PHYSICAL DAMAGE INSURANCE TOWING AND LABOR | | $          for each disablement of a private passenger auto | |
| PREMIUM FOR ENDORSEMENTS | | | |
| | | *ESTIMATED TOTAL PREMIUM | INCL |

FORMS AND ENDORSEMENTS CONTAINED IN THIS COVERAGE PART AT ITS INCEPTION:
AA4183    02/06  AUTOMOBILE SCHEDULE
AA101     03/06  BUSINESS AUTO COVERAGE FORM
AA2009    01/17  CHANGES - TOWING AND LABOR
AA296     07/12  CHANGES - AUDIO, VISUAL AND DATA ELECTRONIC EQUIPMENT COVERAGE
AA4172    09/09  BLANKET WAIVER OF SUBROGATION - AUTO
AA4232TX  05/13  TEXAS UNINSURED/UNDERINSURED MOTORIST COVERAGE

FORMS AND ENDORSEMENTS CONTAINED IN THIS COVERAGE PART AT ITS INCEPTION:

| | | |
|---|---|---|
| AA4246TX | 10/09 | TEXAS CHANGES - CANCELLATION AND NONRENEWAL |
| AA4249TX | 07/09 | TEXAS EXPERIENCE MODIFICATION |
| AA4252TX | 09/19 | NOTICE: TEXAS MOTOR VEHICLE CRIME PREVENTION AUTHORITY (MVCPA) |
| AA4263 | 04/10 | OFFICE OF FOREIGN ASSETS CONTROL (OFAC) COMPLIANCE ENDORSEMENT |
| AP401TX | 12/13 | TEXAS UNINSURED/UNDERINSURED MOTORIST COVERAGE AND PERSONAL INJURY PROTECTION COVERAGE SELECTION/REJECTION |
| CA0196 | 03/06 | TEXAS CHANGES |
| CA2264 | 07/08 | TEXAS PERSONAL INJURY PROTECTION ENDORSEMENT |
| AA265 | 01/16 | CINCIPLUS® BUSINESS AUTO XC® (EXPANDED COVERAGE) ENDORSEMENT |

* This policy may be subject to final audit

# QUICK REFERENCE
# COMMERCIAL AUTO COVERAGE PART
# BUSINESS AUTO COVERAGE FORM
### READ YOUR POLICY CAREFULLY

## DECLARATIONS PAGES

Named Insured and Mailing Address
Policy Period
Description of Business
Coverages and Limits of Insurance

## SECTION I - COVERED AUTOS                                          Beginning on Page

Description of Covered Auto Designation Symbols...........................................................................1
Owned Autos You Acquire After the Policy Begins ........................................................................1
Certain Trailers, Mobile Equipment and
Temporary Substitute Autos.......................................................................................................... 2

## SECTION II - LIABILITY COVERAGE

Coverage....................................................................................................................................... 2
Who is an Insured ......................................................................................................................... 2
Coverage Extensions
    Supplementary Payments......................................................................................................... 2
    Out of State............................................................................................................................. 3
Exclusions .................................................................................................................................... 3
Limit of Insurance ........................................................................................................................ 5

## SECTION III - PHYSICAL DAMAGE COVERAGE

Coverage....................................................................................................................................... 7
Exclusions .................................................................................................................................... 7
Limit of Insurance ........................................................................................................................ 8
Deductible..................................................................................................................................... 8

## SECTION IV - BUSINESS AUTO CONDITIONS

Loss Conditions
    Appraisal for Physical Damage Loss ....................................................................................... 9
    Duties in the Event of Accident, Claim, Suit or Loss............................................................... 9
    Legal Action Against Us .......................................................................................................... 9
    Loss Payment - Physical Damage Coverages........................................................................... 9
    Transfer of Rights of Recovery Against Others to Us............................................................. 10
General Conditions
    Bankruptcy ............................................................................................................................ 10
    Concealment, Misrepresentation or Fraud............................................................................. 10
    Liberalization ........................................................................................................................ 10
    No Benefit to Bailee - Physical Damage Coverages............................................................... 10
    Other Insurance ..................................................................................................................... 10
    Premium Audit....................................................................................................................... 10
    Policy Period, Coverage Territory .......................................................................................... 10
    Two or More Coverage Forms or Policies Issued by Us......................................................... 11

## SECTION V - DEFINITIONS ........................................................................................... 11

## COMMON POLICY CONDITIONS

Cancellation
Changes
Examination of Your Books and Records
Inspections and Surveys
Premiums
Transfer of Your Rights and Duties under this Policy

## ENDORSEMENTS (If Any)

# AUTOMOBILE SCHEDULE

## ITEM   THREE

Attached to and forming a part of Policy Number   __EBA 006 54 53__   , effective   __03-01-2020__

The insurance afforded for any automobile is only with respects to such and so many of the coverages as are indicated by specific premium charge or charges indicated.

### POLICY LIMITS
### State: TX

| | | | |
|---|---|---|---|
| Bodily Injury: | 1,000,000 CSL | Property Damage: | INCLUDED |
| UM/UIM: | 1,000,000 | UMPD | INCLUDED |
| UMPD DED: | 250 | PIP: | 5,000 |
| | | | (*UMPD APPLIES) |

---

**Veh. No.   Vehicle Information**

**1**   2013 FORD FLEX S/N 2FMGK5C82DBD18841            Class: 7391    Territory 003
OTC-COMP DED: 500                               Coll Ded: 500
                                                COST NEW: 33,225    ZIP CODE: 78249

| BI | PD | MP | OTC | COLL | UM* | |
|---|---|---|---|---|---|---|
| 1,532 | INCL | N/A | 195 | 550 | 256 | |
| **PIP** | **MVCPA** | | | | | **TOTAL** |
| 38 | 4 | | | | | 2,575 |

**2**   2015 LAND ROVER RANGE ROVER S/N SALGV2TF6FA214630   Class: 7391    Territory 003
OTC-COMP DED: 500                               Coll Ded: 500
                                                COST NEW: 137,995    ZIP CODE: 78249

| BI | PD | MP | OTC | COLL | UM* | |
|---|---|---|---|---|---|---|
| 1,626 | INCL | N/A | 597 | 1,480 | 256 | |
| **PIP** | **MVCPA** | | | | | **TOTAL** |
| 38 | 4 | | | | | 4,001 |

**3**   2014 FORD C-MAX S/N 1FADP5AU4EL519589            Class: 7391    Territory 003
OTC-COMP DED: 500                               Coll Ded: 500
                                                COST NEW: 25,200    ZIP CODE: 78249

| BI | PD | MP | OTC | COLL | UM* | |
|---|---|---|---|---|---|---|
| 1,565 | INCL | N/A | 197 | 626 | 256 | |
| **PIP** | **MVCPA** | | | | | **TOTAL** |
| 38 | 4 | | | | | 2,686 |

BLANKET WAIVER OF SUBROGATION                   Class:        Territory
OTC-COMP DED: N/A                               Coll Ded: N/A

| BI | PD | MP | OTC | COLL | UM | **TOTAL** |
|---|---|---|---|---|---|---|
| 150 | INCL | | | | | 150 |

---

# AUTOMOBILE SCHEDULE

## ITEM   THREE   (CONTINUED)

| BUSINESS AUTO EXPANDED ENDORSEMENT | | | | | | Class: | Territory |
|---|---|---|---|---|---|---|---|
| OTC-COMP DED: N/A | | | | Coll Ded: N/A | | | |

| BI | PD | MP | OTC | COLL | UM | | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | 142 | | | | 142 |

| HIRED AND NON-OWNED | | | | | | Class: | Territory |
|---|---|---|---|---|---|---|---|
| OTC-COMP DED: N/A | | | | Coll Ded: N/A | | | |

| BI | PD | MP | OTC | COLL | UM | | TOTAL |
|---|---|---|---|---|---|---|---|
| 240 | INCL | N/A | | | | | 240 |

SYMBOLS:

| | | | | |
|---|---|---|---|---|
| BI | -- Bodily Injury | | SPEC | -- Specified Perils |
| PD | -- Property Damage | | COLL | -- Collision |
| MP | -- Medical Payments | | UM | -- Uninsured Motorists |
| OTC | -- Other Than Collision (ACV Coverage applies unless Stated Amount Value is indicated) | | UIM | -- Underinsured Motorists |
| | | | PIP | -- Personal Injury Protection |
| CAC | -- Combined Additional Coverage | | T&L | -- Towing and Labor Costs |
| FT&S | -- Fire, Theft, and Supplemental | | RR | -- Rental Reimbursement |
| MVCPA | --TX Motor Veh Crime Prev Fee | | UMPD | -- Uninsured Motorists PD |

# BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer **to SECTION V - DEFINITIONS**.

## SECTION I - COVERED AUTOS

ITEM TWO of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description of Covered Auto Designation Symbols**

**SYMBOL          DESCRIPTION**

**1 =** ANY "AUTO".

**2 =** OWNED "AUTOS" ONLY. Only those "autos" you own (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" you acquire ownership of after the policy begins.

**3 =** OWNED PRIVATE PASSENGER "AUTOS" ONLY. Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the policy begins.

**4 =** OWNED "AUTOS" OTHER THAN PRIVATE PASSENGER "AUTOS" ONLY. Only those "autos" you own that are not of the private passenger type (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins.

**5 =** OWNED "AUTOS" SUBJECT TO NO-FAULT. Only those "autos" you own that are required to have No-Fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are required to have No-Fault benefits in the state where they are licensed or principally garaged.

**6 =** OWNED "AUTOS" SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW. Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement.

**7 =** SPECIFICALLY DESCRIBED "AUTOS". Only those "autos" described in ITEM THREE of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to a power unit described in ITEM THREE).

**8 =** HIRED "AUTOS" ONLY. Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent, or borrow from any of your "employees" or partners (if you are a partnership), members (if you are a limited liability company) or members of their households.

**9 =** NONOWNED "AUTOS" ONLY. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs.

**B. Owned Autos You Acquire After the Policy Begins**

1. If Symbols 1, 2, 3, 4, 5, or 6 are entered next to a coverage in ITEM TWO of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol 7 is entered next to a coverage in ITEM TWO of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

   **a.** We already cover all "autos" that you own for that coverage or it replaces

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

an "auto" you previously owned that had that coverage; and

**b.** You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. Certain Trailers, Mobile Equipment and Temporary Substitute Autos**

If Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Liability Coverage:

**1.** "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

**2.** "Mobile equipment" while being carried or towed by a covered "auto".

**3.** Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

**a.** Breakdown;

**b.** Repair;

**c.** Servicing;

**d.** "Loss"; or

**e.** Destruction.

# SECTION II - LIABILITY COVERAGE

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1. Who is an Insured**

The following are "insureds":

**a.** You for any covered "auto".

**b.** Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

**(1)** The owner or anyone else from whom you hire or borrow a covered "auto". This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

**(2)** Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

**(3)** Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

**(5)** A partner (if you are a partnership), or a member (if you are a limited liability company), for a covered "auto" owned by him or her or a member of his or her household.

**c.** Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the "insured":

**(1)** All expenses we incur.

**(2)** Up to $2,000 for the cost of bail bonds (including bonds for related traffic law violations) re-

AA 101 03 06

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 2 of 14

quired because of an "accident" we cover. We do not have to furnish these bonds.

**(3)** The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

**(4)** All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

**(5)** All costs taxed against the "insured" in any "suit" against the "insured" we defend.

**(6)** All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend, but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b.** **Out-of-State Coverage Extensions**

While a covered "auto" is away from the state where it is licensed we will:

**(1)** Increase the Limit of Insurance for Liability Coverage to meet the limits specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

**(2)** Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

**B.** **Exclusions**

This insurance does not apply to any of the following:

**1.** **Expected or Intended Injury**

"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the "insured" or which is in fact expected or intended by the "insured", even if the injury or damage is of a different degree or type than actually expected or intended. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**2.** **Contractual**

Liability assumed under any contract or agreement.

But this exclusion does not apply to liability for damages:

**a.** Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

**b.** That the "insured" would have in the absence of the contract or agreement.

**3.** **Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4.** **Employee Indemnification and Employer's Liability**

"Bodily injury" to:

**a.** An "employee" of the "insured" sustained in the "workplace";

**b.** An "employee" of the "insured" arising out of the performance of duties related to the conduct of the "insured's" business; or

**c.** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** or **b.** above.

This Exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract" other than a contract or agreement with a labor leasing firm. For the purposes of the Coverage Form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5.  Fellow Employee**

"Bodily injury" to any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business.

**6.  Care, Custody or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7.  Handling of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

**a.**  Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

**b.**  After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

**8.  Movement of Property by Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

**9.  Operations**

"Bodily injury" or "property damage" arising out of the operation of:

**a.**  Any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment"; or

**b.**  Machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor ve-

hicle insurance law where it is licensed or principally garaged.

**10.  Completed Operations**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

**a.**  Work or operations performed by you or on your behalf; and

**b.**  Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraphs **a.** or **b.** above.

Your work will be deemed completed at the earliest of the following times:

**(1)**  When all of the work called for in your contract has been completed.

**(2)**  When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

**(3)**  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**11.  Pollutant**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants":

**a.**  That are, or that are contained in any property that is:

**(1)**  Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

**(2)**  Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** of this exclusion does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

However, this exception to Paragraph **a.** does not apply if the fuels, lubricants, fluids, exhaust gases or other similar "pollutants" are intentionally discharged, dispersed or released.

Paragraphs **b.** and **c.** of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(1)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(2)** The discharge, dispersal, seepage, migration, release, emission or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**d.** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

**(1)** If the "pollutants" are brought on or to the premises, site or location in connection with such operations by such "insured", contractor or subcontractor; or

**(2)** If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

Subparagraph **d.(1)** does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids are intentionally discharged, dispersed or released, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent to be discharged, dispersed or released as part of the operations being performed by such "insured", contractor or subcontractor.

**12. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This

insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined, resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

**D. Mobile Equipment Subject to Motor Vehicle Insurance Laws**

As respects **SECTION II - LIABILITY COVERAGE** any land vehicle, which would qualify as "mobile equipment", except that it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged, is considered a covered "auto" under **SECTION II - LIABILITY COVERAGE,** irrespective of the Auto Designation Symbols shown for **SECTION II - LIABILITY COVERAGE** in the Declarations.

# SECTION III - PHYSICAL DAMAGE COVERAGE

**A. Coverage**

1. We will pay for "loss" to a covered "auto" or its equipment under:

   **a. Comprehensive Coverage**

   From any cause except:

   **(1)** The covered "auto's" collision with another object; or

   **(2)** The covered "auto's" overturn.

   **b. Specified Causes of Loss Coverage**

   Caused by:

   **(1)** Fire, lightning or explosion;

   **(2)** Theft;

   **(3)** Windstorm, hail or earthquake;

   **(4)** Flood;

   **(5)** Mischief or vandalism; or

   **(6)** The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

   **c. Collision Coverage**

   Caused by:

   **(1)** The covered "auto's" collision with another object; or

   **(2)** The covered "auto's" overturn.

2. **Towing**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage - Hitting a Bird or Animal - Falling Objects or Missiles**

   If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

   **a.** Glass breakage;

   **b.** "Loss" caused by hitting a bird or animal; and

   **c.** "Loss" caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

4. **Coverage Extensions**

   **a. Transportation Expenses**

   We will also pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the private passenger type. We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered

"auto" is returned to use or we pay for its "loss".

**b. Loss of Use Expenses**

For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver, under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

**(1)** Other than collision only if the Declarations indicate that Comprehensive Coverage is provided for any covered "auto";

**(2)** Specified Causes of Loss only if the Declarations indicate that Specified Causes of Loss Coverage is provided for any covered "auto"; or

**(3)** Collision only if the Declarations indicate that Collision Coverage is provided for any covered "auto".

However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

**B. Exclusions**

**1.** We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

**a. Nuclear Hazard**

**(1)** The explosion of any weapon employing atomic fission or fusion; or

**(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

**b. War or Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for "loss" to any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

**3.** We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

**a.** Wear and tear, freezing, mechanical or electrical breakdown; or

**b.** Blowouts, punctures or other road damage to tires.

**4.** We will not pay for "loss" to any of the following:

**a.** Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

**b.** Any device designed or used to detect speed measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment.

**c.** Any electronic equipment, without regard to whether this equipment is permanently installed, that receives or transmits audio, visual or data signals and that is not designed solely for the reproduction of sound.

**d.** Any accessories used with the electronic equipment described in Paragraph **c.** above.

Exclusions **4.c.** and **4.d.** do not apply to:

**a.** Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the covered "auto" at the time of the "loss" or such equipment is removable from a housing unit which is permanently installed in the covered "auto" at the time of the "loss", and such equipment is designed to be solely operated by use of the power from the "auto's" electrical system, in or upon the covered "auto"; or

**b.** Any other electronic equipment that is:

**(1)** Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system; or

**(2)** An integral part of the same unit housing any sound reproducing equipment described in Paragraph **a.** above and permanently installed in the opening of the dash or console of the covered "auto" normally used by the manufacturer for installation of a radio.

**5.** We will not pay for "loss" to a covered "auto" due to "diminution in value".

**C. Limit of Insurance**

**1.** The most we will pay for "loss" in any one "accident" is the lesser of:

**a.** The actual cash value of the damaged or stolen property as of the time of the "loss"; or

**b.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

**2.** An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

**3.** If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

**D. Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

# SECTION IV - BUSINESS AUTO CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

**1. Appraisal for Physical Damage Loss**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties in the Event of Accident, Claim, Suit or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

**(1)** How, when and where the "accident" or "loss" occurred;

**(2)** The "insured's" name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**(4)** Authorize us to obtain medical records or other pertinent information.

**(5)** Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is "loss" to a covered "auto" or its equipment you must also do the following:

**(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

**(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

**(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

**(4)** Agree to examinations under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4. Loss Payment - Physical Damage Coverages**

At our option we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property, at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5. Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom we make payment under this Cov-erage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B. General Conditions**

**1. Bankruptcy**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligations under this Coverage Form.

**2. Concealment, Misrepresentation or Fraud**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This Coverage Form;

**b.** The covered "auto";

**c.** Your interest in the covered "auto"; or

**d.** A claim under this Coverage Form.

**3. Liberalization**

If within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part as of the latter of:

**a.** The date we implemented the change in your state; or

**b.** The date this Coverage Part became effective; and

will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

**4. No Benefit to Bailee - Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**5.    Other Insurance**

    **a.**   For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this Coverage Form provides for the "trailer" is:

        **(1)**  Excess while it is connected to a motor vehicle you do not own.

        **(2)**  Primary while it is connected to a covered "auto" you own.

    **b.**   For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

    **c.**   Regardless of the provisions of Paragraph **a.** above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract".

    **d.**   When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6.    Premium Audit**

    **a.**   The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

    **b.**   If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7.    Policy Period, Coverage Territory**

Under this Coverage Form, we cover "accidents" and "losses" occurring:

    **a.**   During the Policy Period shown in the Declarations; and

    **b.**   Within the coverage territory.

The coverage territory is:

    **a.**   The United States of America;

    **b.**   The territories and possessions of the United States of America;

    **c.**   Puerto Rico;

    **d.**   Canada; and

    **e.**   Anywhere in the world if:

        **(1)**  A covered "auto" of the private passenger type is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and

        **(2)**  The "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico, or Canada or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8.    Two or More Coverage Forms or Policies Issued by Us**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## SECTION V - DEFINITIONS

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means:

**1.** A land motor vehicle, "trailer" or semi-trailer designed for travel on public roads; or

**2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured";

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto"; or

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place

where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** or **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(1)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(2)** The discharge, dispersal, seepage, migration, release, escape or emission of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who is an Insured provision of the applicable coverage.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract":

**1.** Means:

**a.** A lease of premises;

**b.** A sidetrack agreement;

**c.** An easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

**f.** That part of any other contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

**2.** Does not include that part of any contract or agreement:

**a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road beds, tunnel, underpass or crossing; or

**b.** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

**c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" includes supervisors furnished to you by the labor leasing firm. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

**K.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**1.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**2.** Vehicles maintained for use solely on or next to premises you own or rent;

**3.** Vehicles that travel on crawler treads;

**4.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**a.** Power cranes, shovels, loaders, diggers or drills; or

**b.** Road construction or resurfacing equipment such as graders, scrapers or rollers.

**5.** Vehicles not described in Paragraphs **1., 2., 3.,** or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**b.** Cherry pickers and similar devices used to raise or lower workers.

**6.** Vehicles not described in Paragraphs **1., 2., 3.,** or **4.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**a.** Equipment designed primarily for:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(1)** Snow removal;

**(2)** Road maintenance, but not construction or resurfacing; or

**(3)** Street cleaning;

**b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**c.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**L.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and their by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether injury or damage is caused directly or indirectly by the "pollutants" and whether:

**1.** The "insured" is regularly or otherwise engaged in activities which taint or degrade the environment; or

**2.** The "insured" uses, generates or produces the "pollutant".

**M.** "Property damage" means damage to or loss of use of tangible property.

**N.** "Suit" means a civil proceeding in which:

**1.** Damages because of "bodily injury" or "property damage"; or

**2.** A "covered pollution cost or expense",

to which this insurance applies, are alleged.

"Suit" includes:

**a.** An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the insured submits with our consent.

**O.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**P.** "Trailer" includes semitrailer.

**Q.** "Workplace" means that place and during such hours to which the "employee" sustaining "bodily injury" was assigned by you, or any other person or entity acting on your behalf, to work on the date of the "accident".

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

### (Broad Form)

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an "insured" under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an "insured" under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with

respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazard-

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ous properties" of "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

    **(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

    **(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

    **(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "special nuclear material" or "byproduct material";

"Source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material **(a)** containing "byproduct material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    **(a)** Any "nuclear reactor";

    **(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

    **(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    **(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations:

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES - TOWING AND LABOR

This endorsement modifies insurance provided by the following:

**BUSINESS AUTO COVERAGE FORM**

With respect to the coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by this endorsement.

1. **SECTION III - PHYSICAL DAMAGE COVERAGE, A. Coverage, 2. Towing** is deleted in its entirety and replaced with:

   2. **Towing**

      We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" is disabled. However, the labor must be performed at the place of disablement.

**AA 2009 01 17**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES - AUDIO, VISUAL AND DATA ELECTRONIC EQUIPMENT COVERAGE

This endorsement modifies insurance provided by the following:

**BUSINESS AUTO COVERAGE FORM**

With respect to the coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by this endorsement.

1. **SECTION III - PHYSICAL DAMAGE COVERAGE, B. Exclusions, 4.** is deleted in its entirety and replaced with:

   4. We will not pay for "loss" to any of the following:

      a. Tapes, records, discs or similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

      b. Any device designed or used to detect speed-measuring equipment, such as radar or laser detectors, and any jamming apparatus intended to elude or disrupt speed-measuring equipment.

      c. Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

      d. Any accessories used with the electronic equipment described in Paragraph **c.** above.

   Exclusions **4.c.** and **4.d.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:

      a. Permanently installed in or upon the covered "auto";

      b. Removable from a housing unit which is permanently installed in or upon the covered "auto";

      c. An integral part of the same unit housing any electronic equipment described in Paragraphs **a.** and **b.** above; or

      d. Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system.

2. **SECTION III - PHYSICAL DAMAGE COVERAGE, C. Limits of Insurance, 1.** is deleted in its entirety and replaced with:

   1. The most we will pay for:

      a. "Loss" to any covered "auto" is the lesser of;

         (1) The actual cash value of the damaged or stolen property as of the time of the "loss"; or

         (2) The cost of repairing or replacing the damaged or stolen property with other property of like kind or quality.

      b. All electronic equipment that reproduces, receives or transmits audio, visual or data signals in any one "loss", is up to $1,000, if, at the time of "loss", such electronic equipment is:

         (1) Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

         (2) Removable from a permanently installed housing unit as described in Paragraph **b.1.** above; or

         (3) An integral part of such equipment as described in Paragraphs **b.(1)** and **b.(2)** above.

3. **AUDIO, VISUAL AND DATA ELECTRONIC EQUIPMENT COVERAGE ADDED LIMITS**

   The sub-limit in Paragraph **1.b.** above is in addition to the Limit of Insurance shown in the Schedule of the Audio, Visual and Data Equipment Coverage endorsement, if purchased.

AA 296 07 12

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BLANKET WAIVER OF SUBROGATION - AUTO

This endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Effective: | Policy Number: |
|---|---|
| 03-01-2020 | EBA 006 54 53 |
| Named Insured: | |
| MD BEVCO INC DBA MAD DOGS SAN ANTONIO | |
| Countersigned by: | |

(Authorized Representative)

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**1.   Blanket Waiver of Subrogation**

**SECTION IV - BUSINESS AUTO CONDITIONS, A. Loss Conditions, 5. Transfer of Rights of Recovery Against Others to Us** is amended by the addition of the following:

We waive any right of recovery we may have against any person or organization because of payments we make for "bodily injury" or "property damage" arising out of the operation of a covered "auto" when you have assumed liability for such "bodily injury" or "property damage" under an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the "insured contract".

**AA 4172 09 09**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS UNINSURED/UNDERINSURED MOTORIST COVERAGE

Throughout this endorsement "you" and "your" refer to the organization(s) and a natural person(s) shown as a Named Insured on this endorsement. "You" and "your" do not refer to any other person(s) or organization(s), including but not limited to agents, employees, servants, members, shareholders or independent contractors of any person or organization shown as a Named Insured on this endorsement.

For a covered "auto" licensed or principally garaged in, or "garage operations" conducted in Texas, this endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM**
**GARAGE COVERAGE FORM**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by this endorsement.

This endorsement changes the Coverage Form effective on the effective date of the Coverage Form unless another date is indicated below:

| Endorsement Effective: | Policy Number: |
|---|---|
| 03-01-2020 | EBA 006 54 53 |
| Named Insured: | |
| MD BEVCO INC DBA MAD DOGS SAN ANTONIO | |

## SCHEDULE

| Limit of Insurance | |
|---|---|
| $REFER TO AA4183 | Each "Accident" |

Information required to complete this Schedule, if not shown above will be shown in the Declarations.

**A. Coverage**

1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or operator of:

   a. An "uninsured motor vehicle" as defined in Paragraph **F.4.a., c.** and **d.** because of "bodily injury" or "property damage":

      (1) Sustained by the "insured"; and

      (2) Caused by an "accident".

   b. An "uninsured motor vehicle" as defined in Paragraph **F.4.b.** because of "bodily injury" or "property damage" sustained by an "insured".

   The owner's or operator's liability for these damages must result from the ownership,

maintenance or use of the "uninsured motor vehicle". The "insured" shall be required to prove all elements of the "insured's" claim that are necessary to recover from the owner or operator of the "uninsured motor vehicle".

2. With respect to damages resulting from an "accident" with a "motor vehicle" described in Paragraph **F.4.d.** of the definition of "uninsured motor vehicle", we will pay under this endorsement only if **a.** or **b.** below applies:

   a. The limits of insurance under all applicable liability bonds or policies have been exhausted by payment of judgments or settlements; or

   b. A tentative settlement has been made between an "insured" and a person(s) or organization(s) who may

Includes copyrighted material of ISO
Properties, Inc., with its permission.

be legally responsible for the "accident"; or the insurer of the "motor vehicle" described in Paragraph **F.4.d.** of the definition of "uninsured motor vehicle", or legal representative of such person(s) or organizations(s) and we:

   **(1)** Have been given prompt written notice of such settlement; and

   **(2)** Advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

**3.** Any judgment for damages arising out of a "suit" brought without our written consent to both the "suit" and the judgment is not binding on us. If we and the Named Insured do not agree as to whether or not a "motor vehicle" is actually uninsured, the burden of proof as to that issue will be on us.

## B. Who is an Insured

The following are "insureds":

**1.** If any natural persons are specifically listed as a Named Insured on this endorsement, the following persons are "insureds":

   **a.** Natural persons specifically listed as a Named Insured on this endorsement;

   **b.** "Family members" of natural persons specifically listed as a Named Insured on this endorsement;

   **c.** Any natural person, but only for injuries that occur while "occupying" an "auto" for which coverage is provided in the Coverage Form or a temporary substitute for such covered "auto". In such case, the covered "auto" must be out of service because of its break down, repair, servicing, "loss" or destruction; and

   **d.** Any natural person, but only for damages he or she is entitled to recover because of "bodily injury" sustained by an "insured" described in Paragraphs **B.1.a., b.** or **c.**

**2.** If an entity other than a natural person is listed as a Named Insured on this endorsement, the following persons are "insureds":

   **a.** The Named Insured for "property damage" only.

   **b.** Any natural person, but only for injuries that occur while "occupying" an

"auto" for which coverage is provided in the Coverage Form or a temporary substitute for such covered "auto". In such case, the covered "auto" must be out of service because of its break down, repair, servicing, "loss" or destruction.

   **c.** Any natural person is an "insured", but only for damages he or she is entitled to recover because of "bodily injury" sustained by an "insured" described in Paragraph **B.2.b.**

## C. Exclusions

This insurance does not apply to:

**1.** Any claim settled with the person(s) or organization(s) legally responsible for the "accident" or the insurer or legal representative of such person(s) or organization(s) without our consent.

However, this Exclusion (**C.1.**) does not apply to a settlement made with the insurer of the "motor vehicle" described in Paragraph **F.4.d.** of the definition of "uninsured motor vehicle" in accordance with the procedure described in Paragraph **A.2.b.**

**2.** The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, personal injury protection benefits, disability benefits, pension statutes or similar laws.

**3.** "Bodily injury" suffered by any person while operating or "occupying" a "motor vehicle" without a reasonable belief that he or she is entitled to do so. Under no circumstances will a person whose license has been suspended, revoked or never issued be held to have a reasonable belief that he or she is entitled to operate a "motor vehicle".

However, this Exclusion (**C.3.**) does not apply to an individual Named Insured or a "family member" while using a covered "auto".

**4.** "Bodily injury" sustained by an "insured" while the "insured" is operating, "occupying", or when struck by a "motor vehicle" owned by, furnished to, or available for the regular use of a Named Insured, or if the Named Insured is a natural person, a spouse or a "family member" of such Named Insured, if the "motor vehicle" is not specifically identified in the Coverage Form or is not a newly acquired or replacement "motor vehicle" covered under the terms of the Coverage Form.

Includes copyrighted material of ISO Properties, Inc., with its permission.

5.  Any "family member" while operating, "occupying", or when struck by any "motor vehicle" owned by the Named Insured that is insured for Uninsured/Underinsured Motorist Coverage on a primary basis under any other coverage form or policy.

6.  Any person for the first $250 of the amount of damage to the property of that person as a result of any one "accident".

7.  Any person for "bodily injury" or "property damage", or both, resulting from the intentional acts of that person.

8.  Any insurer of property.

D.  **Limit of Insurance**

1.  Regardless of the number of policies or bonds applicable, covered "autos", "insureds", premiums paid, claims made or "motor vehicles" involved in the "accident", the most we will pay for all damages, including damages claimed by any person or organization for care, loss of services, or death due to and arising out of any one "accident" is the limit of **Uninsured Motorist Coverage** shown in the Schedule or the Declarations. Subject to this maximum, our limit of insurance will be the lesser of:

    a.  The difference between the amount of a covered "insured's" damages for "bodily injury" or "property damage" and the amount paid or payable to that covered "insured" for such damages, by or on behalf of person(s) or organization(s) who may be legally responsible, or the insurer or legal representative of such person(s) or organization(s); or

    b.  The applicable limit of insurance for this coverage.

2.  No one will be entitled to receive duplicate payments for the same elements of "loss" under this endorsement and any Liability Coverage Form.

    We will not make a duplicate payment under this endorsement for any element of "loss" for which payment has been made by or for anyone who is legally liable.

    We will not pay for any element of "loss" if a person is entitled to receive payment for the same element of "loss" under any workers' compensation, personal injury protection benefits, disability benefits, pension statutes or similar laws, including medical payments made under any statute.

3.  Any payment under this coverage or under any workers' compensation, personal injury protection benefits, "motor vehicle" insurance medical payments, disability benefits, pension statutes or similar laws to or for an "insured" will reduce any amount that "insured" is entitled to recover for the same damages under this Policy's Insurance Coverage.

4.  **Special Provisions for Property Damage**

    Any "property damage" "loss" to which the Physical Damage Coverage of this Policy (or similar coverage from another policy) and this coverage both apply, the Named Insured may choose the coverage from which damages will be paid. Such Named Insured may recover under both coverages, but only if:

    a.  Neither one by itself is sufficient to cover the "loss" ;

    b.  The Named Insured pays the higher deductible amount (but the Named Insured does not have to pay both deductibles); and

    c.  The Named Insured will not recover more than the actual damages.

E.  **Changes in Conditions**

    The **Conditions** for **Texas Uninsured Motorist Coverage** are changed as follows:

1.  With respect to an "uninsured motor vehicle", the **Other Insurance Condition** in the Business Auto and Garage Coverage Forms are replaced by the following:

    If there is other applicable similar insurance available under one or more policies or provisions of coverage, we will pay our share of the loss. Our share is the proportion that our Limit of Insurance bears to the total of all applicable limits. However, any insurance we provide with respect to a "motor vehicle" the Named Insured does not own shall be excess over any other collectible insurance.

2.  **Duties in the Event of Accident, Claim, Suit or Loss** is changed by adding the following:

    a.  You or any other involved "insured" must promptly notify the police if a hit-and-run driver is involved;

    b.  You or any other involved "insured" must promptly send us copies of the legal papers if a "suit" is brought;

    c.  You and any other involved "insured" must cooperate with us in the investi-

Includes copyrighted material of ISO
Properties, Inc., with its permission.

gation, settlement or defense of the claim or "suit" .Cooperation includes, but is not limited to, identifying all parties who may be responsible for the "accident" and all insurers who may be obligated to provide coverage; and

**d.** Permit us to inspect and appraise the damaged property before its repair or disposal.

**e.** Take reasonable steps after a "loss" to protect the "covered auto" and its equipment from further "loss". We will pay all reasonable expenses incurred to do this.

**f.** Promptly notify us in writing of a tentative settlement between an "insured" and a person(s) or organization(s) who may be legally responsible for the "accident", or the insurer of the "motor vehicle" described in Paragraph **F.4.d.** of the definition of "uninsured motor vehicle", or legal representative of such person(s) or organization(s), and allow us 30 days to advance payment to that "insured" in an amount equal to the tentative settlement to preserve our rights against the person(s) or organization(s) who may be legally responsible for the "accident" or the insurer or legal representative of such person(s) or organization(s).

**3.** **Transfer of Rights of Recovery Against Others to Us** is changed by adding the following:

If we make any payment and the "insured" recovers from another party, the "insured" shall hold the proceeds in trust for us and pay us back the amount we have paid.

Our rights do not apply under this provision with respect to Uninsured Motorist Coverage, as described in Paragraph **F.4.d.** of the definition of "uninsured motor vehicle", if we:

**a.** Have been given prompt written notice of a tentative settlement between an "insured" and a person(s) or organization(s) who may be legally responsible for the "accident" , or the insurer or legal representative of such person(s) or organization(s); and

**b.** Fail to advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

If we advance payment to the "insured" in an amount equal to the tentative settle-

ment within 30 days after receipt of notification:

**a.** That payment will be separate from any amount an "insured" is entitled to recover under the provisions of Uninsured Motorist Coverage; and

**b.** We also have the right to recover the advanced payment.

**4.** The following Condition is added:

**LEGAL ACTION AGAINST US**

Any claim or "suit" for Uninsured Motorist Coverage must be brought within four (4) years from the date of the accident or the date the at-fault party's insurance company denied the claim. Our subrogation rights also must not be prejudiced

**5.** The following Condition is added:

**ARBITRATION**

**a.** If we and an "insured" do not agree:

    **(1)** Whether that "insured" is legally entitled to recover damages from a party responsible for the "accident"; or

    **(2)** As to the amount of damages that may be recovered;

The matter may be settled by arbitration. However, disputes concerning coverage under this endorsement may not be arbitrated.

The "insured" and we must mutually agree to arbitrate the disagreements. If the "insured" and we do not agree to arbitrate, then the disagreement will be resolved in a court having competent jurisdiction.

If arbitration is used, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days as to a third arbitrator, either may request that selection be made by a judge of a court having jurisdiction. Each party will:

    **(1)** Pay the expenses it incurs; and

    **(2)** Bear the expenses of the third arbitrator equally.

**b.** Unless both parties agree otherwise, arbitration will take place in the county in which the "insured" lives. Local rules of law as to arbitration procedures and evidence will apply. A decision agreed to by two of the arbitrators will be binding as to:

Includes copyrighted material of ISO Properties, Inc., with its permission.

**(1)** Whether the "insured" is legally entitled to recover damages from a party responsible for the "accident"; and

**(2)** The amount of damages.

However, at any time prior to the arbitrator's decision, either party may revoke the agreement to arbitrate the matter.

**F.   Additional Definitions**

The following are added to the **Definitions** Section and have special meaning for Uninsured Motorist Insurance:

**1.** "Family member" means a natural person who is related to, and is a resident of the same household as a natural person shown as a Named Insured on this endorsement. Such relation may be by blood, marriage or adoption, and may include a ward or foster child.

**2.** "Motor vehicle" means a self-propelled vehicle designed for use and principally used on public roads, including an automobile, truck, semi-tractor, motorcycle and bus. "Motor vehicle" also includes a motor home, provided the motor home is not stationary and is not being used as a temporary or permanent residence or office. "Motor vehicle" does not include a trolley, streetcar, "trailer", railroad engine, railroad car, motorized bicycle, golf cart, off-road recreational vehicle, snowmobile, fork lift, aircraft, watercraft, construction equipment, farm tractor or other vehicle designed and principally used for agricultural purposes, mobile home, vehicle traveling on treads or rails or any similar vehicle.

**3.** "Occupying" means in, upon, getting in, on, out or off.

**4.** "Uninsured motor vehicle" means a land "motor vehicle" or "trailer":

**a.** To which no liability bond or policy applies at the time of the "accident".

**b.** That is a hit-and-run "motor vehicle" and neither the operator or owner can be identified. The "motor vehicle" must hit an "insured", a covered "auto" or a "motor vehicle" an "insured" is "occupying". We will only accept convincing evidence which may include the testimony, under oath, of a person making claim under this or similar coverage.

**c.** To which an insuring or bonding company denies coverage or is or becomes insolvent.

**d.** Which is an "underinsured motor vehicle". An "underinsured motor vehicle" means a "motor vehicle" or "trailer" for which the sum of the limits of coverage available for payment to the "insured" under all liability bonds or policies covering person(s) or organization(s) liable to the "insured" at the time of the "accident" either:

**(1)** Are not enough to pay the full amount the covered "insured" is legally entitled to recover as damages; or

**(2)** Have been reduced by payment of claims to an amount which is not enough to pay the full amount the covered "insured" is legally entitled to recover as damages.

However "uninsured motor vehicle" does not include any "motor vehicle":

**a.** Owned by or furnished or available for your regular use or that of any "family member" or any other "insured".

**b.** Owned or operated by a self-insurer under any applicable "motor vehicle" law, except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that "motor vehicle" law.

**c.** Owned by any governmental body or agency unless the operator of the "uninsured motor vehicle" is:

**(1)** Uninsured; and

**(2)** There is no statute imposing liability for damage because of "bodily injury" or "property damage" on the governmental body or agency for an amount not less than the Limit of Insurance for this coverage.

**d.** Operated on rails or crawler treads.

**e.** Designed for use mainly off public roads while not on public roads.

**f.** While located for use as a residence or premises.

**g.** For which liability coverage is afforded under this Coverage Form.

**G.** As regards to this coverage endorsement **SECTION V - DEFINITION, M.** "Property Damage" is deleted in its entirety and replaced by the following:

"Property damage" means injury to or loss of use or destruction of:

Includes copyrighted material of ISO Properties, Inc., with its permission.

1.  A covered "auto";

2.  Property owned by the Named Insured or any "family member" of the individual Named Insured while contained in a covered "auto";

3.  Property owned by any other person "occupying" the covered "auto" while contained in the covered "auto"; and

4.  Any property owned by the Named Insured or "family member" of either an individual Named Insured while contained in any "auto" not owned, but being operated by such individual Named Insured or any "family member" of either the individual Named Insured.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES - CANCELLATION
# AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM**
**BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM**
**GARAGE COVERAGE FORM**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** Paragraphs **2.** and **5.** of the Cancellation in Form **IA 501 Common Policy Declarations** are replaced by the following:

**2.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least 10 days before the effective date of cancellation.

The permissible reasons for cancellation are as follows:

**a.** If this policy has been in effect for 60 days or less, we may cancel for any reason except, that under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**b.** If this policy has been in effect for more than 60 days, or if it is a renewal or continuation of a policy issued by us, we may cancel only for one or more of the following reasons:

**(1)** Fraud in obtaining coverage;

**(2)** Failure to pay premiums when due;

**(3)** An increase in hazard within the control of the insured which would produce an increase in rate;

**(4)** Loss of reinsurance covering all or part of the risk covered by the policy; or

**(5)** If we have been placed in supervision, conservatorship or receivership and the cancellation is approved or directed by the supervisor, conservator or receiver.

**5.** If this policy is canceled, we will send the first Named Insured any premium refund due. The refund will be pro rata, subject to the policy minimum premium. The cancellation will be effective even if we have not made or offered a refund.

**B.** The following Condition is added:

**1. Nonrenewal**

**(a)** We may elect to renew this policy except that under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.

**(b)** If we elect not to renew this policy, we may do so by mailing or delivering to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal, stating the reason for nonrenewal, at least 60 days before the expiration date. If notice is mailed or delivered less than 60 days before the expiration date, this policy will remain in effect until the 61st day after the date on which the notice is mailed or delivered. Earned premium for any period of coverage that extends beyond the expiration date will be computed pro rata based on the previous year's premium.

**AA 4246 TX 10 09**

Includes copyrighted material of ISO Properties, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS EXPERIENCE MODIFICATION

This endorsement modifies insurance provided under the following:

> BUSINESS AUTO COVERAGE FORM
> GARAGE COVERAGE FORM

It is agreed that any coverages for liability, medical payments and personal injury protection provided by the policy are subject to experience rating in accordance with the Automobile Liability Rating Plan for the State of Texas. The following provisions apply:

**1.** The modifications applicable to the policy as of its effective date shall remain applicable until the ___1___ day of ___MARCH___ 20 ___21___ or

**2.** The next anniversary rate date, at which time the rates then in effect and new experience modification effective at that time shall apply for the remainder of the policy period.

Premium adjustment shall be made in accordance with the modification.

# NOTICE: TEXAS MOTOR VEHICLE CRIME PREVENTION AUTHORITY (MVCPA)

Your payment includes a $4.00 fee. This fee goes to help fund: (1) auto burglary, theft and fraud prevention, (2) criminal justice efforts, and (3) trauma care and emergency medical services for victims of accidents due to traffic offenses.  By law, we send this fee to the Motor Vehicle Crime Prevention Authority (MVCPA).

**AA 4252 TX 09 19**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OFFICE OF FOREIGN ASSETS CONTROL (OFAC) COMPLIANCE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM**
**GARAGE COVERAGE FORM**

**SECTION IV - BUSINESS AUTO CONDITIONS, B. General Conditions** of the **BUSINESS AUTO COVERAGE FORM** and **SECTION V - GARAGE CONDITIONS, B. General Conditions** of the **GARAGE COVERAGE FORM** are amended to include the following:

**Office of Foreign Assets Control (OFAC) Compliance**

Whenever insurance coverage provided by this policy would be in violation of any United States economic or trade sanctions, such insurance coverage shall be null and void.

**AA 4263 04 10**

# TEXAS UNINSURED/UNDERINSURED MOTORIST COVERAGE AND PERSONAL INJURY PROTECTION COVERAGE SELECTION/REJECTION

| Endorsement Effective: | Policy Number: |
|---|---|
| **03-01-2020** | **EBA 006 54 53** |
| Named Insured: | |
| **MD BEVCO INC DBA MAD DOGS SAN ANTONIO** | |

Texas law permits you to make certain decisions regarding Uninsured/Underinsured Motorist Coverage. Texas law also permits you the option to reject Personal Injury Protection Coverage. This document briefly describes these coverage and the options available.

You should read this document carefully and contact your agent if you have any questions regarding Uninsured/Underinsured Motorist Coverage and/or Personal Injury Protection Coverage and your options with respect to these coverages.

This document includes general descriptions of both coverages. However, no coverage is provided by this document. You should read your policy and review your Declarations Page(s) and/or Schedule(s) for complete information on the coverages you are provided.

## UNINSURED/UNDERINSURED MOTORIST COVERAGE

Uninsured/Underinsured Motorist Coverage provides insurance protection to an insured for damages, which the insured is legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle, because of bodily injury, sickness, disease, or death, or property damage caused by an automobile accident. Also included are damages due to bodily injury or property damage that results from an automobile accident with a hit-and-run vehicle whose owner or operator cannot be identified.

Unless Uninsured/Underinsured Motorist (UM/UIM) Coverage is rejected in writing, Uninsured/Underinsured Motorist Coverage will be afforded at limits at least equal to:

**(1)** Split limits of $30,000 for each person, subject to $60,000 for each accident with respect to bodily injury, and $25,000 with respect to property damage for each accident; or

**(2)** A combined single limit of $85,000 for each accident.

You may select optional higher limits.

Please indicate your choice from either **A.** or **B.** below.

## PERSONAL INJURY PROTECTION COVERAGE

Personal Injury Protection Coverage consists of provisions in a motor vehicle liability policy which provide for payment to you and members of your household, an authorized operator or passenger, including a guest occupant, up to an amount of $2,500 for each such person for payment of all reasonable expenses arising from the accident and incurred within three (3) years from the date thereof for necessary medical, surgical, X-ray and dental services and loss of income as the result of an accident without regard to who is or is not at-fault in causing or contributing to the accident. You may select optional higher limits.

Please indicate your choice from either **C.** or **D.** below.

## A.   REJECTION OF UNINSURED/UNDERINSURED MOTORIST COVERAGE

If you wish to reject Uninsured/Underinsured Motorist Coverage, you may do so by initialing and signing below.

_____     **I reject Uninsured/Underinsured Motorist Coverage.**
   **(Initials)**

_____     _____
   **Signature of Applicant/Named Insured**                              **Date**

Includes copyrighted material of ISO Properties, Inc., with its permission.

**B.   SELECTION OF UNINSURED/UNDERINSURED MOTORIST COVERAGE LIMITS**

If you wish to select Uninsured/Underinsured Motorist Coverage, you may do so by initialing next to the appropriate item(s) and signing below. Please note that we only offer Uninsured/Underinsured Motorist Coverage limits up to the Liability Coverage limits of your policy, even though higher limits may appear below.

---

**(Initials)    I select Uninsured/Underinsured Motorist Coverage at the following limit(s):**

_____

**Choose one Split Limits Bodily Injury option AND one Property Damage, OR choose one Combined Single Limit option from the following:**

| Split Limits Bodily Injury | | Property Damage | |
|---|---|---|---|
| _____ | 30,000/60,000 | _____ | 25,000 |
| _____ | 50,000/100,000 | _____ | 50,000 |
| _____ | 100,000/300,000 | _____ | 100,000 |
| _____ | 250,000/500,000 | _____ | 250,000 |
| _____ | 500,000/1,000,000 | _____ | 500,000 |
| _____ | 1,000,000/1,000,000 | _____ | 1,000,000 |
| _____ | _____ | _____ | _____ |
| | (Other) | | (Other) |

_____            _____

**Signature of Applicant/Named Insured**                 **Date**

**OR**

---

**(Initials)    I select Uninsured/Underinsured Motorist Coverage at the following limit(s):**

_____

**Combined Single Limit Bodily Injury And**

**Property Damage**

| | |
|---|---|
| _____ | 85,000 |
| _____ | 100,000 |
| _____ | 250,000 |
| _____ | 350,000 |
| _____ | 500,000 |
| _____ | 1,000,000 |
| _____ | 2,000,000 |
| _____ | _____ |
| | (Other) |

_____            _____

**Signature of Applicant/Named Insured**                 **Date**

---

**C.   REJECTION OF PERSONAL INJURY PROTECTION COVERAGE**

If you wish to reject Personal Injury Protection Coverage, you may do so by initialing and signing below.

---

_____   **I reject Personal Injury Protection Coverage.**

(Initials)

_____

**Signature of Applicant/Named Insured                    Date**

---

**D.   SELECTION OF PERSONAL INJURY PROTECTION COVERAGE LIMITS**

If you wish to select Personal Injury Protection Coverage, you may do so by initialing next to the appropriate items(s) and signing below.

| (Initials) | I select Personal Injury Protection Coverage at the following limit: |
|---|---|
| _____ | |
| | **Personal Injury Protection** |
| (Initials) | **Coverage** |
| _____ | 2,500 |
| _____ | 5,000 |
| _____ | 10,000 |
| _____ | 25,000 |
| _____ | 50,000 |
| _____ | 75,000 |
| _____ | 100,000 |

_____   _____

**Signature of Applicant/Named Insured                    Date**

**E.   YOUR ACKNOWLEDGMENT**

By signing below, I acknowledge that:

**1.**   I intend that my selection will apply to me and to all other persons or organizations that may be eligible for coverage under this policy.

**2.**   I understand that my selection applies to all subsequent renewals, replacements, substitutions or amendments of my policy unless I request otherwise in writing.

**3.**   I have read and understand the purpose and content of this form and the consequences of my selection.

**4.**   I am legally authorized to make decisions concerning the purchase of Uninsured Motorist Coverage and Personal Injury Protection Coverage.

_____   _____

**Signature of Applicant/Named Insured                    Date**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

For a covered "auto" licensed or principally garaged in Texas, this endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM**
**BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM**
**MOTOR CARRIER COVERAGE FORM**
**TRUCKERS COVERAGE FORM**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Changes in Physical Damage Coverage**

1. The following exclusion is added to Paragraph **B. Exclusions** in the **Physical Damage Coverage** Section:

   We will not pay for "loss" due to or as a consequence of a seizure of a covered "auto" by federal or state law enforcement officers as evidence in a case against you under the Texas Controlled Substances Act or the federal Controlled Substances Act if you are convicted in such case.

2. Paragraphs **C.2.** and **C.3.** of the Limit of Insurance Provision under **Physical Damage Coverage** do not apply.

3. Paragraph **D. Deductible** in the **Physical Damage Coverage** Section is amended by the addition of the following:

   At the mutual agreement of you and us, we will not apply the deductible to "loss" to glass, if the glass is repaired rather than replaced.

**B. Changes in Conditions**

The following Condition is added:

**CLAIM HANDLING PROCEDURES**

1. Within 15 days after we receive written notice of claim, we will:

   a. Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

   b. Begin any investigation of the claim; and

   c. Specify the information you must provide in accordance with Paragraph **b.** of the Duties Condition.

   We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

2. After we receive the information we request, we will notify you in writing as to whether:

   a. The claim will be paid;

   b. The claim has been denied, and inform you of the reasons for denial;

   c. More information is necessary; or

   d. We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

   We will provide notification, as described in **2.a.** through **2.d.** above, within:

   a. 15 "business days"; or

   b. 30 days if we have reason to believe the loss resulted from arson.

   If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

3. If a claim results from a weather related catastrophe or a major natural disaster as defined by the Texas Department of Insurance, the claim handling deadlines described above are extended for an additional 15 days.

4. If we notify you that we will pay your claim, or part of your claim, we will pay within 5 "business days" after we notify you.

   However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms under this policy, we will make payment within 5 "business days" after the date you have complied with such terms.

5. We will notify you in writing of:

**a.** An initial offer to compromise or settle a claim made or "suit" brought against any insured under the Liability Coverage Section of this policy. The notice will be given no later than the 10th day after the date on which the offer is made.

**b.** Any settlement of a claim made or "suit" brought against the "insured" under the Liability Coverage Section of this policy. The notice will be given not later than the 30th day after the date of settlement.

As used in this Condition, business day means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**C. Changes in Uninsured/Underinsured Motorists Coverage**

All references to "Uninsured Motorists Coverage" in the title or text of any coverage form or endorsement thereto are changed to read "Uninsured/Underinsured Motorists Coverage".

**D. Changes in Trailer Interchange Coverage**

The following exclusion is added to Paragraph **B.1. Exclusions** of **Section III - Trailer Interchange Coverage** in the Motor Carrier and Truckers Coverage Forms:

We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss":

**TEXAS CONTROLLED SUBSTANCE ACT**

We will not pay for "loss" due to or as a consequence of a seizure of a covered "auto" by federal or state law enforcement officers as evidence in a case against you under the Texas Controlled Substances Act or the federal Controlled Substances Act if you are convicted in such case.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS PERSONAL INJURY PROTECTION ENDORSEMENT

For a covered "auto" licensed or principally garaged in, or "garage operations" conducted in, Texas, this endorsement modifies insurance provided under the following:

**BUSINESS AUTO COVERAGE FORM**
**GARAGE COVERAGE FORM**
**MOTOR CARRIER COVERAGE FORM**
**TRUCKERS COVERAGE FORM**

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

## SCHEDULE

| Limit of Insurance (Each Insured) | Premium |
|---|---|
| $   5,000 | $   INCL |
| $ | $ |
| $ | $ |
| $ | $ |

| **Description of Covered Autos** (check appropriate box): |||
|---|---|
| x | Any "auto" owned by you. |
| | Any private passenger "auto" owned by you. |
| | Any motor vehicle to which are attached dealer's license plates issued to you. |
| | Any motor vehicle designated in the Declarations of the policy by the letters P.I.P. and a motor vehicle ownership of which is acquired during the policy period by you as a replacement therefor. |
| | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.  Coverage**

We will pay Personal Injury Protection benefits because of "bodily injury" resulting from a motor vehicle "accident" and sustained by a person "insured". Our payment will only be for "losses" or expenses incurred within three years from the date of the "accident".

Personal Injury Protection benefits consist of:

1.  Necessary expenses for medical and funeral services.

2.  80% of an "insured's" loss of income from employment. These benefits apply only if, at the time of the "accident", the "insured":

    a.  Was an income producer; and

    b.  Was in an occupational status.

    These benefits do not apply to any "loss" after the "insured" dies.

Loss of income is the difference between:

a.  Income which would have been earned had the "insured" not been injured; and

b.  The amount of income actually received from employment during the period of disability.

If the income being earned as of the date of the "accident" is a salary or fixed remuneration, it shall be used in determining the amount of income which would have been earned. Otherwise, the average monthly income earned during the period (not more than 12 months) preceding the "accident" shall be used.

3.  Reasonable expenses incurred for obtaining services. These services must replace those an "insured" would normally have performed:

**a.** Without pay;

**b.** During a period of disability; and

**c.** For the care and maintenance of the family or household.

These benefits apply only if, at the time of the "accident", the "insured":

**a.** Was not an income producer; and

**b.** Was not in an occupational status.

These benefits do not apply to any "loss" after the "insured" dies.

**B. Who is an Insured**

**1.** You or any "family member" while "occupying" or when struck by any "auto".

**2.** Anyone else "occupying" a "covered auto" with your permission.

**C. Exclusions**

We will not provide Personal Injury Protection Coverage for any person for "bodily injury" sustained:

**1.** In an "accident" caused intentionally by that person.

**2.** By that person while in the commission of a felony.

**3.** By that person while attempting to elude arrest by a law enforcement official.

**4.** While "occupying" or when struck by, any motor vehicle (other than a "covered auto") which is owned by you.

**5.** By a "family member" while "occupying" or when struck by any motor vehicle (other than a "covered auto") which is owned by a "family member".

**D. Limit of Insurance**

Regardless of the number of owned "covered autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for "bodily injury" for each "insured" in any one "accident" is the limit of Personal Injury Protection shown in the Schedule or in the Declarations.

**E. Changes in Conditions**

**1.** The following is added to the **Transfer of Rights of Recovery Against Others to Us** Condition:

However, our rights only apply against a person causing or contributing to the "accident" if, on the date of the "loss", the minimum limits required by Texas law have not been established for a motor vehicle involved in the "accident" and operated by that person.

**2.** The reference in the **Other Insurance** Condition in the Business Auto and Garage Coverage Forms and **Other Insurance - Primary and Excess Insurance Provisions** Condition in the Truckers and Motor Carrier Coverage Forms to "other collectible insurance" is replaced by the following:

If there is other Personal Injury Protection Insurance, we will pay only our share. Our share is the proportion that our Limit of Insurance bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible Personal Injury Protection Insurance.

**3.** The following Conditions are added:

**a. Payment Provision**

Loss Payments. Benefits are payable:

**(1)** Not more frequently than every two weeks; and

**(2)** Within 30 days after satisfactory proof of claim is received.

**b. Assignment of Benefits**

Payments for medical benefits will be paid directly to a physician or other health care provider if we receive a written assignment signed by the covered person to whom such benefits are payable.

**F. Additional Definitions**

The following are added to the **Definitions** Section and have special meaning for Personal Injury Protection:

**1.** "Covered auto" means an "auto":

**a.** Owned or leased by you; or

**b.** While temporarily used as a substitute for an owned "covered auto" that has been withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction.

Liability coverage of this policy must apply to the "covered auto".

"Covered auto" includes "autos" (described in Paragraphs **a.** and **b.** above) for which Personal Injury Protection coverage has not been rejected in writing.

**2.** "Family member" means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

**3.** "Occupying" means in, upon, getting in, on, out or off.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CinciPlus®
# BUSINESS AUTO XC®
# (EXPANDED COVERAGE)
# ENDORSEMENT

This endorsement modifies insurance provided by the following:

**BUSINESS AUTO COVERAGE FORM**

With respect to the coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by this endorsement.

**A. Who is an Insured - Amended**

**SECTION II - LIABILITY COVERAGE, A. Coverage, 1. Who is an Insured** is amended by adding the following:

The following are "insureds":

1. Any subsidiary which is a legally incorporated entity of which you own a financial interest of more than 50% of the voting stock on the effective date of this coverage form.

    However, the insurance afforded by this provision does not apply to any subsidiary that is an "insured" under any other automobile liability policy, or would be an "insured" under such policy but for termination of such policy or the exhaustion of such policy's limits of insurance.

2. Any organization that is newly acquired or formed by you and over which you maintain majority ownership.

    The insurance provided by this provision:

    **a.** Is effective on the date of acquisition or formation, and is afforded for 180 days after such date;

    **b.** Does not apply to "bodily injury" or "property damage" resulting from an "accident" that occurred before you acquired or formed the organization;

    **c.** Does not apply to any newly acquired or formed organization that is a joint venture or partnership; and

    **d.** Does not apply to an insured under any other automobile liability policy, or would be an insured under such a policy but for the termination of such policy or the exhaustion of such policy's limits of insurance.

3. Any of your "employees" while using a covered "auto" in your business or your personal affairs, provided you do not own, hire or borrow that "auto".

**B. Liability Coverage Extensions - Supplementary Payments - Higher Limits**

**SECTION II - LIABILITY COVERAGE, A. Coverage, 2. Coverage Extensions, a. Supplementary Payments** is amended by:

1. Replacing the $2,000 Limit of Insurance for bail bonds with $4,000 in **(2)**; and

2. Replacing the $250 Limit of Insurance for reasonable expenses with $500 in **(4)**.

**C. Amended Fellow Employee Exclusion**

**SECTION II - LIABILITY COVERAGE, B. Exclusions, 5. Fellow Employee** is modified as follows:

Exclusion **5. Fellow Employee** is deleted.

**D. Hired Auto - Physical Damage**

If hired "autos" are covered "autos" for Liability Coverage, then Comprehensive and Collision Physical Damage Coverages as provided under **SECTION III - PHYSICAL DAMAGE COVERAGE** of this Coverage Part are extended to "autos" you hire, subject to the following:

1. The most we will pay for "loss" to any hired "auto" is $35,000 or the actual cash value or cost to repair or replace, whichever is the least, minus a deductible.

2. The deductible will be equal to the largest deductible applicable to any owned "auto"

Includes copyrighted material of ISO
Properties, Inc., with its permission.

for that coverage, or $1,000, whichever is less.

**3.** Hired Auto - Physical Damage coverage is excess over any other collectible insurance.

**4.** Subject to the above limit, deductible, and excess provisions we will provide coverage equal to the broadest coverage applicable to any covered "auto" you insured under this policy.

Coverage includes loss of use of that hired auto, provided it results from an "accident" for which you are legally liable and as a result of which a monetary loss is sustained by the leasing or rental concern. The most we will pay for any one "accident" is $1,000.

If a limit for Hired Auto - Physical Damage is shown in the Schedule, then that limit replaces, and is not added to, the $35,000 limit indicated above.

**E. Rental Reimbursement**

**SECTION III - PHYSICAL DAMAGE** is amended by adding the following:

**1.** We will pay for rental reimbursement expenses incurred by you for the rental of an "auto" because of a "loss" to a covered "auto". Payment applies in addition to the otherwise applicable amount of each coverage you have on a covered "auto". No deductible applies to this coverage.

**2.** We will pay only for those expenses incurred during the policy period beginning 24 hours after the "loss" and ending, regardless of the policy's expiration, with the lesser of the following number of days:

    **a.** The number of days reasonably required to repair the covered "auto". If "loss" is caused by theft, this number of days is added to the number of days it takes to locate the covered "auto" and return it to you; or

    **b.** 30 days.

**3.** Our payment is limited to the lesser of the following amounts:

    **a.** Necessary and actual expenses incurred; or

    **b.** $40 per day.

**4.** This coverage does not apply while there are spare or reserve "autos" available to you for your operations.

**5.** We will pay under this coverage only that amount of your rental reimbursement expenses which is not already provided for

under **SECTION III - PHYSICAL DAMAGE COVERAGE, A. Coverage, 4. Coverage Extensions.**

**F. Transportation Expense - Higher Limits**

**SECTION III - PHYSICAL DAMAGE COVERAGE, A. Coverage, 4. Coverage Extensions** is amended by replacing $20 per day with $50 per day, and $600 maximum with $1,500 maximum in Extension a. Transportation Expenses.

**G. Airbag Coverage**

**SECTION III - PHYSICAL DAMAGE COVERAGE, B. Exclusions, 3.a.** is amended by adding the following:

However, the mechanical and electrical breakdown portion of this exclusion does not apply to the accidental discharge of an airbag. This coverage for airbags is excess over any other collectible insurance or warranty.

**H. Loan or Lease Gap Coverage**

**1.** **SECTION III - PHYSICAL DAMAGE COVERAGE, C. Limit of Insurance** is deleted in its entirety and replaced by the following, but only for private passenger type "autos" with an original loan or lease, and only in the event of a "total loss" to such a private passenger type "auto":

    **a.** The most we will pay for "loss" in any one "accident" is the greater of:

        **(1)** The amount due under the terms of the lease or loan to which your covered private passenger type "auto" is subject, but will not include:

            **(a)** Overdue lease or loan payments;

            **(b)** Financial penalties imposed under the lease due to high mileage, excessive use or abnormal wear and tear;

            **(c)** Security deposits not refunded by the lessor;

            **(d)** Costs for extended warranties, Credit Life Insurance, Health, Accident or Disability Insurance purchased with the loan or lease; and

            **(e)** Carry-over balances from previous loans or leases, or

        **(2)** Actual cash value of the stolen or damaged property.

    **b.** An adjustment for depreciation and physical condition will be made in de-

terming actual cash value at the time of "loss".

**2.** **SECTION V - DEFINITIONS** is amended by adding the following, but only for the purposes of this **Loan or Lease Gap Coverage**:

"Total loss" means a "loss" in which the cost of repairs plus the salvage value exceeds the actual cash value.

**I.** **Glass Repair - Waiver of Deductible**

**SECTION III - PHYSICAL DAMAGE COVERAGE, D. Deductible** is amended by adding the following:

No deductible applies to glass damage if the glass is repaired in a manner acceptable to us rather than replaced.

**J.** **Duties in the Event of an Accident, Claim, Suit or Loss - Amended**

**SECTION IV - BUSINESS AUTO CONDITIONS, A. Loss Conditions, 2. Duties in the Event of Accident, Claim, Suit or Loss, a.** is amended by adding the following:

This condition applies only when the "accident" or "loss" is known to:

**1.** You, if you are an individual;

**2.** A partner, if you are a partnership;

**3.** An executive officer or insurance manager, if you are a corporation; or

**4.** A member or manager, if you are a limited liability company.

**K.** **Unintentional Failure to Disclose Hazards**

**SECTION IV - BUSINESS AUTO CONDITIONS, B. General Conditions** is amended by adding the following:

If you unintentionally fail to disclose any hazards existing on the effective date of this Coverage Form, we will not deny coverage under this Coverage Form because of such failure.

**L.** **Mental Anguish Resulting from Bodily Injury**

**SECTION V - DEFINITIONS, C. "Bodily injury"** is deleted in its entirety and replaced by the following:

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including mental anguish and death sustained by the same person that results from such bodily injury, sickness or disease. "Bodily injury" does not include mental anguish or death that does not result from bodily injury, sickness or disease.

# THE CINCINNATI INDEMNITY COMPANY

# EXCESS LIABILITY COVERAGE PART DECLARATIONS

Previous Policy Number

ENP0065453

Attached to and forming part of POLICY NUMBER: **ENP 006 54 53**     Effective Date: **03-01-2020**

**NAMED INSURED** is the same as it appears in the Common Policy Declarations unless another entry is made here.

MD BEVCO INC DBA MAD DOGS SAN ANTONIO
REFER TO US901

## LIMITS OF INSURANCE

| | |
|---|---|
| Each Occurrence Limit | $5,000,000 |
| Aggregate Limit | $5,000,000 |

**ADVANCE PREMIUM** $12,403
Applicable to Premium, if box is checked:

☐  Subject to Annual Adjustment
☐  Subject to Audit as follows:

| Premium Basis | Estimated Exposure | Each Unit of Exposure Rate Per: | Minimum Premium |
|---|---|---|---|
| | | | |

## SCHEDULE OF UNDERLYING INSURANCE

**Underlying Insurance, Carrier, Policy Number & Term:**      **Underlying Limits:**

**a)** Underlying Insurance:                                    Each Occurrence      $
   Carrier:                                                     General Aggregate    $
   Policy Number:                                               Products Aggregate   $
   Policy Term:                          (other)                                     $
                                                                EXCESS of:           $

**b) TEXAS MUTUAL INS**          Employer's Liability       Bodily Injury by Accident:
   **TSF0001177316**                                        $   **1,000,000**   Each Accident
   **03-01-2020 TO 03-01-2021**                             Bodily Injury by Disease:
                                                            $   **1,000,000**   Each Employee
                                                            Bodily Injury by Disease:
                                                            $   **1,000,000**   Policy Limit

**c) CINCINNATI SPECIALITY CO**
**CSU0025980**
**03-01-2020 TO 03-01-2021**

☒ Commercial General Liability
Including:
☒ Products-Completed
Operations Coverage
☐ Cemetery Professional
☐ Druggist Professional
☐ Funeral Service Provider
☐ Pedorthists Professional

Bodily Injury and Property Damage Liability:
$    1,000,000  Each Occurrence Limit
$    2,000,000  General Aggregate Limit
$    2,000,000  Products-Completed
Operations Aggregate Limit

or
☐ Business Liability Including:
☐ Funeral Service Provider
☐ Druggist Professional

$    1,000,000

Personal and Advertising
Injury Limit
Any One Person or
Organization

**d) CINCINNATI IND. CO.**
**EBA 006 54 53**
**03-01-2020 TO 03-01-2021**

Automobile Liability
Including:
☐ Owned Autos
☐ Non-Owned Autos
☐ Hired Autos
☒ Any Auto

Bodily Injury Liability Limit:
$                Each Person
$                Each Accident
Property Damage Liability Limit:
$                Each Accident
or
Bodily Injury Liability and / or Property Damage
Liability or Both Combined Limit:
$    1,000,000  Each Accident

**e)**

Professional Liability

$
$                Aggregate

**f)**

Employee Benefit Liability

$                Each Employee Limit
$                Aggregate Limit

**g)**

Liquor Liability

$                Each Common Cause Limit
$                Aggregate Limit

**Other**

**h)**

---

**FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:**

| | | |
|---|---|---|
| XS101UM | 12/04 | EXCESS LIABILITY - TABLE OF CONTENTS |
| IA450 | 11/87 | LIQUOR LIABILITY EXCLUSION |
| US901 | 07/08 | COMMERCIAL UMBRELLA LIABILITY COVERAGE PART DECLARATIONS NAMED INSURED |
| XS304 | 12/04 | POLLUTANT EXCLUSION |
| XS306 | 09/02 | EMPLOYMENT - RELATED PRACTICES EXCLUSION |
| XS345 | 05/14 | EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION |
| XS444TX | 10/08 | TEXAS CHANGES |
| XS448TX | 10/08 | TEXAS CHANGES |

---

# EXCESS LIABILITY - TABLE OF CONTENTS

**Coverage Part Provision:**                **Begins on Page:**

**Preamble** ..................................................................................................................................... 2

**SECTION I - COVERAGE** ............................................................................................................ 2

    **A. Insuring Agreement** ........................................................................................................... 2

    **B. Exclusions:** ......................................................................................................................... 2

        **1.** Asbestos .................................................................................................................... 2
        **2.** Distribution of Material in Violation of Statutes ......................................................... 3
        **3.** Electronic Data .......................................................................................................... 3
        **4.** Pollutant - Auto ......................................................................................................... 3
        **5.** Pollutant - Other Than Auto ...................................................................................... 4
        **6.** Underlying Insurance ................................................................................................ 5
        **7.** Uninsured or Underinsured Motorists ....................................................................... 5
        **8.** War ............................................................................................................................ 5

    **C. Defense and Supplementary Payments** ............................................................................ 5

**SECTION II - LIMITS OF INSURANCE** ...................................................................................... 6

**SECTION III - CONDITIONS:** ..................................................................................................... 7

        **1.** Appeals ...................................................................................................................... 7
        **2.** Audit .......................................................................................................................... 7
        **3.** Bankruptcy ................................................................................................................ 7
        **4.** Duties in the Event of Occurrence, Claim or Suit ..................................................... 7
        **5.** First Named Insured .................................................................................................. 7
        **6.** Liberalization ............................................................................................................. 7
        **7.** Loss Payments .......................................................................................................... 8
        **8.** Maintenance of Underlying Insurance ...................................................................... 8
        **9.** Other Insurance ........................................................................................................ 8
        **10.** Premium .................................................................................................................... 8
        **11.** Representations ......................................................................................................... 8
        **12.** Transfer of Rights of Recovery Against Others to Us ............................................... 8
        **13.** When We Do Not Renew ........................................................................................... 9

**SECTION IV - DEFINITIONS:** ..................................................................................................... 9

        **1.** "Authorized representative" ...................................................................................... 9
        **2.** "Coverage term" ....................................................................................................... 9
        **3.** "Electronic data" ....................................................................................................... 9
        **4.** "Hostile fire" .............................................................................................................. 9
        **5.** "Insured" .................................................................................................................... 9
        **6.** "Loss" ........................................................................................................................ 10
        **7.** "Pollutants" ............................................................................................................... 10
        **8.** "Underlying insurance" .............................................................................................. 10

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT** ................................................ 11

# EXCESS LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties, and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION IV - DEFINITIONS**.

## SECTION I - COVERAGE

**A. Insuring Agreement**

1. We will pay those sums the "insured" is legally obligated to pay as damages for that part of "loss" to which this insurance applies in excess of "underlying insurance".

2. This insurance applies to injury or offense only if:

    a. The injury or offense takes place during the policy period shown in the Declarations; and

    b. Prior to the "coverage term" in which the injury or offense takes place, you did not know, per Paragraph **4.** below, that the injury or offense had taken place or begun to take place, in whole or in part.

3. Injury or offense which:

    a. Takes place during the "coverage term"; and

    b. Was not, prior to the "coverage term", known by you, per Paragraph **4.** below, to have taken place;

    includes any continuation, change or resumption of that injury or offense after the end of the "coverage term" in which it first became known by you.

4. You will be deemed to know that injury or offense has taken place at the earliest time when any "authorized representative":

    a. Reports all, or any part of the injury or offense to us or any other insurer;

    b. Receives a written or verbal demand or claim for damages because of the injury or offense;

    c. First observes, or reasonably should have first observed, the injury or offense;

    d. Becomes aware, or reasonably should have become aware, by any means, other than as described in **c.** above, that injury or offense has taken place or begun to take place; or

    e. Becomes aware, or reasonably should have become aware, of a condition from which injury or offense is substantially certain to take place.

5. The terms, definitions, conditions, limitations and exclusions of the "underlying insurance" are made a part of this Coverage Part, except for:

    a. Any term or condition relating to:

        (1) Any duty to investigate or defend;

        (2) The limits of insurance;

        (3) The payment of expenses;

        (4) The premium;

        (5) Cancellation or non-renewal;

        (6) Any renewal agreement;

        (7) The policy period; or

    b. Any other provision that is not consistent with this Coverage Part;

    in which case the terms, definitions, conditions, limitations and exclusions of this Coverage Part will apply.

6. The amount we will pay is limited as described in **SECTION II - LIMITS OF INSURANCE**.

No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under **SECTION I - COVERAGE, C. Defense and Supplementary Payments**.

**B. Exclusions**

This insurance does not apply to:

1. **Asbestos**

    Any liability arising out of, attributable to or any way related to asbestos in any form or transmitted in any manner.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**2.  Distribution of Material in Violation of Statutes**

Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.**  The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**b.**  The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.**  Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**3.  Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

**4.  Pollutant - Auto**

Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

**a.**  That are, or that are contained in any property that is:

**(1)**  Being transported or towed by, handled, or handled for movement into, onto or from, an auto that an "insured" owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion;

**(2)**  Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)**  Being stored, disposed of, treated or processed in or upon an auto that an "insured" owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion;

**b.**  Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto an auto that an "insured" owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion; or

**c.**  After the "pollutants" or any property in which the "pollutants" are contained are moved from an auto that an "insured" owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to bodily injury or property damage arising from fuels, lubricants, or other operating fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of an auto that an "insured" owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion or its parts, if:

**(1)**  The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an auto part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)**  The bodily injury or property damage does not arise out of the operation of:

**(a)**  Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; or

**(b)**  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment.

However, this exception to Paragraph **(a)** does not apply if the fuels, lubricants, or other operating fluids, exhaust gases or other similar "pollutants" are intentionally discharged, dispersed, emitted or released.

Paragraphs **b.** and **c.** above do not apply to an occurrence that occurs away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon an auto that an "insured" owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion if:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**(1)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of an auto that an "insured" owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion; and

**(2)** The discharge, dispersal, seepage, migration, release, emission or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**5.   Pollutant - Other Than Auto**

**a.**   Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

**(1)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any "insured".

However, Paragraph **a.(1)** of this exclusion does not apply to the following if such liability is covered by "underlying insurance" listed in the Schedule of Underlying Insurance, and subject to all its terms, limitations and conditions:

**(a)** Bodily injury, if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

**(b)** Bodily injury or property damage for which you may be held liable, if you are a contractor, and the owner or lessee of such premises, site or location has been added to your "underlying insurance" as an additional "insured" with respect to your ongoing operations performed for that additional "insured" at that premises, site or location and such

premises, site or location is not and never was owned or occupied by, or rented or loaned to, any "insured", other than that additional "insured"; or

**(c)** Bodily injury or property damage arising out of heat, smoke or fumes from a "hostile fire";

**(2)** At or from any premises, site or location which is or was at any time used by or for any "insured" or others for the handling, storage, disposal, processing or treatment of waste;

**(3)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any "insured" or any person or organization for whom you may be legally responsible;

**(4)** At or from any premises, site or location on which any "insured" or any contractors or subcontractors working directly or indirectly on any "insured's" behalf are performing operations, if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such "insured", contractor or subcontractor.

However, Paragraph **a.(4)** of this exclusion does not apply to the following if such liability is covered by "underlying insurance" listed in the Schedule of Underlying Insurance, and subject to all its terms, limitations and conditions:

**(a)** Bodily injury or property damage arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of mobile equipment or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the bodily injury or property damage arises out

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such "insured", contractor or subcontractor;

**(b)** Bodily injury or property damage sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(c)** Bodily injury or property damage arising out of heat, smoke or fumes from a "hostile fire"; or

**(5)** At or from any premises, site or location on which any "insured" or any contractors or subcontractors working directly or indirectly on any "insured's" behalf are performing operations, if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, "pollutants".

**b.** Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this Paragraph **b.** does not apply to liability for damages because of property damage that the "insured" would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or suit by or on behalf of a governmental authority.

**6. Underlying Insurance**

Any liability not covered by "underlying insurance" for any reason other than the exhaustion of an aggregate limit of insurance by payment of claims.

**7. Uninsured or Underinsured Motorists**

Any liability or obligation to any "insured" or anyone else under any uninsured motorist, underinsured motorist, automobile no-fault or first party personal injury law.

**8. War**

Any liability, however caused, arising directly or indirectly, out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereign or authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**C. Defense and Supplementary Payments**

**1.** We will have the right and duty to defend the "insured" against any suit seeking damages because of injury or damage to which this insurance applies when the applicable limits of "underlying insurance" and any other insurance have been exhausted by payment of claims. We will have no duty to defend the "insured" against any suit seeking damages for injury or damage to which this insurance does not apply. We may, at our discretion, investigate any occurrence and settle any claim or suit that may result.

Our right and duty to defend ends when the applicable Limits of Insurance, as stated in the Declarations, has been exhausted by payment of claims.

**2.** We have no duty to investigate, settle or defend any claim or suit other than those

circumstances described in Paragraph **C.1.** However, we do have the right to participate in the investigation, settlement or defense of any claim or suit to which this insurance applies. If we exercise this right, we will do so at our expense.

3. If there is no underlying insurer or other insurance obligated to do so, we will pay the following when we provide a defense:

   **a.** All expenses we incur.

   **b.** The cost of bail bonds up to $3,000. We do not have to furnish these bonds.

   **c.** The cost of bonds to appeal a judgment or award in any claim or suit we defend and the cost of bonds to release attachments, but only for bond amounts within the applicable Limits of Insurance. We do not have to furnish these bonds.

   **d.** Reasonable expenses incurred by the "insured" at our request to assist us in the investigation or defense of the claim or suit, including the actual loss of earnings.

   **e.** All costs taxed against the "insured" in the suit.

4. If there is no underlying insurer obligated to do so, we will pay the following expenses for a "loss" to which this insurance applies:

   **a.** Prejudgment interest awarded against the "insured" on that part of the judgment we become obligated to pay and which falls within the applicable Limit of Insurance. If we make an offer to pay the applicable Limits of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   **b.** All interest awarded against the "insured" on the full amount of any judgment that accrues:

      **(1)** After entry of the judgment; and

      **(2)** Before we have paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

5. If we are prevented by law or otherwise from carrying out any of the provisions of **SECTION I - COVERAGE, C. Defense and Supplementary Payments,** we will pay any expense incurred with our written consent.

These payments will not reduce the Limits of Insurance provided by this Coverage Part when defense or supplementary payments provided by the "underlying insurance" do not reduce their Limits of Insurance. However, when defense or supplementary payments provided by the "underlying insurance" reduce their Limits of Insurance then such expense payments paid by us will reduce the Limits of Insurance provided by this Coverage Part.

## SECTION II - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** "Insureds";

   **b.** Claims made or suits brought;

   **c.** Persons or organizations making claims or bringing suits; or

   **d.** Coverages provided under this Coverage Part.

2. The Limits of Insurance of this Coverage Part apply in excess of the "underlying insurance" limits specified in the Schedule of Underlying Insurance.

3. The Aggregate Limit specified in the Declarations is the most we will pay for "loss" to which this insurance applies. The Aggregate Limit of this Coverage Part applies to "loss" in the same manner as the aggregate limit in the "underlying insurance" applies to "loss". When the "underlying insurance" does not apply an aggregate limit of "loss", the Aggregate Limit of this Coverage Part will not apply to "loss". When the "underlying insurance" does apply an aggregate limit to "loss", the Aggregate Limit of this Coverage Part will apply to "loss".

4. Subject to **3.** above, the Each Occurrence Limit specified in the Declarations is the most we will pay for "loss" arising out of any one occurrence.

   We will not pay more than the Limit of Insurance shown in this Coverage Part's Declarations for Each Occurrence because any Personal Umbrella Liability Policy(ies) is / are attached to this policy.

5. The following provision applies only if this Coverage Part contains an Aggregate Limit of Insurance which applies to the "loss".

   If the Each Occurrence Limit of Insurance of the "underlying insurance" is less than as stated in the Schedule of Underlying Insurance because the aggregate limits of the "underlying insurance" have been reduced, this Coverage Part becomes excess of such re-

XS 101 UM 12 04

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Page 6 of 12

duced limit of insurance if such reduction is solely the result of injury or damage occurring after the inception date of this Coverage Part and not before.  This provision does not increase the Limits of Insurance of this Coverage Part.

The Limits of Insurance of this Coverage Part apply separately to each "coverage term".

## SECTION III - CONDITIONS

### 1. Appeals

We may elect to appeal a judgment against any "insured" if the judgment exceeds the underlying limits of insurance.  If we appeal, we will do so at our own expense, but in no event shall this provision increase our liability beyond:

**a.** Our applicable Limits of Insurance as shown in the Declarations;

**b.** Our applicable Defense and Supplementary Payments as described in **SECTION I - COVERAGE, C. Defense and Supplementary Payments**; and

**c.** The expense of such appeal.

### 2. Audit

If this Coverage Part is subject to Audit, as indicated in the Declarations, then the following Condition applies:

**a.** The premium shown in the Declarations as Advance Premium is a deposit premium.  At the close of each audit period, we will compute the earned premium for that period.  If:

**(1)** The earned premium is less than the deposit premium, we will return the excess to the first Named Insured; or

**(2)** The earned premium is greater than the deposit premium, the difference will be due and payable to us by the first Named Insured upon notice from us.  The due date for audit and retrospective premiums is the date shown as the due date on the bill.

However, in no event will the earned premium be less than the Minimum Premium stated in the Declarations.

**b.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

### 3. Bankruptcy

Bankruptcy or insolvency of the "insured" or the "insured's" estate shall not relieve us of any obligations under this Coverage Part.

### 4. Duties in the Event of Occurrence, Claim or Suit

**a.** You must see to it that we and your underlying insurers are notified as soon as practicable of any occurrence which may result in a claim if the claim may involve this Coverage Part or any "underlying insurance".  Notice should include:

**(1)** How, when and where the occurrence took place;

**(2)** The names and addresses of injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the occurrence.

**b.** If a claim is made or suit is brought against any "insured" that is likely to involve this Coverage Part or any "underlying insurance", you must notify us and your underlying insurers as soon as practicable.

**c.** You must see to it that we and your underlying insurers:

**(1)** Are assisted, upon our request, in the enforcement of any right against any person or organization which may be liable to any "insured" because of injury or damage to which this insurance may apply; and

**(2)** Receive the "insured's" cooperation in the investigation, settlement or defense of the claim or suit.

**d.** No "insured", except at their own expense, will voluntarily make a payment, assume any obligation, or incur any expense, other than first aid, without our consent.

### 5. First Named Insured

The person or organization first named in the Declarations will act on behalf of all other "insureds" where indicated in this Coverage Part.

### 6. Liberalization

If, within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Coverage Part, the change will automatically apply to this Coverage Part at the latter of:

**a.** The date we implemented the change in your state; or

**b.** The date this Coverage Part became effective; and

Will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

### 7. Loss Payments

Coverage under this Coverage Part will only apply after you and your underlying insurers are obligated to pay the full amount of the "underlying insurance" limits of insurance. When the amount of the "loss" has finally been determined, we will promptly pay on your behalf the amount of "loss" covered under the terms and conditions of this Coverage Part after the full amount of "underlying insurance" has been paid.

### 8. Maintenance of Underlying Insurance

While this Coverage Part is in effect, you shall maintain in full force "underlying insurance". This means:

**a.** The terms, conditions and endorsements of "underlying insurance" will not materially change;

**b.** Renewals or replacements of "underlying insurance" will not be more restrictive in coverage;

**c.** "Underlying insurance" may not be canceled or nonrenewed without notifying us; and

**d.** Limits of "underlying insurance" will not be reduced, except for any reduction or exhaustion in the aggregate limits due to payment of "loss" for injury or offense that takes place during the corresponding "coverage term" of this Coverage Part.

The limits of "underlying insurance" shall be deemed applicable, regardless of any defense which the insurer who provides the "underlying insurance" may assert because of the "insured's" failure to comply with any Condition of the policy or the inability of the insurer to pay by reason of bankruptcy or insolvency.

Failure to comply with this condition will not invalidate this Coverage Part, but in the event of such failure, we will only be liable to the same extent as if there had been compliance with this condition.

You must see to it that we are notified promptly if any "underlying insurance" is canceled or not renewed.

### 9. Other Insurance

This insurance is excess over, and shall not contribute with any other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

### 10. Premium

The premium for this Coverage Part shall be as stated in the Declarations. The advance and anniversary premiums are not subject to adjustment, except as stated in the Declarations, or as stated in an endorsement issued by us to form a part of this Coverage Part.

You shall maintain records of such information as is necessary for premium computation, and shall, if requested by us, send copies of such records to us at the end of the "coverage term" and at such times during the policy period as we may direct.

Any change in the premium for "underlying insurance" shall be promptly reported to us. We may adjust the premium in accordance with our rules and rates.

### 11. Representations

**a.** By acceptance of this Coverage Part, you agree that the statements in the Declarations are your agreements and representations, that this Coverage Part is issued in reliance upon the truth of such representations and that this Coverage Part embodies all agreements existing between you and us or any of our agents relating to this insurance.

**b.** However, to the extent that the following applies in the "underlying insurance", it will also apply to this Coverage Part:

Based on our dependence upon your representations as to existing hazards, if unintentionally you should fail to disclose all such hazards at the inception date of this Coverage Part, we will not reject coverage under this Coverage Part based solely on such failure.

### 12. Transfer of Rights of Recovery Against Others to Us

**a.** If the "insured" has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The "insured" must do nothing after loss to impair them. At our request, the "insured" will bring suit or

transfer those rights to us and help us enforce them.

**b.** Any recoveries shall be applied as follows:

   **(1)** First, we will reimburse anyone, including the "insured", the amounts actually paid by them that were in excess of our payments;

   **(2)** Next, we will be reimbursed to the extent of our actual payment; and

   **(3)** Lastly, any amounts left after meeting the obligations outlined in **(1)** and **(2)** above will be distributed to anyone else known to us at the time a recovery is made and who is legally entitled to such recovery.

   Expenses incurred in the recovery shall be apportioned among all interests in the ratio of their respective recoveries as finally settled. If there is no recovery as a result of our attempts, we shall bear all of the recovery expenses.

**c.** If prior to injury or damage taking place to which this Coverage Part would apply, you and the issuer of your applicable "underlying insurance" waive any right of recovery against a person or organization for injury or damage, we will also waive any rights we may have against such person or organization.

**13. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION IV - DEFINITIONS**

**1.** "Authorized representative" means:

   **a.** If you are:

   **(1)** An individual, you and your spouse are "authorized representatives".

   **(2)** A partnership or joint venture, your members, your partners, and their spouses are "authorized representatives".

   **(3)** A limited liability company, your members and your managers are "authorized representatives".

   **(4)** An organization other than a partnership, joint venture or limited liability company, your executive officers and directors are "authorized representatives". Provided you are not a publicly traded organization, your stockholders are also "authorized representatives".

   **(5)** A trust, your trustees are "authorized representatives".

   **b.** Your employees assigned to manage your insurance program, or assigned to give or receive notice of an occurrence, offense, claim or suit are also "authorized representatives".

**2.** "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

   **a.** The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

   **(1)** The day the policy period shown in the Declarations ends; or

   **(2)** The day the policy to which this Coverage Part is attached is terminated or cancelled.

   **b.** However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

**3.** "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**4.** "Hostile fire" means one that becomes uncontrollable or breaks out from where it was intended to be.

**5.** "Insured" means the Named Insured shown in the Declarations and any person or organization qualifying as such in the "underlying insurance".

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

6. "Loss" means those sums paid as damages in the settlement or satisfaction of a claim to which this insurance applies for which the "insured" is legally liable, after making deductions for all recoveries, salvages and other insurance, whether collectible or not, other than the "underlying insurance" and excess insurance written specifically to be excess over this insurance. "Loss" does not include investigation, adjustment, defense or appeal costs and expenses, even though "underlying insurance" may provide insurance for such costs and expenses.

7. "Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants include, but are not limited to, substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the "pollutants" and whether:

   a. The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or

   b. The insured uses, generates or produces the "pollutant".

8. "Underlying insurance" means the policy(ies) and limits of insurance shown in the Schedule of Underlying Insurance, including any renewal or replacement of such policy(ies), which provide the layer of coverage, whether primary or excess, immediately preceding the layer of coverage provided by this Coverage Part.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY COVERAGE PART**

**A.** **SECTION I - COVERAGE, B. Exclusions** is modified to add the following:

This insurance does not apply to:

1. Any liability:

    **a.** With respect to which an "insured" under the Coverage Part is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    **b.** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(1)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(2)** the "insured" is, or had this Coverage Part not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2. Any liability resulting from the "hazardous properties" of "nuclear material", if

    **a.** The "nuclear material" **(1)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(2)** has been discharged or dispersed therefrom,

    **b.** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

    **c.** The injury or damage arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **c.** applies only to property damage to such "nuclear facility" and any property thereat.

**B.** **SECTION IV - DEFINITIONS** is hereby modified to add the following definitions:

1. "Hazardous properties" include radioactive, toxic or explosive properties;

2. "Nuclear material" means "source material", "special nuclear material" or "by-product material";

3. "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

4. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

5. "Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

6. **"Nuclear facility" means:**

    **a.** Any "nuclear reactor";

    **b.** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", **(3)** or handling, processing or packaging "waste";

    **c.** Any equipment or device used for the processing, fabricating or alloying of "special nuclear materials", if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

or any combination thereof, or more than 250 grams of uranium 235;

**d.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**7.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**8.** "Property damage" includes all forms of radioactive contamination of property.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIQUOR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY COVERAGE FORM**

**EXCESS LIABILITY COVERAGE FORM, XS 101 UM, SECTION I, - COVERAGE, B. Exclusions,** is amended to add the following:

This insurance does not apply to:

Any liability for which any "insured" may be held liable by reason of:

**a.**    Causing or contributing to the intoxication of any person;

**b.**    The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**c.**    Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages.  This exclusion applies if you are an owner or lessor of premises used for such purposes and liability is imposed by **c.** above.

**NAMED INSURED(S):**

PRINTED NAME OF INDIVIDUAL AUTHORIZED TO SIGN                Title

Signature _____               Date Signed: _____

IA 450 11 87 A

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART DECLARATIONS**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART DECLARATIONS**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE DECLARATIONS**
**CLAIMS-MADE EXCESS LIABILITY COVERAGE PART DECLARATIONS**
**EXCESS LIABILITY COVERAGE PART DECLARATIONS**

### NAMED INSURED

```
MD BEVCO INC DBA MAD DOGS SAN ANTONIO
MD MANAGE CO INC
MD PROPERTY CO LLC
CATHAY CALEDONIAN INC
GENERAL PARTNER FOR CALEDONIAN PACIFIC LTD
GENERAL PARTNER FOR TEXAS CALEDONIAN LTD
```

**US 901 07 08**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLLUTANT EXCLUSION

This endorsement modifies insurance provided under the following:

> **EXCESS LIABILITY COVERAGE PART**
> **CLAIMS-MADE EXCESS LIABILITY COVERAGE PART**

**SECTION I - COVERAGE, B. Exclusions** is modified as follows:

Exclusion **5. Pollutant - Other Than Auto** is hereby deleted and replaced by the following:

**5.    Pollutant - Other Than Auto**

This insurance does not apply to:

**a.**    Any liability arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

**(1)**    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any "insured".

**(2)**    At or from any premises, site or location which is or was at any time used by or for any "insured" or others for the handling, storage, disposal, processing or treatment of waste;

**(3)**    Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any "insured" or any person or organization for whom you may be legally responsible; or

**(4)**    At or from any premises, site or location on which any "insured" or any contractors or subcontractors working directly or indirectly on any "insured's" behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured contractor or subcontractor.

Subparagraphs **a.(1)** and **a.(4)** do not apply:

**(a)**    To bodily injury or property damage arising out of heat, smoke or fumes from a "hostile fire"; or

**(b)**    If insurance is provided to the "insured" by "underlying insurance" specifically listed in the Schedule of Underlying Insurance at the underlying limit scheduled, but only to the extent bodily injury or property damage coverage is provided by that "underlying insurance" specifically listed in the Schedule of Underlying Insurance and subject to all its terms and conditions.

**(5)**    At or from any premises, site or location on which any "insured" or any contractors or subcontractors working directly or indirectly on any "insured's" behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, "pollutants".

**b.**    Any "loss", cost or expense arising out of any:

**(1)**    Request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)**    Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of property damage that the "insured" would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or suit by or on behalf of a governmental authority.

XS 304 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT - RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following

**EXCESS LIABILITY COVERAGE PART**
**CLAIMS-MADE EXCESS LIABILITY COVERAGE PART**

**SECTION I - COVERAGE, B. Exclusions** is modified to add the following:

This insurance does not apply to any liability to:

**a.**   A person arising out of any:

   **(1)**   Refusal to employ that person;

   **(2)**   Termination of that person's employment; or

   **(3)**   Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**b.**   The spouse, child, parent, brother or sister of that person as a consequence of any of the employment-related practices described in Paragraphs **(1)**, **(2)**, or **(3)** above directed at that person.

This exclusion applies:

**a.**   Whether the insured may be liable as an employer or in any other capacity; and

**b.**   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**XS 306 09 02**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION

This endorsement modifies insurance provided under the following:

    **CLAIMS-MADE EXCESS LIABILITY COVERAGE PART**
    **EXCESS LIABILITY COVERAGE PART**

**SECTION I - COVERAGE, B. Exclusions** is modified to add the following:

This insurance does not apply to:

**Access or Disclosure of Confidential or Personal Information**

Any liability arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

**CLAIMS-MADE EXCESS LIABILITY COVERAGE PART**
**EXCESS LIABILITY COVERAGE PART**

**A.** **SECTION III - CONDITIONS,** is modified to add the following;

    **4.** Duties in the Event of Occurrence, Claim or Suit

        **e.** With regard to liability for Bodily Injury, Property Damage and Personal and Advertising Injury, unless we are prejudiced by the "insured's" or your failure to comply with the requirement, no provision of this Coverage Part requiring you or any "insured" to give notice of occurrence, claim or suit, or forward demands, notices, summonses or legal papers in connection with a claim or suit, will bar coverage under this Coverage Part.

        This does not apply with respect to the ownership, maintenance or use of covered autos.

    **14. Changes in Conditions**

The following condition is added:

**CLAIMS HANDLING PROCEDURES**

We will notify you in writing of:

    **(a)** An initial offer to compromise or settle a claim made or suit brought against any "insured". The notice will be given no later than the 10th day after the date on which the offer is made.

    **(b)** Any settlement of a claim made or suit brought against the "insured". The notice will be given not later than the 30th day after the date of settlement.

**B.** **SECTION IV - DEFINITIONS, 7.** "Pollutants" is deleted in its entirety and replaced by the following:

    **7.** "Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

XS 444 TX 10 08

Includes copyrighted material of ISO Properties, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY COVERAGE PART**

**A.** **SECTION I - COVERAGE**, **A. Insuring Agreement, 4.c., d.** and **e.** are deleted in their entirety and replaced by the following:

   **c.** First observes, or first observed the, injury or offense;

   **d.** Becomes aware, or become aware, by any means, other than as described in **c.** above, that injury or offense has taken place or begun to take place; or

   **e.** Becomes aware, or become aware, of a condition from which injury or offense is substantially certain to take place.

Includes copyrighted material of ISO Properties, Inc., with its permission.

# THE CINCINNATI INDEMNITY COMPANY
A Stock Insurance Company

# CINCINNATI DATA DEFENDER™ COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD" OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Attached to and forming part of POLICY NUMBER: `ENP 006 54 53`          Effective Date `03-01-2020`

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

**Retroactive Date:**   `03-01-2018`

### Limits of Insurance and Deductible

| Insuring Agreement | | Annual Aggregate | Sublimit | | Deductible |
|---|---|---|---|---|---|
| **A** | Response Expenses | $50,000 | | | $1,000 |
| | | | Forensic IT Review | $25,000 | |
| | | | Legal Review | $25,000 | |
| | | | PR Services | $25,000 | |
| **B** | Defense and Liability | $50,000 | | | $1,000 |
| | | | Regulatory Fines and Penalties | $25,000 | |
| | | | PCI Fines and Penalties | $25,000 | |
| **C** | Identity Recovery | $25,000 | | | $250 |
| | | | Lost Wages and Child and Elder Care | $5,000 | |
| | | | Mental Health Counseling | $1,000 | |
| | | | Miscellaneous Unnamed Costs | $1,000 | |

| **TOTAL ANNUAL PREMIUM** | $143 |
|---|---|

| Optional Supplemental Extended Reporting Period - Term: | Optional Supplemental Extended Reporting Period - Premium: |
|---|---|
| 1 YEAR | 28 |
| 2 YEAR | 56 |
| 3 YEAR | 74 |
| 4 YEAR | 93 |
| 5 YEAR | 102 |
| 6 YEAR | 111 |

FORMS AND/OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:

`HC102`     `01/18` CINCINNATI DATA DEFENDER™ COVERAGE FORM

`HC472TX`   `01/18` TEXAS CHANGES - CINCINNATI DATA DEFENDER™ COVERAGE PART

# CINCINNATI DATA DEFENDER™ COVERAGE FORM

### TABLE OF CONTENTS

**Coverage Part Provision:**                                                                    **Begins on Page:**

Preamble ...................................................................................................................3

**SECTION I - COVERAGES** ........................................................................................3

**A.  Insuring Agreements** ........................................................................................3

    **1.  Insuring Agreement A - Response Expenses** ...........................................3
    **2.  Insuring Agreement B - Defense and Liability** .........................................5
    **3.  Insuring Agreement C - Identity Recovery** ...............................................5

**B.  Exclusions** ........................................................................................................5

    **1.**  Applicable to Insuring Agreements **A** and **B** ...............................................5

        **a.  Contractual Liability** ...........................................................................5
        **b.  Criminal Investigations or Proceedings** ...........................................5
        **c.  Deficiency Correction** ........................................................................5
        **d.  Extortion** .............................................................................................6
        **e.  Fraudulent, Dishonest or Criminal Acts** ..........................................6
        **f.  Non-monetary Relief** ..........................................................................6
        **g.  Previously Reported Data Compromises** .........................................6
        **h.  Prior Data Compromises** ...................................................................6
        **i.  Prior or Pending Litigation** ...............................................................6
        **j.  Reckless Disregard** ............................................................................6
        **k.  Uninsurable** ........................................................................................6
        **l.  Willful Complicity** ...............................................................................6

    **2.**  Applicable to Insuring Agreement **C** ...........................................................6

        **a.  Fraudulent, Dishonest or Criminal Acts** ..........................................6
        **b.  Professional or Business Identity** ....................................................6
        **c.  Unreported Identity Theft** ..................................................................6

    **3.**  Applicable to Insuring Agreements **A**, **B** and **C** .......................................6

        **a.  Nuclear** ...............................................................................................6
        **b.  War** ......................................................................................................6

**SECTION II - LIMITS OF INSURANCE AND DEDUCTIBLE** ......................................7

**SECTION III - DEFENSE AND SETTLEMENT** .........................................................8

**SECTION IV - CONDITIONS** ....................................................................................8

    **1.  Bankruptcy** ................................................................................................8
    **2.  Due Diligence** ...........................................................................................8
    **3.  Duties in the Event of a Claim, Regulatory Proceeding or Loss** ............9
    **4.  Help Line** ...................................................................................................10
    **5.  Legal Action Against Us** ..........................................................................10
    **6.  Legal Advice** .............................................................................................10
    **7.  Liberalization** ...........................................................................................10
    **8.  Office of Foreign Assets Control (OFAC) Compliance** ...........................11
    **9.  Other Insurance** .......................................................................................11
    **10. Pre-Notification Consultation** .................................................................11
    **11. Representations** .......................................................................................11
    **12. Separation of Insureds** ...........................................................................11
    **13. Service Providers** ....................................................................................11
    **14. Services** ....................................................................................................11
    **15. Subrogation** .............................................................................................12
    **16. Valuation - Settlement** ............................................................................12
    **17. When We Do Not Renew** .........................................................................12

## TABLE OF CONTENTS (CONT'D)

**Coverage Part Provision:**                                          **Begins on Page:**

**SECTION V - EXTENDED REPORTING PERIODS** ...........................................................................12

**SECTION VI - DEFINITIONS** ..............................................................................................13

    **1.**   "Affected individual".................................................................................13
    **2.**   "Authorized representative"...........................................................................13
    **3.**   "Claim" ..................................................................................................13
    **4.**   "Coverage term"......................................................................................13
    **5.**   "Coverage territory"..................................................................................14
    **6.**   "Data compromise liability"..........................................................................14
    **7.**   "Defense costs".......................................................................................14
    **8.**   "Employee".............................................................................................14
    **9.**   "Executive"............................................................................................15
    **10.**  "Identity recovery case manager"....................................................................15
    **11.**  "Identity recovery expenses"........................................................................15
    **12.**  "Identity recovery insured".........................................................................16
    **13.**  "Identity theft"......................................................................................16
    **14.**  "Insured"..............................................................................................16
    **15.**  "Loss".................................................................................................16
    **16.**  "Named insured".......................................................................................16
    **17.**  "Personal data compromise"..........................................................................16
    **18.**  "Personally identifying information".................................................................17
    **19.**  "Personally sensitive information"..................................................................17
    **20.**  "Policy period".......................................................................................17
    **21.**  "Regulatory proceeding"..............................................................................17

# CINCINNATI DATA DEFENDER™ COVERAGE FORM

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD" OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE DE-DUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Various provisions in this Coverage Part restrict coverage. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the "named insured" shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VI** - **Definitions**.

## SECTION I - COVERAGES

### A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which an Aggregate Limit of Insurance is shown in the Declarations:

**1. Insuring Agreement A - Response Expenses**

**a.** Coverage under Insuring Agreement **A** - Response Expenses applies only if all of the following conditions are met:

**(1)** There has been a "personal data compromise"; and

**(2)** Such "personal data compromise" is first discovered by you during the "coverage term"; and

**(3)** Such "personal data compromise" took place in the "coverage territory"; and

**(4)** Such "personal data compromise" is reported to us within 60 days after the date it is first discovered by you.

**b.** If the conditions listed in **a.** above have been met, then we will provide coverage for the following expenses when they arise directly from the "personal data compromise" described in **a.** above and are necessary and reasonable. Coverages **(4)** and **(5)** apply only if there has been a notification of the "personal data compromise" to "affected individuals" as covered under coverage **(3)**.

**(1) Forensic IT Review**

Professional information technologies review if needed to determine, within the constraints of what is possible and reasonable, the nature and extent of the "personal data compromise" and the number and identities of the "affected individuals".

This does not include costs to analyze, research or determine any of the following:

**(a)** Vulnerabilities in systems, procedures or physical security;

**(b)** Compliance with PCI or other industry security standards; or

**(c)** The nature or extent of loss or damage to data that is not "personally identifying information" or "personally sensitive information".

If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under Forensic IT Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

**(2) Legal Review**

Professional legal counsel review of the "personal data compromise" and how you should best respond to it. If there is reasonable cause to suspect that a covered "personal data compromise" may have occurred, we will pay for costs covered under

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Legal Review, even if it is eventually determined that there was no covered "personal data compromise". However, once it is determined that there was no covered "personal data compromise", we will not pay for any further costs.

**(3) Notification to Affected Individuals**

We will pay your necessary and reasonable costs to provide notification of the "personal data compromise" to "affected individuals".

**(4) Services to Affected Individuals**

We will pay your necessary and reasonable costs to provide the following services to "affected individuals":

**(a)** The following services apply to any "personal data compromise".

**1)** Informational Materials

A packet of loss prevention and customer support information.

**2)** Help Line

A toll-free telephone line for "affected individuals" with questions about the "personal data compromise". Where applicable, the line can also be used to request additional services as listed in **(b)1)** and **2)** below.

Note, calls by "affected individuals" or their representatives to the Help Line do not constitute the making of a "claim" under Insuring Agreement **B** - Defense and Liability.

**(b)** The following additional services apply to "personal data compromise" events involving "personally identifying information".

**1)** Credit Report and Monitoring

A credit report and an electronic service automatically monitoring for activities affecting an individual's credit records. This service is subject to the "affected individual" enrolling for this service with the designated service provider.

**2)** Identity Restoration Case Management

As respects any "affected individual" who is or appears to be a victim of "identity theft" that may reasonably have arisen from the "personal data compromise", the services of an identity restoration professional who will assist that "affected individual" through the process of correcting credit and other records and, within the constraints of what is possible and reasonable, restoring control over his or her personal identity.

**(5) PR Services**

We will pay the necessary and reasonable fees and expenses you incur, with our prior written consent, for a professional public relations firm review of and response to the potential impact of the "personal data compromise" on your business relationships. We will only pay for such fees and expenses when such a public relations firm review and response is reasonably necessary to avert or mitigate material damage to your business relationships from the "personal data compromise".

Such fees and expenses include costs to implement public relations recommendations of such public relations firm. However, when such recommendations include advertising and special promotions designed to retain your relationship with "affected individuals", we will not pay for promotions:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

    **(a)** Provided to any of your "executives" or "employees"; or

    **(b)** Costing more than $25 per "affected individual".

**2. Insuring Agreement B - Defense and Liability**

  **a.** Coverage under Insuring Agreement **B** - Defense and Liability applies only if all of the following conditions are met:

    **(1)** During the "coverage term" or any applicable Extended Reporting Period, you first receive notice of a "claim" or "regulatory proceeding" which arises from a "personal data compromise" that:

      **(a)** Took place on or after the Retroactive Date shown in the Declarations and before the end of the "policy period";

      **(b)** Took place in the "coverage territory"; and

      **(c)** Was submitted to us and covered under Insuring Agreement **A** - Response Expenses; and

    **(2)** Such "claim" or "regulatory proceeding" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first received by you.

  **b.** If the conditions listed in **a.** above have been met, then we will pay on behalf of the "insured" "defense costs" and "data compromise liability" directly arising from the "claim" or "regulatory proceeding".

  **c.** All "claims" or "regulatory proceedings" caused by a single "personal data compromise" will be deemed to have been made at the time that notice of the first of those "claims" or "regulatory proceedings" is received by you.

**3. Insuring Agreement C - Identity Recovery**

  **a.** Coverage under Insuring Agreement **C** - Identity Recovery applies only if all of the following conditions are met:

    **(1)** There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this Coverage Part; and

    **(2)** Such "identity theft" is first discovered by the "identity recovery insured" during the "coverage term"; and

    **(3)** Such "identity theft" took place in the "coverage territory"; and

    **(4)** Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured".

  **b.** If the conditions listed in **a.** above have been met, then we will provide the following to the "identity recovery insured":

    **(1)** Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

    **(2)** Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft".

**B. Exclusions**

  **1.** Applicable to Insuring Agreements **A** and **B** only:

    This insurance does not apply to "loss" or "claims" based upon, attributable to or arising out of:

  **a. Contractual Liability**

    An "insured's" assumption of liability by contract or agreement, whether oral or written. However, this exclusion shall not apply to:

    **(1)** Any liability that an "insured" would have incurred in the absence of such contract or agreement; or

    **(2)** Any PCI fines or penalties explicitly covered under Insuring Agreement **B** − Defense and Liability.

  **b. Criminal Investigations or Proceedings**

    Any criminal investigations or proceedings.

  **c. Deficiency Correction**

    Costs to research or correct any deficiency. This includes, but is not limited to, any deficiency in your sys-

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

tems, procedures or physical security that may have contributed to a "personal data compromise".

**d. Extortion**

Any extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance.

**e. Fraudulent, Dishonest or Criminal Acts**

Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by the "insured".

**f. Non-monetary Relief**

That part of any "claim" seeking any non-monetary relief.

**g. Previously Reported Data Compromises**

The same facts alleged or contained in any "claim" which has been reported, or in any circumstances of which notice has been given, under any insurance policy of which this Coverage Part is a renewal or replacement.

**h. Prior Data Compromises**

Any "personal data compromise" first occurring before the Retroactive Date shown in the Declarations, or any "claim" arising from a "personal data compromise" that first occurred prior to the Retroactive Date shown in the Declarations.

**i. Prior or Pending Litigation**

Any "claim" or other proceeding against an "insured" which was pending or existed prior to the "coverage term", or arising out of the same or substantially the same facts, circumstances or allegations which are the subject of, or the basis for, such "claim" or other proceeding.

**j. Reckless Disregard**

Your reckless disregard for the security of "personally identifying information" or "personally sensitive information" in your care, custody or control.

**k. Uninsurable**

Any amount not insurable under applicable law.

**l. Willful Complicity**

The "insured's" intentional or willful complicity in a "personal data compromise".

**2.** Applicable to Insuring Agreement **C** only:

This insurance does not apply to:

**a. Fraudulent, Dishonest or Criminal Acts**

Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any "authorized representative" of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion shall not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

**b. Professional or Business Identity**

The theft of a professional or business identity.

**c. Unreported Identity Theft**

An "identity theft" that is not reported in writing to the police.

**3.** Applicable to Insuring Agreements **A, B** and **C**:

This insurance does not apply to "loss" or "claims" based upon, attributable to or arising out of:

**a. Nuclear**

Nuclear reaction or radiation or radioactive contamination, however caused.

**b. War**

**(1)** War, including undeclared or civil war or civil unrest;

**(2)** Warlike action by military force, including action hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

## SECTION II - LIMITS OF INSURANCE AND DEDUCTIBLE

**A.** Insuring Agreement **A** - Response Expenses:

**1.** The most we will pay under Insuring Agreement **A** - Response Expenses is the Response Expenses Limit of Insurance stated in the Declarations.

**2.** The Response Expenses Limit of Insurance is an annual aggregate limit. This amount is the most we will pay for the total of all "loss" covered under Insuring Agreement **A** - Response Expenses arising out of all "personal data compromise" events which are first discovered by you during the "coverage term". This limit applies regardless of the number of "personal data compromise" events discovered by you during that period.

**3.** A "personal data compromise" may be first discovered by you in one "coverage term" but cause covered "loss" in one or more subsequent "coverage terms". If so, all covered "loss" arising from such "personal data compromise" will be subject to the Response Expenses Limit of Insurance applicable to the "coverage term" when the "personal data compromise" was first discovered by you.

**4.** The most we will pay under Insuring Agreement **A** - Response Expenses for Forensic IT Review, Legal Review and PR Services coverages for "loss" arising from any one "personal data compromise" is the applicable sublimit for each of those coverages stated in the Declarations. These sublimits are part of, and not in addition to, the Aggregate Limit of Insurance referenced in Paragraph **2.** PR Services coverage is also subject to a limit per "affected individual" as described in Section **I., A.1.b.(5)** PR Services.

**5.** Coverage for Services to "affected individuals" is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals" or the period required by law, whichever is longer. Notwithstanding the foregoing, coverage for Identity Restoration Case Management services initiated within such period may continue for a period of up to one year from the date such Identity Restoration Case Management services are initiated.

**6.** Response Expenses coverage is subject to the Response Expenses Deductible stated in the Declarations. You shall be responsible for such deductible amount as respects each "personal data compromise" covered under this Coverage Part. We may, at our option, pay any part or all of the deductible amount in order to respond effectively to a "personal data compromise" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**B.** Insuring Agreement **B** - Defense and Liability:

**1.** The most we will pay under Insuring Agreement **B** - Defense and Liability (other than post-judgment interest) is the Limit of Insurance stated in the Declarations.

**2.** The Insuring Agreement **B** - Defense and Liability Limit of Insurance is an annual aggregate limit. This amount is the most we will pay for all "loss" covered under Insuring Agreement **B** - Defense and Liability (other than post-judgment interest) arising out of all "claims".

**3.** The most we will pay under Insuring Agreement **B** — Defense and Liability for "data compromise liability" and "defense costs" related to Regulatory Fines and Penalties and PCI Fines and Penalties coverages arising from any one "claim" or "regulatory proceeding" is the applicable sublimit for each of those coverages stated in the Declarations. These sublimits are part of, and not in addition to, the Aggregate Limit of Insurance referenced in Paragraph **2.**

**4.** The Defense and Liability Limit of Insurance for the Extended Reporting Periods (if applicable) shall be part of, and not in addition to, the Defense and Liability Limit for the immediately preceding "coverage term".

**5.** The Insuring Agreement **B** - Defense and Liability coverage is subject to the Deductible stated in the Declarations. You shall be responsible for such deductible amount as respects each "claim" or "regulatory proceeding" covered under this Coverage Part. We may, at our option, pay any part or all of the deductible amount to defend or effect settlement of any "claim", "loss" or "regulatory proceeding" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**C.** Insuring Agreement **C** - Identity Recovery:

**1.** Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the Limit of Insurance available for "identity recovery expenses".

2. Coverage under Insuring Agreement **C** - Identity Recovery is subject to the Annual Aggregate Limit of Insurance stated in the Declarations per "identity recovery insured". Regardless of the number of "identity theft" incidents, this limit is the most we will pay for the total of all "loss" arising out of all "identity thefts" suffered by one "identity recovery insured" which are first discovered by the "identity recovery insured" during the "coverage term". If an "identity theft" is first discovered in one "coverage term" and continues into other "coverage terms", all "loss" arising from such "identity theft" will be subject to the aggregate Limit of Insurance applicable to the "coverage term" when the "identity theft" was first discovered.

3. Legal costs as provided under Item **d.** of the definition of "identity recovery expenses" are part of, and not in addition to, the aggregate limit described in Paragraph **2.**

4. Item **e.** (Lost Wages) and Item **f.** (Child and Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to the sublimit stated in the Declarations. This sublimit is part of, and not in addition to, the aggregate Limit of Insurance described in Paragraph **2.** Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".

5. Item **g.** (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to the sublimit stated in the Declarations. This sublimit is part of, and not in addition to, the aggregate limit described in Paragraph **2.** Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".

6. Item **h.** (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to the sublimit stated in the Declarations. This sublimit is part of, and not in addition to, the aggregate Limit of Insurance described in Paragraph **2.** Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured".

7. Coverage under Insuring Agreement **C** - Identity Recovery is subject to the Identity Recovery Deductible stated in the Declarations. Each "identity recovery insured" shall be responsible for such deductible amount only once during each "coverage term". This deductible applies only to "identity recovery expenses".

The Limits of Insurance apply separately to each "coverage term".

## SECTION III - DEFENSE AND SETTLEMENT

The provisions contained within this Section apply only to Insuring Agreement **B** - Defense and Liability.

1. We will have the right and duty to select counsel and defend the "insured" against any "claim" or "regulatory proceeding" covered by Insuring Agreement **B** - Defense and Liability, regardless of whether the allegations of such "claim" or "regulatory proceeding" are groundless, false or fraudulent. However, we shall have no duty to defend the "insured" against any "claim" or "regulatory proceeding" seeking damages or other relief not insured by Insuring Agreement **B** - Defense and Liability.

2. We may, with your written consent, make any settlement of a "claim" or "regulatory proceeding" which we deem reasonable. If you withhold consent to such settlement, our liability for all "loss" resulting from such "claim" will not exceed the amount for which we could have settled such "claim" or "regulatory proceeding" plus "defense costs" incurred as of the date we proposed such settlement in writing to you.

3. We shall not be obligated to pay any "loss", or to defend or continue to defend any "claim" or "regulatory proceeding", after the Insuring Agreement **B** - Defense and Liability Limit of Insurance has been exhausted.

4. We shall pay all interest on that amount of any judgment within the Insuring Agreement **B** - Defense and Liability Limit of Insurance which accrues:

   **a.** After entry of judgment; and

   **b.** Before we pay, offer to pay or deposit in court that part of the judgment within the Insuring Agreement **B** - Defense and Liability Limit of Insurance or, in any case, before we pay or offer to pay the entire Insuring Agreement **B** - Defense and Liability Limit of Insurance.

   These interest payments shall be in addition to and not part of the Defense and Liability Limit.

## SECTION IV – CONDITIONS

1. **Bankruptcy**

   Your bankruptcy, or the bankruptcy of your estate if you are a sole proprietor, will not relieve us of our obligations under this Coverage Part.

2. **Due Diligence**

   You agree to use due diligence to prevent and mitigate "loss" covered under this Coverage Part. This includes, but is not limited to, complying with, and requiring your vendors to

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

comply with, reasonable and industry-accepted protocols for:

**a.** Providing and maintaining appropriate physical security for your premises, computer systems and hard copy files;

**b.** Providing and maintaining appropriate computer and Internet security;

**c.** Maintaining and updating at appropriate intervals backups of computer data;

**d.** Protecting transactions, such as processing credit card, debit card and check payments; and

**e.** Appropriate disposal of files containing "personally identifying information" or "personally sensitive information", including shredding hard copy files and destroying physical media used to store electronic data.

### 3. Duties in the Event of a Claim, Regulatory Proceeding or Loss

**a.** If, during the "coverage term", the "insured" first becomes aware of any circumstance that could reasonably be expected to give rise to a "claim" or "regulatory proceeding", the "insured" may give written notice to us. The notice must be made as soon as practicable, but in no event more than 60 days after the date the circumstance is first discovered by the "insured", must be made during the "coverage term" and must include:

**(1)** The specific details, including the date, of the circumstance;

**(2)** The alleged injuries or damage sustained or which may be sustained;

**(3)** The names of potential claimants; and

**(4)** The manner in which the "insured" first became aware of the circumstance.

Any subsequent "claim" or "regulatory proceeding" arising out of any circumstance which is the subject of such a written notice will be deemed to have been made at the time written notice in compliance with these requirements was first received by us.

**b.** If a "claim" or "regulatory proceeding" is brought against any "insured", you must:

**(1)** Immediately record the specifics of the "claim" or "regulatory proceeding" and the date received; and

**(2)** Provide us with written notice, as soon as practicable, but in no event

more than 60 days after the date the "claim" or "regulatory proceeding" is first received by you.

**(3)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "regulatory proceeding";

**(4)** Authorize us to obtain records and other information;

**(5)** Cooperate with us in the investigation, settlement or defense of the "claim" or "regulatory proceeding";

**(6)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of "loss" or "defense costs" to which this insurance may also apply; and

**(7)** Not take any action, or fail to take any required action, that prejudices your rights or our rights with respect to such "claim" or "regulatory proceeding".

**c.** In the event of a "personal data compromise" covered under Insuring Agreement **A** - Response Expenses, you must see that the following are done:

**(1)** Notify the police if a law may have been broken.

**(2)** Notify us as soon as practicable, but in no event more than 60 days after the "personal data compromise". Include a description of any property involved.

**(3)** As soon as possible, give us a description of how, when and where the "personal data compromise" occurred.

**(4)** As often as may be reasonably required, permit us to:

**(a)** Inspect the property proving the "personal data compromise";

**(b)** Examine your books, records, electronic media and records and hardware;

**(c)** Take samples of damaged and undamaged property for inspection, testing and analysis; and

**(d)** Make copies from your books, records, electronic media and records and hardware.

**(5)** Send us signed, sworn proof of loss containing the information we request

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

to investigate the "personal data compromise". You must do this within 60 days after our request. We will supply you with the necessary forms.

**(6)** Cooperate with us in the investigation of the "personal data compromise" or settlement of the "loss".

**(7)** If you intend to continue your business, you must resume all or part of your operations as quickly as possible.

**(8)** Make no statement that will assume any obligation or admit any liability, for any loss for which we may be liable, without our prior written consent.

**(9)** Promptly send us any legal papers or notices received concerning the "personal data compromise" or "loss".

**d.** We may examine any "insured" under oath, while not in the presence of any other "insured" and at such times as may be reasonably required, about any matter relating to this insurance or the "claim" or "loss", including an "insured's" books and records. In the event of an examination, an "insured's" answers must be signed.

**e.** No "insured" may, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

**4. Help Line**

For assistance, the "identity recovery insured" should call the **Identity Recovery Help Line** at **1-866-219-9831**. The **Identity Recovery Help Line** can provide the "identity recovery insured" with:

**a.** Information and advice for how to respond to a possible "identity theft"; and

**b.** Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.

As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records

that support his or her claim for "identity recovery expenses".

**5. Legal Action Against Us**

**a.** No person or organization has a right:

**(1)** To join us as a party or otherwise bring us into a suit asking for damages from an "insured"; or

**(2)** To sue us under this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an "insured"; but we will not be liable for damages that are not payable under this Coverage Part, or that are in excess of the applicable Aggregate Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the first "named insured" and the claimant or the claimant's legal representative.

**b.** You may not bring any legal action against us involving "loss":

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of "loss" with us; and

**(3)** Unless brought within 2 years from the date you reported the "claim" or "loss" to us.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**6. Legal Advice**

We are not your legal advisor. Our determination of what is or is not covered under this Coverage Part does not represent advice or counsel from us about what you should or should not do.

**7. Liberalization**

If, within 60 days prior to the beginning of this Coverage Part or during the "policy period", we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part at the latter of:

**a.** The date we implemented the change in your state; or

**b.** The date this Coverage Part became effective; and

will be considered as included until the end of the current "policy period". We will make no additional premium charge for this additional coverage during the interim.

### 8. Office of Foreign Assets Control (OFAC) Compliance

Whenever insurance coverage provided by this policy would be in violation of any United States economic or trade sanctions, such insurance coverage shall be null and void.

### 9. Other Insurance

**a.** If any covered "loss" is covered by any other valid policy, then this Coverage Part shall apply only in excess of the amount of any deductible, retention and limit of insurance under such other policy whether such other policy is stated to be primary, contributory, excess, contingent or otherwise, unless such other policy is written specifically excess of this Coverage Part by reference in such other policy to this policy's policy number.

**b.** When this insurance is excess, we will have no duty to defend the "insured" against any "claim" if any other insurer has a duty to defend the "insured" against that "claim". But we will have the right to associate in the defense and control of any "claim" that we reasonably believe is likely to involve the insurance provided under this Coverage Part. If no other insurer defends, we will undertake to do so, but we will be entitled to the "insured's" rights against all those other insurers.

### 10. Pre-Notification Consultation

You agree to consult with us prior to the issuance of notification to "affected individuals". We assume no responsibility under this Coverage Part for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under Condition **12.** Service Providers. You must provide the following at our pre-notification consultation with you:

**a.** The exact list of "affected individuals" to be notified, including contact information.

**b.** Information about the "personal data compromise" that may appropriately be communicated with "affected individuals".

**c.** The scope of services that you desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Response Expenses Limit.

### 11. Representations

You represent that all information and statements contained in any application or questionnaire submitted in connection with this Coverage Part are true, accurate and complete. All such information and statements are the basis for our issuing this Coverage Part and shall be considered as incorporated into and shall constitute a part of this Coverage Part. Misrepresentation or omission of any material fact may be grounds for the rescission of this Coverage Part.

### 12. Separation of Insureds

Except with respect to the applicable Limit of Insurance, and any rights or duties specifically assigned in this Coverage Part or the policy to which it is attached, to the first "named insured", this insurance applies separately to each "insured" against whom a "claim" is made.

### 13. Service Providers

**a.** We will only pay under this Coverage Part for services that are provided by service providers approved by us. You must obtain our prior approval for any service provider whose expenses you want covered under this Coverage Part. We will not unreasonably withhold such approval.

**b.** Prior to the Pre-Notification Consultation described in the Pre-Notification Consultation Condition above, you must come to agreement with us regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals. We will suggest a service provider. If you prefer to use an alternate service provider, our coverage is subject to the following limitations:

**(1)** Such alternate service provider must be approved by us;

**(2)** Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested; and

**(3)** Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested.

### 14. Services

The following conditions apply as respects any services provided to you or any "affected indi-

vidual" or "identity recovery insured" by us, our designees or any service firm paid for in whole or in part under this Coverage Part:

**a.** The effectiveness of such services depends on the cooperation and assistance of you, "affected individuals" and "identity recovery insureds".

**b.** All services may not be available or applicable to all individuals. For example, "affected individuals" and "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

**c.** We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

**d.** Except for the services of an "identity recovery case manager" under Insuring Agreement **C** - Identity Recovery, which we will provide directly, you will have a direct relationship with the professional service firms paid for in whole or in part under this Coverage Part. Those firms work for you.

## 15. Subrogation

With respect to any payment under this Coverage Part on behalf of any "insured", we shall be subrogated to the "insured's" rights of recovery to the extent of such payment. The "insured" shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable us to bring suit in the "insured's" name. Any recoveries, less the cost of obtaining them, will be distributed as follows:

**a.** To you, until you are reimbursed for any "loss" you sustain that exceeds the sum of the applicable Aggregate Limit of Insurance and the Deductible Amount, if any;

**b.** Then to us, until we are reimbursed for the payment under this Coverage Part;

**c.** Then to you, until you are reimbursed for that part of the payment equal to the Deductible Amount, if any.

## 16. Valuation - Settlement

All premiums, Limits of Insurance, Deductible Amounts, "loss" and any other monetary amounts under this Coverage Part are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is agreed to or another component of "loss" under this Coverage Part is expressed in any currency other than United States of America dollars, payment under this Coverage Part shall be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is entered, settlement amount is agreed upon, or the other component of "loss" is due, respectively.

## 17. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first "named insured" shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - EXTENDED REPORTING PERIODS

The provisions contained within this Section apply only to Insuring Agreement **B** - Defense and Liability.

**1.** You shall have the right to the Extended Reporting Periods described in this section, in the event that:

**a.** You or we cancel this Coverage Part;

**b.** You or we refuse to renew this Coverage Part; or

**c.** We renew this Coverage Part on other than a claims-made basis or with a retroactive date later than the Retroactive Date shown in the Declarations.

**2.** If an event as specified in Paragraph **1.** has occurred, you shall have the right to the following:

**a.** An Automatic Extended Reporting Period of 90 days after the effective date of cancellation or nonrenewal at no additional premium in which to give to us written notice of a "claim" or "regulatory proceeding" of which you first receive notice during said Automatic Extended Reporting Period for any "personal data compromise" occurring on or after the Retroactive Date shown on the Declarations and before the end of the "policy period" and which is otherwise covered by this Coverage Part; and

**b.** Upon payment of the additional premium stated in the Declarations, a Supplemental Extended Reporting Period for the term stated in the Supplemental Extended Reporting Period Endorsement will be provided immediately following the effective date of cancellation or nonrenewal in which to give to us written notice of a "claim" or "regulatory proceeding" of which you first receive notice during said Supplemental Extended Reporting Period

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

for any "personal data compromise" occurring on or after the Retroactive Date shown in the Declarations and before the end of the "policy period" and which is otherwise covered by this Coverage Part.

To obtain the Supplemental Extended Reporting Period, you must request it in writing and pay the additional premium due, within 60 days of the effective date of cancellation or nonrenewal. The additional premium for the Supplemental Extended Reporting Period shall be fully earned at the inception of the Supplemental Extended Reporting Period. If we do not receive the written request as required, you may not exercise this right at a later date.

**c.** The Defense and Liability Limit of Insurance for the Extended Reporting Periods shall be part of, and not in addition to, the Defense and Liability Limit of Insurance for the immediately preceding "coverage term".

## SECTION VI - DEFINITIONS

**1.** "Affected individual" means any person whose "personally identifying information" or "personally sensitive information" is lost, stolen, accidentally released or accidentally published by a "personal data compromise" covered under this Coverage Part. This definition is subject to the following provisions:

**a.** "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual".

**b.** An "affected individual" may reside anywhere in the world.

**2.** "Authorized representative" means a person or entity authorized by law or contract to act on behalf of an "identity recovery insured".

**3.** "Claim":

**a.** Means:

**(1)** A civil proceeding in which it is alleged that the claimant suffered damages arising from:

**(a)** A "personal data compromise" that was covered under Insuring Agreement **A** - Response Expenses section of this Coverage Part and in connection with which you submitted a claim to us and provided notifications and services to "affected individuals" in consultation with us pursuant to Insuring Agreement **A** - Response Expenses; or

**(b)** The violation of a governmental statute or regulation arising from a "personal data compromise" that was covered under Insuring Agreement **A** - Response Expenses and in connection with which you submitted a claim to us and provided notifications and services to "affected individuals" in consultation with us pursuant to Insuring Agreement **A** - Response Expenses.

**(2)** "Claim" includes:

**(a)** An arbitration proceeding in which such damages are claimed and to which the "insured" must submit or does submit with our consent;

**(b)** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the "insured" must submit or does submit with our consent; or

**(c)** A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

**b.** Does not include any demand or action brought by or on behalf of someone who is:

**(1)** Your "executive";

**(2)** Your owner or part-owner; or

**(3)** A holder of your securities;

in their capacity as such, whether directly, derivatively, or by class action. "Claim" will include proceedings brought by such individuals in their capacity as "affected individuals", but only to the extent that the damages claimed are the same as would apply to any other "affected individual".

**4.** "Coverage term" means the following individual increment, or if a multi-year "policy period", increments, of time, which comprise the "policy period" of this Coverage Part:

**a.** The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year "policy period", each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

address shown in the Declarations on the earlier of:

**(1)** The day the "policy period" shown in the Declarations ends; or

**(2)** The day the policy to which this Coverage Part is attached is terminated or cancelled.

**b.** However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

**5.** "Coverage territory" means:

**a.** With respect to Insuring Agreement **A** - Response Expenses, anywhere in the world.

**b.** With respect to Insuring Agreement **B** - Defense and Liability, anywhere in the world, however, "claims" must be brought in the United States (including its territories and possessions), Puerto Rico or Canada.

**c.** With respect to Insuring Agreement **C** - Identity Recovery, anywhere in the world

**6.** "Data compromise liability":

**a.** Means the following, when they arise from a "claim" or "regulatory proceeding":

**(1)** Damages (including punitive and exemplary damages and the multiple portion of any multiplied damage award), judgments or settlements;

**(2)** Attorney's fees and other litigation costs added to that part of any judgment paid by us, when such fees and costs are awarded by law or court order; and

**(3)** Pre-judgment interest on that part of any judgment paid by us.

**b.** Also includes any Payment Card Industry (PCI) fine or penalty imposed under a contract to which you are a party when such fine or penalty arises from a "claim". PCI Fines and Penalties do not include any increased transaction costs.

**c.** Also includes any fine or penalty imposed by law, to the extent such fine or penalty is legally insurable under the law of the applicable jurisdiction when such fine or penalty arises from a "regulatory proceeding".

**d.** Does not include:

**(1)** Civil or criminal fines or penalties imposed by law, except for civil fines and penalties expressly covered under paragraphs **b.** and **c.** above;

**(2)** Taxes; or

**(3)** Matters which may be deemed uninsurable under the applicable law.

**e.** With respect to fines and penalties and punitive, exemplary and multiplied damages, the law of the jurisdiction most favorable to the insurability of those fines, penalties or damages shall control for the purpose of resolving any dispute between us and any "insured" regarding whether the fines, penalties or damages specified in this definition above are insurable under this Coverage Part, provided that such jurisdiction:

**(1)** Is where those fines, penalties or damages were awarded or imposed;

**(2)** Is where any "personal data compromise" took place for which such fines, penalties or damages were awarded or imposed;

**(3)** Is where you are incorporated or you have your principal place of business; or

**(4)** Is where we are incorporated or have our principal place of business.

**7.** "Defense costs":

**a.** Means reasonable and necessary expenses resulting solely from the investigation, defense and appeal of any "claim" or "regulatory proceeding" against an "insured". Such expenses may be incurred by us. Such expenses may include premiums for any appeal bond, attachment bond or similar bond. However, we have no obligation to apply for or furnish such bond.

**b.** Does not include the salaries or wages of your "employees" or "executives", or your loss of earnings.

**8.** "Employee" means any natural person, other than an "executive", who was, now is or will be:

**a.** Employed on a full- or part-time basis by you;

**b.** Furnished temporarily to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions;

**c.** Leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties relat-

ed to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **8.b.**; or

**d.** Your volunteer worker, which includes unpaid interns.

**9.** "Executive" means any natural person who was, now is or will be:

**a.** The owner of a sole proprietorship that is a "named insured"; or

**b.** A duly elected or appointed:

  **(1)** Director;

  **(2)** Officer;

  **(3)** Managing Partner;

  **(4)** General Partner;

  **(5)** Member (if a limited liability company);

  **(6)** Manager (if a limited liability company); or

  **(7)** Trustee,

of a "named insured".

**10.** "Identity recovery case manager" means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured". This includes, with the permission and cooperation of the "identity recovery insured", written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

**11.** "Identity recovery expenses" means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft" suffered by an "identity recovery insured":

**a.** Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft".

**b.** Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft".

**c.** Costs for credit reports from established credit bureaus.

**d.** Fees and expenses for an attorney approved by us for the following:

  **(1)** The defense of any civil suit brought against an "identity recovery insured".

  **(2)** The removal of any civil judgment wrongfully entered against an "identity recovery insured".

  **(3)** Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency.

  **(4)** Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report.

  **(5)** The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured".

**e.** Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self-employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

**f.** Actual costs for supervision of children or elderly or infirm relatives or dependents of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured".

**g.** Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured".

**h.** Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft".

  **(1)** Such costs include:

    **(a)** Costs by the "identity recovery insured" to recover control over his or her personal identity.

    **(b)** Deductibles or service fees from financial institutions.

  **(2)** Such costs do not include:

    **(a)** Costs to avoid, prevent or detect "identity theft" or other loss.

**(b)** Money lost or stolen.

**(c)** Costs that are restricted or excluded elsewhere in this Coverage Part or policy.

**12.** "Identity recovery insured" means the following:

**a.** When the entity insured under this Coverage Part is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the "named insured".

**b.** When the "named insured" under this Coverage Part is a partnership, the "identity recovery insureds" are the current partners.

**c.** When the "named insured" under this Coverage Part is a corporation or other form of organization, other than those described in **a.** or **b.** above, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" shall be:

**(1)** The chief executive of the insured entity; or

**(2)** As respects a religious institution, the senior ministerial employee.

**d.** The legally recognized spouse of any individual described in **a.**, **b.** or **c.** above.

An "identity recovery insured" must always be an individual person. The "named insured" under this Coverage Part is not an "identity recovery insured".

**13.** "Identity theft" means the fraudulent use of "personally identifying information". This includes fraudulently using such information to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

**14.** "Insured" means:

**a.** With respect to Insuring Agreement **A** - Response Expenses any "named insured".

**b.** With respect to Insuring Agreement **B** - Defense and Liability:

**(1)** Any "named insured"; and

**(2)** Any "employee" or "executive" of a "named insured", but:

**(a)** Only for the conduct of the "named insured's" business within the scope of his or her employment or duties as an "executive"; and

**(b)** Such "employee" or "executive" shall not be an "insured" to the extent his or her actions or omissions are criminal, fraudulent, dishonest or constitute an intentional or knowing violation of the law.

**c.** With respect to Insuring Agreement **C** - Identity Recovery any "named insured".

**15.** "Loss" means:

**a.** With respect to Insuring Agreement **A** - Response Expenses:

Those expenses enumerated in Section **I**, **A.**, Paragraph **1.b.**

**b.** With respect to Insuring Agreement **B** - Defense and Liability:

**(1)** "Defense costs"; and

**(2)** "Data compromise liability".

**c.** With respect to Insuring Agreement **C** - Identity Recovery, "identity recovery expenses".

**16.** "Named insured" means the entity or entities shown in the Declarations as a Named Insured.

**17.** "Personal data compromise" means the loss, theft, accidental release or accidental publication of "personally identifying information" or "personally sensitive information" as respects one or more "affected individuals". If the loss, theft, accidental release or accidental publication involves "personally identifying information", such loss, theft, accidental release or accidental publication must result in or have the reasonable possibility of resulting in the fraudulent use of such information. This definition is subject to the following provisions:

**a.** At the time of the loss, theft, accidental release or accidental publication, the "personally identifying information" or "personally sensitive information" need not be at the insured premises but must be in the direct care, custody or control of:

**(1)** You; or

**(2)** A professional entity with which you have a direct relationship and to which you (or an "affected individual" at your direction) have turned over (directly or via a professional transmission or transportation provider) such information for storage, pro-

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

cessing, transmission or transportation of such information.

**b.** "Personal data compromise" includes disposal or abandonment of "personally identifying information" or "personally sensitive information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

**(1)** The failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

**(2)** Such disposal or abandonment must take place during the time period for which this Coverage Part is effective.

**c.** "Personal data compromise" includes situations where there is a reasonable cause to suspect that such "personally identifying information" or "personally sensitive information" has been lost, stolen, accidentally released or accidentally published, even if there is no firm proof.

**d.** All incidents of "personal data compromise" that are discovered at the same time or arise from the same cause will be considered one "personal data compromise".

**18.** "Personally identifying information" means information, including health information, that could be used to commit fraud or other illegal activity involving the credit, access to health care or identity of an "affected individual" or "identity recovery insured". This includes, but is not limited to, Social Security numbers or account numbers.

"Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses.

**19.** "Personally sensitive information" means private information specific to an individual the release of which requires notification of "affected individuals" under any applicable law.

"Personally sensitive information" does not mean or include "personally identifying information".

**20.** "Policy period" means the cumulative total of each individual "coverage term" comprising the period of time from the inception date of this Coverage Part shown in the Declarations to the expiration date shown in the Declarations, or its earlier cancellation or termination date.

**21.** "Regulatory proceeding" means an investigation, demand or proceeding alleging a violation of law or regulation brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission or other administrative or regulatory agency, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES - CINCINNATI DATA DEFENDER™ COVERAGE PART

This endorsement modifies insurance provided under the following:

**CINCINNATI DATA DEFENDER™ COVERAGE PART**

**A. SECTION I - COVERAGES, A. Insuring Agreements** is amended as follows:

  **1. Insuring Agreement A - Response Expenses**, Paragraph **1.a.(4)** is deleted in its entirety and replaced by the following:

    **(4)** Such "personal data compromise" is reported to us within 90 days after the date it is first discovered by you.

  **2. Insuring Agreement B - Defense and Liability**, Paragraph **2.a.(2)** is deleted in its entirety and replaced by the following:

    **(2)** Such "claim" or "regulatory proceeding" is reported to us as soon as practicable, but in no event more than 90 days after the date it is first received by you.

**B. SECTION I - COVERAGES, B. Exclusions,** Paragraph **1.** is amended by deleting Exclusion **j. Reckless Disregard** in its entirety and replacing it with the following:

This insurance does not apply to "loss" or "claims" based upon, attributable to or arising out of:

  **j. Reckless Disregard**

    Your "reckless disregard" for the security of "personally identifying information" or "personally sensitive information" in your care, custody or control.

**C. SECTION IV - CONDITIONS** is amended as follows:

  **1.** Condition **3. Duties in the Event of a Claim, Regulatory Proceeding or Loss** is amended by replacing the reference to 60 days in Paragraphs **3.a., 3.b.(2)** and **3.c.(2)** with 90 days.

  **2. Condition 5. Legal Action Against Us, b.(3)** is replaced by the following:

    **(3)** The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

  **3.** Condition **17. When We Do Not Renew** is deleted in its entirety.

  **4.** The following Condition is added and is applicable to Insuring Agreements **A** - Response Expenses and **B** - Defense and Liability only:

  **Prompt Payment of Claims**

  **a. Receipt of Notice of Claim**

    **(1)** Not later than the 15th day after the date we receive notice of a claim, we will:

      **(a)** Acknowledge receipt of the claim;

      **(b)** Commence any investigation of the claim; and

    **(2)** Request from you all items, statements, and forms that we reasonably believe, at that time, will be required from you.

    **(3)** We may make additional requests for information if during the investigation of the claim the additional requests are necessary.

    **(4)** If the acknowledgment of receipt of a claim is not made in writing, we will make a record of the date, manner, and content of the acknowledgment.

  **b. Notice of Acceptance or Rejection of Claim**

    **(1)** Except as provided in **d. Delay in Payment of Claim** below, we will notify you in writing of the acceptance or rejection of a claim not later than the 15th business day after the date we receive all items, statements, and forms required by us to secure final proof of loss.

    **(2)** If we reject the claim, the notice required by **(1)** above must state the reasons for the rejection.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** If we are unable to accept or reject the claim within the period specified in **(1)** above, we, within that same period, will notify you of the reasons that we need additional time. We will accept or reject the claim not later than the 45th day after the date we notify you.

**c.   Payment of Claim**

**(1)** Except as otherwise provided, if we notify you under **(2)** below that we will pay a claim or part of a claim, we will pay the claim not later than the fifth business day after the date notice is made.

**(2)** If payment of the claim or part of the claim is conditioned on the performance of an act by you, we will pay the claim not later than the fifth business day after the date the act is performed.

**d.   Delay in Payment of Claim**

**(1)** Except as otherwise provided, if we, after receiving all items, statements, and forms reasonably requested and required under **a. Receipt of Notice of Claim** above, delay payment of the claim for a period exceeding the period specified by applicable statutes or, if other statutes do not specify a period, for more than 60 days, we will pay damages and other items as provided by Texas Insurance Code Section 542.060.

**(2)** Paragraph **(1)** above does not apply in a case in which it is found as a result of arbitration or litigation that a claim received by us is invalid and should not be paid by us.

**D.   SECTION V - EXTENDED REPORTING PERIODS** is amended by deleting Paragraph **2.b.** in its entirety and replacing it with the following:

**b.** Upon payment of the additional premium stated in the Declarations, a Supplemental Extended Reporting Period for the term stated in the Supplemental Extended Reporting Period Endorsement will be provided immediately following the effective date of cancellation or nonrenewal in which to give to us written notice of a "claim" or "regulatory proceeding" of which you first receive notice during said Supplemental Extended Reporting Period for any "personal data compromise" occurring on or after the Retroactive Date shown in the Declarations and before the end of the "policy period" and which is otherwise covered by this Coverage Part.

To obtain the Supplemental Extended Reporting Period, you must request it in writing and pay the additional premium due, within 60 days of the effective date of cancellation or nonrenewal. If we do not receive the written request as required, you may not exercise this right at a later date.

**E.   SECTION VI - DEFINITIONS** is amended to include the following definition:

"Reckless disregard" means that:

**a.**   The action or procedure is deliberate; and

**b.**   The action or procedure entails either a certainty or a high probability of causing or allowing a "personal data compromise".

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# THE CINCINNATI INDEMNITY COMPANY
A Stock Insurance Company

# CINCINNATI NETWORK DEFENDER™ COVERAGE PART DECLARATIONS

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD" OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Attached to and forming part of POLICY NUMBER: `ENP 006 54 53`     Effective Date `03-01-2020`

Named Insured is the same as it appears in the Common Policy Declarations unless another entry is made here.

**Retroactive Date:** `03-01-2019`

## Limits of Insurance and Deductible

| Insuring Agreement | Annual Aggregate | Sublimit | | Deductible | |
|---|---|---|---|---|---|
| **A** Computer Attack | $50,000 | | | $1,000 | 1 |
| | | Cyber Extortion | $10,000 | $1,000 | 2 |
| | | Loss of Business | $25,000 | | |
| | | Public Relations | $25,000 | | |
| **B** Network Security and Electronic Media Liability | $50,000 | | | $1,000 | |

| TOTAL ANNUAL PREMIUM | $187 |
|---|---|

| Optional Supplemental Extended Reporting Period - Term: | Optional Supplemental Extended Reporting Period - Premium: |
|---|---|
| 1 YEAR | 60 |
| 2 YEAR | 120 |
| 3 YEAR | 160 |
| 4 YEAR | 200 |
| 5 YEAR | 220 |
| 6 YEAR | 240 |

FORMS AND/OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:

| HC103 | 01/18 | CINCINNATI NETWORK DEFENDER™ COVERAGE FORM |
|---|---|---|
| HC473TX | 01/18 | TEXAS CHANGES - CINCINNATI NETWORK DEFENDER™ COVERAGE |

---

[1] Computer Attack Deductible other than Cyber Extortion
[2] Cyber Extortion Deductible

# CINCINNATI NETWORK DEFENDER™ COVERAGE FORM

## TABLE OF CONTENTS

Coverage Part Provision:      Begins on Page:

Preamble ................................................................................................................................................3

SECTION I – COVERAGES ....................................................................................................................3

A. Insuring Agreements ........................................................................................................................3

    1. Insuring Agreement A – Computer Attack ..................................................................................3
    2. Insuring Agreement B – Network Security and Electronic Media Liability ..............................3

B. Exclusions ........................................................................................................................................4

    1. Contractual Liability ....................................................................................................................4
    2. Criminal Investigations or Proceedings ....................................................................................4
    3. Deficiency Correction ..................................................................................................................4
    4. Extortion ......................................................................................................................................4
    5. Fines or Penalties ........................................................................................................................4
    6. Fraudulent, Dishonest or Criminal Acts ....................................................................................4
    7. Information Technology Products ..............................................................................................4
    8. Infrastructure Failure ..................................................................................................................4
    9. Knowledge of Falsity ..................................................................................................................4
    10. Non-monetary Relief ..................................................................................................................4
    11. Nuclear ........................................................................................................................................4
    12. Patent or Trade Secret Infringement ........................................................................................4
    13. Previously Reported Claims ......................................................................................................4
    14. Prior Wrongful Acts ....................................................................................................................5
    15. Prior or Pending Litigation ........................................................................................................5
    16. Property Damage or Bodily Injury ............................................................................................5
    17. War ..............................................................................................................................................5
    18. Willful Complicity ........................................................................................................................5

SECTION II – LIMITS OF INSURANCE AND DEDUCTIBLE ................................................................5

SECTION III – DEFENSE AND SETTLEMENT ......................................................................................6

SECTION IV – CONDITIONS ..................................................................................................................6

    1. Bankruptcy ..................................................................................................................................6
    2. Due Diligence ..............................................................................................................................6
    3. Duties in the Event of a Claim or Loss ......................................................................................6
    4. Legal Action Against Us ..............................................................................................................7
    5. Liberalization ..............................................................................................................................8
    6. Office of Foreign Assets Control (OFAC) Compliance ..............................................................8
    7. Other Insurance ..........................................................................................................................8
    8. Representations ..........................................................................................................................8
    9. Separation of Insureds ..............................................................................................................8
    10. Services ......................................................................................................................................8
    11. Subrogation ................................................................................................................................8
    12. Valuation – Settlement ..............................................................................................................9
    13. When We Do Not Renew ............................................................................................................9

SECTION V – EXTENDED REPORTING PERIODS ..............................................................................9

SECTION VI – DEFINITIONS ..................................................................................................................9

    1. "Actual cash value" ......................................................................................................................9
    2. "Bodily injury" ..............................................................................................................................9
    3. "Business income loss" ..............................................................................................................9
    4. "Claim" ........................................................................................................................................10
    5. "Computer attack" ......................................................................................................................10
    6. "Computer system" ....................................................................................................................10
    7. "Coverage term" ........................................................................................................................10

**TABLE OF CONTENTS (CONT'D)**

**Coverage Part Provision:**                                                              **Begins on Page:**

**SECTION VI – DEFINITIONS (Cont'd)**...................................................................................**10**

   **8.**  "Coverage territory"..........................................................................**10**
   **9.**  "Cyber extortion expenses"...............................................................**10**
  **10.**  "Cyber extortion threat"....................................................................**11**
  **11.**  "Data re-creation costs"....................................................................**11**
  **12.**  "Data restoration costs"....................................................................**11**
  **13.**  "Defense costs".................................................................................**11**
  **14.**  "Denial of service attack".................................................................**11**
  **15.**  "Electronic media incident"..............................................................**11**
  **16.**  "Employee".......................................................................................**12**
  **17.**  "Executive".......................................................................................**12**
  **18.**  "Extra expense"................................................................................**12**
  **19.**  "Insured"...........................................................................................**12**
  **20.**  "Interrelated"....................................................................................**12**
  **21.**  "Loss"...............................................................................................**12**
  **22.**  "Malware attack".............................................................................**12**
  **23.**  "Named insured"..............................................................................**12**
  **24.**  "Network security incident".............................................................**12**
  **25.**  "Period of restoration".....................................................................**13**
  **26.**  "Personally identifying information".................................................**13**
  **27.**  "Personally sensitive information"...................................................**13**
  **28.**  "Policy period".................................................................................**13**
  **29.**  "Property damage"...........................................................................**13**
  **30.**  "Ransomware"..................................................................................**13**
  **31.**  "Settlement costs"...........................................................................**13**
  **32.**  "System restoration costs"...............................................................**13**
  **33.**  "Third party corporate data"............................................................**14**
  **34.**  "Unauthorized access incident".......................................................**14**
  **35.**  "Wrongful act".................................................................................**14**

# CINCINNATI NETWORK DEFENDER™ COVERAGE FORM

**THIS COVERAGE PART PROVIDES CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD" OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF INSURANCE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE DEDUCTIBLE. IN NO EVENT WILL WE BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE LIMIT OF INSURANCE. READ THE ENTIRE POLICY CAREFULLY.**

Various provisions in this Coverage Part restrict coverage. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the "named insured" shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VI** - **Definitions**.

## SECTION I - COVERAGES

### A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which an Aggregate Limit of Insurance is shown in the Declarations:

1. **Insuring Agreement A - Computer Attack**

   a. Coverage under Insuring Agreement **A** - Computer Attack applies only if all of the following conditions are met:

      (1) There has been a "computer attack"; and

      (2) Such "computer attack" is first discovered by you during the "policy period"; and

      (3) Such "computer attack" occurred in the "coverage territory"; and

      (4) Such "computer attack" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first discovered by you.

   b. If all of the conditions in **a.** above have been met, then we will provide you the following coverages for "loss" directly arising from such "computer attack".

      (1) **Cyber Extortion**

          We will pay your necessary and reasonable "cyber extortion expenses".

   (2) **Data Restoration**

       We will pay your necessary and reasonable "data restoration costs".

   (3) **Data Re-creation**

       We will pay your necessary and reasonable "data re-creation costs".

   (4) **System Restoration**

       We will pay your necessary and reasonable "system restoration costs".

   (5) **Loss of Business**

       We will pay your actual "business income loss" and your necessary and reasonable "extra expenses".

   (6) **Public Relations**

       If you suffer covered "business income loss", we will pay the necessary and reasonable fees and expenses you incur, with our prior written consent, for a professional public relations firm review of and response to the potential impact of the "computer attack" on your business relationships. We will only pay for such fees and expenses when such a public relations firm review and response is reasonably necessary to avert or mitigate material damage to your business relationships from the "computer attack".

2. **Insuring Agreement B - Network Security and Electronic Media Liability**

   a. Coverage under Insuring Agreement **B** - Network Security and Electronic Media Liability applies only if all of the following conditions are met:

      (1) During the "coverage term" or any applicable Extended Reporting Period, you first receive no-

tice of a "claim" which arises from a "wrongful act" that:

**(a)** Took place on or after the Retroactive Date shown in the Declarations and before the end of the "policy period"; and

**(b)** Took place in the "coverage territory"; and

**(2)** Such "claim" is reported to us as soon as practicable, but in no event more than 60 days after the date it is first received by you.

**b.** If the conditions listed in **a.** above have been met, then we will pay on behalf of the "insured" the "insured's" necessary and reasonable "defense costs" and "settlement costs" directly arising from the "claim".

**c.** All "claims" caused by a single "wrongful act" or series of "interrelated" "wrongful acts" will be deemed to have been made at the time that notice of the first of those "claims" is received by you.

## B. Exclusions

This insurance does not apply to "loss" or "claims" based upon, attributable to or arising out of:

### 1. Contractual Liability

An "insured's" assumption of liability by contract or agreement, whether oral or written. However, this exclusion shall not apply to any liability that an "insured" would have incurred in the absence of such contract or agreement.

### 2. Criminal Investigations or Proceedings

Any criminal investigations or proceedings.

### 3. Deficiency Correction

Costs to research or correct any deficiency.

### 4. Extortion

Any threat, extortion or blackmail. This includes, but is not limited to, ransom payments and private security assistance.

This exclusion does not apply to the extent that insurance coverage is provided under **SECTION I - COVERAGES**, Paragraph **A.1.b.(1) Cyber Extortion**.

### 5. Fines or Penalties

Any fines or penalties.

### 6. Fraudulent, Dishonest or Criminal Acts

Any criminal, fraudulent or dishonest act, error or omission, or any intentional or knowing violation of the law by the "insured".

### 7. Information Technology Products

The propagation or forwarding of malware, including viruses, worms, Trojans, spyware and keyloggers in connection with hardware or software created, produced or modified by you for sale, lease or license to third parties.

### 8. Infrastructure Failure

Failure or interruption of or damage to any electrical power supply network or telecommunication network not owned and operated by the "insured" including, but not limited to, the internet, internet service providers, DNS service providers, cable and wireless providers, internet exchange providers, search engine providers, tier 1 internet protocol networks and other providers of telecommunications or internet infrastructure.

### 9. Knowledge of Falsity

Any oral or written publication of material, if done by the "insured" or at the "insured's" direction with knowledge of its falsity.

### 10. Non-monetary Relief

That part of any "claim" seeking any non-monetary relief.

### 11. Nuclear

Nuclear reaction or radiation or radioactive contamination, however caused.

### 12. Patent or Trade Secret Infringement

Any actual or alleged patent or trade secret violation including any actual or alleged violation of the Patent Act, the Economic Espionage Act of 1996, or the Uniform Trade Secrets Act and their amendments.

### 13. Previously Reported Claims

The same facts alleged or contained in any "claim" which has been reported, or in any circumstances of which notice has been given, under any insurance policy of which this Coverage Part is a renewal or replacement.

### 14. Prior Wrongful Acts

Any "wrongful act" first occurring before the Retroactive Date shown in the Declarations or any "claim" arising from a "wrongful act" that first occurred prior to the Retroactive Date shown in the Declarations.

### 15. Prior or Pending Litigation

Any "claim" or other proceeding against an "insured" which was pending or existed prior to the "coverage term", or arising out of the same or substantially the same facts, circumstances or allegations which are the subject of, or the basis for, such "claim" or other proceeding.

### 16. Property Damage or Bodily Injury

"Property damage" or "bodily injury" other than "bodily injury" arising from an "electronic media incident".

### 17. War

**a.** War, including undeclared or civil war or civil unrest;

**b.** Warlike action by military force, including action hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by government authority in hindering or defending against any of these.

### 18. Willful Complicity

The "insured's" intentional or willful complicity in a covered "loss" event or your reckless disregard for the security of your "computer system" or data.

## SECTION II - LIMITS OF INSURANCE AND DEDUCTIBLE

### A. Insuring Agreement A - Computer Attack

**1.** The most we will pay under Insuring Agreement **A** - Computer Attack for Cyber Extortion coverage for "loss" arising from any one "computer attack" is the Cyber Extortion Sublimit stated in the Declarations. This Limit of Insurance is part of, and not in addition to, the Computer Attack Aggregate Limit of Insurance stated in Paragraph **4.** below.

**2.** The most we will pay under Insuring Agreement **A** - Computer Attack for Loss of Business coverage for "loss" arising from any one "computer attack" is the Loss of Business Sublimit stated in the Declarations. This sublimit is part of, and not in addition to, the Computer Attack Aggregate Limit of Insurance stated in Paragraph **4.** below.

**3.** The most we will pay under Insuring Agreement **A** - Computer Attack for Public Relations coverage for "loss" arising from any one "computer attack" is the Public Relations Sublimit stated in the Declarations. This sublimit is part of, and not in addition to, the Computer Attack Aggregate Limit of Insurance stated in Paragraph **4.** below.

**4.** The Computer Attack Aggregate Limit of Insurance is an annual aggregate limit. This amount is the most we will pay for the total of all "loss" covered under Insuring Agreement **A** - Computer Attack arising out of all "computer attack" events which are first discovered by you during the "coverage term". This limit applies regardless of the number of "computer attack" events first discovered during the "coverage term".

**5.** A "computer attack" may be first discovered by you in one "coverage term" but it may cause covered "loss" in one or more subsequent "coverage terms". If so, all covered "loss" arising from such "computer attack" will be subject to the Computer Attack Aggregate Limit of Insurance applicable to the "coverage term" when the "computer attack" was first discovered by you.

**6.** The Computer Attack coverage is subject to the:

**a.** Computer Attack other than Cyber Extortion; and

**b.** Cyber Extortion;

deductibles stated in the Declarations. In the event that elements of "loss" from the same "computer attack" include "cyber extortion expenses" as well as other insured expenses or costs, then only the single highest deductible will apply. You shall be responsible for the applicable deductible amount as respects "loss" arising from each "computer attack" covered under this Coverage Part.

### B. Insuring Agreement B - Network Security and Electronic Media Liability

**1.** Except for post-judgment interest, the most we will pay under Insuring Agreement **B** - Network Security and Electronic Media Liability is the Network Security and Electronic Media Liability Aggregate Limit of Insurance stated in the Declarations.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

2.   The Network Security and Electronic Media Liability Aggregate Limit of Insurance is an annual aggregate limit. This amount is the most we will pay for the total of all "loss" covered under Insuring Agreement **B** - Network Security and Electronic Media Liability (other than post-judgment interest) arising out of all "claims".

3.   The Network Security and Electronic Media Liability Aggregate Limit of Insurance for the Extended Reporting Periods (if applicable) shall be part of, and not in addition to, the Network Security and Electronic Media Liability Aggregate Limit of Insurance for the immediately preceding "coverage term".

4.   The Insuring Agreement **B** - Network Security and Electronic Media Liability coverage is subject to the Network Security and Electronic Media Liability Deductible stated in the Declarations. You shall be responsible for the applicable deductible amount as respects "loss" arising from each "claim" covered under this Coverage Part. We may, at our option, pay any part or all of the deductible amount to defend or effect settlement of any "claim" or "loss" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

The Limits of Insurance apply separately to each "coverage term".

## SECTION III - DEFENSE AND SETTLEMENT

The provisions contained within this Section apply only to Insuring Agreement **B** - Network Security and Electronic Media Liability.

1.   We will have the right and duty to select counsel and defend the "insured" against any "claim" covered by Insuring Agreement **B** - Network Security and Electronic Media Liability, regardless of whether the allegations of such "claim" are groundless, false or fraudulent. However, we shall have no duty to defend the "insured" against any "claim" seeking damages or other relief not insured by Insuring Agreement **B** - Network Security and Electronic Media Liability.

2.   We may, with your written consent, make any settlement of a "claim" which we deem reasonable. If you withhold consent to such settlement, our liability for all "loss" resulting from such "claim" will not exceed the amount for which we could have settled such "claim" plus "defense costs" incurred as of the date we proposed such settlement in writing to you.

3.   We shall not be obligated to pay any "loss", or to defend or continue to defend any "claim", after the Insuring Agreement **B** - Network Secu-

rity and Electronic Media Liability Limit of Insurance has been exhausted.

4.   We shall pay all interest on that amount of any judgment within the Insuring Agreement **B** - Network Security and Electronic Media Liability Limit of Insurance which accrues:

   a.   After entry of judgment; and

   b.   Before we pay, offer to pay or deposit in court that part of the judgment within the Insuring Agreement **B** - Network Security and Electronic Media Liability Limit of Insurance or, in any case, before we pay or offer to pay the entire Insuring Agreement **B** - Network Security and Electronic Media Liability Limit of Insurance.

These interest payments shall be in addition to and not part of the Network Security and Electronic Media Liability Limit of Insurance.

## SECTION IV - CONDITIONS

1.   **Bankruptcy**

   Your bankruptcy, or the bankruptcy of your estate if you are a sole proprietor, will not relieve us of our obligations under this Coverage Part.

2.   **Due Diligence**

   You agree to use due diligence to prevent and mitigate "loss" covered under this Coverage Part. This includes, but is not limited to, complying with, and requiring your vendors to comply with, reasonable and industry-accepted protocols for:

   a.   Providing and maintaining appropriate physical security for your premises, "computer systems" and hard copy files;

   b.   Providing and maintaining appropriate computer and Internet security; and

   c.   Maintaining and updating at appropriate intervals backups of computer data.

3.   **Duties in the Event of a Claim or Loss**

   a.   If, during the "coverage term", the "insured" first becomes aware of any circumstance that could reasonably be expected to give rise to a "claim", the "insured" may give written notice to us. The notice must be made as soon as practicable, but in no event more than 60 days after the date the circumstance is first discovered by the "insured", must be made during the "coverage term" and must include:

      (1)   The specific details, including the date, of the circumstance;

      (2)   The alleged injuries or damage sustained or which may be sustained;

HC 103 01 18

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 6 of 14

(3) The names of potential claimants; and

(4) The manner in which the "insured" first became aware of the circumstance.

Any subsequent "claim" arising out of any circumstance which is the subject of such a written notice will be deemed to have been made at the time written notice in compliance with these requirements was first received by us.

**b.** If a "claim" is brought against any "insured", you must:

(1) Immediately record the specifics of the "claim" and the date received; and

(2) Provide us with written notice, as soon as practicable, but in no event more than 60 days after the date the "claim" is first received by you.

(3) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

(4) Authorize us to obtain records and other information;

(5) Cooperate with us in the investigation, settlement or defense of the "claim";

(6) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to you because of "loss" to which this insurance may also apply; and

(7) Not take any action, or fail to take any required action, that prejudices your rights or our rights with respect to such "claim".

**c.** In the event of a "computer attack" covered under Insuring Agreement **A** - Computer Attack, you must see that the following are done:

(1) Notify the police if a law may have been broken.

(2) Notify us as soon as practicable, but in no event more than 60 days after the "computer attack". Include a description of any property involved.

(3) As soon as possible, give us a description of how, when and where the "computer attack" occurred.

(4) As often as may be reasonably required, permit us to:

(a) Inspect the property proving the "computer attack";

(b) Examine your books, records, electronic media and records and hardware;

(c) Take samples of damaged and undamaged property for inspection, testing and analysis; and

(d) Make copies from your books, records, electronic media and records and hardware.

(5) Send us signed, sworn proof of loss containing the information we request to investigate the "computer attack". You must do this within 60 days after our request. We will supply you with the necessary forms.

(6) Cooperate with us in the investigation or settlement of the "computer attack".

(7) If you intend to continue your business, you must resume all or part of your operations as quickly as possible.

(8) Make no statement that will assume any obligation or admit any liability, for any "loss" for which we may be liable, without our prior written consent.

(9) Promptly send us any legal papers or notices received concerning the "computer attack" or "loss".

**d.** We may examine any "insured" under oath, while not in the presence of any other "insured" and at such times as may be reasonably required, about any matter relating to this insurance or the "claim" or "loss", including an "insured's" books and records. In the event of an examination, an "insured's" answers must be signed.

**e.** No "insured" may, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our prior written consent.

**4. Legal Action Against Us**

**a.** No person or organization has a right:

(1) To join us as a party or otherwise bring us into a suit asking for damages from an "insured"; or

(2) To sue us under this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

final judgment against an "insured"; but we will not be liable for damages that are not payable under this Coverage Part, or that are in excess of the applicable Aggregate Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the first "named insured" and the claimant or the claimant's legal representative.

**b.** You may not bring any legal action against us involving "loss":

**(1)** Unless you have complied with all the terms of this insurance;

**(2)** Until 90 days after you have filed proof of "loss" with us; and

**(3)** Unless brought within 2 years from the date you reported the "claim" or "loss" to us.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**5. Liberalization**

If, within 60 days prior to the beginning of this Coverage Part or during the "policy period", we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part at the latter of:

**a.** The date we implemented the change in your state; or

**b.** The date this Coverage Part became effective; and

will be considered as included until the end of the current "policy period". We will make no additional premium charge for this additional coverage during the interim.

**6. Office of Foreign Assets Control (OFAC) Compliance**

Whenever insurance coverage provided by this policy would be in violation of any United States economic or trade sanctions, such insurance coverage shall be null and void.

**7. Other Insurance**

**a.** If any covered "loss" is covered by any other valid policy, then this Coverage Part shall apply only in excess of the amount of any deductible, retention and limit of insurance under such other policy whether such other policy is stated to be primary, contributory, excess, contingent or otherwise, unless such other policy is written specifically excess of this Coverage Part

by reference in such other policy to this policy's policy number.

**b.** When this insurance is excess, we will have no duty to defend the "insured" against any "claim" if any other insurer has a duty to defend the "insured" against that "claim". But we will have the right to associate in the defense and control of any "claim" that we reasonably believe is likely to involve the insurance provided under this Coverage Part. If no other insurer defends, we will undertake to do so, but we will be entitled to the "insured's" rights against all those other insurers.

**8. Representations**

You represent that all information and statements contained in any application or questionnaire submitted in connection with this Coverage Part are true, accurate and complete. All such information and statements are the basis for our issuing this Coverage Part and shall be considered as incorporated into and shall constitute a part of this Coverage Part. Misrepresentation or omission of any material fact may be grounds for the rescission of this Coverage Part.

**9. Separation of Insureds**

Except with respect to the applicable Limit of Insurance, and any rights or duties specifically assigned in this Coverage Part or the policy to which it is attached, to the first "named insured", this insurance applies separately to each "insured" against whom "claim" is made.

**10. Services**

The following conditions apply as respects any services provided to you by any service firm provided or paid for in whole or in part under this Coverage Part:

**a.** The effectiveness of such services depends on your cooperation and assistance.

**b.** We do not warrant or guarantee that the services will end or eliminate all problems associated with the covered events.

**11. Subrogation**

With respect to any payment under this Coverage Part on behalf of any "insured", we shall be subrogated to the "insured's" rights of recovery to the extent of such payment. The "insured" shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable us to bring suit in the "insured's" name. Any recoveries, less the cost of obtaining them, will be distributed as follows:

a.  To you, until you are reimbursed for any "loss" you sustain that exceeds the sum of the applicable Aggregate Limit of Insurance and the Deductible Amount, if any;

b.  Then to us, until we are reimbursed for the payment under this Coverage Part;

c.  Then to you, until you are reimbursed for that part of the payment equal to the Deductible Amount, if any.

## 12. Valuation - Settlement

All premiums, Limits of Insurance, Deductible Amounts, "loss" and any other monetary amounts under this Coverage Part are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is agreed to or another component of "loss" under this Coverage Part is expressed in any currency other than United States of America dollars, payment under this Coverage Part shall be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is entered, settlement amount is agreed upon, or the other component of "loss" is due, respectively.

## 13. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first "named insured" shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - EXTENDED REPORTING PERIODS

The provisions contained within this Section apply only to Insuring Agreement **B** - Network Security and Electronic Media Liability.

1.  You shall have the right to the Extended Reporting Periods described in this section, in the event that:

    a.  You or we cancel this Coverage Part;

    b.  You or we refuse to renew this Coverage Part; or

    c.  We renew this Coverage Part on other than a claims-made basis or with a retroactive date later than the Retroactive Date shown in the Declarations.

2.  If an event as specified in Paragraph **1.** has occurred, you shall have the right to the following:

    a.  An Automatic Extended Reporting Period of 90 days after the effective date of cancellation or nonrenewal at no additional premium in which to give to us written no-

tice of a "claim" of which you first receive notice during said Automatic Extended Reporting Period for any "wrongful act" occurring on or after the Retroactive Date shown in the Declarations and before the end of the "policy period" and which is otherwise covered by this Coverage Part; and

b.  Upon payment of the additional premium stated in the Declarations, a Supplemental Extended Reporting Period for the term stated in the Supplemental Extended Reporting Period Endorsement will be provided immediately following the effective date of cancellation or nonrenewal in which to give to us written notice of a "claim" of which you first receive notice during said Supplemental Extended Reporting Period for any "wrongful act" occurring on or after the Retroactive Date shown in the Declarations and before the end of the "policy period" and which is otherwise covered by this Coverage Part.

To obtain the Supplemental Extended Reporting Period, you must request it in writing and pay the additional premium due, within 60 days of the effective date of cancellation or nonrenewal. The additional premium for the Supplemental Extended Reporting Period shall be fully earned at the inception of the Supplemental Extended Reporting Period. If we do not receive the written request as required, you may not exercise this right at a later date.

c.  The Network Security and Electronic Media Liability Limit for the Extended Reporting Periods shall be part of, and not in addition to, the Network Security and Electronic Media Liability Limit for the immediately preceding "coverage term".

## SECTION VI - DEFINITIONS

1.  "Actual cash value" means replacement cost less a deduction that reflects depreciation, age, condition and obsolescence.

2.  "Bodily injury" means bodily harm or injury**,** sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

3.  "Business income loss" means the sum of the:

    a.  Net income (net profit or loss before income taxes) that would have been earned or incurred; and

    b.  Continuing normal and necessary operating expenses incurred, including "employee" and "executive" payroll,

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

actually lost by you during the "period of restoration".

4. "Claim":

   **a.** Means a civil proceeding against an "insured" in which damages are alleged arising from a "wrongful act" or a series of "interrelated" "wrongful acts" allegedly committed by an "insured", including any appeal therefrom.

   **b.** "Claim" includes:

      **(1)** An arbitration or alternative dispute resolution proceeding that the "insured" is required to submit to or does submit to with our consent; or

      **(2)** A written demand for money, when such demand could reasonably result in a civil proceeding as described in this definition.

   **c.** Does not include any demand or action brought by or on behalf of someone who is:

      **(1)** Your "executive";

      **(2)** Your owner or part-owner; or

      **(3)** A holder of your securities;

      in their capacity as such, whether directly, derivatively, or by class action.

5. "Computer attack" means one of the following involving the "computer system":

   **a.** An "unauthorized access incident";

   **b.** A "malware attack";

   **c.** A "denial of service attack" against a "computer system"; or

   **d.** A "cyber extortion threat".

6. "Computer system" means a computer or other electronic hardware that:

   **a.** Is owned or leased by you and operated under your control; or

   **b.** Is operated by a third party service provider and used for the purpose of providing hosted computer application services to you or for processing, maintaining, hosting or storing your electronic data, pursuant to a written contract with you for such services, but such computer or other electronic hardware operated by such third party shall only be considered to be a "computer system" with respect to the specific services provided by such third party to you under such contract.

7. "Coverage term" means the following individual increment, or if a multi-year "policy period",

increments, of time, which comprise the "policy period" of this Coverage Part:

   **a.** The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year "policy period", each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

      **(1)** The day the "policy period" shown in the Declarations ends; or

      **(2)** The day the policy to which this Coverage Part is attached is terminated or cancelled.

   **b.** However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

8. "Coverage territory" means:

   **a.** With respect to Insuring Agreement **A** - Computer Attack:

      Anywhere in the world, but "loss" must involve a "computer system" within the United States (including its territories and possessions), Puerto Rico or Canada.

   **b.** With respect to Insuring Agreement **B** - Network Security and Electronic Media Liability:

      Anywhere in the world, however, "claims" must be brought in the United States (including its territories and possessions), Puerto Rico or Canada.

9. "Cyber extortion expenses" means:

   **a.** The cost of a negotiator or investigator retained by you in connection with a "cyber extortion threat"; and

   **b.** Any amount paid by you in response to a "cyber extortion threat" to the party that made the "cyber extortion threat" for the purposes of eliminating the "cyber extortion threat";

   when such expenses are necessary and reasonable and arise directly from a "cyber extortion threat". The payment of "cyber extortion expenses" must be approved in advance by us. We will not pay for "cyber extortion expenses" that have not been approved in ad-

HC 103 01 18

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 10 of 14

vance by us. We will not unreasonably withhold our approval.

10. "Cyber extortion threat" means a demand for money from you based on a credible threat, or series of related credible threats, to:

   a. Launch a "denial of service attack" against the "computer system";

   b. Gain access to a "computer system" and use that access to steal, release or publish "personally identifying information", "personally sensitive information" or "third party corporate data";

   c. Alter, damage or destroy electronic data or software while such electronic data or software is stored within a "computer system";

   d. Launch a "computer attack" against a "computer system" in order to alter, damage or destroy electronic data or software while such electronic data or software is stored within a "computer system";

   e. Cause the "insured" to transfer, pay or deliver any funds or property using a "computer system" without your authorization; or

   f. Inflict "ransomware" on a "computer system".

   "Cyber extortion threat" does not include any threat made in connection with a legitimate commercial dispute.

11. "Data re-creation costs":

   a. "Data re-creation costs" means the costs of an outside professional firm hired by you to research, re-create and replace data that has been lost or corrupted and for which there is no electronic source available or where the electronic source does not have the same or similar functionality to the data that has been lost or corrupted.

   b. "Data re-creation costs" also means your actual "business income loss" and your necessary and reasonable "extra expenses" arising from the lack of the lost or corrupted data during the time required to research, re-create and replace such data.

   c. "Data re-creation costs" does not mean costs to research, re-create or replace:

      (1) Software programs or operating systems that are not commercially available; or

      (2) Data that is obsolete, unnecessary or useless to you.

12. "Data restoration costs":

   a. Means the costs of an outside professional firm hired by you to replace electronic data that has been lost or corrupted. In order to be considered "data restoration costs", such replacement must be from one or more electronic sources with the same or similar functionality to the data that has been lost or corrupted.

   b. Does not include costs to research, restore or replace:

      (1) Software programs or operating systems that are not commercially available; or

      (2) Data that is obsolete, unnecessary or useless to you.

13. "Defense costs":

   a. Means reasonable and necessary expenses resulting solely from the investigation, defense and appeal of any "claim" against an "insured". Such expenses may be incurred by us. Such expenses may include premiums for any appeal bond, attachment bond or similar bond. However, we have no obligation to apply for or furnish such bond.

   b. Does not include the salaries or wages of your "employees" or "executives", or your loss of earnings.

14. "Denial of service attack" means an intentional attack against a target computer or network of computers designed to overwhelm the capacity of the target computer or network in order to deny or impede authorized users from gaining access to the target computer or network through the internet.

15. "Electronic media incident" means the display of information in electronic form by you on a website or in an "insured's" email that resulted in an allegation of:

   a. Infringement of another's copyright, title, slogan, trademark, trade name, trade dress, service mark or service name;

   b. Defamation against a person or organization that is unintended;

   c. A violation of a person's right of privacy, including false light and public disclosure of private facts; or

   d. Interference with a person's right of publicity.

**16.** "Employee" means any natural person, other than an "executive", who was, now is or will be:

   **a.** Employed on a full- or part-time basis by you;

   **b.** Furnished temporarily to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions;

   **c.** Leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **b.**; or

   **d.** Your volunteer worker, which includes unpaid interns.

**17.** "Executive" means any natural person who was, now is or will be:

   **a.** The owner of a sole proprietorship that is a "named insured"; or

   **b.** A duly elected or appointed:

      **(1)** Director;

      **(2)** Officer;

      **(3)** Managing Partner;

      **(4)** General Partner;

      **(5)** Member (if a limited liability company);

      **(6)** Manager (if a limited liability company); or

      **(7)** Trustee,

      of a "named insured".

**18.** "Extra expense" means the additional cost you incur to operate your business during the "period of restoration" over and above the cost that you normally would have incurred to operate your business during the same period had no "computer attack" occurred.

**19.** "Insured" means:

   **a.** With respect to Insuring Agreement **A** - Computer Attack any "named insured".

   **b.** With respect to Insuring Agreement **B** - Network Security and Electronic Media Liability:

      **(1)** Any "named insured"; and

      **(2)** Any "employee" or "executive" of a "named insured", but:

         **(a)** Only for the conduct of the "named insured's" business with-

in the scope of his or her employment or duties as an "executive"; and

         **(b)** Such "employee" or "executive" shall not be an "insured" to the extent his or her actions or omissions are criminal, fraudulent, dishonest or constitute an intentional or knowing violation of the law.

**20.** "Interrelated" means all events or incidents that have as a common nexus any:

   **a.** Fact, circumstance, situation, event, transaction, cause; or

   **b.** Series of causally connected facts, circumstances, situations, events, transactions or causes.

**21.** "Loss" means:

   **a.** With respect to Insuring Agreement **A** - Computer Attack:

      Those expenses enumerated in Section **I**, **A.**, Paragraph **1.b.**

   **b.** With respect to Insuring Agreement **B** - Network Security and Electronic Media Liability:

      **(1)** "Defense costs"; and

      **(2)** "Settlement costs".

**22.** "Malware attack" means an attack that damages a "computer system" or data contained therein arising from malicious code, including viruses, worms, Trojans, spyware and keyloggers. This does not mean damage from shortcomings or mistakes in legitimate electronic code or damage from code installed on your "computer system" during the manufacturing process or normal maintenance.

**23.** "Named insured" means the entity or entities shown in the Declarations as a Named Insured.

**24.** "Network security incident" means a negligent security failure or weakness with respect to a "computer system" which allowed one or more of the following to happen:

   **a.** The unintended propagation or forwarding of malware, including viruses, worms, Trojans, spyware and keyloggers. Malware does not include shortcomings or mistakes in legitimate electronic code.

   **b.** The unintended abetting of a "denial of service attack" against one or more other systems.

   **c.** The unintended loss, release or disclosure of "third party corporate data".

**25.** "Period of restoration" means the period of time that begins at the time that the "computer attack" is discovered by you and continues until the earlier of:

   **a.** The date that all data restoration, data re-creation and system restoration directly related to the "computer attack" has been completed; or

   **b.** The date on which such data restoration, data re-creation and system restoration could have been completed with the exercise of due diligence and dispatch.

**26.** "Personally identifying information" means information, including health information, that could be used to commit fraud or other illegal activity involving the credit, access to health care or identity of an individual. This includes, but is not limited to, Social Security numbers or account numbers.

   "Personally identifying information" does not mean or include information that is otherwise available to the public, such as names and addresses.

**27.** "Personally sensitive information" means private information specific to an individual the release of which requires notification of affected individuals under any applicable law.

   "Personally sensitive information" does not mean or include "personally identifying information".

**28.** "Policy period" means the cumulative total of each individual "coverage term" comprising the period of time from the inception date of this Coverage Part shown in the Declarations to the expiration date shown in the Declarations, or its earlier cancellation or termination date.

**29.** "Property damage" means:

   **a.** Physical injury to or destruction of tangible property including all resulting loss of use; or

   **b.** Loss of use of tangible property that is not physically injured.

**30.** "Ransomware" means any software that is used to demand a ransom payment by:

   **a.** Restricting access to a "computer system"; or

   **b.** Encrypting data held within a "computer system".

**31.** "Settlement costs":

   **a.** Means the following, when they arise from a "claim":

     **(1)** Damages (including punitive and exemplary damages and the multiple portion of any multiplied damage award), judgments or settlements;

     **(2)** Attorney's fees and other litigation costs added to that part of any judgment paid by us, when such fees and costs are awarded by law or court order; and

     **(3)** Pre-judgment interest on that part of any judgment paid by us.

   **b.** Does not include:

     **(1)** Civil or criminal fines or penalties imposed by law;

     **(2)** Taxes; or

     **(3)** Matters which may be deemed uninsurable under the applicable law.

   **c.** With respect to punitive, exemplary and multiplied damages, the law of the jurisdiction most favorable to the insurability of those fines, penalties or damages shall control for the purpose of resolving any dispute between us and any "insured" regarding whether the fines, penalties or damages specified in this definition above are insurable under this Coverage Part, provided that such jurisdiction:

     **(1)** Is where those fines, penalties or damages were awarded or imposed;

     **(2)** Is where any "personal data compromise" took place for which such fines, penalties or damages were awarded or imposed;

     **(3)** Is where you are incorporated or you have your principal place of business; or

     **(4)** Is where we are incorporated or have our principal place of business.

**32.** "System restoration costs":

   **a.** Means the costs of an outside professional firm hired by you to do any of the following in order to restore your "computer system" to its pre- "computer attack" level of functionality:

     **(1)** Replace or reinstall computer software programs;

     **(2)** Remove any malicious code; and

     **(3)** Configure or correct the configuration of your "computer system".

   **b.** Does not include:

     **(1)** Costs to increase the speed, capacity or utility of your "computer system";

**(2)** Labor of your "employees" or "executives";

**(3)** Any costs in excess of the "actual cash value" of your "computer system"; or

**(4)** Costs to repair or replace hardware.

**33.** "Third party corporate data" means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not an "insured" under this Coverage Part which is not available to the general public and is provided to the "named insured" subject to a mutually executed written confidential-ity agreement or which the "named insured" is legally required to maintain in confidence; however, "third party corporate data" shall not include "personally identifiable information" or "personally sensitive information".

**34.** "Unauthorized access incident" means the gaining of access to a "computer system" by:

**a.** An unauthorized person or persons; or

**b.** An authorized person or persons for un-authorized purposes.

**35.** "Wrongful act" means:

**a.** An "electronic media incident"; or

**b.** A "network security incident".

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES - CINCINNATI NETWORK DEFENDER™ COVERAGE PART

This endorsement modifies insurance provided under the following:

**CINCINNATI NETWORK DEFENDER™ COVERAGE PART**

**A.   SECTION I - COVERAGES, A. Insuring Agreements** is amended as follows:

    **1.   Insuring Agreement A - Computer Attack**, Paragraph **1.a.(4)** is deleted in its entirety and replaced by the following:

        **(4)**  Such "computer attack" is reported to us as soon as practicable, but in no event more than 90 days after the date it is first discovered by you.

    **2.   Insuring Agreement B - Network Security and Electronic Media Liability**, Paragraph **2.a.(2)** is deleted in its entirety and replaced by the following:

        **(2)**  Such "claim" is reported to us as soon as practicable, but in no event more than 90 days after the date it is first received by you.

**B.   SECTION I - COVERAGES, B. Exclusions**, is amended by deleting Exclusion **18. Willful Complicity** in its entirety and replacing it with the following:

This insurance does not apply to "loss" or "claims" based upon, attributable to or arising out of:

**18.  Willful Complicity**

The "insured's" intentional or willful complicity in a covered "loss" event or your "reckless disregard" for the security of your computer system or data.

**C.   SECTION IV - CONDITIONS** is amended as follows:

    **1.**   Condition **3. Duties in the Event of a Claim or Loss** is amended by replacing the reference to 60 days in Paragraphs **3.a., 3.b.(2)** and **3.c.(2)** with 90 days.

    **2.   Condition 4. Legal Action Against Us, b.(3)** is replaced by the following:

        **(3)**  The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

    **3.**   Condition **13. When We Do Not Renew** is deleted in its entirety.

    **4.**   The following Condition is added:

    **Prompt Payment of Claims**

    **a.   Receipt of Notice of Claim**

        **(1)**  Not later than the 15th day after the date we receive notice of a claim, we will:

            **(a)**  Acknowledge receipt of the claim;

            **(b)**  Commence any investigation of the claim; and

        **(2)**  Request from you all items, statements, and forms that we reasonably believe, at that time, will be required from you.

        **(3)**  We may make additional requests for information if during the investigation of the claim the additional requests are necessary.

        **(4)**  If the acknowledgment of receipt of a claim is not made in writing, we will make a record of the date, manner, and content of the acknowledgment.

    **b.   Notice of Acceptance or Rejection of Claim**

        **(1)**  Except as provided in **d. Delay in Payment of Claim** below, we will notify you in writing of the acceptance or rejection of a claim not later than the 15th business day after the date we receive all items, statements, and forms required by us to secure final proof of loss.

        **(2)**  If we reject the claim, the notice required by **(1)** above must state the reasons for the rejection.

        **(3)**  If we are unable to accept or reject the claim within the period

specified in **(1)** above, we, within that same period, will notify you of the reasons that we need additional time. We will accept or reject the claim not later than the 45th day after the date we notify you.

**c.   Payment of Claim**

**(1)**   Except as otherwise provided, if we notify you under **(2)** below that we will pay a claim or part of a claim, we will pay the claim not later than the fifth business day after the date notice is made.

**(2)**   If payment of the claim or part of the claim is conditioned on the performance of an act by you, we will pay the claim not later than the fifth business day after the date the act is performed.

**d.   Delay in Payment of Claim**

**(1)**   Except as otherwise provided, if we, after receiving all items, statements, and forms reasonably requested and required under **a. Receipt of Notice of Claim** above, delay payment of the claim for a period exceeding the period specified by applicable statutes or, if other statutes do not specify a period, for more than 60 days, we will pay damages and other items as provided by Texas Insurance Code Section 542.060.

**(2)**   Paragraph **(1)** above does not apply in a case in which it is found as a result of arbitration or litigation that a claim received by us is invalid and should not be paid by us.

**D.   SECTION V - EXTENDED REPORTING PERIODS** is amended by deleting Paragraph **2.b.** in its entirety and replacing it with the following:

**b.**   Upon payment of the additional premium stated in the Declarations, a Supplemental Extended Reporting Period for the term stated in the Supplemental Extended Reporting Period Endorsement will be provided immediately following the effective date of cancellation or nonrenewal in which to give to us written notice of a "claim" of which you first receive notice during said Supplemental Extended Reporting Period for any "wrongful act" occurring on or after the Retroactive Date shown in the Declarations and before the end of the "policy period" and which is otherwise covered by this Coverage Part.

To obtain the Supplemental Extended Reporting Period, you must request it in writing and pay the additional premium due, within 60 days of the effective date of cancellation or nonrenewal. If we do not receive the written request as required, you may not exercise this right at a later date.

**E.   SECTION VI - DEFINITIONS** is amended to include the following definition:

"Reckless disregard" means that:

**a.**   The action or procedure is deliberate; and

**b.**   The action or procedure entails either a certainty or a high probability of causing or allowing a "computer attack" or "network security incident".

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# Exhibit B

BEXAR COUNTY



EXECUTIVE ORDER NW-03 OF COUNTY JUDGE NELSON W. WOLFF
ISSUED March 23, 2020

WHEREAS, pursuant to Texas Government Code Section 418.108, Bexar County Judge Nelson W. Wolff declared a state of local disaster on March 13, 2020 due to imminent threat arising from COVID-19;

WHEREAS, in accordance with Texas Government Code Section 418.108(b), on March 18, 2020, the Bexar County Commissioners Court approved an Order Continuing Declaration of State of Local Disaster for Bexar County (hereafter, the *"Order of Continuation of Declaration"*);

WHEREAS, in accordance with Texas Government Code Section 418.108(b), the consent by Commissioners Court authorizes the Bexar County Judge to continue to exercise the powers granted by the Texas Disaster Act of 1975 for the period specified in the Order of Continuing Declaration;

WHEREAS, on March 13, 2020, Texas Governor Greg Abbott issued a declaration of public health disaster in and for the State of Texas and on March 19, 2020, the Texas Department of State Health Services issued a declaration of a public health disaster in the State of Texas for the first time since 1901;

WHEREAS, on March 18, 2020 the Bexar County Commissioners Court approved the Order of Continuation of Declaration and authorized the Bexar County Judge to take such actions as are necessary in order to protect the health, safety and welfare of the citizens of Bexar County;

WHERAS, the County Judge has determined that extraordinary emergency measures must be taken to mitigate the effects of this public health emergency and to facilitate a cooperative response; and

WHEREAS, to remain consistent with the declaration of the Texas Department of State Health Services and the executive order issued by Governor Greg Abbott as of March 19, 2020 and to harmonize, to the extent possible, the executive orders of Governor Greg Abbott, the Bexar County Judge and the mandates contained in the declaration of the Mayor of the City of San Antonio, as extended, I hereby rescind my previous Executive Order as issued on March 19, 2020 and issue this Executive Order in its place.

**PURSUANT TO THE TEXAS DISASTER ACT OF 1975, BEXAR COUNTY JUDGE
NELSON W. WOLFF HEREBY ISSUES THIS EXECUTIVE ORDER AS FOLLOWS:**

I.e      Effective as of 11:59 p.m. on Tuesday, March 24, 2020, and continuing throughe 11:59 p.m. on April 9, 2020, unless extended, terminated early by Bexar Countye Judge Nelson W. Wolff or otherwise indicated below:e

      1.e Subject to the definitions and further guidance set out in Subsection (i) below,e that all persons currently residing within the incorporated and unincorporatede territory of Bexar County are hereafter directed to stay at home *("Stay Home Work Safe Measures")*. All persons may only leave their residences to engagee in allowable activities which shall include Exempted Activities or Exemptede Businesses (as defined below) but must implement all social distancinge requirements and adopt other mitigating measures. All public or privatee gatherings of any number of people occurring outside a single household aree hereafter prohibited, except as otherwise provided herein. Nothing in thise Executive Order prohibits the gathering of members within a household.e

      2.e With the exception of Exempted Businesses, as defined below, that alle businesses operating within Bexar County are required to cease all activities ate any facility located in the incorporated or unincorporated portions of Bexare County. Notwithstanding the above requirement to cease all activities, thise prohibition shall not extend to: (i) employees or contractors performinge activities at their own residences (i.e. working from home or operation of ae home-based businesses regardless of whether it constitutes an Exemptede Business); (ii) operations to maintain security, upkeep, and maintenance ofe premises, equipment or inventory; (iii) IT or other operations that facilitatee employees working from home.e

        (i)e  **<u>Definitions of Exempted Business and Exempted Individual Activity</u>**:

        (a)eFor purposes of this Executive Order, **Exempted Activities** are defined ase follows:e

          i)e **Health and Safety Activities**. For example, to engage in activities ore perform tasks essential to their health and safety, or to the health ande safety of their family or household members (for example, obtaining food,e medical supplies or medication, visiting a health care professional, ore obtaining supplies needed to work from home) or to care for a familye member or pet in another household.e

          ii)e**Necessary Supplies**. To obtain necessary services or supplies fore themselves and their family or household members, or to deliver thosee services or supplies to others (for example, food, pet supply, and any othere

household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences);

iii) **Outdoor Activity**. To engage in activity in an outdoor open space, such as walking, biking, hiking, or running, provided the individuals comply with social distancing requirements of six feet; and/or

iv) **Work at an Exempted Business**.  Activities necessary to work at or conduct an Exempted Business or to otherwise carry out activities specifically permitted in this Executive Order.

(b) For purposes of this Executive Order, **Exempted Businesses** are defined as follows:

i) **Healthcare Services**. For example, healthcare operations, including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, mental health providers, substance abuse service providers, blood banks, medical research, laboratory services, or any related and/or ancillary healthcare services. Home-based and residential-based care for seniors, adults, or children are also considered healthcare operations. Healthcare operations also includes veterinary care and all healthcare services provided to animals. This exemption shall be viewed broadly to avoid any impacts to the delivery of healthcare.  *Healthcare operations do not include fitness and exercise gyms and similar facilities. Healthcare operations do not include elective medical, surgical, and dental procedures.*

ii) **Government Functions**. For example, those services provided by local governments needed to ensure the continuing operation of the government agencies to provide for the health, safety and welfare of the public including law enforcement and operation of jails and detention facilities, fire and EMS or otherwise necessary for health and safety of residents of Bexar County.

iii) **Education and Research**. To include educators or other personnel supporting public and private K-12 schools, colleges, and universities for purposes of facilitating distance learning or performing other functions in support of Exempted Individual Activities or Exempted Businesses and companies engaged in science or engineering research and development.

iv) **Infrastructure, Development, Operation and Construction**.  For example, public works construction, construction of housing or other types of construction including commercial, manufacturing, airport operations and aircraft manufacturing, maintenance or repair, water, sewer gas, electrical, oil refining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

v) **Transportation**.  Businesses related to the operation, maintenance, construction, and manufacture of transportation services.  For example, a) vehicle manufacturers, automotive suppliers and parts departments, car dealerships, parts distributers, maintenance and repair facilities; b) public transportation; c) businesses supporting airport operations; d) street and highway maintenance and construction; e) gas stations and other fuel distribution businesses; f) vehicles for hire including taxis and rideshare.

vi) **IT Services**. For example, businesses and activity necessary to maintain internet and telecommunications systems, including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services.

vii) **Food, Household Staples and Retail**. For example, food service providers, including grocery stores, warehouse stores, big-box stores, liquor stores, bodegas, gas stations, and farmers' markets that sell food products and household staples for pick-up or businesses that ship or deliver groceries, food, goods or services directly to residences. Nothing shall restrict employees supporting pick-up or delivery under this exception so long as there is sufficient space to implement social distancing. Restaurants prepared food retailers, microbreweries, micro-distilleries, or wineries and other facilities that prepare and serve food, but **only for delivery, curbside pick-up or carry out**. Schools and other entities that typically provide free services to students or members of the public on a pick-up/take-away basis.

viii) **Services to Economically Disadvantaged Populations**. For example, transit services, nonprofits and other businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals.

ix) **Services Necessary to Maintain Residences or Support Exempt Businesses**. For example, hotels and other temporary residence facilities, laundromats, dry cleaners, and laundry service providers, trash and recycling collection, processing and disposal, mail and shipping services, building cleaning and maintenance, warehouse/distribution and fulfillment, and storage for Essential Businesses. This shall include plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operations of residences, Essential Activities, and Exempted Businesses. Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities.

x) **News Media**. To include newspapers, television, radio, and other media services.

xi) **Financial Institutions and Insurance Services**. To include banks, credit unions, and other financial institutions and service providers as well as companies providing insurance services and products.

      xii) **Childcare Services**. To include childcare facilities providing services that enable employees exempted in this Executive Order to work as permitted.

      xiii) **Worship Services**.  Religious and worship services may only be provided by video, teleconference or other remote measures.

      xiv) **Funeral Services**.  For example, funeral homes, crematoriums and cemeteries.

      xv) **CISA Sectors**.  All business and operations necessary to the operations and maintenance of the 16 critical infrastructure sectors as identified by the National Cybersecurity Infrastructure Agency ("CISA") and outlined at: https://www.cisa.gov/sites/default/files/publications/CISA-Guidance-on-Essential-Critical-Infrastructure-Workers-1-20-508c.pdf

3. That Bexar County rental property owners temporarily suspend evictions for at least the next 30 days to prevent renters from being displaced due to the public health emergency;

4. That foreclosure proceedings within Bexar County be temporarily suspended for at least the next 30 days to prevent the displacement of occupants during the public health emergency;

5. That residents of Bexar County conduct essential Bexar County business online or via regular mail to avoid visiting any Bexar County facilities unless absolutely necessary.

6. That no person shall sell any of the following goods or services for more than the price the person charged for the goods or serves on 11:59 p.m. on Thursday, March 19, 2020 and continuing during the pendency of this Executive Order:
    1) Groceries, beverages, toilet articles, ice;
    2) Restaurant, cafeteria, and boarding-house meals; and
    3) Medicine, pharmaceutical, and medical equipment and supplies.

7. That as of the date of this Executive Order and continuing for the remainder of the period set out in the joint third amended emergency order of the Supreme Court of Texas in Misc. Docket No. 20-9044 and the Court of Criminal Appeals of Texas in Misc. Docket No. 20-008, all courts within Bexar County restrict non-essential in person proceedings in accordance with this Executive Order and the Declaration of Public Health Emergency of the City of San Antonio. Section 9 of this Executive Order shall hereby be suspended as to this Section 7.

8. That people who are sick should stay at home and not engage in any activity outside of their residence unless related to treatment or health care.  If someone in a household has tested positive for COVID-19, then the other members of the household should consider themselves positive if they become symptomatic

and follow the current policies and procedures in place for isolation and quarantine.

9. That any peace officer or other person with lawful authority is hereby authorized to enforce the provisions of this Executive Order in accordance with the authority granted under the Texas Disaster Act of 1975. Any person who violates this Executive Order may be subject to a fine not exceeding $1,000 or confinement for a period not exceeding 180 days.

10. The sections, paragraphs, sentences, clauses and phrases of this Executive Order are severable and if any phrase, clause, sentence, paragraph or section of this Executive Order should be declared invalid by the final judgment or decree of any court or competent jurisdiction, such invalidity shall not affect any of the remaining phrases, clauses, sentences, paragraphs and sections that can be given effect without the invalid provision, and to this end, the provisions of this Executive Order are severable.

II.   All provisions of the executive orders of Governor Greg Abbott either existing or as, if and when issued, shall be automatically incorporated into and constitute terms of this Executive Order enforceable as if set forth herein without necessity for the issuance of any further orders. To the extent that there is a conflict between this Executive Order and any executive order of the Governor, the strictest order shall prevail.

**DECLARED this 23ʳᵈ day of March, 2020**

NELSON W. WOLFF
Bexar County Judge



*VG-247-2020-20200012425*

## File Information

### FILED IN THE OFFICIAL PUBLIC RECORDS OF BEXAR COUNTY
### LUCY ADAME-CLARK, BEXAR COUNTY CLERK

| | |
|---|---|
| Document Number: | 20200012425 |
| Recorded Date: | March 23, 2020 |
| Recorded Time: | 5:13 PM |
| Total Pages: | 7 |
| Total Fees: | $0.00 |

### ** THIS PAGE IS PART OF THE DOCUMENT **

### ** Do Not Remove **

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was FILED in File Number Sequence on this date and at the time stamped hereon by me and was duly RECORDED in the Official Public Record of Bexar County, Texas on: 3/23/2020 5:13 PM



Lucy Adame-Clark
Bexar County Clerk



GOVERNOR GREG ABBOTT

March 31, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____ 2 PM _____ O'CLOCK

MAR 3 1 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

Executive Order No. GA-14 relating to statewide continuity of essential services
and activities during the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# Executive Order

### BY THE
### GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**March 31, 2020**

### EXECUTIVE ORDER
### GA 14

*Relating to statewide continuity of essential services and activities*
*during the COVID-19 disaster.*

———————————

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, the Commissioner of the Texas Department of State Health Services (DSHS), Dr. John Hellerstedt, has determined that COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, I have issued numerous executive orders and suspensions of Texas laws in response to the COVID-19 disaster, aimed at protecting the health and safety of Texans and ensuring an effective response to this disaster; and

WHEREAS, I issued Executive Order GA-08 on March 19, 2020, mandating certain obligations for Texans in accordance with the President's Coronavirus Guidelines for America, as promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC) on March 16, 2020, which called upon Americans to take actions to slow the spread of COVID-19 for 15 days; and

WHEREAS, Executive Order GA-08 is subject to expiration at 11:59 p.m. on April 3, 2020, absent further action by the governor; and

WHEREAS, on March 29, 2020, to avoid scenarios that could lead to hundreds of thousands of deaths, the President announced that, based on advice from Dr. Anthony Fauci and Dr. Deborah Birx, the restrictive social-distancing Guidelines should extend through April 30, 2020; and

WHEREAS, DSHS Commissioner Dr. Hellerstedt and White House Coronavirus Response Coordinator Dr. Birx say that the spread of COVID-19 can be reduced by minimizing social gatherings; and

WHEREAS, all government entities and businesses should be allowed to continue providing essential services during the COVID-19 disaster, and all critical infrastructure should be allowed to remain operational; and

WHEREAS, the "governor is responsible for meeting … the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders … hav[ing] the force and effect of law;" and

WHEREAS, under Section 418.016(a), the "governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business … if strict compliance with the provisions … would in any way prevent, hinder, or delay necessary action in coping with a disaster;" and

WHEREAS, under Section 418.017(a), the "governor may use all available resources of state government and of political subdivisions that are reasonably necessary to cope with a disaster;" and

WHEREAS, under Section 418.018(c), the "governor may control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area;" and

WHEREAS, under Section 418.173, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable by a fine not to exceed $1,000, confinement in jail for a term not to exceed 180 days, or both fine and confinement.

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis effective 12:01 a.m. on April 2, 2020, and continuing through April 30, 2020, subject to extension based on the status of COVID-19 in Texas and the recommendations of the CDC and the White House Coronavirus Task Force:

In accordance with guidance from DSHS Commissioner Dr. Hellerstedt, and to achieve the goals established by the President to reduce the spread of COVID-19, every person in Texas shall, except where necessary to provide or obtain essential services, minimize social gatherings and minimize in-person contact with people who are not in the same household.

"Essential services" shall consist of everything listed by the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, Version 2.0, plus religious services conducted in churches, congregations, and houses of worship. Other essential services may be added to this list with the approval of the Texas Division of Emergency Management (TDEM). TDEM shall maintain an online list of

*Governor Greg Abbott*
March 31, 2020

*Executive Order GA-14*
Page 3

home unless they are essential services that cannot be provided through remote telework. If religious services cannot be conducted from home or through remote services, they should be conducted consistent with the Guidelines from the President and the CDC by practicing good hygiene, environmental cleanliness, and sanitation, and by implementing social distancing to prevent the spread of COVID-19.

In accordance with the Guidelines from the President and the CDC, people shall avoid eating or drinking at bars, restaurants, and food courts, or visiting gyms, massage establishments, tattoo studios, piercing studios, or cosmetology salons; provided, however, that the use of drive-thru, pickup, or delivery options for food and drinks is allowed and highly encouraged throughout the limited duration of this executive order.

This executive order does not prohibit people from accessing essential services or engaging in essential daily activities, such as going to the grocery store or gas station, providing or obtaining other essential services, visiting parks, hunting or fishing, or engaging in physical activity like jogging or bicycling, so long as the necessary precautions are maintained to reduce the transmission of COVID-19 and to minimize in-person contact with people who are not in the same household.

In accordance with the Guidelines from the President and the CDC, people shall not visit nursing homes, state supported living centers, assisted living facilities, or long-term care facilities unless to provide critical assistance as determined through guidance from the Texas Health and Human Services Commission.

In accordance with the Guidelines from the President and the CDC, schools shall remain temporarily closed to in-person classroom attendance and shall not recommence before May 4, 2020.

This executive order shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster, but only to the extent that such a local order restricts essential services allowed by this executive order or allows gatherings prohibited by this executive order.  I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions inconsistent with this executive order, provided that local officials may enforce this executive order as well as local restrictions that are consistent with this executive order.

This executive order supersedes Executive Order GA-08, but not Executive Orders GA-09, GA-10, GA-11, GA-12, or GA-13, and shall remain in effect and in full force until April 30, 2020, unless it is modified, amended, rescinded, or superseded by the governor.



Given under my hand this the 31st day of March, 2020.

*Governor Greg Abbott*
March 31, 2020

*Executive Order GA-14*
Page 4

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

# Exhibit C



G O V E R N O R   G R E G   A B B O T T

March 31, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____2 PM_____ O'CLOCK

MAR 3 1 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

> Executive Order No. GA-14 relating to statewide continuity of essential services
> and activities during the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# 𝕰𝖝𝖊𝖈𝖚𝖙𝖎𝖛𝖊 𝕺𝖗𝖉𝖊𝖗

### BY THE
### GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**March 31, 2020**

**EXECUTIVE ORDER**
**GA 14**

*Relating to statewide continuity of essential services and activities*
*during the COVID-19 disaster.*

━━━━━━━━━━━━━━━━━

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, the Commissioner of the Texas Department of State Health Services (DSHS), Dr. John Hellerstedt, has determined that COVID-19 represents a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, I have issued numerous executive orders and suspensions of Texas laws in response to the COVID-19 disaster, aimed at protecting the health and safety of Texans and ensuring an effective response to this disaster; and

WHEREAS, I issued Executive Order GA-08 on March 19, 2020, mandating certain obligations for Texans in accordance with the President's Coronavirus Guidelines for America, as promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC) on March 16, 2020, which called upon Americans to take actions to slow the spread of COVID-19 for 15 days; and

WHEREAS, Executive Order GA-08 is subject to expiration at 11:59 p.m. on April 3, 2020, absent further action by the governor; and

WHEREAS, on March 29, 2020, to avoid scenarios that could lead to hundreds of thousands of deaths, the President announced that, based on advice from Dr. Anthony Fauci and Dr. Deborah Birx, the restrictive social-distancing Guidelines should extend through April 30, 2020; and

WHEREAS, DSHS Commissioner Dr. Hellerstedt and White House Coronavirus Response Coordinator Dr. Birx say that the spread of COVID-19 can be reduced by minimizing social gatherings; and

WHEREAS, all government entities and businesses should be allowed to continue providing essential services during the COVID-19 disaster, and all critical infrastructure should be allowed to remain operational; and

WHEREAS, the "governor is responsible for meeting …  the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders …  hav[ing] the force and effect of law;" and

WHEREAS, under Section 418.016(a), the "governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business …  if strict compliance with the provisions …  would in any way prevent, hinder, or delay necessary action in coping with a disaster;" and

WHEREAS, under Section 418.017(a), the "governor may use all available resources of state government and of political subdivisions that are reasonably necessary to cope with a disaster;" and

WHEREAS, under Section 418.018(c), the "governor may control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area;" and

WHEREAS, under Section 418.173, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable by a fine not to exceed $1,000, confinement in jail for a term not to exceed 180 days, or both fine and confinement.

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis effective 12:01 a.m. on April 2, 2020, and continuing through April 30, 2020, subject to extension based on the status of COVID-19 in Texas and the recommendations of the CDC and the White House Coronavirus Task Force:

> In accordance with guidance from DSHS Commissioner Dr. Hellerstedt, and to achieve the goals established by the President to reduce the spread of COVID-19, every person in Texas shall, except where necessary to provide or obtain essential services, minimize social gatherings and minimize in-person contact with people who are not in the same household.

> "Essential services" shall consist of everything listed by the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, Version 2.0, plus religious services conducted in churches, congregations, and houses of worship.  Other essential services may be added to this list with the approval of the Texas Division of Emergency Management (TDEM).  TDEM shall maintain an online list of

home unless they are essential services that cannot be provided through remote telework. If religious services cannot be conducted from home or through remote services, they should be conducted consistent with the Guidelines from the President and the CDC by practicing good hygiene, environmental cleanliness, and sanitation, and by implementing social distancing to prevent the spread of COVID-19.

In accordance with the Guidelines from the President and the CDC, people shall avoid eating or drinking at bars, restaurants, and food courts, or visiting gyms, massage establishments, tattoo studios, piercing studios, or cosmetology salons; provided, however, that the use of drive-thru, pickup, or delivery options for food and drinks is allowed and highly encouraged throughout the limited duration of this executive order.

This executive order does not prohibit people from accessing essential services or engaging in essential daily activities, such as going to the grocery store or gas station, providing or obtaining other essential services, visiting parks, hunting or fishing, or engaging in physical activity like jogging or bicycling, so long as the necessary precautions are maintained to reduce the transmission of COVID-19 and to minimize in-person contact with people who are not in the same household.

In accordance with the Guidelines from the President and the CDC, people shall not visit nursing homes, state supported living centers, assisted living facilities, or long-term care facilities unless to provide critical assistance as determined through guidance from the Texas Health and Human Services Commission.

In accordance with the Guidelines from the President and the CDC, schools shall remain temporarily closed to in-person classroom attendance and shall not recommence before May 4, 2020.

This executive order shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster, but only to the extent that such a local order restricts essential services allowed by this executive order or allows gatherings prohibited by this executive order.  I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions inconsistent with this executive order, provided that local officials may enforce this executive order as well as local restrictions that are consistent with this executive order.

This executive order supersedes Executive Order GA-08, but not Executive Orders GA-09, GA-10, GA-11, GA-12, or GA-13, and shall remain in effect and in full force until April 30, 2020, unless it is modified, amended, rescinded, or superseded by the governor.



Given under my hand this the 31st day of
March, 2020.

*Governor Greg Abbott*
March 31, 2020

*Executive Order GA-14*
Page 4

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

# Exhibit D



**Johnathan A. Malish**
Field Claims Specialist

*The Cincinnati Insurance Company ▪ The Cincinnati Indemnity Company*
*The Cincinnati Casualty Company ▪ The Cincinnati Life Insurance Company*
*The Cincinnati Specialty Underwriters Insurance Company*

Monday, May 11, 2020

**VIA EMAIL AND U.S. MAIL**

MD Bevco, Inc.
DBA Mad Dogs
4714 Shavano Oak, Bldg 2
San Antonio TX 78249
Terry@maddogs.net

|  |  |
|---|---|
| **Insured:** | MD Bevco, Inc. dba Mad Dogs |
| **Policy No.:** | ENP0065453 |
| **Claim No.:** | 3525178 |
| **Date of Loss:** | 03/18/2020 |

Dear Terry Corless,

This letter provides Cincinnati Insurance Company's ("Cincinnati") coverage decision for the above-referenced claim made by MD Bevco, Inc. dba Mad Dogs ("you" or "Mad Dogs"). As submitted, the claim involves the Novel Coronavirus known as SARS-CoV-2, which causes the viral infection known as COVID-19 ("Coronavirus"). The claim asserts Business Interruption due to COVID-19. Cincinnati has determined that coverage is unavailable for the claimed loss. Cincinnati regrets that this decision is necessary and wants to describe the basis for its decision. Should you have any disagreement with the basis for this decision, Cincinnati invites you to state the reasons for your disagreement in writing, including by submitting any additional information or documentation. Cincinnati will consider any further information or documents you may supply.

## I.   SUMMARY

The Cincinnati policy provides coverage for direct physical loss or damage to Covered Property at the premises. This direct physical loss or direct physical damage must be to property at the covered premises. Cincinnati's investigation has found no evidence of direct physical loss or damage at your premises. Similarly, there is no evidence of damage to property at other locations, precluding coverage for orders of civil authority.

Nothing in this letter is a waiver of any rights available to Cincinnati under the policy or applicable law. Cincinnati reserves the right to rely on additional rights and/or language in the policy whether or not discussed in this letter.

## II.   THE CINCINNATI POLICY

Cincinnati issued policy number ENP0065453 to MD Bevco, Inc. dba Mad Dogs (the "Policy"). The Policy's effective dates are from March 01, 2020 through March 01, 2021. The Commercial Property Coverage provides limits of insurance for the following locations:

- Business Income with Extra Expense up to twelve (12) months for Actual Loss Sustained (ALS) for the following 4 locations, to further include:
  - 123 Losoya St Ste 19 San Antonio TX 78205
    - Business Personal Property including Improvements and Betterments: $2,550,000
  - 126 Losoya St San Antonio TX 78205
    - Business Personal Property including Improvements and Betterments: $357,000
  - 123 Losoya St Ste 7 San Antonio TX 78205
    - Business Personal Property including Improvements and Betterments: $204,000
  - 420 E Houston St San Antonio TX 78205
    - Business Personal Property including Improvements and Betterments: $306,000

## III.    BACKGROUND

On March 24, 2020, we were notified of a claim due to Business Interruption as a result of COVID-19 restrictions. We sent a follow up letter advising of coverage concerns and requested specific information from you. Consequent communication with you concerning this claim provided and/or advised that:

- There was no physical loss or damage to your premises due to COVID-19.
- There has been no known and/or confirmed cases of COVID-19 at your premises.
- Four of your Locations are closed due to civil authority. As you further stated, "All restaurants and bars were instructed to close immediately by the Mayor of San Antonio, Ron Nirenberg."
- You provided a word document with extracts from Mayor Nirenberg's San Antonio Executive Order mandating to promote social distancing all Bars, lounges, nightclubs, taverns ... shall close.

## IV.    NO COVERAGE UNDER THE POLICY FOR LOSS OF INCOME DUE TO CORONAVIRUS

### A.    No Direct Physical Loss

The Policy's insuring agreement at Section A. Coverage provides the following coverage:

We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

(FM 101 05 16 at p. 3.) The Policy defines "loss" as "accidental physical loss or accidental physical damage." (FM 101 05 16 at p. 38.) The Policy defines "premises" as "the Locations and Buildings described in the Declarations." (FM 101 05 16 at p. 39.)

This claim does not satisfy the Policy's insuring agreement. The claim does not involve direct, physical loss to property at your premises caused by a Covered Cause of Loss. Accordingly, the Policy's insuring agreement is not met and coverage is unavailable under the Policy.

**B.**   **No Business Income and Extra Expense Coverage**

The Policy's Coverage Extensions section contains provisions for Business Income and Extra Expense coverage, included in Form FM 101 05 16:

**(1) Business Income**

We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property In the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

With respect to the requirements of the preceding paragraph, if you are a tenant and occupy only part of the site at which the "premises" are located, for the purpose of this Coverage Extension only, your "premises" Is the portion of the building that you rent, lease or occupy, including:

**(a)**   Any area within the building or on the site at which the "premises" are located if that area services or is used to gain access to the "premises"; and

**(b)**   Your personal property in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

**(2) Extra Expense**

**(a)**   We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d)**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

**(b)**   If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **(2)(c))** to:

   **1)**   Avoid or minimize the "suspension" of business and to continue "operations" either:

      **a)**   At the "premises"; or

      **b)**   At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

   **2)**   Minimize the "suspension" of business if you cannot continue "operations".

**(c)**   We will also pay expenses to:

   **1)**   Repair or replace property; or

**2)** Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage will be reduced by the salvage value of that property.

**(d)** Extra Expense does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM.**

(Form FM 101 05 16 at pp. 18-19, 21.)

Additionally, the Policy at Form FA 213 05 16 provides separate Business Income and Extra Expense coverage provisions:

**1. Business Income**

**a.** We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss. With respect to "loss" to personal property in the open (or personal property in a vehicle or portable storage unit), the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater.

**b.** With respect to the requirements set forth in the preceding paragraph, if you are a tenant and occupy only part of the site at which the "premises" are located, for the purposes of this Coverage Part only, your "premises" is the portion of the building which you rent, lease or occupy, including:

**(1)** Any area within the building or on the site at which the "premises" are located if that area services or is used to gain access to the described "premises".

**(2)** Your personal property in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater.

**2. Extra Expense**

**a.** Extra Expense coverage is provided at the "premises" described in the Declarations only if the Declarations show that "Business Income" coverage applies at that "premises".

**b.** Extra Expense means necessary expenses you sustain (as described in Paragraphs **2.c., d.** and **e.**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

**c.**   If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **2.d.**) to:

   **(1)**   Avoid or minimize the "suspension" of business and to continue "operations" either:

   **(a)** At the "premises"; or

   **(b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

   **(2)**   Minimize the "suspension" of business if you cannot continue "operations".

**d.**   We will also pay expenses to:

   **(1)**   Repair or replace property; or

   **(2)**   Research, replace or restore the lost information on damaged "valuable papers and records"

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage Form will be reduced by the salvage value of that property.

**e.**   Extra Expense as described in Paragraphs **2.a.** thru **2.d.** does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

(FA 213 05 16 at pp.1-2.)

Like the Policy's insuring agreement, the Business Income and Extra Expense coverages require that there be direct physical loss or damage to Covered Property at the premises or within 1,000 feet of those premises. There is no evidence of any such physical loss or damage. Accordingly, the Business Income and Extra Expense requirements are not satisfied and coverage is unavailable under the Policy.

## C. <u>Pollution Exclusion</u>

For the reasons stated above, there is no coverage here because there was no direct physical loss at the premises. But, even assuming that there was direct physical loss, there was no covered cause of loss. This is because the Policy's Exclusions section at FM 101 05 16 excludes from coverage any "loss" caused by or resulting from:

**(l)**   **Pollutants**

Discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" unless the discharge, dispersal, seepage, migration, release, escape or emission is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" results in a "specified cause

of loss", we will pay for the "loss" caused by that "specified cause of loss".

(FM 101 05 16 at pp. 8, 10.)

The Policy defines "pollutants" as

any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, asbestos, chemicals, petroleum, petroleum products and petroleum by-products, and waste. . . . 'Pollutants' include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property, or the environment regardless of whether injury or damage is caused directly or indirectly by the 'pollutants' . . . .

(FM 101 05 16 at p. 39.)

The Coronavirus is a solid irritant or contaminant. Moreover, the government generally recognizes the Coronavirus as harmful to people. Accordingly, to the extent the Policy's insuring agreement was otherwise satisfied, coverage would ultimately be excluded because under the Pollutants exclusion there was no covered cause of loss.

### D. **No Civil Authority Coverage**

The Policy's Coverage Extensions section contains provisions for Civil Authority coverage, included in Form FM 101 05 16:

When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(a)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(b)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

**1)** 30 consecutive days after the time of that action; or

**2)** When your "Business Income" coverage ends;

whichever is later.

(Form FM 101 05 16 at pp. 19, 21.)

Additionally, the Policy at Form FA 213 05 16 provides separate Civil Authority coverage provisions:

When a Covered Cause of Loss causes direct damage to property other than Covered Property at the "premises", we will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for "Business Income" will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will apply for a period of up to 30 consecutive days from the date on which such coverage began.

Civil Authority coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will end 30 consecutive days after the date of that action; or when your Civil Authority coverage for "Business income" coverage ends, whichever is later.

(FA 213 05 16 at p. 2.)

Although you closed your business in response to a governmental order, there is no evidence that the order was entered because of direct damage to property at other locations or dangerous physical conditions at other locations. Moreover, the order does not restrict access to the area immediately surrounding your premises. Because these requisite elements of the Civil Authority coverage are not present here, coverage is unavailable under the Policy.

## V.   **CONCLUSION**

For the reasons discussed above, Cincinnati has concluded that the Policy provides no coverage for your claim. Cincinnati therefore cannot indemnify MD Bevco, Inc. dba Mad Dogs for any loss of business income from Coronavirus.

You should note that the U.S. Small Business Administration ("SBA") may be providing assistance for citizens in your circumstances. I understand that the SBA's contact information is:

Website:      https://www.sba.gov/funding-programs/disaster-assistance
Phone:        1-800-659-2955

This letter is not intended to be a limitation or waiver of any rights available to Cincinnati. Cincinnati's position is based on the information available to date. Cincinnati

reserves all of its rights under the Policy and the applicable law. Cincinnati reserves the right to rely on any and all provisions of the Policy whether or not addressed in this letter.

If you have any information that you believe may impact any of the issues raised in this letter, please forward it to us as soon as possible. If you believe that we have misunderstood the facts or are in error regarding any of the statements set forth above, please notify us as soon as possible.

Please feel free to contact me if you have any questions or would like to discuss this matter.

Sincerely,

**Johnathan Malish**
Field Claims Specialist
P.O. Box 126 Bulverde, TX 78163
Cell: (210) 243-3025
Fax: (833) 854-2412
Email: Johnathan_Malish@cinfin.com

**CC:** Catto & Catto LLP and Catto & Catto Benefits Group,
Desiree Ibarra: dibarra@catto.com

# Exhibit E



THE CINCINNATI INSURANCE COMPANIES

**Brennan J. Lowry**
Senior Claims Specialist

The Cincinnati Insurance Company ▪ The Cincinnati Indemnity Company
The Cincinnati Casualty Company ▪ The Cincinnati Specialty Underwriters Insurance Company
The Cincinnati Life Insurance Company

March 25, 2020

**VIA EMAIL AND U.S. MAIL**

MD BEVCO INC DBA MAD DOGS SAN ANTONIO
ATTN: JOAN ZEZULA
4714 SHAVANO OAK STE 2
SAN ANTONIO, TX 78249
Joan@maddogs.net

RE:   Insured:          MD BEVCO INC DBA MAD DOGS SAN ANTONIO
      Policy No.:       03ENP0065453
      Claim No.:        3525178
      Date of Loss:     3/18/2020

Dear Ms. Zezula:

I am the Cincinnati claims professional responsible for your claim. All communications regarding your claim should be directed to my attention. This letter further addresses the above-referenced claim made by MD Bevco Inc. dba Mad Dogs San Antonio to Cincinnati Insurance Company ("Cincinnati"). As submitted, the claim involves the Novel Coronavirus known as SARS-CoV-2, which causes the viral infection known as COVID-19 ("Coronavirus"). The claim asserts "Business interruption due to COVID 19."

Cincinnati will investigate your claim. However, it is important that you understand certain coverage issues that may be implicated by your claim. To that end, certain of your Policy provisions are referred to in this letter. Nevertheless, Cincinnati reserves the right to rely on other or different Policy provisions should it become appropriate to do so as this investigation progresses. Cincinnati is investigating your claim under a full reservation of rights.

**THE CINCINNATI POLICY**

Cincinnati issued Policy no. 03ENP0065453 to MD Bevco Inc. dba Mad Dogs San Antonio (the "Policy"). The Policy's effective dates are from March 1, 2020 through March 1, 2021.

**RESERVATION OF RIGHTS**

**A.     Direct Physical Loss**

The Policy[1] provides the following coverage:

> We will pay for direct "loss" to Covered Property at the "premises" caused
> by or resulting from any Covered Cause of Loss.

(FM 101 05 16 at p. 3.) The Policy defines "loss" as "accidental physical loss or accidental physical damage." (FM 101 05 16 at p. 38.) The Policy defines "premises" as "the Locations and Buildings described in the Declarations." (FM 101 05 16 at p. 39.)

At the threshold, there must be direct physical loss or damage to Covered Property caused by a covered cause of loss in order for the claim to be covered. Covered Property generally entails your premises and business personal property. Direct physical loss or damage generally means a physical effect on Covered Property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect. Your notice of claim indicates that your claim involves Coronavirus. However, the fact of the pandemic, without more, is not direct physical loss or damage to property at the premises.

**B.     Business Income and Extra Expense Coverage**

The Policy provides coverage for Business Income and Extra Expense under certain circumstances. This coverage is included in Form FM 101 05 16:

**(1) Business Income**

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property In the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

---

[1]     We cite to or quote provisions of the Policy in this letter. In some instances, in the interests of brevity, we quote or cite only portions of the language. Any terms in bold are in bold in the policy and do not denote additional emphasis unless so indicated. Please refer to the Policy for a full reading of all the terms, conditions or other language cited or referenced.

With respect to the requirements of the preceding paragraph, if you are a tenant and occupy only part of the site at which the "premises" are located, for the purpose of this Coverage Extension only, your "premises" Is the portion of the building that you rent, lease or occupy, including:

**(a)** Any area within the building or on the site at which the "premises" are located if that area services or is used to gain access to the "premises"; and

**(b)** Your personal property in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

**(2) Extra Expense**

**(a)** We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d))** during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

**(b)** If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **(2)(c))** to:

**1)** Avoid or minimize the "suspension" of business and to continue "operations" either:

**a)** At the "premises"; or

**b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

**2)** Minimize the "suspension" of business if you cannot continue "operations".

**(c)** We will also pay expenses to:

**1)** Repair or replace property; or

**2)** Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay

under this Coverage will be reduced by the salvage value of that property.

**(d)** Extra Expense does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM.**

\*     \*     \*

The most we will pay for "loss" in any one occurrence under this "Business Income" and Extra Expense Coverage Extension is $25,000.

(Form FM 101 05 16 at pp. 18-19, 21.)

Additionally, your policy includes form FA 213 05 16, which also supplies Business Income and Extra Expense coverage. That form states, in relevant part:

## 1. <u>Business Income</u>

**a.**     We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss. With respect to "loss" to personal property in the open (or personal property in a vehicle or portable storage unit), the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater.

**b.**     With respect to the requirements set forth in the preceding paragraph, if you are a tenant and occupy only part of the site at which the "premises" are located, for the purposes of this Coverage Part only, your "premises" is the portion of the building which you rent, lease or occupy, including:

**(1)** Any area within the building or on the site at which the "premises" are located if that area services or is used to gain access to the described "premises".

**(2)** Your personal property in the open (or in a vehicle or portable storage unit) within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater.

## 2. <u>Extra Expense</u>

**a**.   Extra Expense coverage is provided at the "premises" described in the Declarations only if the Declarations show that "Business Income" coverage applies at that "premises".

**b**.   Extra Expense means necessary expenses you sustain (as described in Paragraphs **2.c., d.** and **e.**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

**c**.   If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **2.d**.) to:

**(1)**   Avoid or minimize the "suspension" of business and to continue "operations" either:

**(a)** At the "premises"; or

**(b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

**(2)**   Minimize the "suspension" of business if you cannot continue "operations".

**d**.   We will also pay expenses to:

**(1)**   Repair or replace property; or

**(2)**   Research, replace or restore the lost information on damaged "valuable papers and records"

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage Form will be reduced by the salvage value of that property.

**e**.   Extra Expense as described in Paragraphs **2.a.** thru **2.d.** does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

(FA 213 05 16 at pp.1-2.)

The "Business Income" and Extra Expense coverages provided under both of these forms require that there be direct physical loss or direct physical damage caused

by a Covered Cause of Loss. This direct physical loss or direct physical damage must be to property at the covered premises. Without it, there can be no business income or extra expense coverage. Moreover, as stated, direct physical loss or damage generally means a physical effect on covered property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect. Your notice of claim indicates that your claim involves Coronavirus. However, the fact of the pandemic, without more, is not direct physical loss to property at the premises. Later in this letter, we ask questions and seek information directed toward these issues.

### C.    Civil Authority

The Policy provides coverage for an interruption of your business caused by an order from a civil authority. This coverage is included in the main property form in your policy, FM 101 05 16:

> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(a)**      Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(b)**      The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

> This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

> This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

**1)**   30 consecutive days after the time of that action; or

**2)**   When your "Business Income" coverage ends;

> whichever is later.

*      *      *

The most we will pay for "loss" in any one occurrence under this "Business Income" and Extra Expense Coverage Extension is $25,000.

(Form FM 101 05 16 at pp. 19, 21.)

Civil authority coverage is also included in policy form FA 213 05 16. That form provides:

When a Covered Cause of Loss causes direct damage to property other than Covered Property at the "premises", we will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for "Business Income" will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will apply for a period of up to 30 consecutive days from the date on which such coverage began.

Civil Authority coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will end 30 consecutive days after the date of that action; or when your Civil Authority coverage for "Business income" coverage ends, whichever is later.

(FA 213 05 16 at p. 2.)

This civil authority coverage described in Form FA 213 05 16 above is included within and not additional to the "Business Income" and Extra Expense Limits of Insurance.

There are certain key elements to this coverage that are your burden to show to us. These are: damage to property other than your own that was caused by a covered cause of loss; access to the area immediately surrounding the other, damaged property is prohibited by civil authority; and the action of the civil authority is taken in response to dangerous physical conditions resulting from the damage to the other property. Later in this letter, we ask questions and seek information directed toward these issues.

**CONCLUSION**

This letter addresses certain key, threshold policy provisions that are generally implicated by Coronavirus claims. Other policy provisions may become relevant as our investigation continues. Should that happen, we will supplement this letter to inform you of those policy provisions and to discuss their relationship to your claim.

Cincinnati is conducting its investigation subject to a full reservation of its rights. As part of Cincinnati's investigation, please provide the following documents and information as soon as possible:

- Please describe any direct physical loss or damage to your premises or property at your premises by the Coronavirus. Additionally, please specify these details and supply these documents:

    o The reason or reasons why you believe that there was direct physical loss or damage to your premises or to property at your premises.
    o Copies of all inspection reports and test reports referring or relating to actual or suspected presence of Coronavirus at your premises or on property at your premises.
    o Documents referring or relating to the presence of Coronavirus at your premises, including among employees, customers or other visitors to the premises.
        ▪ These documents should include any relevant correspondence or emails.

- Please state whether you have been ordered by a civil authority, such as a government official, to close, or restrict access to, your premises. If so, please specify these details and supply these documents:

    o Identify the civil authority that issued the order or orders.
    o Identify the date and nature of the order or orders.
    o Supply a copy of the order or orders.

- Identify any property, other than your own, that suffered direct physical loss or direct physical damage, thereby causing the civil authority order to issue. Additionally, please specify these details and supply these documents:

    o The reason or reasons why you believe that there was direct physical loss or direct physical damage to premises or to property at premises other than your own premises.

- ▪ The reason or reasons why you believe that the presence of Coronavirus at that other premises caused the issuance of the civil authority order involved in your claim.
  - ○ Copies of all inspection reports and test reports referring or relating to direct physical loss or direct physical damage to that other premises.
  - ○ Copies of all inspection reports and test reports referring or relating to actual or suspected presence of Coronavirus at that other premises or property at that other premises.

\*   \*   \*

Cincinnati is not waiving any of its rights under the Policy. Cincinnati reserves the right to rely on any other language in the Policy which may become applicable as circumstances develop. Cincinnati reserves the right to rely on other provisions or terms of the Policy and not just those discussed in this letter.

Please feel free to contact me if you have any questions or would like to discuss this matter.

Very truly yours,

Brennan Lowry
Senior Claims Specialist

CC:    Catto & Catto LLP - Desiree R. Ibarra <dibarra@catto.com>

Exhibit 2

FILED
In the Office of the
Secretary of State of Texas

SEP 1 6 1994

Corporations Section

ARTICLES OF INCORPORATION

OF

MD BEVCO, INC.

### ARTICLE 1

The name of the corporation is MD Bevco, Inc. (the "Corporation").

### ARTICLE 2

The period of its duration is perpetual.

### ARTICLE 3

The Corporation is organized to transact any and all lawful business for which a corporation may be incorporated under the Texas Business Corporation Act (the "Act").

### ARTICLE 4

The aggregate number of shares which the Corporation shall have authority to issue is 1,000 of the par value of one dollar ($1.00) each, all of one class which shall be designated Common Stock.

### ARTICLE 5

The Corporation will not commence business until it has received consideration of the value of One Thousand Dollars ($1,000.00) consisting of money, labor done or property actually received, for the issuance of its shares.

### ARTICLE 6

The street address of its initial registered office is 1100 Frost Bank Tower, 100 W. Houston Street, San Antonio, Texas 78205, and the name of its initial registered agent at this address is Matthew McCarty.

### ARTICLE 7

The number of initial Directors is one (1). The name and address of the Director is Matthew McCarty, whose address is 1100 Frost Bank Tower, 100 W. Houston Street, San Antonio, Texas 78205.

### ARTICLE 8

The name and address of the Incorporator of the Corporation is: Matthew McCarty, 1100 Frost Bank Tower, 100 W. Houston Street, San Antonio, Texas 78205.

## ARTICLE 9

The shareholders of the Corporation shall not be entitled to cumulate their votes in the election of Directors.

## ARTICLE 10

The shareholders of the Corporation shall not have a preemptive right to acquire additional, unissued or treasury shares of the Corporation, or securities of the Corporation convertible into or carrying a right to subscribe to or acquire shares of the Corporation.

## ARTICLE 11

No director of the Corporation shall be liable to the Corporation or its shareholders for monetary damages for an act or omission in the director's capacity as a director, except that this Article does not eliminate or limit the liability of a director for:

(1)  a breach of a director's duty of loyalty to the Corporation or its shareholders;

(2)  an act or omission not in good faith that constitutes a breach of duty of the director to the Corporation or an act or omission that involves intentional misconduct or a knowing violation of the law;

(3)  a transaction from which a director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's office; or

(4)  an act or omission for which the liability of a director is expressly provided for by statute.

## ARTICLE 12

Any action required under the Texas Business Corporation Act to be taken at any annual or special meeting of shareholders, or any action which may be taken at any annual or special meeting of shareholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take such action at a meeting at which the holders of all shares entitled to vote on the action were present and voted.

2

IN WITNESS WHEREOF, I have hereunto set my hand this $16$ day of _____Sedember_____, 1994.

_____
Matthew McCarty, Incorporator

paf·dnd\bk\bevco\art-incorp
2204-006

3

**Articles of Amendment**
**to**
**Articles of Incorporation**
**of**
**MD Bevco, Inc.**

FILED
in the Office of the
Secretary of State of Texa

DEC 20 2005

Corporation sn

Pursuant to the provisions of Article 4.04 of the Texas Business Corporation Act, MD Bevco, Inc., a Texas corporation (the "Corporation"), adopts the following Articles of Amendment to its Articles of Incorporation:

1.    The name of the Corporation is MD Bevco, Inc.

2.    Article 4 of the Articles of Incorporation is hereby deleted in its entirety and replaced to read as follows:

> "The aggregate number of shares which the Corporation shall have the authority to issue is 1,700 of the par value of one dollar ($1.00) each, all of one class which shall be designated Common Stock."

3.    This amendment to the Articles of Incorporation was adopted by the Board of Directors of the corporation on December 15, 2005, and was submitted to a vote of the shareholders of the Corporation, consistent with the Texas Business Corporation Act and the constituent documents of the Corporation. This amendment to the Articles of Incorporation was approved by the unanimous written consent of the shareholders of the Corporation on December 15, 2005, This document will become effective when it is filed by the Secretary of State of Texas.

Dated:  December 15, 2005.

Terry Corless, President

**Assumed Name Certificate**
**of**
**MD Bevco, Inc.**

FILED
In the Office of the
Secretary of State of Texas

MAR 23 2009

Corporations Section

1. The assumed name under which such business is or is to be conducted or rendered is Mad Dogs British Pub.

2. The name of the corporation as stated in its articles of incorporation filed with the office of the Secretary of State is MD Bevco, Inc.

3. The corporation was incorporated under the laws of the State of Texas and its Articles of Incorporation have been registered with the Secretary of State of the State of Texas.

4. The period for which the assumed name will be used is ten (10) years.

5. The corporation is a business corporation.

6. The registered office of the corporation is 412 W. Nakoma, San Antonio, Texas 78216, and its registered agent is Terry J. Corless.

7. Business is to be conducted under such assumed name in Bexar County, Texas.

MD Bevco, Inc.

By: _____
Terry J. Corless, President

**STATE OF TEXAS**          §
                            §
**COUNTY OF BEXAR**         §

BEFORE ME, the undersigned authority, on this day personally appeared Terry J. Corless, President of MD Bevco, Inc., a Texas corporation, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes therein expressed, in the capacity therein stated, and as the act and deed of said corporation.

GIVEN MY HAND AND SEAL OF OFFICE on this **27** day of February 2009.

_____
Notary Public, State of Texas

JAMES SCOTT CHEBLOCK
MY COMMISSION EXPIRES
July 20, 2012

**FILED**
In the Office of the
Secretary of State of Texas

**MAR 2 3 2009**

**Corporations Section**

**Assumed Name Certificate**
**of**
**MD Bevco, Inc.**

1. The assumed name under which such business is or is to be conducted or rendered is Mad Dogs.

2. The name of the corporation as stated in its articles of incorporation filed with the office of the Secretary of State is MD Bevco, Inc.

3. The corporation was incorporated under the laws of the State of Texas and its Articles of Incorporation have been registered with the Secretary of State of the State of Texas.

4. The period for which the assumed name will be used is ten (10) years.

5. The corporation is a business corporation.

6. The registered office of the corporation is 412 W. Nakoma, San Antonio, Texas 78216, and its registered agent is Terry J. Corless.

7. Business is to be conducted under such assumed name in Bexar County, Texas.

MD Bevco, Inc.

By: _____
Terry J. Corless, President

**STATE OF TEXAS**           §
                             §
**COUNTY OF BEXAR**          §

BEFORE ME, the undersigned authority, on this day personally appeared Terry J. Corless, President of MD Bevco, Inc., a Texas corporation, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes therein expressed, in the capacity therein stated, and as the act and deed of said corporation.

GIVEN MY HAND AND SEAL OF OFFICE on this **27** day of February 2009.

_____
Notary Public, State of Texas

JAMES SCOTT CHEBLOCK
MY COMMISSION EXPIRES
July 20, 2012



**Office of the Secretary of State**
**Corporations Section**
P.O. Box 13697
Austin, Texas 78711-3697
**(Form 503)**

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 132716100  7/30/2013**
**Document #: 492343060003**
**Image Generated Electronically**
**for Web Filing**

## ASSUMED NAME CERTIFICATE
## FOR FILING WITH THE SECRETARY OF STATE

1. The assumed name under which the business or professional service is or is to be conducted or rendered is:
**Bier Garten**

2. The name of the entity as stated in its certificate of formation, application for registration, or comparable document is:
**MD BEVCO, INC.**

3. The state, country, or other jurisdiction under the laws of which it was incorporated, organized or associated is **TEXAS**  and the address of its registered or similar office in that jurisdiction is:
**4714 SHAVANO OAK #2, San Antonio, TX, USA 78249**

4. The period, not to exceed 10 years, during which the assumed name will be used is :  **10 year(s)**

5. The entity is a : **Domestic For-Profit Corporation**

6. The entity's principal office address in Texas is:
**4714 Shavano Oak, Building 2, San Antonio, TX, USA 78249**

7. The entity is not organized under the laws of Texas and is not required by law to maintain a registered agent and registered office in Texas. Its office address outside the state is:

8. The county or counties where business or professional services are being or are to be conducted or rendered under such assumed name are:
**ALL COUNTIES LISTED BELOW:**
**BEXAR,**

9. The undersigned, if acting in the capacity of an attorney-in-fact of the entity, certifies that the entity has duly authorized the attorney-in-fact in writing to execute this document. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

## MD BEVCO, INC.

**Name of the entity**


By: **Michael G. Panzarella, Authorized Agent**

**Signature of officer, general partner, manager,
representative or attorney-in-fact of the entity**


**FILING OFFICE COPY**

FILED
In the Office of the
Secretary of State of Texas

AUG 1 5 2019

Corporations Section

**Assumed Name Certificate**
**of**
**MD Bevco, Inc.**

1. The assumed name under which the business will be conducted is: **Mad Dogs British Pub**.

2. The name of the company as stated in its Certificate of Formation as filed with the office of the Secretary of State is **MD Bevco, Inc**.

3. The entity filing the assumed name is a Texas corporation and its Certificate of Formation has been filed with the Secretary of State of Texas.

4. The file number issued to the filing entity by the Secretary of State is 132716100.

5. The corporation was formed under the laws of the State of Texas and its Certificate of Formation has been filed with the Secretary of State of the State of Texas.

6. The registered office of the company is 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249. The name of the company's registered agent for service of process at the registered office is Terry J. Corless.

7. The filing entity's principal office is 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

8. The period for which the assumed name will be used is ten (10) years from the date of filing with the Secretary of State.

9. Business is to be conducted under such assumed name in all counties of Texas.

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and also certifies that the person is authorized to sign on behalf of the identified entity. If the undersigned is acting in the capacity of an attorney in fact for the entity, the undersigned certifies that the entity has duly authorized undersigned in writing to execute this document.

August 15, 2019

MD Bevco, Inc.

By: _____
Terry J. Corless, President

{00433106}
Assumed Name Certificate                    1                    Mad Dogs British Pub

STATE OF TEXAS          §
                        §
COUNTY OF BEXAR         §

BEFORE ME, the undersigned authority, on this day personally appeared Terry J. Corless, President of  MD Bevco, Inc., a Texas corporation, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes therein expressed, in the capacity therein stated, and as the act and deed of MD Bevco, Inc., a Texas corporation.

GIVEN MY HAND AND SEAL OF OFFICE on this *15th* day of August, 2019.



CINDY A MCCLOSKEY
Notary Public, State of Texas
Comm. Expires 12-30-2021
Notary ID 12966160-4

Notary Public, State of Texas

FILED
In the Office of the
Secretary of State of Texas

AUG 1 5 2019

Corporations Section

**Assumed Name Certificate**
**of**
**MD Bevco, Inc.**

1.   The assumed name under which the business will be conducted is:  **Mad Dogs.**

2.   The name of the company as stated in its Certificate of Formation as filed with the office of the Secretary of State is **MD Bevco, Inc.**

3.   The entity filing the assumed name is a Texas corporation and its Certificate of Formation has been filed with the Secretary of State of Texas.

4.   The file number issued to the filing entity by the Secretary of State is 132716100.

5.   The corporation was formed under the laws of the State of Texas and its Certificate of Formation has been filed with the Secretary of State of the State of Texas.

6.   The registered office of the company is 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249. The name of the company's registered agent for service of process at the registered office is Terry J. Corless.

7.   The filing entity's principal office is 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

8.   The period for which the assumed name will be used is ten (10) years from the date of filing with the Secretary of State.

9.   Business is to be conducted under such assumed name in all counties of Texas.

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and also certifies that the person is authorized to sign on behalf of the identified entity. If the undersigned is acting in the capacity of an attorney in fact for the entity, the undersigned certifies that the entity has duly authorized undersigned in writing to execute this document.

August **15**, 2019

MD Bevco, Inc.

By: _____
Terry J. Corless, President

(00433104)
Assumed Name Certificate                    1                    Mad Dogs

**STATE OF TEXAS** §
§
**COUNTY OF BEXAR** §

BEFORE ME, the undersigned authority, on this day personally appeared Terry J. Corless, President of MD Bevco, Inc., a Texas corporation, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes therein expressed, in the capacity therein stated, and as the act and deed of MD Bevco, Inc., a Texas corporation.

GIVEN MY HAND AND SEAL OF OFFICE on this 15th day of August, 2019.

> CINDY A MCCLOSKEY
> Notary Public, State of Texas
> Comm. Expires 12-30-2021
> Notary ID 12966160-4

*Cindy A. McCloskey*
Notary Public, State of Texas

Assumed Name Certificate
(00433104)

2

Mad Dogs

Exhibit 3

# ARTICLES OF INCORPORATION

## OF

## CRAZY SAM'S SEAFOOD, INC.

FILED
In the Office of the
Secretary of State of Texas

SEP 2 7 1996

Corporations Section

I, the undersigned, a natural person of the age of eighteen (18) years or more, as an incorporator of a corporation under the Texas Business Corporation Act, do hereby adopt the following Articles of Incorporation for such corporation, to-wit:

### ARTICLE ONE

The name of the corporation is:  CRAZY SAM'S SEAFOOD, INC.

### ARTICLE TWO

The period of its duration is perpetual.

### ARTICLE THREE

The purpose or purposes for which the corporation is organized are: the transaction of any or all lawful business for which corporations may be incorporated under the Texas Business Corporation Act.

### ARTICLE FOUR

The aggregate number of shares which the corporation shall have authority to issue is One Thousand (1000) of the par value of One Dollar ($1.00) consisting of money, labor done, or property actually received.

### ARTICLE FIVE

The corporation shall not commence business until it has received for the issuance of its shares consideration of the value of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) consisting of money, labor done, or property actually received.

### ARTICLE SIX

The Post Office address of its registered office is:  2900 Mossrock, Suite 110, San Antonio, Texas  78230 and the name of its registered agent at such address is: JOSEPH L. PETERSON, JR.

### ARTICLE SEVEN

The number of initial directors is one (1) and the name and address of the director is:  SAMUEL L. PANCHEVRE, 1503 W. Huisache, San Antonio, Texas 78201.

## ARTICLE EIGHT

The name and address of the incorporator is:  JOSEPH L. PETERSON, JR., 2900 Mossrock, Suite 110, San Antonio, Texas  78230.

WITNESS MY HAND this 26th day of September, 1996.

JOSEPH L. PETERSON, JR.

THE STATE OF TEXAS §
§
COUNTY OF BEXAR §

BEFORE ME, the undersigned authority, on this day personally appeared JOSEPH L. PETERSON, JR., who having been by me duly sworn, on his oath stated and acknowledged that he had executed the foregoing Articles of Incorporation in the capacity therein stated and that all matters therein contained are true and correct.

SWORN TO AND SUBSCRIBED before me on this _____ day of September, 1996, to certify which witness my hand and seal of office.

NOTARY PUBLIC, STATE OF TEXAS

KATHY A. NEUGEBAUER
NOTARY PUBLIC
State of Texas
Comm. Exp. 09-22-00



**Office of the Secretary of State**
**Corporations Section**
P.O. Box 13697
Austin, Texas 78711-3697
**(Form 503)**

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 141759600  7/30/2013**
**Document #: 492384080006**
**Image Generated Electronically**
**for Web Filing**

## ASSUMED NAME CERTIFICATE
## FOR FILING WITH THE SECRETARY OF STATE

1. The assumed name under which the business or professional service is or is to be conducted or rendered is:

**Bier Garten**

2. The name of the entity as stated in its certificate of formation, application for registration, or comparable document is:

**CRAZY SAM'S SEAFOOD, INC.**

3. The state, country, or other jurisdiction under the laws of which it was incorporated, organized or associated is **TEXAS** and the address of its registered or similar office in that jurisdiction is:
**2900 MOSSROCK STE 110, San Antonio, TX, USA 78230**

4. The period, not to exceed 10 years, during which the assumed name will be used is : **10 year(s)**

5. The entity is a : **Domestic For-Profit Corporation**

6. The entity's principal office address in Texas is:
**126 Losoya St., San Antonio, TX, USA 78205**

7. The entity is not organized under the laws of Texas and is not required by law to maintain a registered agent and registered office in Texas. Its office address outside the state is:

8. The county or counties where business or professional services are being or are to be conducted or rendered under such assumed name are:
**ALL COUNTIES LISTED BELOW:**
**BEXAR,**

9. The undersigned, if acting in the capacity of an attorney-in-fact of the entity, certifies that the entity has duly authorized the attorney-in-fact in writing to execute this document. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

**CRAZY SAM'S SEAFOOD, INC.**

**Name of the entity**


By:  **Michael G. Panzarella, Authorized Agent**

**Signature of officer, general partner, manager,**
**representative or attorney-in-fact of the entity**


**FILING OFFICE COPY**

Exhibit 4

F I L E D
In the Office of the
Secretary of State of Texas

OCT 18 2018

Corporations Section

**Certificate of Formation**
**For**
**MD Sports Pub, Inc.**

The undersigned organizer files this Certificate of Formation and states:

1.    The name of the filing entity being formed is MD Sports Pub, Inc., and it is a for-profit corporation. The filing entity's address is 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

2.    The filing entity is being formed for any lawful purpose.

3.    The period of duration of the filing entity is perpetual.

4.    The street address of the initial registered office of the filing entity and the name of the initial registered agent of the filing entity at the office is Terry J. Corless, 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

5.    The name and address of the organizer is Terry J. Corless, 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

6.    The filing entity is authorized to issue 100,000 shares and the par value per share is $0.01.

7.    A board of directors will manage the filing entity and the number of directors constituting the initial board of directors is one (1). The names and addresses of each person who will serve as a director until the first annual meeting of shareholders and a successor is elected and qualified is Terry J. Corless, 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

8.    No director of the filing entity shall be liable to the filing entity or its owners for monetary damages for an act or omission of the person in the person's capacity as a governing person.

9.    The owners of the filing entity may take action without holding a meeting, providing notice, or taking a vote if owners of the filing entity having at least the minimum number of votes that would be necessary to take the action that is the subject of the consent at a meeting, in which each owner entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

---

Certificate of Formation                    1                    MD Sports Pub, Inc.

{00386054}

10.    This document becomes effective when the document is filed by the Secretary of State.


The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: October 17, 2018

_____
Terry J. Corliss, Organizer


### Acceptance of Appointment and Consent to Serve as Registered Agent


I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for MD Sports Pub, Inc. I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the Corporation; to forward such to the Corporation; and to immediately notify the Corporation and submit a statement of resignation to the Secretary of State if I resign.


Dated: October 17, 2018

_____
Terry J. Corliss, Registered Agent


Certificate of Formation                  2                  MD Sports Pub, Inc.

(00386054)

Exhibit 5

F I L E D
In the Office of the
Secretary of State of Texas

OCT 1 0 2017

Corporations Section

Certificate of Formation
for
MD Riverwalk, LLC

The undersigned organizer files this Certificate of Formation and states:

1.      The filing entity being formed is a limited liability company and its name is MD Riverwalk, LLC (the "Company"), and its office address is 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

2.      The Company is being formed for any lawful purpose.

3.      The period of duration of the filing entity is perpetual.

4.      The Company will have managers. The name and address of the initial manager is Terry J. Corless, 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

5.      The name of the initial registered agent of the Company and the street address of the initial registered office of the Company at the office is Terry J. Corless, 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

6.      The name and address of the organizer is Terry J. Corless, 4714 Shavano Oak, Suite 2, San Antonio, Texas 78249.

7.      The owners of the Company may take action without holding a meeting, providing notice, or taking a vote if owners of the Company having at least the minimum number of votes that would be necessary to take the action that is the subject of the consent at a meeting, in which each owner entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

8.      No manager of the Company shall be liable to the Company or its members for monetary damages for an act or omission in the manager's capacity as a manager, except that this Article does not eliminate or limit the liability of a manager for: (a) a breach of a manager's duty of loyalty to the Company or its members; (b) an act or omission not in good faith that constitutes a breach of duty of the manager to the Company or an act or omission that involves intentional misconduct or a knowing violation of the law; (o) a transaction from which a manager received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the manager's office; or (d) an act or omission for which the liability of a manager is expressly provided for by an applicable statute.

(00308574)
Certificate of Formation                                    1                                    MD Riverwalk, LLC



·Signed subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Dated: October 9 , 2017

Terry J. Corless, Organizer

### Acceptance of Appointment and Consent to Serve as Registered Agent

I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for MD Riverwalk, LLC. I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the Company; to forward such to the Company; and to immediately notify the Company and submit a statement of resignation to the Secretary of State if I resign.

Dated: October 9 , 2017

Terry J. Corless, Registered Agent



**Office of the Secretary of State**
**Corporations Section**
P.O. Box 13697
Austin, Texas 78711-3697
**(Form 503)**

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 802834347 4/15/2020**
**Document #: 96371220002**
**Image Generated Electronically**
**for Web Filing**

## ASSUMED NAME CERTIFICATE
## FOR FILING WITH THE SECRETARY OF STATE

1. The assumed name under which the business or professional service is or is to be conducted or rendered is:
**On The Bend Oyster Bar**

2. The name of the entity as stated in its certificate of formation, application for registration, or comparable document is:
**MD Riverwalk, LLC**

3. The state, country, or other jurisdiction under the laws of which it was incorporated, organized or associated is **TEXAS**

4. The period, not to exceed 10 years, during which the assumed name will be used is :
**04/15/2030**

5. The entity is a : **Domestic Limited Liability Company (LLC)**

6. The entity's principal office address is:
**4714 Shavano Oak, Building 2, San Antonio, TX, USA 78249**

7. The county or counties where business or professional services are being or are to be conducted or rendered under such assumed name are:
**ALL COUNTIES**

8. The undersigned, if acting in the capacity of an attorney-in-fact of the entity, certifies that the entity has duly authorized the attorney-in-fact in writing to execute this document. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

**MD Riverwalk, LLC**
**Name of the entity**

By: **Terry J. Corless, President**

**Signature of officer, general partner, manager,
representative or attorney-in-fact of the entity**

**FILING OFFICE COPY**

# Texas Franchise Tax Public Information Report

Comptroller of Public Accounts FORM 05-102 (Rev.9-11/30)

*To be filed by Corporations , Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

■ Tcode 13196 Franchise

| ■ Taxpayer number | ■ Report year |
|---|---|
| 3 2 0 6 5 0 9 0 2 3 8 | 2 0 1 9 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request, and correct information we have on file about you. Contact us at (800) 252-1381or (512) 463-4600.*

Taxpayer name: **MD Riverwalk, LLC**

Mailing address: **4714 SHAVANO OAK STE 2**

City: **SAN ANTONIO**  State: **TX**  ZIP Code: **78249**  Plus 4:

Secretary of State (SOS) file number or Comptroller file number: **0802834347**

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: **San Antonio, Texas**

Principal place of business: **San Antonio, Texas**

*Please sign below!*

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

3206509023819

**SECTION A**  Name, title and mailing address of each officer, director or manager.

| Name | Title | Director | Term expiration | m m d d y y |
|---|---|---|---|---|
| **TERRY J CORLESS** | **PRESIDENT** | ○ YES | | |
| Mailing address **4714 SHAVANO OAK, BLDG 2** | City **SAN ANTONIO** | State **TX** | | ZIP Code **78249** |
| **TERRY J CORLESS** | **DIRECTOR** | ● YES | | |
| Mailing address **4714 SHAVANO OAK, BLDG 2** | City **SAN ANTONIO** | State **TX** | | ZIP Code **78249** |
| | | ○ YES | | |
| Mailing address | City | State | | ZIP Code |

**SECTION B**  Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C**  Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file. *(see instructions if you need to make changes)*  ○ Blacken circle if you need forms to change the registered agent or registered office information.

Agent: **TERRY J. CORLESS**

Office: **4714 SHAVANO OAK, SUITE 2**  City **SAN ANTONIO**  State **TX**  ZIP Code **78249**

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

sign here ▶ **William M Russell**  Title **Electronic**  Date **04-23-2019**  Area code and phone number **( 210 )  404 - 2211**

**Texas Comptroller Official Use Only**

VE/DE ○  PIR IND ○

Exhibit 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No.: | 2:20-cv-04423-AB-SK | Date: | July 27, 2020 |

| | |
|---|---|
| Title: | *Mark's Engine Co. No. 28 Rest., LLC v. Traveler's Indem. Co. of Conn., et al.* |

| | |
|---|---|
| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** **[In Chambers] ORDER <u>DENYING</u> PLAINTIFF'S MOTION FOR REMAND [DKT. NO. 22]**

Before the Court is Plaintiff Mark's Engine Company No. 28 Restaurant, LLC's ("Plaintiff") motion for remand. (Dkt. No. 22.) Defendant Travelers Property Casualty Company of America ("Defendant") opposes Plaintiff's motion. (Dkt. No. 26.) The Court found this matter suitable for decision without oral argument and took Plaintiff's motion under submission. (Dkt. No. 32.) For the reasons stated below, the Court **DENIES** Plaintiff's motion for remand.

## I. BACKGROUND

On April 15, 2020, Plaintiff filed its complaint against Traveler's Indemnity Company of Connecticut[1] ("Travelers"), Mayor Eric Garcetti ("Mayor Garcetti"), and Does 1–25 in the Superior Court of the State of California, County of Los Angeles. (Dkt. No. 1-2.)

---

[1] Defendant contends that it was erroneously sued as The Travelers Indemnity Company of Connecticut. (Dkt. No. 26 at 1.)

On May 15, 2020, Travelers removed Plaintiff's suit to this Court. (Dkt. No. 1.) In its notice of removal, Travelers argued that removal was proper because the only non-diverse defendant, Mayor Garcetti, was fraudulently joined, and the amount in controversy exceeds $75,000. (*Id.* at 4–14.) Plaintiff's initial complaint alleged three causes of action: (1) a claim for declaratory relief against all defendants, (2) a claim for breach of implied covenant of good faith and fair dealing against Travelers and Does 1–25, and (3) a claim for *per se* violation of California Insurance Code Section 790.03 against Travelers and Does 1–25. (Dkt. No. 1-1 at ¶¶ 23–48.)

On May 29, 2020, after Defendant filed a motion to dismiss Plaintiff's initial complaint, Plaintiff filed a First Amended Complaint ("FAC") and the instant motion for remand. (Dkt. Nos. 13, 14, 21, 22.) Plaintiff's FAC alleges the following causes of action: (1) a claim for declaratory relief against all defendants, (2) a claim for breach of contract against Travelers and Does 1–25, (3) a claim for breach of the implied covenant of good faith and fair dealing against Travelers and Does 1–25, and (4) a claim for violation of California's Business & Professions Code § 17200 against Travelers and Does 1–25. (Dkt. No. 21 at ¶¶ 23–55.)

Plaintiff moves to remand this action on the ground that Mayor Garcetti was not fraudulently joined, thus eliminating complete diversity of citizenship among the parties. (Dkt. No. 22 at 1–3.) Plaintiff also moves to remand on the ground that this case raises unsettled questions of state law from which the Court should abstain under the Declaratory Judgment Act. (*Id.* at 3–9.) Finally, Plaintiff argues that this Court should remand based on the *Colorado River* and *Younger* abstention doctrines. (*Id.* at 9–13.)

## II. LEGAL STANDARDS

### A. Removal Jurisdiction

28 U.S.C. § 1441(a) ("Section 1441") provides that a civil action may be removed to the district court where the action is pending if the district court has original jurisdiction over the action. 28 U.S.C. § 1332 ("Section 1332") provides that a district court has original jurisdiction of a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the dispute is between "citizens of different states." Section 1332(a)(1) requires complete diversity, meaning that "the citizenship of each plaintiff is diverse from the citizenship of each defendant." *Caterpillar Inc. v. Lewis*, 519 U.S.

61, 68 (1996). Section 1441(b)(2) further limits removal based on diversity jurisdiction to cases where no defendant "properly joined and served . . . is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2).

"The burden of establishing federal jurisdiction is on the party seeking removal, and the removal statute is strictly construed against removal jurisdiction." *Prize Frize, Inc. v. Matrix (U.S.) Inc.*, 167 F.3d 1261, 1265 (9th Cir.1999), *superseded by statute on other grounds as stated in Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir.2006); *Martinez v. Los Angeles World Airports*, 2014 WL 6851440, at *2 (C.D. Cal. Dec. 2, 2014). Thus, "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

## B. Fraudulent Joinder

A non-diverse party may be disregarded for purposes of determining whether jurisdiction exists if the court determines that the party's joinder was "fraudulent" or a "sham." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001); *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998). "There are two ways to establish fraudulent joinder: '(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court.'" *Grancare, LLC v. Thrower by & through Mills*, 889 F.3d 543, 548 (9th Cir. 2018) (internal citation omitted).

"Fraudulent joinder is a term of art. If the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state, the joinder of the resident defendant is fraudulent." *McCabe v. Gen. Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) (citing Moore's Federal Practice (1986) ¶ 0.161[2]). In practice, the burden of proving fraudulent joinder is a heavy one, *Gaus*, 980 F.2d at 566, as the defendant must prove fraudulent joinder by clear and convincing evidence. *See Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007) (citing *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir.1998)).

Despite this high bar, the Ninth Circuit has upheld rulings of fraudulent joinder "where a defendant presents extraordinarily strong evidence or arguments that a plaintiff could not possibly prevail on her claims against the allegedly fraudulently joined defendant." *Grancare*, 889 F.3d at 548. Examples of such

"extraordinarily strong evidence or arguments" include instances where "plaintiff's claims against [an] alleged sham defendant were all predicated on a contract to which the defendant was not a party." *Id.* (citing *United Comput. Sys. Inc. v. AT&T Corp.*, 298 F.3d 756, 761 (9th Cir. 2002))*; see also Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1427 (9th Cir. 1989) ("Defendants are correct that plaintiffs cannot prevail on any claims they seek to bring against the defendants . . . because plaintiffs were not parties to the alleged agreements.").

## C. The Declaratory Judgment Act

The Declaratory Judgment Act ("DJA") provides, in relevant part, that:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

The DJA "does not confer jurisdiction, and therefore also does not afford the opportunity to decline it." *Countrywide Home Loans, Inc., v. Mortg. Guar. Ins. Corp.*, 642 F.3d 849, 853 (9th Cir. 2011). Rather, "federal courts have discretion under the DJA only as to whether to award declaratory relief pursuant to the jurisdiction that they must properly derive from the underlying controversy between the litigants." *Id.*

"There is no presumption in favor of abstention in declaratory actions generally, nor in insurance coverage cases specifically." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc). Moreover, when an action for declaratory relief is joined with other claims, "(e.g., bad faith, breach of contract, breach of fiduciary duty, rescission, or claims for other monetary relief), the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *Id.* (citing *Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1367 (9th Cir. 1991)). Indeed, the Ninth Circuit has recognized that "[r]emanding only the declaratory component of such an action will frequently produce piecemeal litigation . . . a result which the [DJA] was intended to avoid[.]" *See Snodgrass v. Provident Life and Accident Ins. Co.*, 147 F.3d 1163, 1167 (9th Cir. 1998) (citation omitted).

### D. *Colorado River* and *Younger* Abstention Doctrines

#### a.  *Colorado River* Abstention Doctrine

"*Colorado River* and its progeny provide a multi-pronged test for determining whether 'exceptional circumstances' exist warranting federal abstention from concurrent federal and state proceedings." *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841 (9th Cir. 2017). The Court evaluates eight factors to determine the appropriateness of a stay or dismissal under *Colorado River*, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.* at 842 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)). The factors are as follows:

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

*Id.* at 841–42 (quoting *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 978–79 (9th Cir. 2011)).

In applying these factors, the Court must be mindful that "federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them, including in cases involving parallel state litigation." *Id.* (internal quotation marks omitted). "Abdication of the obligation to decide cases can be justified under [*Colorado River*] only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id.* (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)) (alteration added).

#### a.  *Younger* Abstention Doctrine

Abstention pursuant to *Younger* is grounded in a "longstanding public policy against federal court interference with state court proceedings." *Younger v. Harris*, 401 U.S. 37, 43 (1971). The Ninth Circuit has held that a federal court "may

abstain under *Younger* in three categories of cases: "(1) parallel, pending state criminal proceedings, (2) state civil proceedings that are akin to criminal prosecutions, and (3) state civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts." *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043–44 (9th Cir. 2019) (quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)). If an action falls into one of these three categories, it "must also satisfy a three-part inquiry: the state proceeding must be (1) 'ongoing,' (2) 'implicate important state interests,' and (3) provide 'an adequate opportunity . . . to raise constitutional challenges.'" *Id.* at 1044 (quoting *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). "If the state proceeding falls into one of the . . . categories and meets the three . . . factors, a federal court may abstain under *Younger* so long as the federal action would have the practical effect of enjoining the state proceedings." *Id.* (internal quotation marks omitted).

## III.   DISCUSSION

### A. Defendant has met its burden of demonstrating that Mayor Garcetti was fraudulently joined

The Court concludes that Defendant has met its burden to show that Mayor Garcetti was fraudulently joined.

Plaintiff contends that the insurance policy in dispute provides coverage for "'Business Income and Extra Expense Coverage' in the event of business closures by order of Civil Authority." (Dkt. No. 22 at 2.) In light of the COVID-19 pandemic, Mayor Garcetti issued an Executive Order on March 15, 2020 that directed all non-essential business in Los Angeles to close. (*Id.*) Plaintiff argues that this triggered Plaintiff's insurance coverage under the policy as Plaintiff was forced to close by order of Civil Authority. (*Id.*) Further, Plaintiff argues that the denial of the policy would not have occurred absent Mayor Garcetti's order, the propriety of which is a significant issue that allegedly must be resolved. (*Id.* at 2–3.) Accordingly, Plaintiff claims that Mayor Garcetti's joinder was proper. (*Id.* at 3.) Plaintiff also argues that "even if the Court finds that no cause of action exists against Mayor Garcetti in the Complaint as presently plead[ed], Travelers has not shown that Plaintiff cannot amend its pleadings to establish a cause of action against Mayor Garcetti." (*Id.*)

In response, Defendant asserts that "[t]his action turns on a contract between Plaintiff and Travelers, and Mayor Garcetti is not a party to that contract." (Dkt.

No. 26 at 8.) As Defendant correctly indicates in its opposition to Plaintiff's motion, Plaintiff's pleadings clearly show Mayor Garcetti is not a party to the insurance contract in dispute. (*See* Dkt. No. 1-2 at ¶¶ 6, 24.); (*see also* FAC ¶ 6). Although Plaintiff argues that its "complaint clearly alleges a possible claim against [Mayor Garcetti,] as the complaint is seeking declaratory relief regarding the denial of the insurance policy arising from [Mayor Garcetti's] executive orders" (Dkt. No. 27 at 2), seeking a declaratory judgment that a government official's action triggers insurance coverage does not amount to a cause of action against that government official. Moreover, it is well established that a party is fraudulently joined where a "plaintiff's claims against [the] alleged sham defendant [are] all predicated on a contract to which the defendant [is] not a party." *See Grancare*, 889 F.3d at 548 (citing *United Compt. Sys., Inc.*, 298 F.3d at 761). Because Plaintiff's claim against Mayor Garcetti is predicated on a contract to which Mayor Garcetti is not a party, Mayor Garcetti was fraudulently joined.

Plaintiff's remaining arguments with respect to fraudulent joinder are unavailing. Although Plaintiff contends that it could amend its complaint to allege additional causes of action against Mayor Garcetti, including a State Constitutional Takings Claim, (*see* Dkt. No. 22 at 3; Dkt. No. 27 at 2), the Court "determines removability of a complaint at the time of removal . . . [and] declines to consider causes of action that were not pleaded in the operative complaint to determine whether [Mayor Garcetti] is a sham defendant." *See Health Pro Dental Corp. v. Travelers Prop. Cas. Co. of Am.*, CV 17-00637-BRO-SK, 2017 WL 1033970, at *5 n.6 (C.D. Cal. Mar. 17, 2017). With respect to the Plaintiff's sole claim against Mayor Garcetti for declaratory relief, the Court concludes that this claim could not possibly be saved by amendment. *See Padilla v. AT&T Corp.*, 697 F. Supp. 2d 1156, 1159 (C.D. Cal. 2009) ("[A] defendant seeking removal based on an alleged fraudulent joinder must . . . show that there is no possibility that the plaintiff could prevail on any cause of action is brought against the non-diverse defendant.").

Because Mayor Garcetti, the only non-diverse defendant in this action, was fraudulently joined, complete diversity of citizenship among the parties is present. Moreover, the Court concludes that the amount-in-controversy requirement is easily met here, and Plaintiff does not seek to remand based on the amount in controversy. (*See* Dkt. No. 1 at 5–9); (*see also* Dkt. No. 22.)

B. **Abstention pursuant to the Declaratory Judgment Act is unwarranted**

Although the Court has diversity jurisdiction over this action, Plaintiff contends that the Court should abstain from exercising that jurisdiction pursuant to the DJA. (Dkt. No. 22 at 3–9.) However, as Defendant correctly argues in opposition where, as here, "other claims are joined with an action for declaratory relief . . . the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." *See Gov't Emps. Ins. Co.*, 133 F.3d at 1225; *see also Scotts Co. v. Seeds, Inc.*, 688 F.3d 1154, 1159 (9th Cir. 2012) (same). Accordingly, because Plaintiff's suit seeks more than declaratory relief, the Court declines to abstain under the DJA.[2] *See Seneca Ins. Co.*, 862 F.3d at 840 ("So long as the suit seeks more than merely declaratory relief . . ., the entire action should be analyzed under the *Colorado River* framework[, not under the *Brillhart* framework.]").

C. **Abstention pursuant to *Colorado River* and *Younger* is unwarranted**

Plaintiff argues that this Court should abstain from exercising its jurisdiction pursuant to *Colorado River* and *Younger*. (Dkt. No. 22 at 9–13.) The Court addresses each argument in turn.

a. *Colorado River*

The "exceptional circumstances" that merit abstention pursuant to *Colorado River* are nonexistent here. The first two factors "are irrelevant in this case because the dispute does not involve a specific piece of property and both the federal and state forums are located in Los Angeles." *See R.R. St. & Co., Inc.*, 656 F.3d at 979. Further, the Court concludes that there is no risk of piecemeal litigation and that the state court proceedings identified by Plaintiff will not resolve all issues before

---

[2] Moreover, even assuming that the *Brillhart* factors are applicable here, the Court concludes that these factors do not favor abstention or remand, as Plaintiff has not identified any pending state court proceeding presenting the same issues and the same parties. *See Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942) ("Ordinarily it would be uneconomical . . . for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties.").

Court, as the identified state court proceedings involve different parties. Similarly, the Court concludes that the identified state court proceedings will not adequately protect the rights of Defendant, as Defendant is not a party to any of these proceedings. Additionally, "[b]ecause the case[] here involve[s] routine issues of state law, such as breach of [the implied covenant of good faith and fair dealing] . . . this factor does not weigh against jurisdiction." *See R.R. St. & Co.*, 656 F.3d at 980–81. Finally, the Court concludes that concerns of forum shopping do not weigh against exercising jurisdiction, as the Court has diversity jurisdiction over this action and this case was properly removed. *See Id.* at 982 ("[T]he desire for a federal forum is assured by the constitutional provision for diversity jurisdiction and the congressional statute implementing Article III." (quoting *First State Ins. Co. v. Callan Assocs., Inc.*, 113 F.3d 161, 162 (9th Cir. 1997))). Accordingly, the Court declines to abstain from exercising its jurisdiction pursuant to *Colorado River*.

### b. *Younger*

Abstention pursuant to *Younger* is also inappropriate. Here, Plaintiff does not identify any parallel, pending state criminal proceedings, any state civil proceedings akin to a criminal prosecution, or any state civil proceeding that implicate a State's interest in enforcing the order and judgments of its courts. (Dkt. No. 22 at 12–13.) Accordingly, abstention pursuant to *Younger* is improper.

### IV.   CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's motion for remand.

**IT IS SO ORDERED**.

# Exhibit 7

CAUSE NO. 2020CI11466

| | | |
|---|---|---|
| MD BEVCO, INC. DBA MAD DOGS | § | IN THE DISTRICT COURT |
| SAN ANTONIO; CRAZY SAM'S | § | |
| SEAFOOD, INC. DBA BIER GARTEN; | § | |
| MD SPORTS PUB, INC. AND MD | § | |
| RIVERWALK, LLC DBA ON THE | § | |
| BEND, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| **v.** | § | 166TH JUDICIAL DISTRICT |
| | § | |
| THE CINCINNATI INDEMNITY | § | |
| COMPANY AND JOHNATHAN | § | |
| ANDREW MALISH, | § | |
|     *Defendants*. | § | BEXAR COUNTY, TEXAS |

**NOTICE OF REMOVAL OF CIVIL ACTION TO**
**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS**

**TO: THE CLERK OF THE 166ᵗʰ JUDICIAL DISTRICT COURT, BEXAR COUNTY**

Please take notice that on August 3, 2020, Defendant The Cincinnati Indemnity Company filed in the United States District Court for the Western District of Texas its Notice of Removal. A copy of said Notice of Removal (without exhibits) is attached as Exhibit "A".

Please take further notice that, pursuant to 28 U.S.C. § 1446, the filing of that Notice of Removal in the United States District Court, together with the filing of a copy of the Notice of Removal with this Court, effects the removal of this action and the above-captioned Court may proceed no further unless and until the case is remanded.

Respectfully submitted this 3ʳᵈ day of August, 2020.

        */s/ S. Jan Hueber*
        **S. Jan Hueber**
        State Bar No. 20331150
        Hueber@litchfieldcavo.com
        **Mahan Wright**
        State Bar No. 24096880
        WrightM@litchfieldcavo.com

**LITCHFIELD CAVO LLP**
100 Throckmorton St., Ste. 500
Fort Worth, Texas 76102
Telephone: (817) 945-8025
Facsimile: (817) 753-3232

**ATTORNEYS FOR DEFENDANT
THE CINCINNATI INDEMNITY COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was served on this the 3rd day of August, 2020, on all counsel of record, by electronic service in accordance with the Texas Rules of Civil Procedure.

**Email: shannon@theloydlawfirm.com**
Shannon E. Loyd
State Bar No. 24045706
THE LOYD LAW FIRM, P.L.L.C.
12703 Spectrum Drive, Suite 201
San Antonio, Texas 78249
**ATTORNEYS FOR PLAINTIFFS**

*/s/ S. Jan Hueber*
**S. Jan Hueber**

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MD BEVCO, INC. DBA MAD DOGS** | § | |
| **SAN ANTONIO; CRAZY SAM'S** | § | |
| **SEAFOOD, INC. DBA BIER GARTEN;** | § | |
| **MD SPORTS PUB, INC. AND MD** | § | |
| **RIVERWALK, LLC DBA ON THE** | § | |
| **BEND,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **CASE NO.** |
| | § | |
| | § | |
| **THE CINCINNATI INDEMNITY** | § | |
| **COMPANY AND JONATHAN** | § | |
| **ANDREW MALISH,** | § | |
| *Defendants*. | § | |

**LIST OF ALL COUNSEL OF RECORD**

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

In connection with the removal of the cause styled *MD Bevco, Inc. DBA Mad Dogs San Antonio; Crazy Sam's Seafood, Inc. DBA Bier Garten; MD Sports Pub, Inc.; and MD Riverwalk, LLC DBA On The Bend v. The Cincinnati Indemnity Company, and Jonathan Andrew Malish* bearing Cause No. 2020CI11466, In the 166th Judicial District Court of Bexar County, Texas, Defendant, The Cincinnati Indemnity Company, submits this List of All Counsel of Record:

1.      **Attorneys for Defendant The Cincinnati Indemnity Company:**

**S. Jan Hueber**
State Bar No. 20331150
Email: hueber@litchfieldcavo.com
**Mahan V. Wright** - *Motion for Pro Hac Vice to be filed*
State Bar No. 24096880
wrightM@litchfieldcavo.com
**LITCHFIELD CAVO LLP**
100 Throckmorton St., Ste. 500
Fort Worth, Texas 76102
Telephone: (817) 945-8025

Facsimile: (817) 753-3232

**2.      Attorneys for Plaintiffs:**

**Shannon E. Loyd**
State Bar No. 24045706
Email: shannon@theloydlawfirm.com
**THE LOYD LAW FIRM, P.L.L.C.**
12703 Spectrum Drive, Suite 201
San Antonio, Texas 78249
Telephone: (210) 775-1421
Facsimile: (210) 775-1410

                                      Respectfully submitted,


                                      */s/ S. Jan Hueber*
                                      **S. Jan Hueber**
                                      State Bar No. 20331150
                                      Hueber@litchfieldcavo.com
                                      **Mahan V. Wright -** *Motion for Pro Hac*
                                      *Vice to be filed*
                                      State Bar No. 24096880
                                      wrightm@litchfieldcavo.com
                                      **LITCHFIELD CAVO LLP**
                                      100 Throckmorton St., Ste. 500
                                      Fort Worth, Texas 76102
                                      Telephone: (817) 945-8025
                                      Facsimile: (817) 753-3232

                                      **ATTORNEYS FOR DEFENDANT**
                                      **THE CINCINNATI INDEMNITY COMPANY**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was served on this the 26th day of May, 2020, on all counsel of record, by electronic service in accordance with the Federal Rules of Civil Procedure.

**Email: shannon@theloydlawfirm.com**
Shannon E. Loyd
State Bar No. 24045706
THE LOYD LAW FIRM, P.L.L.C.
12703 Spectrum Drive, Suite 201
San Antonio, Texas 78249
**ATTORNEYS FOR PLAINTIFFS**

*/s/ S. Jan Hueber*
**S. Jan Hueber**

Exhibit 9

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MD BEVCO, INC. DBA MAD DOGS SAN ANTONIO; CRAZY SAM'S SEAFOOD, INC. DBA BIER GARTEN; MD SPORTS PUB, INC. AND MD RIVERWALK, LLC DBA ON THE BEND,** | § § § § § § | |
| *Plaintiffs*, | § § | **CASE NO.** |
| **v.** | § § | |
| **THE CINCINNATI INDEMNITY COMPANY AND JOHNATHAN ANDREW MALISH.** | § § § § | |
| *Defendants*. | § | |

**CERTIFICATE OF NOTICE OF FILING
BY DEFENDANT THE CINCINNATI INDEMNITY COMPANY**

The undersigned attorney of record for Defendant, The Cincinnati Indemnity Company, certifies that on the 3rd day of August, 2020, a copy of the Notice of Removal of this action was filed with the Bexar County District Clerk and that written notice of filing of the Notice of Removal was served via e-service to the Plaintiffs in this action through its attorney of record. Attached to the notice was a copy of the Notice of Removal.  Removal of this action is effective as of that date, pursuant to 28 U.S.C. § 1441.

Respectfully submitted,

*/s/ S. Jan Hueber*
_____
**S. Jan Hueber**
State Bar No. 20331150
Hueber@litchfieldcavo.com
**Mahan V. Wright** - *Motion for Pro Hac Vice to be filed*
State Bar No. 24096880
wrightM@litchfieldcavo.com

LITCHFIELD CAVO LLP
100 Throckmorton St., Ste. 500
Fort Worth, Texas 76102
Telephone: (817) 945-8025
Facsimile: (817) 753-3232

ATTORNEYS FOR DEFENDANT
THE CINCINNATI INDEMNITY COMPANY

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above pleading was served on this the

3rd day of August, 2020, on all counsel of record, by electronic service in accordance with the

Federal Rules of Civil Procedure.

**Email: shannon@theloydlawfirm.com**
Shannon E. Loyd
State Bar No. 24045706
THE LOYD LAW FIRM, P.L.L.C.
12703 Spectrum Drive, Suite 201
San Antonio, Texas 78249
ATTORNEYS FOR PLAINTIFFS

*/s/ S. Jan Hueber*
**S. Jan Hueber**

Exhibit 10

CERTIFIED MAIL #70191120000131734543

Case Number: 2020-CI-11466    2020CI11466 S00001

MD BEVCO INC ET AL

vs.

THE CINCINNATI INDEMNITY COMPANY ET AL

(Note: Attached document may contain additional litigants).

IN THE DISTRICT COURT
166th JUDICIAL DISTRICT
BEXAR COUNTY, TEXAS

## CITATION



**"THE STATE OF TEXAS"**

DIRECTED TO:    THE CINCINNATI INDEMNITY COMPANY

BY SERVING ITS REGISTERED AGENT, CT CORPORATION SYSTEM
1999 BRYAN ST 900
DALLAS TX 75201-3136

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk  who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were  served this CITATION and ORIGINAL PETITION , a default judgment may be taken against you." Said  CITATION with ORIGINAL PETITION  was filed on the 24th day of June, 2020.

ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS 30TH  DAY OF June  A.D., 2020.

SHANNON E LOYD
ATTORNEY FOR PLAINTIFF
12703 SPECTRUM DR 201
SAN ANTONIO, TX 78249-3400

**Mary Angie Garcia**
Bexar County District Clerk
101 W. Nueva, Suite 217
San Antonio, Texas  78205

By: *Adrianna Cardenas,* Deputy

---

MD BEVCO INC ET AL
vs
THE CINCINNATI INDEMNITY COMPANY ET AL

Officer's Return

Case Number: 2020-CI-11466
Court:166th Judicial District Court

Came to hand on the 30th day of June 2020, A.D., at  4:17 o'clock P.M. and EXECUTED (NOT EXECUTED) by CERTIFIED MAIL, on the ___7th___ day of ___July___ 20_20_, by delivering to: ___A Williams___ at 1999 BRYAN ST 900 DALLAS TX 75201-3136 a true copy of this Citation, upon which I endorsed that date of delivery, together with the accompanying copy of the CITATION with ORIGINAL PETITION .

Cause of failure to execute this Citation is _____

**FILED**
12 O'CLOCK 03 PM

JUL 0 9 2020
MARY ANGIE GARCIA
District Clerk, Bexar County, Texas
BY _____ DEPUTY

**Mary Angie Garcia**
Clerk of the District Courts
of Bexar County, TX

By: *Adrianna Cardenas,* Deputy

**DOCUMENT SCANNED AS FILED**

RETURN TO COURT (DK003)



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com*®.

**OFFICIAL USE**

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
- ☐ Return Receipt (hardcopy)        $
- ☐ Return Receipt (electronic)      $
- ☐ Certified Mail Restricted Delivery  $
- ☐ Adult Signature Required         $
- ☐ Adult Signature Restricted Delivery  $

Postage

JUL 02 2020
Postmark
Here
SAN ANTONIO, TX

THE CINCINNATI INDEMNITY COMPANY
C/O CT CORPORATION SYSTEM
1999 BRYAN ST 900
DALLAS, TX 75201-3136

2020CI11466  6/30/2020  CITCM  ADRIANNA CARDENAS

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

7019 1120 0001 3173 4543

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature
X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery
A Williams     7/7/2020

1. Article Addressed to:

THE CINCINNATI INDEMNITY COMPANY
C/O CT CORPORATION SYSTEM
1999 BRYAN ST 900
DALLAS, TX 75201-3136

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

2020CI11466  6/30/2020  CITCM ADRIANNA CARDENAS

9590 9402 4164 8092 5402 61

3. Service Type.
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

2. Article Number *(Transfer from service label)*
7019 1120 0001 3173 4543

PS Form 3811, July 2015 PSN 7530-02-000-9053   DOCUMENT SCANNED AS FILED   Domestic Return Receipt

USPS TRACKING #

9590 9402 4164 8092 5402

**United States Postal Service**

FILED
DISTRICT CLERK
BEXAR CO. TEXAS

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

2020 JUL -9 PM 12: 03

DEPUTY

Mary Angie Garcia
Bexar County District Clerk
101 W. Nueva, Suite #217
BY San Antonio, TX 78205

NS

Exhibit 11

CERTIFIED MAIL #70191120000131734550

Case Number: 2020-CI-11466                    2020CI11466  S00002

MD BEVCO INC ET AL

vs.

THE CINCINNATI INDEMNITY COMPANY ET AL                    IN THE DISTRICT COURT
                                                          166th JUDICIAL DISTRICT
(Note: Attached document may contain additional litigants).   BEXAR COUNTY, TEXAS

                              **CITATION**

**"THE STATE OF TEXAS"**
DIRECTED TO:    JOHNATHAN ANDREW MALISH


              31872 CAST IRON CV
              BULVERDE TX 78163-4045


"You have been sued. You may employ an attorney. If you or your attorney do not file a
written answer with the clerk  who issued this citation by 10:00 a.m. on the Monday next
following the  expiration of twenty days after you were  served this CITATION and ORIGINAL
PETITION , a default judgment may be  taken against you." Said  CITATION with ORIGINAL
PETITION  was filed on the 24th day of June, 2020.



ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS 30TH  DAY OF June  A.D., 2020.


SHANNON E LOYD                                  **Mary Angie Garcia**
ATTORNEY FOR PLAINTIFF                          Bexar County District Clerk
12703 SPECTRUM DR 201                           101 W. Nueva, Suite 217
SAN ANTONIO, TX 78249-3400                      San Antonio, Texas  78205


                                                By: *Adrianna Cardenas,* Deputy

---

MD BEVCO INC ET AL                Officer's Return      Case Number: 2020-CI-11466
vs                                                      Court:166th Judicial District Court
THE CINCINNATI INDEMNITY COMPANY ET AL


Came to hand on the 30th day of June 2020, A.D., at  4:17 o'clock P.M. and EXECUTED (NOT
EXECUTED) by CERTIFIED MAIL, on the ___ day of __June__ 20__, by delivering
to: ___John Garcia___  at 31872 CAST IRON CV BULVERDE TX
78163-4045 a true copy of this Citation, upon which I endorsed that date of delivery,
together with the accompanying copy of the CITATION with ORIGINAL PETITION .

Cause of failure to execute this Citation is _____.

                    **FILED**
              12 O'CLOCK 03 ᶜ M

                  JUL 0 9 2020              **Mary Angie Garcia**
               MARY ANGIE GARCIA           Clerk of the District Courts
            District Clerk, Bexar County, Texas   of Bexar County, TX
            BY _____
                              DEPUTY       By: *Adrianna Cardenas,* Deputy


                                                    RETURN TO COURT (DK003)

                **DOCUMENT SCANNED AS FILED**



U.S. Postal Service™
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)       $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required          $
☐ Adult Signature Restricted Delivery $

Postage

JOHNATHAN ANDREW MALISH
31872 CAST IRON CV
BULVERDE, TX  78163-4045

2020CI11466  6/30/2020  C1TCM  ADRIANNA CARDENAS

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7019 1120 0001 3173 4550

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

JOHNATHAN ANDREW MALISH
31872 CAST IRON CV
BULVERDE, TX 78163-4045

2020CII1466  6/30/2020  CITCM ;ADRIANNA CARDENAS

9590 9402 4164 8092 5402 78

2. Article Number *(Transfer from service label)*

7019 1120 0001 3173 4550

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                              ☐ Addressee

B. Received by *(Printed Name)*          C. Date of Delivery

                                    6/3/20

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   DOCUMENT SCANNED AS FILED   Domestic Return Receipt

USPS TRACKING #

9590 9402 4164 8098 5402 78

FILED
DISTRICT CLERK

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

2020 JUL -9 PM 12: 03

DEPUTY

BY

Mary Angie Garcia
Bexar County District Clerk
101 W. Nueva, Suite #217
San Antonio, TX 78205

NS

# Exhibit 12

Case 5:20-cv-00899-FB Document 1-1 Filed 08/03/20 Page 384 of 385



# Case #2020CI11466

**Name**:

**Date Filed** : 6/24/2020

**Case Status** : PENDING

**Litigant Type** : DEFENDANT

**Court** : 166

**Docket Type** : INSURANCE

**Business Name** : 2020CI11466

**Style** : MD BEVCO INC ET AL

**Style (2)** : vs THE CINCINNATI INDEMNITY COMPANY ET AL

# Case History

*Currently viewing all records*

| Sequence | Date Filed | Description |
|----------|-----------|-------------|
| P00003 | 7/1/2020 | ATTORNEY UNAVAILABILITY NOTICE FILED FOR SHANNON LOYD |
| S00002 | 6/30/2020 | CITATION CERTIFIED MAIL<br>JOHNATHAN ANDREW MALISH<br>ISSUED: 6/30/2020 RECEIVED: 6/30/2020<br>RETURNED: 7/9/2020 |
| S00001 | 6/30/2020 | CITATION CERTIFIED MAIL<br>THE CINCINNATI INDEMNITY COMPANY<br>ISSUED: 6/30/2020 RECEIVED: 6/30/2020<br>EXECUTED: 7/7/2020 RETURNED: 7/10/2020 |
| P00002 | 6/24/2020 | PETITION |
| P00001 | 6/24/2020 | SERVICE ASSIGNED TO CLERK 1 |